R. VAUGHN GOURLEY, ESQ.
Nevada Bar No. 503
STEPHENS, GOURLEY & BYWATER
3636 North Rancho Drive
Las Vegas, Nevada 89130
(702) 656-2355 Telephone
(702) 656-2776 Facsimile
Attorneys for Plaintiff

FILED
MAR 18 2004
U.S. COURT OF
FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

MAURICE L. BIANCHI, fdba M. BIANCHI OF CALIFORNIA,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

Docket No.: 04- 440C

## COMPLAINT

For his Complaint, Plaintiff Maurice L. Bianchi ("Bianchi"), formally doing business as an individual proprietorship known as M. Bianchi of California, alleges and avers as follows:

## JURISDICTION

1. That jurisdiction regarding this suit is founded upon Title 28, United States Code, Section 1491. That jurisdiction is further founded upon the decision rendered by the United States Court of Appeals for the Ninth Circuit in Bianchi v. Walker, (9th Cir. 1998) 163 F.3d 564, 569, Paragraph VI, wherein the Court of Appeals held that only the Court of Federal Claims can resolve the issue as to whether or not the United States Government is liable to pay Bianchi for his Value Engineering Change Proposal awards. (Exhibit "1")

**BACKGROUND**

2. That the Plaintiff's claims arise under a Stipulation to Board Decision (Stipulation) (Exhibit "2") as entered on September 27, 1988 before the U.S. Armed Services Board of Contract Appeals, ("ASBCA") ASBCA No. 26362, et al, pursuant to Contract Nos. DLA100-79-C-2894, DLA100-80-C-2290, and DLA100-80-C-2972, which stipulation reads in pertinent part:

> ".......1. The parties agree that Mr. Maurice Bianchi, as the successor to M. Bianchi of California, is entitled to recover $617,500.00 on his claims in the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933 and 29934; that the government is entitled to take nothing on its claims in the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933 and 29934; that Mr. Bianchi is entitled to interest computed in accordance with Clauses L78 (Disputes (1979 MAR)) of the contracts, at the rates prescribed by the Secretary of the Treasury, under the Renegotiation Act, Public Law 92-41, on the principal amount of $617,500, such interest to run from June 18, 1981 until the date of payment; and that the parties waive their rights to seek reconsideration of this stipulated decision of the Board or to appeal that stipulated decision.
>
> 2. This settlement is without prejudice to Mr. Bianchi's right to pursue any and all value engineering change proposal claims under his contracts with DPSC; and
>
> 3. This settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act to recover whatever legal fees and litigation expenses to which he may be entitled in connection with these claims and appeals. That Parties stipulate that the issues of prevailing party and substantial justification will be decided on the basis of the record made at the first trial. The Parties agree that the application for legal fees and litigation expenses under the Equal Access to Justice Act will be submitted within thirty (30) days of receipt by Appellant of the agreed upon settlement payment."

3. Pursuant to the Stipulation, the United States specifically agreed to pay Bianchi the principal amount of Six Hundred Seventeen Thousand Five Hundred Dollars ($617,500.00) with interest, to run from June 18, 1981 until date of payment. (Exhibit "2"). Furthermore, the

Parties to the Stipulation also agreed to waive their rights to seek reconsideration of the stipulated decision of the board, or to appeal the stipulated decision. (Exhibit "2"). Bianchi's entitlement to recover the Six Hundred Seventeen Thousand Five Hundred Dollars ($617,500.00) on his claims related to the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934. (Exhibit "2")

4. Moreover, the United States, pursuant to the terms of the Stipulation, was entitled to take nothing on its $2.5 Million Dollar ($2,500,000.00) claim in relation to the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934. (Exhibit "2"; Exhibit "6", page 3,paragraph 1).

5. Furthermore, Bianchi was also entitled to interest computed in accordance with clause L78 (entitled disputes (1979 MAR)) of the contracts, and at the rates prescribed by the Secretary of the Treasury, under the Renegotiation Act, Public Law 92-41, on the principal amount of Six Hundred Seventeen Thousand Five Hundred Dollars ($617,500.00), with such interest to run from June 1981 until payment. (Exhibit "2").

6. That pursuant to the Stipulation, Bianchi was paid the sum of approximately $1,141,000.00. (Exhibit "3").

7. Thereafter the Bank of America, NT&SB, then sued to recover money which it claimed was erroneously paid to Bianchi by the United States, in the U.S. Claims Court, Case No. 90-3961C (Exhibit "4"). Pursuant to that opinion, Bianchi was ordered to repay the United States the sum of $1,141,220.83. The Court further ordered the dismissal of the Bank of America, NT&SB. Subsequently, Bianchi appealed the decision of the U.S. Claims Court, Case No. 90-3961C, to the U.S. Court of Appeals for the Federal Circuit, Case No. 93-5059, 5060.

8. The United States Court of Appeals, Case No. 93-5059, 5060, then reversed the lower court's judgment in favor of the United States against Bianchi, as well as reversed the judgment in favor of the United States against the Bank of America, NT&SB. (Exhibit "5")

9. Bianchi subsequently timely applied for attorney's fees before the Armed Services Board of Contract Appeals ("ASBCA") pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504 ("EAJA"), and was awarded approximately $475,724.51 in September of 1990. (Exhibit "6"). Despite Bianchi's April 4, 1994 correspondence to Thomas Hornak (DLA), Bianchi's Counsel's May 13, 1998 correspondence to the Commanding Officer of the Defense. Personnel Support Center (DLA), the September 4, 1998 correspondence from Bianchi's legal counsel to the Defense Finance & Accounting Office, and the September 9, 1998 correspondence from Bianchi's legal counsel to Katherine Hallan, Chief Trial Attorney, Defense Supply Center Philadelphia (DLA), regarding the unequivocal and clear order of the U.S. Armed Services Board of Contract Appeals awarding Bianchi over $475,000.00 under the EAJA, the United States refused to pay and did fail to pay Bianchi's attorney's fees for over 8 years. (Exhibit "7").

10. After complying with all of the demand procedures required by all applicable federal statues and regulations, Bianchi then filed an action in the U.S. District Court for the District of Nevada, entitled Maurice Bianchi, dba M. Bianchi of California v. William J. Perry, Secretary of Defense, et al, Case No. CV-S-94-0686-HDM (RJJ), in order to collect the $475,724.51 EAJA Judgment that Bianchi was previously awarded. The U.S. District Court (Nevada), CV-S-94-0686-HDM (RJJ) subsequently granted summary judgment against Bianchi on his EAJA Judgment. (Exhibit "8") Bianchi then appealed this decision to the U.S. Court of Appeals for the Ninth Circuit, as Case No. 96-15869, and entitled Bianchi v. Perry, 140 F.3d 1294 (9th Cir. 1998). On April 9, 1998, the U.S. Court of Appeals in reversing the U.S. District Court's decision was highly critical of the Government's lawyer handling the case, holding:

> ".......Any honest and competent lawyer would understand this settlement agreement in the same way. It means Bianchi gets $617,500.00 plus interest, plus whatever he can win on his "Value Engineering Change Proposal claims," plus whatever he can win on his Equal Access to Justice Act claim. Attorney's fees claims often are broken out of a settlement, as in this one, because the parties

cannot agree on what determinations a court will make on prevailing party, substantial justification, and amount, see 5.U.S.C., § 504, and each is willing to bear the risk of a less favorable determination than it expects."

"For a lawyer to enter into such a settlement agreement, with the unstated intention that his client should not pay the money agreed to, would be sharp practice. The government argues from lack of parallelism in the phrasing of the different paragraphs of the settlement agreement that Bianchi is only entitled to the $617,500.00 without setoff, not the EAJA award. The settlement agreement said Bianchi "is entitled to recover" $617,500.00, but only that it is "without prejudice to" his "right to pursue" his Equal Access to Justice Act claim "to recover" attorneys' fees and expenses, so it did not agree to pay the EAJA award.

The government's theory is that it promised Bianchi could "recover" the $617,500.00, but not the EAJA award, which it only left Mr. Bianchi free to "pursue".

We reject the distinction. It is apparent from a reading of the stipulation in its entirety that the parties did not mean that the government would only pay the $617,500.00, but dispute payment of what Mr. Bianchi was found to be entitled to as an EAJA award. Had the government meant that, the agreement would have said so. The agreement says Bianchi is entitled "to recover" the $617,500.00 principal, and that he is "entitled to" interest, yet even though the agreement did not use the phrase "to recover" regarding Mr. Bianchi's entitlement to interest, neither side understood absence of the phrase to imply that he could not "recover" the interest without a setoff. The Agreement does use the phrase "to recover" in the EAJA provision, "right to pursue an application..... to recover". The phrase "to recover" is not in the Value Engineering Change Proposal Claims paragraph, "right to pursue." Not a single one of the provisions is written in parallel phrasing with any other. The only plausible reading we can see for the slight differences in phrasing are lack of careful editing for parallelism, not an expressed mutual intention that even if Bianchi won an EAJA award, it would not be paid without a fight. ".....Were an insurance defense lawyer to enter into such a settlement agreement on behalf of an insurance company, and then claim that they only promised to allow pursuit of the money, not to pay it, the best the lawyer and insurer could hope for would be long-term distrust, and more likely, they could expect bad faith litigation. Giving the settlement agreement so strained construction would encourage sharp practice.....". (Exhibit "9")

11. The U.S. Court of Appeals also mandated the payment of the EAJA Judgment ($475,724.51) rendered in ASBCA No. 26362, et al. for attorney's fees. The United States ultimately paid Bianchi's EAJA award, as referenced by Bianchi's Legal Counsel's September 9, 1998 correspondence to Katherine Hallan, Chief Trial Attorney, Defense Supply Center

Philadelphia (DLA), and the United States Treasury Check, dated August 28, 1998, check number 3225. (Exhibit "10").

12. Subsequently, Bianchi applied for an additional EAJA award with the U.S. Court of Appeals for the Ninth Circuit, in Bianchi v. Perry, Case No. 96-15869, regarding the attorney's fees incurred in pursuing the original ASBCA EAJA award. Bianchi was granted a judgment on the second EAJA award of $67,961.24 on May 24, 1999. (Exhibit "11")

13. Pursuant to the 1988 Stipulation, Bianchi was also entitled to pursue all of his then outstanding Value Engineering Change Proposal Claims. ("VECP") (Exhibit "2")

14. On February 10, 1993, the U.S. Armed Services Board of Contract Appeals awarded Bianchi a judgment, on one of his VECP claims, (ASBCA No. 36518) in the amount of $58,613.03, plus interest under the Contract Dispute Act of 1978 ("CDA"), 10 U.S.C. § 2410, from November 17, 1987. (Exhibit "12").

15. And, on December 28, 2000, the U.S. Armed Services Board of Contract Appeals awarded Bianchi another judgment, in another of his VECP Claims, (ASBCA No. 37029, et al), in the amount $16,574.74, plus CDA interest from March 3, 1988. (Exhibit "13").

16. Under correspondence dated December 29, 2000, the U.S. Armed Services Board of Contract Appeals provided Bianchi with an authenticated copy of its decision awarding the $16,574.74, together with CDA interest, and the ASBCA stated that:

> "...The Board has received the following instructions from the Department of the Treasury for processing payment of awards from the judgment fund. If the Parties do not contemplate an appeal or motion for reconsideration but plan to use the judgment fund for payment of the monetary award, the US Treasury requires that the government agency concerned submit completed copies of the following forms:
>
> - FMS Form 195: Judgment Fund Payment Request;
> - FMS Form 196: Judgment Fund Award Data Sheet;
> - FMS Form 197A: Voucher for Payment;
> - FMS Form 198: Judgment Award Data Sheet Additional Deductions (if applicable);

- Certificates of Finality from the Government Agency and the Contractors/Appellant; and
- A copy of the Board's decision.

Copies of the appropriate documents are enclosed for use by the Parties. The government using FMS Form 195 as a transmittal letter, should send completed forms to: Judgment Funds Section Financial Management Service, Department of the Treasury, Room 6F03 3700 East-West Highway Hyattsville, Maryland 20782." [Emphasis Added] (Exhibit "13").

17. That despite the prior decisions, judgments and awards by the ASBCA in favor of Bianchi, the United States, by and through the Defenses Logistics Agency ("DLA") has failed and refused to pay the VECP awards to Bianchi in the amounts of $58,613.03 and $16,574.74 respectively, and any CDA interest due on said VECP awards. Instead the DLA has denied that it was liable by alleging unsupported or undocumented so-called setoff amounts to the VECP awards, in favor of the Bank of America, NT&SB. Yet, as recent as March 31, 2003, legal counsel for the DLA stated to Bianchi that the:

"DLA is not making any claim that there are additional assignments to the Bank." (Paragraph 2, Exhibit "14").

Thus, the United States admitted to Bianchi that no documentation exists that would support its withholding of payments on the Bianchi VECP Awards. Nor can the DLA substantiate any other assignment from Bianchi, which would allow the DLA to pay or disburse these award amounts directly to the Bank of America, NT&SB, or to any other third party. (See Exhibit "14"). At the present time, no documentation exists or has been produced by the United States to Bianchi which would allow, or does allow, the DLA to set off any amounts against Bianchi's VECP awards, including any and all demand documentation produced and/or made by the Bank of America, NT&SB, to the United States and to the DLA.

18. Numerous demands have been made by Bianchi upon the DLA and its counsel requesting copies of any and all documents evidencing any setoff amounts pursuant to the alleged Bianchi assignments and notes under the appropriate Federal Assignments of Claims Act

provisions, or any other documentation supporting the withholding of the payment of Bianchi's VECP awards, and the subsequent DLA payment of the same to the Bank of America, NT&SB. Such demands, and responses from the United States to the same, include the following: Letter dated September 11, 2000 from Attorney Scott Cantor to Bruce Baird, DLA; Letter dated September 15, 2000 from Attorney Scott Cantor to Mary Clarke, DLA; Letter dated October 6, 2000 from Attorney Bruce Baird to Congressman Jim Gibbons; Letter dated October 20, 2000 from Attorney Michael Clancy to Wade Thompson, Legislative Assistant to Congressman Jim Gibbons; Letter dated September 10, 2002 from Attorney Mary Clarke (DLA), to Attorney Scott Cantor; Letter dated September 17, 2002 to Attorney Bruce Baird (DLA) from Attorney Scott Cantor; Letter dated March 31, 2003 from Attorney Bruce Baird (DLA) to Attorney Scott Cantor; Letter dated April 22, 2003 from Attorney Scott Cantor to Mary Clarke (DLA). (Exhibits "15" and "16").

19. Pursuant to Title 28, United States Code, Section 1494, and pursuant to the decision by the U.S. Court of Appeals for the Ninth Circuit in <u>Bianchi v. Walker v. Bank of America</u>, (9th Cir. 1998) 163 F.3d 564, (Exhibit "1"), this Court has exclusive jurisdiction to determine and order the payment of any and all the amounts due and owing to Bianchi from the United States by reason of the above-described unsettled accounts of the United States owing to Bianchi. Moreover: (1) Bianchi has applied to the proper department of the United States for the payment of his VECP awards; (2) three years has now elapsed from the date of such application without payment; and, (3) no suit upon the same has been brought by the United States.

20. Bianchi has, over the last three years, made numerous written and oral demands upon and requests for payment to the DLA regarding his VECP awards, and all interest relating thereto, (pursuant to Title 28, U.S.C, § 1494), all without settlement or payment by the United

States, in contradiction of this Court's prior decisions and those of the Federal Circuits. (Exhibits "15" & "16")

21. Title 28, U.S.C., Section 1494, states:

> "Accounts of Officers, Agents or Contractors. The United States Court of Federal Claims shall have jurisdiction to determine the amount, if any, due to or from the United States by reason of any unsettled account of any officer or agent of, or contractor with, the United States, or a guarantor, surety or personal representative of any such officer, agent or contractor, and to render judgment thereof, where - (1) Claimant or the person he represents has applied to the proper department of the government for settlement of the account; (2) Three years have elapsed from the date of such application without settlement; and (3) No suit upon the same has been brought by the United States."

## CLAIMS

22. Despite repeated requests for payment by Bianchi, the DLA has failed and refused to pay the awards and interest, or to even produce evidence and/or documentation that would dispute the payment of Bianchi's VECP awards, with interest, directly to Bianchi, despite repeated requests by Bianchi for said documentation. Moreover, the DLA made a number of material misrepresentations to Congressman Jim Gibbons in its October 6, 2000 correspondence including but not limited to stating that the Bank of America had received over $1,141,000.00 and that Bianchi had also received interest on the EAJA Award of $475,000.00. Both statements were untrue and mislead Congressman Gibbons. (Exhibits "15" and "16").

23. There is now due and owing to Bianchi the undisputed sums of $58,613.03 and $16,574.74, plus all applicable Contracts Dispute Act ("CDA") interest from the specified dates of the awards dealing with these VECP awards, plus any and all reasonable attorney's fees and costs under the EAJA, and pursuant to any and all applicable federal statutes, laws and/or contracts at issue.

24. The United States is not entitled to claim any setoff amounts against the VECP awards due and owing to Bianchi, as based upon the prior decisions of this Court and those of

the Federal Circuits, due to the absence of and non-production of any evidence and/or documentation required to establish and/or assert any legal claim or right to setoff by way of lawful and valid assignments or notes under the CDA and/or FAC, or any other federal statutes and/or documentation.

25. The prohibition against the United States' right to a setoff as against the Bianchi awards is further evidenced by the documents as contained in Exhibits "15" & "16", as well as by this Court's decision in Bank of America vs. United States vs. Bianchi, Case No. 90-3961C, as decided on April 6, 1995. (Exhibit "17"), which expressly held that any assignments evidencing setoff amounts must be directly related to loaned money or money made available for specific contract performance, and that any monies loaned for any reason other than the direct performance of the contract invalidates any purported assignments relating thereto.

26. The VECP awards to Bianchi are not subject to any valid assignments or notes in favor of the Bank of America, NT&SB. Moreover, the United States has completely and fully satisfied all of Bianchi's Assignments in favor of the Bank of America, by a full accounting and payment to the Bank of America, NT&SB, in the Court of Federal Claims, Case No. 90-3961C, and entitled: Bank of America, et. al. vs. the United States of America vs. Bianchi.

27. That under this Court's decision (Case No. 90-3961C), this Court held that the Bank of America, NT&SB, had been paid in full for any and all prior claims against Bianchi on any of their valid written assignments and notes under the FAC that were pled in this Court under written declarations and evidence as filed with this Court by the Bank of America, NT&SB. Moreover, under said Court decision, neither the Bank of America, NT&SB, nor the United States, is entitled to any amounts or rights of setoff pursuant to these fully discharged assignments and/or notes in regards to Bianchi's outstanding VECP awards of $58,613.03 and $16,574.74, respectively, and all interest relating thereto. (Exhibit "4").

28. Upon information and belief, and subsequent to this Court's decision (as above-referenced), and during the pendency of the Ninth Circuit Court of Appeals decision in Bianchi vs. Walker, (9th Cir. 1998), 163 F.3d 564, the Bank of America, NT&SB, knowingly failed to withdraw the appeal to the Ninth Circuit, nor advise them of the fully paid and discharged Bianchi assignments and notes, as directed by this Court's decision in Bank of America, et al. vs. the United States of America vs. Bianchi, Case No. 90-3961C. Therefore, the United States wrongfully paid the Bank of America, NT&SB, Bianchi's VECP award of $58,613.03, plus interest, and Bianchi's additional VECP award of $16,574.74, plus interest, all in direct violation of this Court's prior Orders and Decisions, as well as the Orders and Decisions of the U.S. Court of Appeals for the Federal Circuit, as evidenced by written correspondence from counsel for the General U.S. Accounting Office, the Defense Logistics Agency, the Department of Justice, and the SBA as follows: GAO letter dated August 26, 1994 to Attorney George Graziadei from GAO Assistant Chief of Claims Group, Ken Schutt; correspondence dated August 24, 1994 from SBA Attorney Joel Meese to GAO Senior Attorney Neill Martin-Rolsky; letter dated August 23, 1994 to GAO Senior Attorney Neill Martin-Rolsky from DLA Chief Trial Attorney Thomas Hornak; correspondence dated August 1, 1994 to GAO Senior Attorney Neill Martin-Rolsky from DOJ Division Attorney Mark Melnick. (Exhibit "18").

29. And, the United States has maintained Mr. Mark Melnick as its legal counsel throughout all of the proceedings before the U.S. Court of Federal Claims, (Case No. 90-3961C); the U.S. Court of Appeals for the Federal Circuit, (Case No. 93-5059-5060), the remand from the U.S. Court of Appeals for the Federal Circuit to this Court, (Case No. 90-3961C), and the subsequent actions before this Court under Case No. 90-3961C. This same legal counsel is fully aware of the finality and payment of $341,140.05 to the Bank of America on that Complaint, including interest payments in full and final settlement and satisfaction of all of Bianchi's prior

assignments to the Bank of America, NT&SB, for a total of $717,009.94 paid by the United States to the Bank of America, NT&SB, as of August 22, 1995. That the same assistant U.S. Attorney was also maintained throughout the legal proceedings in the U.S. District Court for the District of Nevada, (Case No. CV-S-94-0686-HDM (RJJ)) and the subsequent Appeal to the Ninth Circuit Court of Appeals, in Bianchi v. Walker, (9th Cir. 1998), 163 F.3d 564. That said assistant U.S. Attorney had full knowledge of the payments as ordered by this Court to be paid to the Bank of America, NT&SB, which, as a matter of law and this Court's Orders, fully discharged any obligations claimed by the United States under the prior Bianchi assignments in favor of the Bank of America, NT&SB.

30. The United States damaged Bianchi by allowing the Bank of America, NT&SB, to proceed with improper pleadings and improper demands for continued payments on the discharged FAC assignments as setoffs against monies owed by the United States to Bianchi.

31. And, said United States counsel failed to withdraw the interpleader of the Bank of America, in either the U.S. District Court (Nevada), Bianchi v. Walker, CV-S-94-0686-HDM (RJJ), or in the subsequent appeal to the Ninth Circuit Court of Appeals in Walker, (9th Cir. 1998) 163 F.3d 564, all in violation of the civil False Claims Act, 31 U.S.C. § 3729, knowing that the Bank of America, NT&SB, had been fully paid by the United States under Bianchi's prior assignments and notes, and pursuant to this Court's Orders in Case No. 90-3961C, and the orders of the Court of Appeals for the Federal Circuit, in Case No. 93-5059-5060.

32. Under the decisions and orders of the U.S. Court of Federal Claims, and the U.S. Court of Appeals for the Federal Circuit, the United States has no setoff rights against Bianchi. However, the United States, by and through Mark Melnick, Assistant U.S. Attorney, knowingly elected to wrongfully pay the Bank of America, NT&SB, the monies due to Bianchi, and to maintain the interpleader action in the U.S. District Court for the District of Nevada, and in the

U.S. Court of Appeals for the Ninth Circuit, all in violation of the prior Decisions and Orders of this Court of Appeals for the Federal Circuit. (Exhibit "18")

33. That the United States has no setoff amounts applicable to Bianchi's VECP awards and all interest and/or attorney's fees to which Bianchi is currently to be paid. The United States is now required, and must be ordered by this Court to immediately contact the United States Treasury, and inform it that the United States holds no valid claims under the Bianchi assignments and notes in favor of the Bank of America, NT&SB, and that there is no right to setoff to any of the awards so claimed by Bianchi, as based upon this Court's prior decision, in Case No. 90-3961C. (Exhibit "4"). Despite correspondence from the DLA stating that Bianchi must contact the United States Treasury, and inform the United States Treasury, that there are no more assignments and notes applicable to Bianchi's VECP Claims and awards; that that responsibility is the sole and direct responsibility of the United States, and not that of Bianchi. (Exhibit "13").

34. Bianchi subsequently amended and supplemented his original Complaint on October 15, 1998 in the United States Court of Federal Claims, Case No. 98-794C in order to bring a claim for the payment of costs awarded to Bianchi in the sum of $1,870.04, as issued as part of the judgment of the Court of Appeals for the Federal Circuit, wherein the Court of Appeals awarded Bianchi the sum of $1,870.04 for and as costs in its judgment entered on April 29, 1994 and pursuant to the Court's mandate as issued on June 30, 1994. Bianchi, by and through his counsel, then sought to collect the costs award, but the payment of this award was not forthcoming by the United States, and the United States continued to refuse to pay the same, even though authorization for payment of the costs award had been represented by the United States on September 18, 1998. The withholding of the payment of the costs award had occurred since June 30, 1994. (Exhibit "19")

35. Thereafter on or after October 1998, and over four years later, and after Bianchi had been required to amend his original Complaint in Case No. 98-794C, in order to bring the costs award claim as well, Bianchi finally received a check from the United States in the amount of $1,870.04. (Exhibit "20") However said payment did not include interest or attorney's fees on the judgment of the Court of Appeals for the Federal Circuit for the period between issuance of the judgment and the date of payment.

36. In addition, the Court of Federal Claims, in Case No. 98-794C, then entered judgment on Count II of the amended and supplemental Complaint of Bianchi, allowing Bianchi to recover of and from the United States the additional sum of $454.06 in full settlement of Count II of the Complaint. (Exhibit "21"). That said judgment, including an offer of judgment by the United States to allow judgment to be entered against it in the amount of $454.06 in full settlement of count II of the Complaint as filed by Bianchi, and Bianchi's required efforts to continue to pursue the United States for the payment of monies previously awarded by the Court, further evidences bad faith on the part of the United States in its failure to comply with the orders of this Court and of the Court of Appeals for the Federal Circuit, as well as other judgments and decisions as rendered by the Ninth Circuit Court of Appeals, in favor of Bianchi.

WHEREFORE, Bianchi now demands judgment in his favor from this Court ordering the payment from the United States of his VECP awards in the amounts of $58,613.03 and $16,574.74 respectively, as well as for legal interest due and owing him under the CDA, as required by law and/or statute, and/or by the VECP awards, for the period of time during which the payments were withheld, and has been withheld, and for such other and further relief as the Court may deem just and lawful under the premises, regarding the monies wrongfully withheld from Bianchi.

Dated this 3rd day of March, 2004.

Respectfully Submitted,

STEPHENS, GOURLEY & BYWATER

R. VAUGHN GOURLEY, ESQ.
Nevada Bar No. 503
3636 North Rancho Drive
Las Vegas, Nevada 89130
(702) 656-2355 Telephone
(702) 656-2776 Facsimile
Attorneys for Plaintiff

Of Counsel:

George E. Graziadei, Esq.
Nevada Bar No. 1775
Scott Michael Cantor, Esq.
Nevada Bar No. 1713
Graziadei & Cantor, Ltd.
302 East Carson Avenue, Suite 400
Las Vegas, Nevada 89101
(702) 477-7733 Telephone
(702) 477-0020 Facsimile

**VERIFICATION**

STATE OF Nevada )
) ss
COUNTY OF Clark )

Maurice L. Bianchi, being first duly sworn, under penalty of perjury, deposes and says:

That he is the Plaintiff in the above entitled action; that he has read the foregoing Complaint and knows the contents thereof, and that the same is true of his own knowledge, except for those matters therein stated on information and belief, and as to those matters he believes them to be true.

Maurice Bianchi

MAURICE L. BIANCHI

SUBSCRIBED and SWORN to before me this 3RD day of March, 2004.

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
PAULA MARIE TIMMONS
Appt. No. 99-59308-1
My Appt. Expires Sept. 29, 2007

Paula Marie Timmons

NOTARY PUBLIC in and for said County and State

# EXHIBIT "1"

H

United States Court of Appeals,
Ninth Circuit.

**Maurice BIANCHI, f/d/b/a M. Bianchi of California, Plaintiff-counter-defendant-Appellant,**
**v.**
**David M. WALKER, [FN1] Comptroller General of the United States General Accounting Office, Defendant-counter-claimant-Appellee,**

FN1. David M. Walker is substituted for Charles Bousher, former Comptroller General of the United States General Accounting Office, pursuant to Fed. R.App. P. 43(c)(1).

**v.**
**Bank of America National Trust & Savings Association, Counter-defendant/claimant in Interpleader-Appellee.**

**No. 97-17024.**

Argued and Submitted Nov. 5, 1998.
Decided Dec. 11, 1998.

Government contractor filed complaint for writ of mandamus, seeking order to compel United States to pay amount awarded to him by Armed Services Board of Contract Appeals (ASBCA). Government filed counterclaim for interpleader, requesting determination as to whether bank, as contractor's assignee, should be awarded amount owed to contractor. The United States District Court for the District of Nevada, Lloyd D. George, J., entered summary judgment for bank on its claim in interpleader. Contractor appealed. The Court of Appeals, Alarcon, Circuit Judge, held that: (1) district court lacked jurisdiction over contractor's complaint for writ of mandamus, but it did have jurisdiction over government's counterclaim for interpleader; (2) Court of Appeals had jurisdiction over appeal of district court's grant of summary judgment to bank on its claim in interpleader; and (3) prior Ninth Circuit and Federal Circuit opinions were not res judicata as to bank's claim to money owed to contractor under value engineering change proposal (VECP) provisions of his contracts with federal government.

Affirmed.

See also: 23 F.3d 380, 140 F.3d 1294.

West Headnotes

**[1] Federal Courts ⚿973**
170Bk973 Most Cited Cases

In context of government contractor's complaint for writ of mandamus, seeking order to compel United States to pay amount awarded to him by Armed Services Board of Contract Appeals (ASBCA), district court had jurisdiction over government's counterclaim for interpleader, requesting determination as to whether bank, as contractor's assignee, should be awarded amount owed to contractor. 28 U.S.C.A. § 1345; Fed.Rules Civ.Proc.Rule 22, 28 U.S.C.A.

**[2] Federal Courts ⚿1139**
170Bk1139 Most Cited Cases

District court lacked subject matter jurisdiction over government contractor's complaint for writ of mandamus, seeking order to compel United States to pay amount awarded to him by Armed Services Board of Contract Appeals (ASBCA), since contractorsought damages totalling more than $10,000 based on settlement agreement, such that complaint for writ of mandamus should have been filed instead in the Court of Federal Claims. 28 U.S.C.A. §§ 1346(a)(2), 1491(a)(1).

**[3] Federal Courts ⚿776**
170Bk776 Most Cited Cases

Appellate review of district court's order granting or denying summary judgment is de novo. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[4] Federal Courts ⚿759.1**
170Bk759.1 Most Cited Cases

On appeal of summary judgment order, Court of Appeals may affirm judgment of district court on any basis established by the record.

**[5] Federal Courts ⚿542**
170Bk542 Most Cited Cases

Though district court lacked subject matter jurisdiction over government contractor's mandamus

complaint, seeking to compel United States to pay amounts awarded by Armed Services Board of Contract Appeals (ASBCA), Court of Appeals nonetheless had jurisdiction over appeal of district court's grant of summary judgment to bank on its interpleader claim, since trial court had jurisdiction to consider merits of bank's claim that, as contractor's assignee, it was entitled to the amount owing to contractor, and court's decision that bank was entitled to proceeds of ASBCA award disposed of the only issues that were properly before it. 28 U.S.C.A. § 1346(a)(2).

**[6] Judgment ⚷735**
228k735 Most Cited Cases

Assignee-bank's claim to money owed to government contractor under value engineering change proposal (VECP) provisions of his contracts with federal government was not barred by prior appellate decision regarding parties' rights in monies awarded to contractor in his appeals before the Armed Services Board of Contract Appeals (ASBCA), since prior appellate decision did not reach question whether government was liable to pay amounts sought on VECP claims.

**[7] Federal Courts ⚷766**
170Bk766 Most Cited Cases

**[7] Federal Courts ⚷802**
170Bk802 Most Cited Cases

On appeal of order granting summary judgment, Court of Appeals must determine, viewing evidence in light most favorable to nonmoving party, whether there are any genuine issues of material fact and whether district court correctly applied relevant substantive law. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[8] Judgment ⚷707**
228k707 Most Cited Cases

Prior appellate decision, issued in connection with government contractor's action to collect fees and expenses he was awarded under Equal Access to Justice Act (EAJA) in accordance with settlement agreement with government, was not res judicata on question whether bank, as contractor's assignee, was entitled to recover amount owing on certain claim under government contract pursuant to assignment agreement, since bank was not party or privy to prior EAJA action; bank and government were not in privity, but were adverse parties. 28 U.S.C.A. § 2412.

**[9] Judgment ⚷540**
228k540 Most Cited Cases

Res judicata only applies to persons who were parties or their privies in a prior action involving the same claim.

*566 Gerson B. Kramer, Braude & Margulies, Washington, DC; Scott Michael Cantor and George E. Graziadei (on the briefs), Graziadei & Cantor, Ltd., Las Vegas, Nevada, for the plaintiff-counter-defendant-appellant.

Mark A. Melnick, Assistant Director and David M. Cohen, Director (on the briefs), United States Department of Justice, Washington, DC, for the defendant-counter-claimant-appellee.

Dennis L. Olson and Diana L. Sullivan (on the briefs), Jones Vargas, Las Vegas, Nevada, for the counter-defendant-claimant-appellee.

Appeal from the United States District Court for the District of Nevada; Lloyd D. George, District Judge, Presiding. D.C. No. CV-94-00747-LDG.

Before: ALARCON, O'SCANNLAIN and FERNANDEZ, Circuit Judges.

ALARCON, Circuit Judge:

Maurice Bianchi, formerly doing business as M. Bianchi of California, ("Bianchi") appeals from the order granting summary judgment in favor of Bank of America ("Bank"), and the denial of his motions for summary judgment against the Bank and Charles Bousher, Comptroller General of the United States of America, the United States of America, and the United States General Accounting Office ("Government") and his motion for a new trial or, in the alternative, to alter and amend findings of facts and conclusions of law, and to amend the judgment. Bianchi contends that the district court erred in ruling that the Bank was entitled to recover the money owed to Bianchi by the Government based on the assignment agreement between the Bank and Bianchi. We affirm because we conclude that Bianchi was barred by the collateral estoppel doctrine from contending that the assignment agreement was not valid.

I

A recitation of the factual and procedural background of this case is essential to understanding the issue before this court. This dispute arose out of the contracts between Bianchi and the Government. Prior to the filing of this action, this same dispute spawned three separate actions, two in the federal courts and one in a California state court. In 1979 and 1980, Bianchi was awarded three contracts by the Defense Personnel Support Center to produce clothing for the military. These contracts were assigned to the Bank by Bianchi as collateral for money loaned to Bianchi. The Bank properly notified the Government of this assignment under the Assignment of Claims Act. During 1980, the Bank loaned Bianchi additional money on these contracts which was guaranteed by the Small Business Administration ("SBA").

A dispute arose regarding Bianchi's performance of certain of these contracts. Bianchi filed appeals before the Armed Services Board of Contract Appeals ("ASBCA") in ASBCA case numbers 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934 ("the ASBCA claims"). These appeals did *not* include Bianchi's Value Engineering Change Proposal ("VECP") claims.

On September 27, 1988, the Government and Bianchi entered into an agreement to settle the ASBCA claims. The settlement provided for a monetary award to Bianchi of $617,500 plus interest for a total of $1,141,330.83. The settlement contract expressly reserved Bianchi's right to pursue his VECP claims, and to apply for an award of Bianchi's legal fees and expenses under the Equal *567 Access to Justice Act. [FN2]

FN2. The settlement agreement provides:
1. The parties agree that Mr. Maurice Bianchi, as the successor to M. Bianchi of California is entitled to recover $617,500.00 on his claims in the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934; that Mr. Bianchi is entitled to interest ... at the rates prescribed by the Secretary of the Treasury ... and that the parties waive their rights to seek reconsideration of this stipulated decision of the Board or to appeal that stipulated decision;
2. This settlement is without prejudice to Mr. Bianchi's right to pursue any and all Value Engineering Change Proposal Claims under his contracts with DPSC; and 3. This settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act to recover whatever legal fees and litigation expenses to which he may be entitled in connection with these claims and appeals ...
It is the Board's decision pursuant to 41 U.S.C. § 607(d), § 612(b), and the parties' stipulation and agreement, that the appeals are sustained. In the nature of a consent judgment the Board makes a monetary award in the amount of $617,500 with interest from 18 June 1981.

The settlement agreement was integrated in the decision of the ASBCA. The Government paid Bianchi $1,141,220.83 to settle each of the claims identified in the settlement agreement. This amount did not include any payment to satisfy Bianchi's VECP claims.

On November 21, 1990, the Bank filed an action in the United States Court of Federal Claims against the Government in which it alleged that under its assignment agreement with Bianchi, it was entitled to be paid the amount of $1,141,220.83 awarded to Bianchi by the ASBCA. *See Bank of America Nat'l. Trust and Sav. Ass'n. v. United States,* 23 F.3d 380, 382 (Fed.Cir.1994) ( "*Bank of America*"). In its answer, the Government denied liability to the Bank based on its contention that the SBA had a superior security interest in the proceeds of the ASBCA claims. The Government also filed a third-party claim against Bianchi to recover the $1,141,220.83 it had paid to him. *See id.*

The United States Court of Federal Claims granted the Government's motion for a summary judgment. It held that the SBA had a superior security interest in money owing to Bianchi to that asserted by the Bank. The Court of Federal Claims also ordered Bianchi to return the $1,141,220.83 to the Government. *See Bank of America,* 23 F.3d at 382.

The Federal Circuit reversed the judgment of the Court of Federal Claims. It held that the Bank was entitled to be paid the amount awarded by the ASBCA pursuant to its rights under the assignment. The Federal Circuit also determined that Bianchi was entitled to retain the money paid to him by the Government under the terms of the settlement agreement. The court further held that the SBA's security interests in the ASBCA claims were subordinate to the Bank's rights under the assignment. *Id.* at 384. In addition, the Federal Circuit decided that the Government could not set off Bianchi's debt to the SBA because Bianchi's right to receive the total amount awarded to him pursuant to

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

the settlement agreement was independent of any liability to the SBA. *Id.* at 385.

Bianchi initiated this action by filing a complaint in the nature of a writ of mandamus for an order to compel the United States to pay the amount awarded to him by the ASBCA. The ASBCA determined that the Government was liable to Bianchi in the amount of $58,613.03 under a VECP provision of an express contract. The Government refused to make payment.

The Government filed an answer and a counterclaim for interpleader. In its counterclaim, the Government requested that the district court determine whether the Bank should be awarded the amount owed to Bianchi on the VECP claim pursuant to the assignment agreement between the Bank and Bianchi. The Government requested that if the court determined that the Bank was entitled to the amount due under the ASBCA decision, the Government should be discharged from any liability to Bianchi. The Government further requested that, if the district court concluded that the Bank was not entitled to the amounts due under the ASBCA decision, the court should offset the amount Bianchi owes to the SBA from the *568 $58,613.03 sought by Bianchi in his complaint for a writ of mandamus.

In its claim, the Bank asserted that "the Bank's claim to the interpleader stake is prior to any other claim and that the Bank is entitled to all funds at issue held by the Government." In his answer to the Bank's claim in interpleader, Bianchi asserted that the decision of the United States Court of Appeals for the Federal Circuit in *Bank of America* "speaks for itself" regarding the Bank's claim that under the assignment agreement it was entitled to the amount owing to Bianchi.

The Bank moved for summary judgment. It argued that it was entitled to the money held by the Government because, under the doctrine of collateral estoppel, Bianchi was precluded from relitigating the question whether the assignments were valid.

Bianchi filed a motion for summary judgment against the Government. He asserted that he was entitled to the $58,613.03 because the Government had agreed to pay the VECP claim as part of a stipulated agreement that was integrated into the decision of the ASBCA. Bianchi also requested summary judgment on the Government's claim that it was entitled to an offset.

Bianchi also filed a cross-motion for a summary judgment against the Bank. In the court below, Bianchi argued that he was entitled to summary judgment on the Bank's claim in interpleader because the Bank breached the terms of the assignment agreement. However, subsequent to the denial of his motion for summary judgment and prior to his motion for a new trial, the California Court of Appeals found that the Bank had not breached the assignment agreement. *See Bianchi v. Bank of America Nat'l. Trust and Savings Ass'n.*, G014893 (Cal.Ct.App.1997) (unpublished). Bianchi now asserts that he is entitled to recovery on two different grounds: (1) the Federal Circuit's decision in *Bank of America* establishes that he is entitled to recover on the settlement agreement regardless of whether the Government remains liable to the Bank; and (2) the Bank's recovery in *Bank of America* was in full settlement of the assignment agreement and, therefore, the assignment was discharged. Bianchi no longer contends that the Bank breached the assignment agreement.

The district court granted the Bank's motion for a summary judgment. It also denied Bianchi's motion for summary judgment against the Government and his cross-motion for a summary judgment against the Bank.

In explaining its decision, the district court reasoned that the Bank was entitled to summary judgment because "Bianchi is collaterally estopped from arguing that the assignments were not valid." The court stated that precise issue had been resolved against Bianchi in *Bank of America*, 23 F.3d at 384.

The district court's judgment reads as follows:

> Pursuant to this Court's Order, JUDGMENT is entered in favor of Counterdefendant/Claimant in Interpleader Bank of America National Trust and Savings Association, and against Plaintiff Maurice Bianchi fdba as M. Bianchi of California (Bianchi) and Defendant/Counterclaimant Charles Bousher, Comptroller General of the United States General Accounting Office. Defendant/Counterclaimant Charles Bousher shall pay to the Bank of America National Trust and Savings Association the amount of $58,613.03, plus interest due from November 17, 1987.

The court's judgment is silent regarding Bianchi's complaint for a writ of mandamus.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Bianchi filed a motion for a new trial or, in the alternative, to alter and amend findings of fact, conclusions of law, and to amend judgment. The district court denied these motions and this timely appeal followed. This motion makes no reference to Bianchi's complaint for a writ of mandamus.

II

Before discussing the merits of this appeal, we have a duty to determine *sua sponte* whether the district court entered a final decision in this matter. The parties have represented that we have jurisdiction pursuant to 28 U.S.C. § 1291. None of the parties have argued before this court that the district court's judgment did not encompass a *569 disposition of Bianchi's complaint for a writ of mandamus.

[1] The district court had jurisdiction over the Government's counterclaim for interpleader in this matter pursuant to 28 U.S.C. § 1345 and Rule 22 of the Federal Rules of Civil Procedure. A person who is subject to claims from more than one claimant may require them to interplead their claims to avoid multiple liability. Fed.R.Civ.P. 22. A defendant exposed to liability from more than one claimant may obtain interpleader relief by filing a counterclaim. *Id.*

[2] The question we must address is whether this order was final as to Bianchi's claim for a writ of mandamus. There is no express indication in the record of the district court's disposition of the petition for a writ of mandamus.

[3][4] Our review of a district court'sorder granting or denying summary judgment is *de novo*. *See Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998). "We may affirm the judgment of a district court on any basis established by the record." *DELTA v. Humane Soc. of U.S., Inc.*, 50 F.3d 710, 712 (9th Cir.1995).

The record shows that the district court lacked subject matter jurisdiction over Bianchi's complaint for a writ of mandamus. A district court has jurisdiction over an action filed against the United States arising out of a contract dispute where the amount in dispute does not exceed $10,000. 28 U.S.C. § 1346(a)(2). The United States Court of Federal Claims has jurisdiction over any claim against the United States concerning an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1). Because Bianchi seeks damages totalling more than $10,000 based on the settlement agreement, the complaint for a writ of mandamus should have been filed in the Court of Federal Claims. *See id.*

[5] We conclude that we have jurisdiction over this appeal. The district court had subject matter jurisdiction to consider the merits of the Bank's claim that it was entitled to the amount owing to Bianchi under the assignment. It lacked subject matter jurisdiction to consider a claim, however disguised, that the Government owed Bianchi in excess of $10,000 based on the VECP provisions of the contract. The district court's decision that the Bank was entitled to the proceeds of the VECP award disposed of the only issues that were properly before it.

III

[6][7] Bianchi contends that the Bank's claim to the money owed to Bianchi under the VECP provisions of his contracts with the Government as Bianchi's assignee is barred by the decision of the United States Court of Appeals for the Federal Circuit in *Bank of America*. A grant of summary judgment is reviewed *de novo*. *See Margolis*, 140 F.3d at 852. Our review is governed by the same standard used by the trial court under Federal Rules of Civil Procedure 56(c). *See Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1054 (9th Cir.1997), *cert. denied*, --- U.S. ----, 118 S.Ct. 1034, 140 L.Ed.2d 101 (1998); *Parker v. United States*, 110 F.3d 678, 681 (9th Cir.1997). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See Margolis*, 140 F.3d at 852; *see also Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir.1997).

Bianchi's contention that the Government was required to pay the money due on the VECP claims was not presented to the Court of Federal Claims or the Federal Circuit in *Bank of America*. Therefore, Bianchi's reliance on the doctrine of res judicata is misplaced.

The Federal Circuit's decision was limited to an analysis ofBianchi's right to retain the amount the Government agreed to pay to settle the pending ASBCA claims pursuant to the first paragraph of the settlement agreement. It did not determine whether the Government was required to pay Bianchi any

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

amount he might recover under the reservation-of-rights provisions of the second paragraph of the settlement agreement, notwithstanding the Bank's rights under its assignment *570 agreement with Bianchi. The question whether the Government is liable to pay Bianchi the $58,613.03 Bianchi seeks to recover under its VECP claims has not been presented in the United States Court of Federal Claims in an action against the Government as required pursuant to 28 U.S.C. § 1491(a)(1), nor has this issue been reviewed by the Federal Circuit.

IV

[8][9] Bianchi also maintains that this court's decision in *Bianchi v. Perry,* 140 F.3d 1294 (9th Cir.1998) is res judicata on the question whether the Bank is entitled to recover the amount owing on the VECP claim pursuant to the assignment agreement. This contention lacks merit. *Bianchi v. Perry* cannot serve as a bar to the Bank's claim because it was not a party or privy to that action. [FN3] Res judicata only applies to persons who were parties or their privies in a prior action involving the same claim. *See In Re Schimmels,* 127 F.3d 875, 881 (9th Cir.1997). The Bank and the Government are not in privity, they are adverse parties. Accordingly, neither *Bank of America* nor *Bianchi v. Perry* bars the Bank's rights under the assignment agreement.

FN3. We note also that *Bianchi v. Perry* did not involve the claim presented in this matter. The issue presented in *Bianchi v. Perry* was whether the Government was entitled to set off the debt owed to the United States against Bianchi's right to statutory fees and expenses under the EAJA. *Id.* at 1299.

V

Bianchi also asserts that the district court erred in denying his motion for a new trial, or in the alternative, his motion to alter or amend the district court's findings of fact and conclusions of law. The district court did not err in denying Binachi's motion because his contentions are without merit.

Bianchi claims that the district court was not aware of the prior judgment in the Bank of America case in which the Government was held liable to the Bank for a certain sum. Bianchi claims that this payment discharged the assignment and any further recovery by the Bank would put it in a position to receive double recovery.

Bianchi's arguments are without merit. The Bank's award in *Bank of America* was based on Bianchi's compromise of certain contract claims in the settlement agreement. As stated above, the VECP provision was not included in this compromise. Therefore, just as Bianchi's rights to pursue this award were not foreclosed, neither were the Bank's rights as assignee of the underlying contract.

VI

We conclude that the district court was not precluded from determining that the Bank was entitled, as Bianchi's assignee, to be awarded the amount owed by the Government on the VECP contracts. The claim presented in this matter was not presented to the Federal Circuit in *Bank of America.* This court's decision in *Bianchi v. Perry* is not res judicata regarding the Bank's right to recover on its assignment because the Bank was not a party to the action, nor in privity with the litigants, and the rights of the Bank, under the assignment agreement were not reviewed in that matter.

Bianchi's claim against the Government is based on his express contracts with the Government. The amount in controversy concerning that dispute exceeds $10,000. Accordingly, the district court lacked subject matter jurisdiction pursuant to 28 U.S.C. § 1346(a)(2) to determine whether the Government is liable to pay Bianchi $58,613.03. Only the Court of Federal Claims can resolve that dispute.

AFFIRMED.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

# EXHIBIT "2"

BEFORE THE
ARMED SERVICES BOARD OF CONTRACT APPEALS
ALEXANDRIA, VIRGINIA 22332-0700

| | | |
|---|---|---|
| Appeal of<br><br>M. BIANCHI OF CALIFORNIA<br><br>Under Contract Numbers:<br><br>DLA100-79-C-2894<br>DLA100-80-C-2290<br>DLA100-80-C-2972 | : | ASBCA Nos. 26362, et al. |

STIPULATION TO BOARD DECISION

The parties to the above-listed appeals agree to stipulate to the following decision by the Board:

"1. The parties agree that Mr. Maurice Bianchi, as the successor to M. Bianchi of California, is entitled to recover $617,500.00 on his claims in the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933 and 29934; that the government is entitled to take nothing on its claims in the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933 and 29934; that Mr. Bianchi is entitled to interest computed in accordance with Clauses L78 (Disputes (1979 MAR)) of the contracts, at the rates prescribed by the Secretary of the Treasury, under the Renegotiation Act, Public Law 92-41, on the principal amount of $617,500, such interest to run from June 18, 1981 until the date of payment; and that the parties waive their rights to seek reconsideration of this stipulated decision of the Board or to appeal that stipulated decision;

"2. This settlement is without prejudice to Mr. Bianchi's right to pursue any and all Value Engineering Change Proposal Claims under his contracts with DPSC; and

"3. This settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act to recover whatever legal fees and litigation expenses to which he may be entitled in connection with these claims and appeals. The parties stipulate that the issues of prevailing party and substantial justification will be decided on the basis of the record made at the first trial. The parties agree that the application for legal fees and litigation expenses under the Equal Access to Justice Act will be submitted within thirty days of receipt by Appellant of the agreed-upon settlement payment."

Except as noted above, Appellant and the government agree to stipulate to the dismissal of these appeals with prejudice.

Respectfully submitted,

D. Michael Fitzhugh
D. Michael Fitzhugh
McKENNA, CONNER & CUNEO
1575 Eye Street, N.W.
Washington, D.C. 20005

Attorney for Appellant
M. Bianchi of California

Dated: 9/27/88

Michael J. McGonigle
Chief Trial Attorney
DPSC-GA
2800 South 20th Street
Philadelphia, Pennsylvania 19101-8419

Attorney for the Government

Dated: ______________________

"2. This settlement is without prejudice to Mr. Bianchi's right to pursue any and all Value Engineering Change Proposal Claims under his contracts with DPSC; and

"3. This settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act to recover whatever legal fees and litigation expenses to which he may be entitled in connection with these claims and appeals. The parties stipulate that the issues of prevailing party and substantial justification will be decided on the basis of the record made at the first trial. The parties agree that the application for legal fees and litigation expenses under the Equal Access to Justice Act will be submitted within thirty days of receipt by Appellant of the agreed-upon settlement payment."

Except as noted above, Appellant and the government agree to stipulate to the dismissal of these appeals with prejudice.

Respectfully submitted,

D. Michael FitzHugh

D. Michael Fitzhugh
McKENNA, CONNER & CUNEO
1575 Eye Street, N.W.
Washington, D.C. 20005

Attorney for Appellant
M. Bianchi of California

Dated: 9/27/88

Michael J. McGonigle

Michael J. McGonigle
Chief Trial Attorney
DPSC-GA
2800 South 20th Street
Philadelphia, Pennsylvania 19101-8419

Attorney for the Government

Dated: 9/27/88

# EXHIBIT "3"

G11331

1121 B103301D000093 11211539 FT1B N    1121L2LFJY1D000004 11211540FTS1P

11-21-1988 15:25:09 ****** REPRINT ******

CNB

## INCOMING WIRE TRANSFER ORDER
CONFIRMATION

NO. - 4757

FICE TEO    TIME REC'D 2:20    SERIAL NO. OF WIRE TRF. RECORD    DATE 11/21

EE'S NAME Maurice L Bianchi or Arlene Bianchi

EE'S ADDRESS    TELEPHONE NO.

ITTER'S NAME    CITY    STATE    ZIP

ITTING K    AMOUNT OF TRANSFER . . . . . . . . $ 1,141,230.23

IT. BANK'S ADDRESS

IOD OF MENT    [redacted]

ICH K    WIRE TRF. DEPT. CLERK

11-21-1988 15:25:21 ****** REPRINT ******

7027984468 CONT. NAT. BANK 12/13/90 13:15 P02

# EXHIBIT "4"

# In the United States Claims Court

No. 90-3961C

(Filed: October 16, 1992)

RECEIVED OCT 20 1992

* * * * * * * * * *

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant and Third Party Plaintiff,

v.

MAURICE L. BIANCHI,

Third Party Defendant.

* * * * * * * * * *

THIS OPINION WILL NOT BE PUBLISHED IN THE UNITED STATES CLAIMS COURT REPORTER.

Michael L. Burack, Washington, D.C., attorney for plaintiff.

Michael A. Hordell, Washington, D.C., attorney for third-party defendant.

Mark A. Melnick, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

HODGES, Judge.

Plaintiff Bank of America (Bank) sues to recover money erroneously paid to Bianchi by Defendant. All parties move for summary judgment. We rule for Defendant.

## FACTS

During 1979 and 1980 the Defense Logistics Agency (Defendant) awarded three contracts to third-party defendant (Bianchi) to manufacture coats and jackets. After award, Bianchi assigned the proceeds and rights associated with each contract to the Bank in return for financial backing. Following each assignment, the Bank notified the appropriate contracting officer and disbursing officer in accordance with the Anti-Assignment Act. 31 U.S.C. § 3727 (1988), 41 U.S.C. § 15 (1988). Each notification was acknowledged.

In late 1980 Bianchi applied to the Bank for a $500,000 loan and signed a security agreement granting the Bank "all rights to the payment of money now owned or hereafter acquired by Borrower, . . . including, but not limited to, accounts, contract rights, chattel paper, instruments and general intangibles . . ." (collateral). The Small Business Administration (SBA) insured the loan up to 90% of its value in return for a lien on the collateral.

In July 1981 SBA insured an additional $50,000 loan from the Bank to Bianchi for working capital. SBA took as security for the new loan "assignment of proceeds arising from claims against the Government and or the Defense Logistics Agency."

Bianchi defaulted on the loans in August and October 1981, and the Bank demanded payment from SBA on its loan guarantees in December. In return for SBA's payment, the Bank assigned all of its rights in both loans to SBA, including its first lien rights to the collateral.

Bianchi's contracts with Defendant resulted in a contract dispute which was appealed to the Armed Services Board of Contract Appeals. In 1988, the Board directed Defendant to pay Bianchi $1.1 million. Defendant paid the money to Bianchi as ordered, notwithstanding the various assignments of rights associated with the contracts. Defendant realized its error, and in October 1990 it sent a letter to Bianchi demanding that he repay the money. Bianchi refused. Believing that it was entitled to the judgment paid Bianchi, the Bank initiated this suit against the Government in November 1990. Defendant impleaded Bianchi as third-party defendant.

DECISION

1. Summary Judgment

Summary judgment is proper when no genuine issues of material fact are presented. The mere existence of some factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). We have considered each party's motion for summary judgment on its own merits, and we find summary judgment to be proper here.

2. Bianchi Assignments to Bank

Bianchi alleges that his original assignments to the Bank were not valid because they were made under duress and because they were claims against the government which did not meet the requirements of the Anti-Assignment Act. 31 U.S.C. § 3727 (1988), 41 U.S.C. § 15 (1988). However, a party opposing summary judgment must set

forth specific facts showing that there is a genuine issue for trial. Anderson, 477 U.S. at 248; Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Bianchi has not met that burden with his broad allegations of fraud and duress. We need not address unsupported allegations made over ten years after the assignments.

The three original assignments of contractual rights by Bianchi to the Bank meet all of the requirements of the Anti-Assignment Act. The Bank (1) qualified as a financial institution, (2) loaned or made available money to Bianchi for the performance of the contracts, and (3) provided appropriate notice to the contracting officers and disbursing officers associated with each contract. Manufacturers Hanover Trust Co. v. United States, 590 F.2d 893 (Ct. Cl. 1978). Bianchi's assignments to the Bank were therefore effective.

3. Defendant's Payment to Bianchi

Bianchi asserts that Defendant is not entitled to repayment of the money. However, the Government may recover funds that its agents have wrongfully, erroneously, or illegally paid. American Nat'l Bank and Trust v. United States, 23 Cl. Ct. 542, 547 (1991); United States v. Wurts, 303 U.S. 414, 415 (1938). The Government cannot be estopped from recovering by the mistakes of its officers or agents. American Nat'l Bank, 23 Cl. Ct. at 547. Ordinarily, the Government may recover its erroneously paid funds without regard to the passage of time. Wurts, 303 U.S. at 416. In this case, Defendant made an erroneous payment to Bianchi, and Bianchi must return the payment.

Bianchi argues that the six-year Statute of Limitations has run since the claim first

accrued -- when Bianchi defaulted on the loans. This argument assumes that Defendant is suing Bianchi directly in an attempt to set off Bianchi's debt with the judgment. This court is not deciding a set-off question and cannot dictate what Defendant will do with the money once it is returned. We find only that Defendant paid Bianchi erroneously and is entitled to repayment. Defendant did not pay the money to Bianchi until 1988, so we cannot agree that the Statute of Limitations has run.

4. Bank Assignments to SBA

The Bank argues that it is entitled to payment of the money because its assignments to SBA violated the Anti-Assignment Act. We find that the Anti-Assignment Act does not apply to the agreements between the Bank and SBA.

The Anti-Assignment Act is designed to protect the Government from secret assignment arrangements, to prevent possible multiple claims, and to make unnecessary the investigation of alleged assignments. American Nat'l Bank, 23 Cl. Ct. at 546 (1991). The Act does not address an assignment to a Government entity, and it should not be applied against SBA in this case.

The assignments from the Bank to SBA were valid. We must rely on the language of the original loan agreements, the notes, and the Security Agreement, all of which the Bank assigned to SBA. By paying the agreed 90% of the defaulted loans, SBA acquired all rights to those loans, and Bianchi became indebted to SBA. The Bank has received all that it bargained for and has no further claim against Defendant.

5. Interest

The Government seeks interest on the money from November 1988 when it erroneously paid Bianchi. See Astro-Space Labs., Inc. v. United States, 470 F.2d 1003, 1020 (Ct. Cl. 1972) (court has discretion to award interest). However, the erroneous payment resulted from Defendant's own negligence, and Defendant did not request return of the money until it sent the October 1990 letter to Bianchi. Interest on the erroneous payment is therefore denied.

CONCLUSION

Defendant's motion for summary judgment is GRANTED. Plaintiff's motion for summary judgment is DENIED. Third-party defendant's cross-motion for summary judgment is DENIED. Third-party defendant is ordered to repay the Government the sum of $1,141,220.83. The Clerk will dismiss plaintiff's complaint. No costs.

# EXHIBIT "5"

COPY

# United States Court of Appeals for the Federal Circuit

93-5059,-5060

RECEIVED
JUL 05 1994
Ans'd.

BANK OF AMERICA NATIONAL TRUST and
SAVINGS ASSOCIATION,

Plaintiff/Cross-Appellant,

v.

THE UNITED STATES,

Defendant/Third Party
Plaintiff-Appellee,

v.

MAURICE L. BIANCHI,

Third Party Defendant-Appellant.

## Judgment

*ON APPEAL from the* UNITED STATES COURT OF FEDERAL CLAIMS

*in CASE NO(S).* 90-3961C

*This CAUSE having been heard and considered, it is*

*ORDERED and ADJUDGED:*

REVERSED IN PART, VACATED IN PART

*ENTERED BY ORDER OF THE COURT*

*DATED* APR 29 1994

Francis X. Gindhart

*Francis X. Gindhart, Clerk*

COSTS: Third Party Defendant-Appellant against Appellee.

PRINTING-------------------------$1,870.04

TOTAL----------------------------$1,870.04

ISSUED AS A MANDATE: June 30, 1994

# United States Court of Appeals for the Federal Circuit

93-5059,-5060

BANK OF AMERICA NATIONAL TRUST and
SAVINGS ASSOCIATION,

Plaintiff/Cross-Appellant,

v.

THE UNITED STATES,

Defendant/Third Party
Plaintiff-Appellee,

v.

MAURICE L. BIANCHI,

Third Party Defendant-Appellant.

Michael L. Burack, Wilmer, Cutler & Pickering, of Washington, D.C., argued for plaintiff/cross-appellant. With him on the brief were Eric R. Markus and Lydia R. Pulley.

Mark A. Melnick, Attorney, Commercial Litigation Branch, Department of Justice, of Washington, D.C., argued for defendant/third party plaintiff-appellee. With him on the brief were Stuart E. Schiffer, Acting Assistant Attorney General and David M. Cohen, Director. Also on the brief were Sandra Guydon, Office of the Philadelphia, Pennsylvania and Joel K. Meese, Small Business Administration, of counsel.

Michael A. Hordell, Petrillo & Hordell, of Washington, D.C., argued for Third Party Defendant-Appellant. With him on the brief was Eric L. Lipman, of counsel. Mr. Hordell and the law firm of Petrillo & Hordell, withdrew as counsel of record with the court's permission before the matter was decided.

Appealed from: U.S. Court of Federal Claims

Judge Hodges, Jr.

United States Court of Appeals for the Federal Circuit

93-5059,-5060

BANK OF AMERICA NATIONAL TRUST and
SAVINGS ASSOCIATION,

Plaintiff/Cross-Appellant,

v.

THE UNITED STATES,

Defendant/Third Party
Plaintiff-Appellee,

v.

MAURICE L. BIANCHI,

Third Party Defendant-Appellant.

---

DECIDED: April 29, 1994

---

Before RICH, MAYER, and LOURIE, Circuit Judges.

PER CURIAM.

Maurice L. Bianchi appeals the judgment of the United States Court of Federal Claims,[1] No. 90-3961C, entered pursuant to the grant of summary judgment in favor of the United States, and the denial of his cross-motion for summary judgment. Bank of America likewise appeals the court's grant of summary judgment in favor of the United States against it, and the denial of its motion for summary judgment. We reverse in part and vacate in part.

---

1 The United States Claims Court was renamed the United States Court of Federal Claims on October 29, 1992. Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 902(a), 106 Stat. 4506, 4516.

Background

The following facts are not disputed. In June 1979, Bianchi executed a security agreement in favor of Bank of America (bank), granting it a security interest in his property, including after-acquired accounts and contract rights. This interest secured Bianchi's existing obligations to the bank, as well as future loans and advances by the bank to Bianchi.

During 1979 and 1980, the Defense Logistics Agency (DLA) awarded three contracts for military clothing (numbers DLA100-79-C2894, DLA100-80-C2290, and DLA100-80-C2972) to M. Bianchi of California, a sole proprietorship of Maurice Bianchi. Shortly after the award of each contract, Bianchi assigned the proceeds and rights associated with each contract to the bank as security for loans to finance Bianchi's performance of the contracts. The bank notified the appropriate contracting and disbursing officers in accordance with the Assignment of Claims Act, 31 U.S.C. § 3727 (1988), 41 U.S.C. § 15 (1988); the government acknowledged and accepted each assignment. Thereafter, the bank received payments from the government of sums due Bianchi under the contracts.

Later in 1980, Bianchi and the bank sought to restructure their relationship, applying to the Small Business Administration (SBA) for a 90 percent guarantee on an additional $500,000 loan to Bianchi. The application disclosed the bank's preexisting lien position. The SBA approved the application, and the bank issued the loan; the collateral included a third lien on all receivables, including contract rights. Bianchi executed another security

agreement, again granting the bank a security interest in all rights to payment of money owned or thereafter acquired by him. In July of 1981, the bank made another 90 percent SBA guaranteed loan to Bianchi of $50,000. The new loan was covered by the future advances clause of the December 1980 agreement.

Soon thereafter, DLA terminated two of the contracts for default. Bianchi defaulted on the loans, including both the SBA guaranteed loans and the bank's prior non-guaranteed loans. In December 1981, the bank applied to the SBA for payment on the guarantees, in return for which it assigned its interest in the guaranteed loans to the SBA.

In 1981, Bianchi instituted a series of claims under the contracts before the Armed Services Board of Contract Appeals (board). In September 1988, DLA and Bianchi agreed to settle the claims. Under the settlement agreement, DLA agreed to pay $617,500 plus interest directly to Bianchi. The government paid Bianchi a total of $1,141,220.83.

In June 1990, the bank requested that the government pay it the settlement amount under the Assignment of Claims Act. On October 23, 1990, DLA wrote to Bianchi, demanding repayment of the money, acknowledging that payment should have gone to the bank under the assignment. Bianchi made no repayment, and the government took no further action until the bank filed this suit.

On November 21, 1990, the bank filed its complaint against the government in the United States Court of Federal Claims seeking payment of the $1,141,220.83 as assignee under the Assignment of

Claims Act. The government asserted as an affirmative defense the SBA's superior right to the money paid to Bianchi. On April 16, 1992, the government filed a third-party complaint against Bianchi seeking return of the money paid under the settlement.

All parties moved for summary judgment. The court granted summary judgment in favor of the government against the bank, holding that the bank had assigned its rights to the SBA and had no further claim on money due Bianchi under the contracts. The court also granted summary judgment in favor of the government against Bianchi in the amount of $1,141,220.83, concluding that the government had erroneously paid Bianchi and was therefore entitled to repayment.

## Discussion

### I.

Bianchi raises constitutional and procedural objections to the judgment against him in the Court of Federal Claims. We decline to reach Bianchi's constitutional arguments because we conclude that the government was not entitled to assert its claims against Bianchi in the first instance.[2]

The funds the government seeks to recover through its third-party complaint stem from an agreement reached between the

---

[2] Although the concurrence would resolve this case on constitutional grounds, we adhere to the doctrine that we should avoid deciding constitutional questions where an alternative basis exists upon which our decision may rest. See Hagans v. Lavine, 415 U.S. 528, 565 (1974) (Rehnquist, J., dissenting); SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1126, (Fed. Cir. 1985) (Markey, C.J., additional views).

government and Bianchi in 1988 settling a contractual dispute. Pursuant to the agreement, the government agreed to pay Bianchi $617,500 plus interest in satisfaction of Bianchi's claims. This agreement was incorporated into a decision of the Armed Services Board of Contract Appeals, in which it was stipulated that the parties waived their rights to appeal or seek reconsideration of the board's decision.

In support of its claim against Bianchi, the government now contends that the settlement award was paid to Bianchi in contravention of the various assignments of rights associated with Bianchi's contracts and that it has a right to recover any funds erroneously paid from the public treasury. The government does not have that right in this case.

The government's right to recoup erroneously paid funds cannot be invoked by the government as a means to circumvent a legal obligation. In return for Bianchi's agreement to discontinue his action against the government, the government agreed to settle his claims and voluntarily relinquished its right to disturb the settlement. Bianchi accordingly ceased pursuing his contract claims and the government must likewise be held to its end of the bargain. "The law strongly favors settlement of litigation, and there is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into." Hemstreet v. Spiegel, Inc., 851 F.2d 348, 350, (Fed. Cir. 1988) (citing Bergh v. Department of Transp., 794 F.2d 1575, 1577 (Fed. Cir.), cert. denied, 479 U.S. 950 (1986)).

The government does not challenge the validity or the enforceability of the settlement. Indeed, there is no indication that the parties failed to deal with each other at arm's length or that Bianchi withheld material information. The government certainly had adequate knowledge of the various financial arrangements associated with the contracts in view of the fact that the assignments from Bianchi to the bank were made pursuant to the Assignment of Claims Act, which was designed to protect the government from secret assignments. See McKenzie v. Irving Trust Co., 323 U.S. 365, 369 (1945); Pittman v. United States, 116 F. Supp. 576, 580 (1953), cert. denied, 348 U.S. 815 (1954). In the absence of any fraud, misdirection, or concealment, the government may not recover funds paid in good faith and to the satisfaction of the interested parties. See McKnight v. United States, 13 Ct. Cl. 292, 313 (1877), aff'd, 98 U.S. 179 (1878). Here, "[t]here was nothing contrary to good morals or conscience in the payment or receipt of the money. The facts were all known." 98 U.S. at 85-86.

The government could easily have taken appropriate steps to avoid incurring any liability to the bank. For example, the government could have insisted that any settlement award be paid to the bank in view of the bank's asserted security interest. The government did not do so, perhaps because Bianchi would not have agreed to that arrangement or because the government presumed that the bank retained an inferior interest. Whatever the reason for its failure to protect itself, the government cannot now renege on

its commitment to honor its settlement with Bianchi, into which it entered voluntarily and with full knowledge of the facts. "To permit [the government] to escape its obligation under the settlement would seriously decrease the willingness of parties to settle litigation on mutually agreeable terms and thus weaken the efficacy of settlements generally." Hemstreet, 851 F.2d at 350.

Although the government waived its right to challenge the board's decision awarding payment to Bianchi, it attempts to do just that by means of a third-party complaint filed in another forum. The government should not be allowed to do indirectly what it is prohibited from doing directly. We therefore hold that the government, having waived its right to challenge the settlement, is precluded from seeking to recover the settlement award through a third-party complaint filed in the Court of Federal Claims.

II.

In its cross-appeal, Bank of America challenges the trial court's conclusion that the bank retained no right to receive payments under the Bianchi contracts after it assigned its interest in the guaranteed loans to the SBA in return for payment on the loan guarantees. Specifically, the bank argues that it is entitled to judgment because of its superior right to contract payments as Bianchi's assignee under the Assignment of Claims Act.

Both the bank and the SBA claim a security interest in Bianchi's contract receivables. The bank obtained its interest, the assignment, in return for its original loans to finance

Bianchi's contract performance. When it later extended the guaranteed loans, Bianchi again granted it a security interest in the receivables, an interest the bank eventually transferred to the SBA in return for payment on the loan guarantees. The Court of Federal Claims agreed with the government that this transfer assigned all of the bank's interest in the contract payments, not merely those associated with the guaranteed loans.

The loan documents refute this position, for they show that the bank assigned away only its rights "in th[ose] certain Note[s]" relating to the guaranteed loans. Since the rights under the guaranteed loans attached after the interest under the earlier loans secured by the same collateral, the SBA took its interest subject to the preexisting interest retained by the bank. _Cf. United States v. McDermott_, 113 S.Ct. 1526, 1531 (1993) ("When two private lenders both exact from the same debtor security agreements with after-acquired-property clauses, the second lender knows . . . that that category of property will be subject to another claim"). Indeed, the record shows that the SBA clearly knew of the bank's senior interest in the contract payments.

As an assignee under the Assignment of Claims Act, the bank's security interest included the right to bring a suit against the government to recover any contract payment made to another. _Produce Factors Corp. v. United States_, 467 F.2d 1343, 1349 (Ct. Cl. 1972). As we said, the bank never relinquished this right. "The Government having received timely notice of plaintiff's assignment paid [Bianchi] at its peril. And where an erroneous

payment is made by the Government it is no bar to the rightful claimant." Central Nat'l Bank v. United States, 91 F. Supp. 738, 741 (Ct. Cl. 1950) (citation omitted). The government's payment to Bianchi in settlement of the contract dispute was a payment under the contract that should have gone to the bank under the assignment. Thus, the bank has a right to the payment under the Act.

The government asserts a right to set off the amount that Bianchi owed to the SBA against any money owed to the bank by virtue of the settlement. Of course, like any creditor, the government has the right to set off a contractor's debts against payments due the contractor. United States v. Munsey Trust Co., 332 U.S. 234, 239 (1947). The government argues that as an assignee, the bank had no greater claim to the payment than did Bianchi, its assignor. If true, the government could set off Bianchi's liability to the SBA against money due the bank. Cf. id. at 239-40 ("Insofar as the suitor in the Court of Claims asserted the contractor's title to the sum in dispute, that court was under statutory duty to recognize the undisputed claim for damages of the United States").

But the bank is not simply an ordinary assignee. The Assignment of Claims Act expressly limits the government's right to set off Bianchi's debts against payments to the bank. 31 U.S.C. § 3727; 41 U.S.C. § 15. Under the Act, government contracts may provide that an assignee's right to contract payments "shall not be subject to reduction or set-off for any liability of any nature

of the assignor to the United States or any department or agency thereof which arises independently of such contract . . . ." 41 U.S.C. § 15. Bianchi's contracts contained such a clause.

The goal of the Assignment of Claims Act is to make it easier for contractors to finance performance of their obligations to the government. Produce Factors Corp. v. United States, 467 F.2d at 1348. The inclusion of "no set-off" clauses alleviates some of the uncertainty that would otherwise hinder financing by ensuring assignees a stream of payments unaffected by the contractor's potentially numerous "obligations to the United States not imposed by the contract from which the payments flowed." Central Bank v. United States, 345 U.S. 639, 643 (1953). See Produce Factors, 467 F.2d at 1348 (assignee's right to receive payment of contract proceeds dependent only on "performance by the contractor of his contractual obligations").

While the government could assert against the bank any defenses arising against Bianchi under the contracts, Produce Factors Corp., 467 F.2d at 1349 (non-performance or failure of consideration), Bianchi's indebtedness to the government arose not from the contracts, but from the notes. The government argues that the notes are not independent of the contracts, for they were intended to finance the performance of the contracts, and, indeed, the security agreements expressly listed rights to contract payments as collateral. Even accepting that Bianchi's liability on the notes was "related to" the contracts, however, we agree with

the bank that the liability on the notes arose "independently of such contract."

The Supreme Court addressed this language in Central Bank v. United States, 345 U.S. at 646, ruling that the United States could not set off a contractor's tax indebtedness against sums due an assignee on the contract. The tax liability arose from the contractor's failure to pay withholding and unemployment taxes for work done on the contract. The Court reasoned, however, that the government could not set off the tax because it did not arise from the contract; the tax was imposed by statute, and would have been due even absent a contract with the government. Id. at 645-46.

Like a contractor's tax liability, Bianchi's liability on the notes did not arise from his defense contracts, it was imposed by the loan documents. He could owe on the notes even if he had no contract. Moreover, the government has conceded any defense to payment based on inadequate performance of the contracts by settling Bianchi's contract claims. Because his liability on the notes "lay neither in execution nor in breach of the contract[s]," Central Bank, 345 U.S. at 646, Bianchi's liability to the SBA on the notes is independent of the contracts, barring set-off by the government. Therefore, the bank should recover the amount due under the government's settlement with Bianchi.

## Conclusion

Accordingly, we reverse the judgment of the Court of Federal Claims in the government's favor against the bank, and vacate the judgment in favor of the government against Bianchi.

## COSTS

The bank and Bianchi shall have their costs.

## REVERSE IN PART, VACATE IN PART

# United States Court of Appeals for the Federal Circuit

93-5059,-5060

BANK OF AMERICA NATIONAL TRUST and
SAVINGS ASSOCIATION,

Plaintiff/Cross-Appellant,

v.

THE UNITED STATES,

Defendant/Third Party
Plaintiff-Appellee,

v.

MAURICE L. BIANCHI,

Third Party Defendant-Appellant.

MAYER, Circuit Judge, concurring in part and concurring in the judgment.

I join the court's opinion insofar as it explains why the bank prevails. I also agree that the government's claims against Bianchi should have been dismissed, but write separately because I do not believe the Court of Federal Claims had jurisdiction to reach the merits of those claims. I share the reluctance to reach constitutional questions, but the court impermissibly assumed there is jurisdiction where there is none.

The Court of Federal Claims based its jurisdiction over Bianchi on 41 U.S.C. § 114(b) (Supp. IV 1992), which says that court may "summon any and all persons with legal capacity to be sued to appear as a party or parties in any suit or proceeding of any nature whatsoever pending in said court to assert and defend

their interests . . . ." More specifically, section 114(b) authorizes the Court of Federal Claims to hear the government's "claims and contingent claims for the recovery of money hereafter paid by the United States in respect of the transaction or matter which constitutes the subject matter" of the pending suit. Id.

This court has said that under section 114(b) the Court of Federal Claims may render judgment against a third party on claims by the government in two situations: first, where that party also asserts a claim against the United States; and second, where a plaintiff sues the government for money that the government has disbursed to the third party under a mistake of fact or law. United States v. Rush, 804 F.2d 645, 647 (Fed. Cir. 1986); Bowser Inc. v. United States, 420 F.2d 1057, 1062 (Ct. Cl. 1970). By its language, section 114(b) apparently applies to these government claims, which seek return of the settlement payment, the subject of the bank's suit. The question thus becomes whether the grant of jurisdiction over the government's claims is constitutionally permissible.

Bianchi's constitutional attack on section 114(b) arises from Article III of the Constitution, which provides that

> [t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

U.S. Const., Art. III, § 1. The Court of Federal Claims is established under Article I not Article III. 28 U.S.C. § 171(a) (Supp. IV 1992) ("The Court is declared to be a court established under Article I of the Constitution of the United States").

The Supreme Court tells us that "Article III, § 1, serves both to protect 'the role of the independent judiciary within the constitutional scheme of tripartite government,' and to safeguard litigants' 'right to have claims decided before judges who are free from potential domination by other branches of government.'" Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 848 (1986) (citations omitted). When examining congressional action for impermissible intrusions upon the integrity of the judiciary, the Court has declined to adopt fixed rules, fearing undue restrictions on Congress' Article I powers. Id. at 851. The task is to consider both the nature of the right to be adjudicated and the concerns that led Congress to deviate from Article III in this statutory scheme. Id.

Some disputes, especially those arising between the government and others over the performance of the constitutional functions of the political branches, have historically been subject to resolution exclusively by those branches. Northern Pipeline Co. v. Marathon Pipe Line Co., 458 U.S. 50, 67 (1982) (plurality opinion). Because such disputes could be resolved without resort to the judicial power of the United States, Congress is free to assign their adjudication to administrative agencies or Article I courts. See Thomas v. Union Carbide Agric. Prod., 473 U.S. 568,

589 (1985). These cases are said to involve "public rights"; by contrast, "private rights" cases -- those that fall outside the traditional realm of the political branches -- must be heard under the auspices of Article III. Northern Pipeline, 458 U.S. at 70.

Government contract disputes are classic public rights matters. Historically, government contracts provided that the decision of a contracting officer was final on any question under the contract, and not subject to Article III review. Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1564 (Fed. Cir. 1990). These provisions withstand constitutional scrutiny because, under the concept of sovereign immunity, the government could always decline to be sued by aggrieved contractors. When Congress later created a right of action on the contract in the Court of Claims, and then in the Article I Court of Federal Claims, it was free to attach conditions to the new right, including the waiver of the right to a jury trial or to an Article III forum. Id. at 1563.

This court applied these principles to reject a constitutional challenge to section 114(b) in United States v. Rush, 804 F.2d 645, 647 (Fed. Cir. 1986). We determined that the dispute between the government and a third party contractor turned on public rights -- that is, it arose "between the government and persons subject to its authority in connection with the constitutional functions of the executive and legislative branches and . . . historically could have been determined exclusively by those branches." Rush, 804 F.2d at 647. See Northern Pipeline, 458 U.S. at 67. Rush went no

further; resolution of the case before us, however, requires an examination of why Rush was a public rights dispute.*

Rush contracted with the Air Force to construct a shopping center on the grounds of Arnold Air Force Station. Because the contract was one for the procurement of services by the government, it was necessarily controlled by the provisions of the Contract Disputes Act (CDA). 41 U.S.C. § 602(a) (1988); Seaboard Lumber Co., 903 F.2d at 1565. Under the CDA, the government waived its right to assert sovereign immunity against Rush's contractual claims in return for the contractor's waiver of his right to an Article III trial of government claims against him. 903 F.2d at 1567. Thus, the government could cross-claim against Rush in the Court of Federal Claims seeking return of an alleged overpayment that was the subject of a surety's suit against the government in that court.

Like the contract in Rush, Bianchi's DLA contracts were governed by the CDA, so Bianchi waived his rights under Article III

---

* Like Bianchi, Rush challenged section 114(b) under both Article III and the Seventh Amendment. The Rush court cited Maryland Casualty Co. v. United States, 141 F. Supp. 900 (Ct. Cl. 1956), on which the government relies here. Maryland Casualty upheld the validity of section 114(b) in the face of a Seventh Amendment challenge similar to Bianchi's. But Maryland Casualty was decided by the Court of Claims, a court that sat without a jury, much like the present Court of Federal Claims, but one that was established under Article III. Glidden v. Zdanok, 370 U.S. 530, 584 (1962); see Act of July 28, 1953, § 1, 67 Stat. 226, added to 28 U.S.C. § 171 ("Such court is hereby declared to be a court established under Article III of Constitution of the United States"). Maryland Casualty supports the Rush Seventh Amendment holding, but it does not constrain our analysis of section 114(b) under the broader scope of Article III.

by entering into them. When the government terminated the contracts, Bianchi complied with the CDA and sought relief before the Board of Contract Appeals. The parties then settled the dispute.**

Now the government seeks to recover the money it paid Bianchi under the voluntary settlement, a joint action to fully and finally terminate the prior case. It is not itself a contract for the procurement of goods or services that falls under the CDA, so the terms of that Act do not apply. Cf. Coastal Corp. v. United States, 713 F.2d 728, 730 (Fed. Cir. 1983) (rejecting theory that CDA applies to "contracts tangentially connected with government procurement of goods and services"). Absent the controlling provisions of the CDA, there is no historical basis for resolution of the government's claims against Bianchi by the legislative or executive branches. This is not a case involving a right created by Congress or one assigned by the Constitution or tradition to the political branches. Indeed, if the government had sought to recover the settlement payment absent this precipitative suit by

** Under the settlement, the parties agreed that Bianchi "is entitled to recover $617,500.00 on his claims . . . ; that the Government is entitled to take nothing on its claims . . . ; that Mr. Bianchi is entitled to interest . . . ; and that the parties waive their rights to seek reconsideration of this stipulated decision of the Board or to appeal that stipulated decision . . . ." Appeals of M. Bianchi of California, ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934 (September 29, 1988). Moreover, Bianchi was required to execute a Certificate of Finality, under which he agreed to accept the award as "a full discharge to the United States of all claims and demands arising out of the matters involved . . . ." Certificate of Finality, ASBCA Nos. 26362, et al.

the bank, it would have had to sue in the district court. Whatever rights the government may have to recover its officers' allegedly erroneous payments, see United States v. Wurts, 303 U.S. 414, 415 (1938), it is not necessarily entitled to advert to an Article I forum.

Nor does Bianchi's waiver of his Article III rights under the DLA contracts extend to the settlement. Under the settlement agreement, he accepted a single payment in full satisfaction of his claims under the terminated contracts. The parties agreed that the settlement would be final, and waived any right to reconsideration or appeal to this court. The government was completely discharged from all obligations under the contracts, and, given the broad language of the agreement, Bianchi's obligations, including his contractual duty to submit to Article I jurisdiction, were likewise discharged. The settlement extinguished the prior relationship under the contracts. Cf. Brock & Blevins Co. v. United States, 343 F.2d 951, 954 (Ct. Cl. 1965). Thus, what was a matter of public rights -- a contractual relationship controlled by the CDA -- became a private rights dispute after the settlement. The government's concern that it might be subject to inconsistent judgments cannot overcome the demands of Article III where the government so clearly had the ability to protect its rights, but surrendered them. The government's claims against Bianchi should have been dismissed for lack of jurisdiction.

# EXHIBIT "6"

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Application Under Equal Access to Justice Act -- M. Bianchi of California<br><br>Under Contract Nos. DLA100-79-C-2894, DLA100-80-C-2990, DLA100-80-C-2972 | ) | ASBCA Nos. 26362 26363 26364 26365 26366 26505 26506 26513 26642 29932 29933 29934 |

APPEARANCE(S) FOR THE APPLICANT: Michael A. Hordell, Esq.
Petrillo & Hordell
Washington, D.C.

APPEARANCE(S) FOR THE GOVERNMENT: Alvin M. LaCoste, Esq.
Wayne J. Bober, Esq.
Trial Attorneys
Defense Personnel Support Center (DLA)
Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE BURG

On 29 September 1989 the Board issued its opinion on many of the issues involved in this application for attorney's fees and expenses under the Equal Access to Justice Act, 5 U. S. C. § 504, and remanded the matter to the parties for negotiation in accordance with that decision (ASBCA No. 26362, et al, 90-1 BCA ¶ 22,369). The parties were unable to reach agreement on quantum. Since a settlement conference with the parties and the presiding judge also proved unsuccessful, the Board will resolve quantum based upon the extensive documentation filed by the parties.

In our decision on the merits of this application, we set forth a detailed discussion about the contracts involved in the dispute, the settlement of which resulted in this application. We see no necessity for a detailed repetition in this opinion. We concluded (1) that the Government's position was not substantially justified in failing to grant applicant an extension of time for imposition of a first article inspection requirement, (2) that the Government's position was substantially justified as to the pattern problems arising under these contracts, (3) that the Government was not substantially justified in refusing to extend delivery dates under Contract 2894, so that the contractor was forced to accelerate production under that contract, (4) that the Government was not responsible for costs incurred in prioritizing Contract 2990 before Contract 2894, (5) that applicant is limited in its recovery of attorney fees to a maximum of $75.00 per hour, (6) that the parties should negotiate the impact on legal fees caused by the applicant's change of attorneys three (now four) times during the course of this litigation and the impact of assignment and reassignment

of Government counsel numerous times during the course of this litigation, (6) that the parties should negotiate whether any discovery in these appeals was unnecessary and should not be subject to reimbursement to applicant, (7) that fees and expenses for Mr. Bianchi were not reimbursable under this application, (8) that, under current regulations, expert witness fees are limited to $33.53 per hour plus travel and per diem expenses, (9) that accounting fees and expenses should be recalculated limiting professional fees to $75.00 per hour and eliminating any clerical services, such as word processing or typing which are considered office overhead expenses typically subsumed in professional hourly rates, and (10) that reasonableness of the number of accounting hours claimed should be negotiated by the parties.

When the parties were unable to resolve the quantum by negotiation, they submitted extensive briefs and documentation setting forth the specific amounts and items upon which they were unable to agree. Following the settlement conference, applicant made another submission in which it made additional adjustments to reflect matters raised by the Government. Applicant's revised claim is $925,441.83, reduced from its original claim of $1,998,720.15 prior to our opinion on entitlement. We shall only discuss those items still in dispute between the parties.

<u>Allocation and Reasonableness of Legal Fees</u>

The major area of dispute between the parties concerns the allocation of the fees and expenses among the various matters involved in these appeals. As recited in our prior opinion, only five of the numerous issues before the Board in these appeals were the subject of a hearing and the appeals were settled, reserving several matters, prior to issuance of a formal decision on the litigated issues. One reservation was:

> c. [T]his settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act to recover whatever legal fees and litigation expenses to which he may be entitled in connection with these claims and appeals. The Parties stipulate that the issues of prevailing party and substantial justification will be decided on the basis of the record made at the first trial.

The parties are not in agreement as to the impact of this reservation on allocation of allowable fees and litigation expenses. The Government's position is that allocation should be based solely on our determinations of prevailing party and substantial justification on the litigated issues without any consideration of the issues which were not tried but which were part of the settlement. Therefore, it proposes that the allocation should be on some objective basis such as the ratio of proposed findings of fact in applicant's post-hearing brief for issues in which we concluded the Government's position was substantially justified or applicant was not the prevailing party (80 percent) or the ratio of the number of exhibits introduced into evidence at the hearing using the same approach (which calculates to approximately 74 per cent).

Applicant maintains that this was not the intent of the parties in entering into the reservation set forth above and that the allocation must take into consideration all issues which were included in the settlement and the various stages at which the fees and expenses were incurred. Neither of the present Government counsel participated in the actual settlement of these appeals on the merits or in the drafting of the settlement agreement or release language set forth above. We conclude that the Government's proposal for an allocation on either basis set forth above or some similar basis is too mechanical for the resolution of this issue. It also fails to recognize substantial Government claims totalling over $2,500,000 (for excess costs of reprocurement, recovery of alleged unliquidated progress payments, costs of unreturned Government furnished material, and reduction in price for delivery of substandard items) which were not pursued by the Government as a result of the settlement of these appeals. We, therefore, conclude that recovery of fees and expenses is not to be based solely on our determinations concerning the litigated issues.

Nor can we agree with the Government that the applicant has failed to properly itemize or segregate its application on the basis of the various issues or that the amounts charged are unreasonable. This is not a situation where the applicant has presented us with unsupported figures. The application is supported with in excess of a file drawer of data, including detailed, itemized statements from each of the law firms and experts involved in these appeals. To require the depth of detail demanded by the Government would require that an entire new accounting system be developed for any appeal which would potentially have an application filed under the Equal Access to Justice Act and, in our view, would go far beyond the types of detail necessary for us to reach a jury verdict. We recognize that the most difficult types of allocation involve situations where the parties have settled their disputes, but that does not preclude recovery under the Equal Access to Justice Act.

In our decision on the merits of this application, we indicated that the claims involved in the underlying appeals were intertwined and difficult of segregation. By the same token, we cannot use any of the mechanistic approaches suggested by the Government in allocating legal fees and expenses. Nor were many of the legal fees and expenses incurred capable of the type of billing segregation which the Government argues should have been maintained. Applicant, recognizing that some allocation must be made, has suggested the total amount it seeks in this application be reduced by $100,000. There is no rationale or basis for using this amount to reach a jury verdict and we decline to do so.

The problems involved in allocating between the fees and expenses which are recoverable under EAJA is the reason that the parties were urged to negotiate a settlement based on our entitlement opinion. Their failure to do so will not preclude this Board from reaching a jury verdict since the detailed and carefully prepared submittals by the applicant do give us a basis for reaching such a verdict.

Analysis of the services of each of the three law firms which represented the applicant up to and including the final briefings of quantum under this application makes it possible to reach a jury verdict for that portion of the legal fees and expenses which we conclude are recoverable under this application. Applicant's first legal counsel, Paul, Gordon & Friedland, was involved in early stages of the appeals. This included the initial discovery, including depositions, and the designation of issues which the parties considered the major areas of dispute. As previously noted, it was anticipated at the time of such designation that, if those issues were resolved, the parties would probably be able to negotiate settlements as to the remainder. A great amount of time was spent reviewing documentary evidence - a necessary exercise before one could even begin to determine to which issue or issues particular evidence pertained. This discovery was not limited to the issues which did go to hearing but encompassed all of the issues, including the Government claims of $2.5 million. We estimate that about half of this firm's efforts pertained to matters as to which appellant was the prevailing party and the Government's position was not substantially justified. Therefore, we conclude that appellant is entitled to recover 50 per cent of allowable legal fees for the services of Paul, Gordon & Friedland.

That firm was replaced prior to the oral hearing of the litigated issues by the legal firm of Rogers and Wells. At its request, an additional issue was added and it prepared, tried and briefed the litigated issues and attempted to negotiate a settlement before and after post-hearing conferences concerning probable outcome of the litigated issues. Since most of its efforts concerned the issues for which we have reached conclusions as to who was the prevailing party and for which the Government's position was or was not substantially justified, we conclude that - based on our earlier decision as to prevailing party and substantial justification - 30 per cent of the allowable legal fees of Rogers & Wells are recoverable under this application.

Applicant was then represented by McKenna, Conner & Cuneo, who became involved after unsuccessful settlement negotiations by the parties after hearing, briefing and post-hearing negotiations. They were involved in settlement negotiations with and without the presiding judge, preparation for trial of all remaining issues, including quantum, ultimate settlement of the appeals and preparation and presentation of the application for legal fees and litigation expenses for these appeals. The applicant argues that all of the efforts of McKenna, Conner & Cuneo were after litigation and briefing and were directed toward preparation for hearing of the remaining issues and of quantum and the fees and expenses involved in this application. However, recovery can be had only for that portion of the fees and expenses involved in this application in which applicant is considered the prevailing party and the Government's position was not substantially justified. It is for this reason that we do not agree with applicant's segregation of expenses into those incurred before 30 June 1986 (the date of the last submittal of proposed findings of fact following the oral hearing

on a portion of the issues involved in the appeals) and those incurred after that date or that all time in compiling and submitting the EAJA claim is recoverable. We conclude - again based on our estimate of what work pertained to matters as to which appellant was the prevailing party and the Government's position was not substantially justified - that the applicant is entitled to recover 75 per cent of the allowable legal fees of McKenna, Conner & Cuneo.

In summary, we have reached the following conclusions regarding the percentage of allowable fees which should be recovered by applicant:

| | |
|---|---|
| Paul, Gordon & Friedland | 50% |
| Rogers & Wells | 30% |
| McKenna, Conner & Cuneo | 75% |

The Government further argues that applicant's fees are unreasonable since they include additional hours generated because of two changes in counsel by applicant and because of unnecessary depositions taken by appellant. The hours are challenged in the abstract. No specific number of hours are designated. Because of the number of appeals and the complexity of issues presented, we conclude that the number and length of depositions was not unreasonable. To the extent that there might have been additional billable hours caused by change in counsel, they have been included in the jury verdict percentages set forth above. The Government also challenges estimated legal and accounting fees for additional services anticipated as a result of this opinion. The application includes five hours for such legal and six hours for such accounting fees. Since the applicant again changed its counsel after closing of the record for this application, we have allowed one hour for a telephone conference call between counsel and the presiding judge on this matter on 12 July 1990, and have reduced the total fees for McKenna, Conner & Cuneo by four hours ($300.00), resulting in claimed legal fees of $160,598 for that firm.

The hours claimed have been adjusted by applicant to reflect the other amounts which the Government has challenged. We see no need to set them forth here since they are clearly delineated in the schedules attached to applicant's submittal of 3 May 1990. Total legal fees, therefore, are as follows:

| | | |
|---|---|---|
| Paul, Gordon & Friedland | $190,725.00 x 50% = | $95,362.50 |
| Rogers & Wells | 174,412.50 x 30% = | 52,323.75 |
| McKenna, Conner & Cuneo | 160,598.00 x 75% = | 120,448.50 |
| | TOTAL | $268,134.75 |

Expenses

Applicant has conceded certain adjustments made in expenses which it claims. Applying these adjustments and allocating the expenses on the same basis that legal fees have been allocated, we conclude applicant is entitled to recover expenses as follows:

| | | |
|---|---|---|
| Paul, Gordon & Friedland | $50,538.31 x 50% = | $25,269.16 |
| Rogers & Wells | 90,266.96 x 30% = | 27,080.09 |
| McKenna, Conner & Cuneo | 13,584.00 x 75% = | 13,938.00 |
| | TOTAL | $66,287.25 |

Paralegal Expenses

The application contains paralegal fees billed by Paul, Gordon & Friedland and by McKenna, Conner & Cuneo. No paralegal fees were billed by Rogers & Wells. The paralegal engaged by Paul, Gordon & Friedland, was an independent contractor who was paid $25 per hour by the firm and the Government does not challenge that the amount claimed of $32,540 represents paralegal costs to that firm.

Paralegal fees for McKenna, Conner & Cuneo were billed at $75 par hour. Recognizing the limitation to recovery under EAJA for cost to the law firm for its paralegals by this and other Boards, in its initial application, paralegal fees for 689.5 hours were included at a rate of $48 per hours for a total of $33,321.70. In its 15 March 1990 submittal (after our decision on entitlement) the Government challenged this hourly rate and argues that the hourly rate should be based on the annual salary paid the paralegal ($26,600) plus pension contribution, FICA and bonus ($6,650) divided by annual working hours of 2080. This calculates to $16 per hour. The Government, therefore, argues that the allowable amount should be $11,032 rather than the amount claimed by applicant. We do not agree with the applicant that the Government's challenge of the hourly rate was untimely.

The difference results from inclusion of indirect costs in the hourly rate computed based on the method of allocating indirect costs and by basing the hourly rate on 1300 billable hours per paralegal per year used for accounting and budgeting purposes by the McKenna, Conner & Cuneo, East Coast Practice Group. The Government argues that these expenses should be subsumed in the legal fees not as part of paralegal costs. We conclude that it is appropriate to include indirect costs as part of the cost to the law firm of its paralegals since they generate indirect costs for the firm. Nor do we consider the method of allocation of these indirect costs unreasonable.

We see no necessity to recite in detail the method by which the indirect costs were determined (App.'s Suppl. Brief in Support of Its Application for Fees Pursuant to the EAJA, 16 Feb. 1990, Exh. 3). The indirect costs applied in this instance are less than half of the total figure included in the claim for the hourly paralegal rate. The Government has not disputed the underlying figures or method of computation and we conclude that they appear reasonable. By the same token, the utilization of 1300 hours per

year rather than 2000 is acceptable to us. The amount of unbillable time during the year becomes part of overhead for an employee and is an appropriate part of the cost to the firm for the paralegal's services. We, therefore, hold that applicant is entitled to reimbursement under EAJA for the proportionate amount of paralegal hours which we have concluded should be allowed for services of the particular law firm involved.

| | | |
|---|---|---|
| Paul, Gordon & Friedland | $32,540.00 x 50% = | $16,270.00 |
| McKenna, Conner & Cuneo | 33,321.70 x 75% = | 24,991.28 |
| | TOTAL | $41,261.28 |

Accounting Expenses

Applicant includes accounting fees and expenses from three sources in its claim. The charges have been adjusted to reflect the limitation of $75 per hour maximum allowable fees and to eliminate any duplication of charges where listed both directly and included in the invoices of various legal firms, as follows:

| | | |
|---|---|---|
| Gene G. Burnhurst, Accountant | 1,366.00 hrs(1982-84) | $15,160.00 |
| H.K. Grimshaw | | |
| 1983 | unk. hrs | 356.00 |
| 1987 | unk. hrs | 275.00 |
| Peter Elliott Accountancy Corp. | | |
| 1983 | 145.20 hrs | 8,894.00 |
| 1984 | 305.00 hrs | 18,368.03 |
| 1985 | 109.75 hrs | 7,628.15 |
| 1986 | 25.25 hrs | 1,872.75 |
| 1987 | 156.50 hrs | 12,839.16 |
| 1988 | 276.50 hrs | 22,131.59 |
| 1989-90 | 307.25 hrs | 18,640.70 |

The Government has challenged some of the expenses of the Peter Elliott Accountancy Corp., most especially invoices dated 5, 18 and 24 April 1990. Each of these invoices is attached to applicant's submittal of 3 May 1990 and indicates it was related to updating the EAJA claim or was related to attending the settlement conference at this Board. The Government also argues that Mr. Elliott's presence was not required at the settlement conference so that all fees and expenses related to his attending that conference should be disallowed as unreasonable. We do not agree. The conference was an attempt to negotiate the quantum to be paid under EAJA based on the Board's entitlement decision since the parties had been unable to resolve the matter. While it was unsuccessful, the presence of the accountant who prepared the detailed schedules which were the basis for the quantum was both understandable and reasonable. The Government also challenges that 17 hours were spent revising the EAJA claim for final submission on the theory that it was prepared using a "lotus" type spreadsheet software program which the Government argues a clerk could have modified in two or three hours. We do not consider this argument by counsel in his letter of 16 May 1990 a sufficient basis for holding the charge unreasonable. The claim summary comprised 22 printed pages of spread sheets with a number of changes on a line by line basis to adjust for corrections

and limitations on hourly rates. Corrections consisted of more than the mechanical correction of spread sheets. Someone had to review and note the corrections as well as review the corrected schedules. The Government also challenges the previously noted six hours which are included in the submittal as a charge for Peter Elliott Accountancy Corp. for review and finalization of the quantum portion of this application after this opinion issues. We have no authority to allow recovery for expenses which may be incurred in the future and have eliminated them from the claim, thereby reducing the 1989-90 Peter Elliott Accountancy Copp. fees from $18,640.70 to $18,190.70. We, therefore, conclude that the amounts incurred for accounting services were reasonable and, in the nature of a jury verdict, allowable in accordance with the percentages allocated for legal services for the similar time frames, as follows:

| | | |
|---|---|---|
| Gene G. Burnhurst, Accountant | $15,160.00 @ 50% | $ 7,580.00 |
| H.K. Grimshaw | | |
| 1983 | 356.00 @ 50% | 178.00 |
| 1987 | 275.00 @ 75% | 206.25 |
| Peter Elliott Accountancy Corp. | | |
| 1983 | 8,894.00 @ 50% | 4,447.00 |
| 1984 | 18,368.03 @ 50% | 9,184.02 |
| 1985 | 7,628.15 @ 30% | 2,288.45 |
| 1986 | 1,872.75 @ 30% | 561.83 |
| 1987 | 12,839.16 @ 75% | 9,629.37 |
| 1988 | 22,131.59 @ 75% | 16,598.69 |
| 1989-90 | 18,190.70 @ 75% | 13,643.03 |
| | TOTAL | $64,316.64 |

Expert Witness Fees and Expenses

In our entitlement opinion on this application we concluded that, pursuant to EAJA 5 U.S.C. § 504(b)(1)(A) and BFARs 37.104-70(1), compensation of expert witnesses could not exceed the highest rate for grade GS-15, which, as of 1987, was $33.53 per hour. Applicant argues that this rate should be modified by reducing the number of annual hours in the divisor to 1552 hours (instead of the 2087 used) by elimination of vacation time, holidays, sick leave, and an "efficiency quotient" and then increasing the result for indirect expenses and support. This results in an hourly fee of $75, which amount it has used in its revised claim. Applicant paid its experts, and the Government expert whom it deposed, at varying amounts between $100 and $130 per hour. The Government argues that the amount should be limited to the $33.53 hourly rate cited in our prior opinion.

The relevant portion of the statute provides:

> (A) "fees and other expenses" includes the reasonable expenses of expert witnesses....except that (1) no expert witnesses shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the agency involved....[emphasis added]

After issuance of our opinion on entitlement, the Government admitted that it paid the expert it had contracted to use in the oral hearing on the remaining issues and on quantum in these appeals, at an hourly rate in excess of the $75 hourly rate included by applicant in its revised claim. (The presumption that the Government's payment of its expert was proper and appropriate has not been rebutted.) */ We, therefore, modify our prior opinion and conclude that, pursuant to the statute set forth above, the amount of $75 per hour claimed by applicant is allowable since it does not exceed "the highest rate of compensation for expert witnesses paid by the agency involved."

Applying the percentages which we have concluded should be utilized on the basis of the type of activities involved in the various time frames, we conclude that applicant is entitled to recover for fees and expenses of expert witness as follows:

| | | |
|---|---|---|
| Pollack & Pollack, Inc. | $ 6,839.02 @ 75% | $ 5,129.27 |
| Magnal Limited | 59,840.64 @ 50% | 29,920.32 |
| Dole & Associates | 900.00 @ 75% | 675.00 |
| | TOTAL | $35,724.59 |

Other Expenses

In addition to its claim for reimbursement of expenses incurred in deposing the Government expert (set forth above under "Dole & Associates"), applicant claims $84 for Pamela Gerkin. That invoice indicates 7 hours spent for "legal billing analysis." While not specifically challenged by the Government, we do not consider this amount sufficiently identified as to be allowable under this EAJA application.

Summary

In summary, we conclude that allowable attorneys' fees and expenses under this EAJA application are as follows:

| | |
|---|---|
| Legal Fees | $268,134.75 |
| Legal Expenses | 66,287.25 |
| Paralegal Expenses | 41,261.28 |
| Accounting Expenses | 64,316.64 |
| Expert Witness Expenses | 35,724.59 |
| TOTAL | $475,724.51 |

*/ The Government was ordered to submit a copy of the contract with its expert or an affidavit indicating the hourly rate paid its expert. It has failed to do so. Appellant paid the expert $100 per hour for his deposition.

Dated: 23 September 1990

RUTH C. BURG
Administrative Judge
Member of the Armed Services
Board of Contract Appeals

I concur

WILLIAM J. RUBERRY
Administrative Judge
Acting Chairman, Armed Services
Board of Contract Appeals

I concur

JOHN RIISMANDEL
Administrative Judge
Vice Chairman, Armed Services
Board of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals on an application for fees and other expenses incurred in connection with ASBCA No. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933 and 29934, Application of M. Bianchi of California, rendered in accordance with 5 U.S.C.A. § 504.

Dated: 25 SEP 1990

for EDWARD S. ADAMKEWICZ
Recorder, Armed Services
Board of Contract Appeals



E-8-020

# EXHIBIT "7"

*Maurice L. Bianchi*
*1608 Marathon Drive*
*Las Vegas, Nevada 89108*
*(702) 646-7977*

April 4, 1994

Telefax (215) 737-5913

Thomas Hornak, Esq.
Chief Trial Attorney
Defense Logistics Agency
Defense Contract Administration
Service Region, Philadelphia
2800 S. 20th Street
Philadelphia, PA 19101-8419

Dear Mr. Hornak:

Please refer to my letter dated March 23, 1994. I have given you more than ample time to find out if you had a legal right to hold up the two awards that you are holding up. EAJA award under ASBCA Numbers 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934 for $475,724.51 plus interest and, Case No. 93-1402 8680/36518 for $58,613.03 plus interest.

I am extending the time to April 4, 1994 close of business in Philadelphia, PA time before I turn this over to my attorneys for processing.

Please respond via Telefax to (702) 597-1843. A non response will be considered your position to withhold payment without authority.

Regards

*Maurice L. Bianchi*

Maurice L. Bianchi

...i Arabia Office
...ox 59446
...i Bldg. 6th Floor
...a, Saudi Arabia 11525
...hone/Facsimile (966-1) 405-1291

THE BRAWNER BUILDING
888 SEVENTEENTH STREET, N.W.
SUITE 500
WASHINGTON, D.C. 20006
(202) 293-2993
(202) 331-7916 FAX

United Arab Emirates Offic...
P.O. Box 4390...
Abu Dhabi, U.A.E...
(971-2) 78722...
Fax (971-2) 7840...

May 13, 1998

Commanding Officer
Defense Personnel Support Center
2800 South 20th Street
Philadelphia, PA 19145-5099

Re: M. Bianchi v. Wm J Perry, Sec'y of Defense, et. al.
US Court of Appeals, Ninth Circuit, CV-94-00686-HDM

Dear Sir:

The April 9, 1998 decision of the US Court of Appeals for the Ninth Circuit in the above case removes any impediment to the payment of the EAJA award in the amount of $475,724.51 made to M. Bianchi by the Armed Services Board of Contract Appeals on September 25, 1990 (see 91-1 BCA ¶ 23,445).. This is to request that your agency initiate the processing of the payment action as required by law.

Mr Bianchi has designated me to represent him in connection with any issues concerning the payment of the Equal Access to Justice judgment in his favor. In this connection your attention is invited to the provisions of 31 USC 3728(c) regarding the allowance of interest on the amount withheld. Mr. Bianchi asks that the check be mailed to him at the following address: Maurice L. Bianchi, 1608 Marathon Drive, Las Vegas, NV 89108.

Please do not hesitate to contact me if there are any questions regarding this matter.

Very truly yours,

Gerson B Kramer

Gerson B. Kramer

Cc: M. Bianchi

BRAUDE & MARGULIES, P.C.
THE BRAWNER BUILDING
888 SEVENTEENTH STREET, N.W.
SUITE 500
WASHINGTON, D.C. 20006

(202) 298-2993
(202) 331-7916 FAX

idi Arabia Office
Box 59446
Bldg. 6th Floor
.., Saudi Arabia 11525
Telephone/Facsimile (966-1) 405-1291

United Arab Emirates Office
P.O. Box 43908
Abu Dhabi, U.A.E.
(971-2) 787222
Fax (971-2) 784001

September 4, 1998

By Fax 614/693-0898 & United States Mail
Defense Finance & Accounting Office
PO Box ~~102267~~ 182317
Columbus, OH 43218-~~2267~~ 2317
Attn: John Graham, DFAS-CO/L

Corrected numbers by Mr. Graham's secy.

Re: Check No. 6551-64448225 in amount $475,724.51 for Maurice Bianchi.

Dear Mr. Graham:

At the suggestion of Wm. G. Arnold, Disbursing Officer, I am writing to you to express Mr. Bianchi's concerns regarding the above check and accompanying voucher information. The above check represents an amount awarded to Mr. Bianchi by the Armed Services Board of Contract Appeals under the Equal Access to Justice Act (EAJA) on September 25, 1990. The Board's decision is published at 91-3 BCA ¶ 23,445. This judgment in Mr. Bianchi's favor was not paid in 1990 because the Government initiated litigation against Mr. Bianchi to assert a right of offset to its payment. The matter became the subject of two decisions by the United States Courts of Appeals for the Federal Circuit and the Ninth Circuit, both of which found against the Government's right of offset. These decisions are published in Bank of America v. United States, Maurice L. Bianchi, third-party, 23 F3d 380 (Fed Cir, 1994) and Bianchi v. Perry, 140 F3d 1294 (9th Cir, 1998).

It is Mr. Bianchi's contention and demand that interest is due and owing for the period in which the Government withheld the payment of the EAJA award he received in 1980. His contention is based upon the provisions of the Federal Setoff Statute, 31 USC § 3728 and more specifically 31 USC § 3728(c).

The voucher which accompanies the check that Mr. Bianchi received this week in no way represents the reasons or the facts applicable to the payment. Neither does it recognize Mr. Bianchi's claim for interest. We note that the voucher characterizes the payment as an "Attorney fee settlement", but Mr. Bianchi has not participated in any such settlement on this matter. The fees were allowed by decision and judgment of the Armed Services Board. Further, the voucher uses a form for Purchases and Services other than Personal, and goes on to state that on 8/18/98 a delivery or service was performed. This hardly seems to be an accurate characterization of the reason or basis for the payment.

It is noted that the voucher indicates that the check represents a partial payment. Mr. Bianchi agrees with this description inasmuch it bears out his contention that there remains due and owing to him on the matter an interest allowance under the terms of 31 USC § 3728(c).

For the reasons given above, it would be appreciated if you would furnish Mr. Bianchi with payment documentation that accurately represents the facts of his claim and recognizes his rights with respect to an interest allowance. Mr. Bianchi believes it is necessary that the documentation be accurate inasmuch as further litigation may be necessary to establish his right to an interest allowance if the matter can not be resolved administratively.

Enclosed please find copies of the documents discussed herein. An information copy is being furnished to Mr. Wm. G. Arnold, fax no. 614/693-6530.

Very truly yours,

Gerson B. Kramer,
Attorney for Maurice L. Bianchi.

cc: ML Bianchi

LAW OFFICES
BRAUDE & MARGULIES, P.C.
THE BRAWNER BUILDING
888 SEVENTEENTH STREET, N.W.
SUITE 600
WASHINGTON, D.C. 20006

(202) 298-2993
(202) 331-7916 FAX

..i Arabia Office
. Box 59446
..uzha Bldg. 6th Floor
Riyadh, Saudi Arabia 11525
Telephone/Facsimile (966-1) 405-1291

United Arab Emirates Office
P.O. Box 43906
Abu Dhabi, U.A.E.
(971-2) 787222
Fax (971-2) 784001

September 9, 1998

Via Fax 215/737-5913 & U.S. Mail
Katherine Hallam, Esq.
Chief Trial Attorney (DSCP-GA)
Defense Supply Center Philadelphia
2800 South 20th Street
Philadelphia, PA 19145-5099

Re: M. Bianchi v. Wm J Perry, Sec'y of Defense, et al.

Dear Ms Hallam:

Last week Mr. Bianchi received his EAJA check, together with accompanying voucher documents.

The check in the amount of $ 475,724.51 represents the EAJA award made to him by the ASBCA in 1990.

The accompanying voucher documents, however, are clearly not correct representations of the circumstances of the present matter. Neither is there any recognition given to the fact that Mr. Bianchi, through my correspondence with you and with the Justice Department, has claimed that interest is due him under the Federal Setoff Statute, 31 USC § 3728(c) for the eight year period when the the government withheld payment of the ASBCA's judgment.

In case there is any doubt about the matter please accept this letter as Mr. Bianchi's demand for a decision from DPSC or its successor, recognizing his claim for an interest allowance under 31 USC § 3728(c) and a statement of reasons, if any, as why DPSC or DSCP believes such is not due.

For your information I enclose a copy of my letter to Mr. John Graham of DFAS, which describes in detail Mr. Bianchi's objections to the documentation received.

Very truly yours,

Gerson B. Kramer

Gerson B. Kramer

# EXHIBIT "8"

ENTERED AND SERVED
MAR - 7 1996
U.S. DISTRICT COURT
DISTRICT OF NEVADA

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

MAR 5 8 51 AM '96

MAURICE BIANCHI idba M. BIANCHI OF CALIFORNIA,

Plaintiff(s),

vs.

WILLIAM J. PERRY, Secretary of Defense, et al.,

Defendant(s).

CV-S-94-0686-HDM(RJJ)

MINUTES OF THE COURT

March 1, 1996

PRESENT: HONORABLE HOWARD D. McKIBBEN, U.S. DISTRICT JUDGE

Deputy Clerk: Bette Stewart Reporter/Recorder: Kathryn French

Counsel for Plaintiff(s): Scott M. Cantor & George E. Graziadei

Counsel for Defendant(s): Mark A. Melnick

PROCEEDINGS: Telephonic Hearing on:
Defendants' Renewed Motion for Summary Judgment (#44) and Plaintiff's Motion for Summary Judgment (#47)

8:00 a.m. Court convenes.

The parties agree that this action should be resolved by summary judgment.

Arguments are presented.

Recess: 8:15 a.m. - 8:25 a.m. All present.

The court sets forth the findings and conclusions on the record.

IT IS ORDERED that Defendants' Renewed Motion for Summary Judgment (#44) is granted.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment (#47) is denied.

8:45 a.m. Court adjourns.

LANCE S. WILSON, CLERK

By: [signature]
Deputy Clerk

55

ENTERED AND SERVED

MAR - 1 1996

U.S. DISTRICT COURT DISTRICT OF NEVADA

BY ______ DEPUTY

RECEIVED

MAR 8 8 51 AM '96

AO 450 (Rev. 5/85) Judgment in a Civil Case

# UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

## JUDGMENT IN A CIVIL CASE

MAURICE BIANCHI fdba
M. BIANCHI OF CALIFORNIA

CASE NUMBER: CV-S-94-686-HDM(RJJ)

V.

WILLIAM J. PERRY, Secretary
of Defense, et al.

__ **Jury verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered it's verdict.

X **Decision by court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

__ **Decision by court.** This action came to be considered before the Court. The issues have been considered and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that Defendants' Renewed Motion for Summary Judgment is granted. Summary judgment is entered in favor of the defendants and against the plaintiff.

March 1, 1996
Date

LANCE S. WILSON
Clerk

Bette Stewart
(By) Deputy Clerk

53

# EXHIBIT "9"

**H**

United States Court of Appeals,
Ninth Circuit.

**Maurice BIANCHI, fdba M. Bianchi of California, Plaintiff-Appellant,**
**v.**
**William J. PERRY, Secretary of Defense; United States Department of Defense; E.M. Straw, Vice Admiral, Director of the Defense Logistics Agency; The Defense Logistics Agency; Henry R. Glisson, Brigadier General, Commander of the Defense Personnel Support Center, a Division of the Defense Logistics Agency; The Defense Personnel Support Center, Defendants-Appellees.**

**No. 96-15869.**

Argued and Submitted May 7, 1997.
Decided April 9, 1998.

Government contractor brought action to collect fees and expenses he was awarded under Equal Access to Justice Act (EAJA) in accordance with settlement agreement with government. The United States District Court for the District of Nevada, Howard D. McKibben, J., granted summary judgment for government. Contractor appealed. The Court of Appeals, Kleinfeld, Circuit Judge, held that: (1) lack of parallelism in paragraphs in settlement agreement did not establish parties' intent that contractor would take settlement amount free from setoff, but not EAJA award, and (2) prior appellate decision that government lacked setoff right as to settlement amount and interest had res judicata effect as to government's setoff rights against contractor's EAJA award.

Reversed.

West Headnotes

**[1] Compromise and Settlement ⚷11**
89k11 Most Cited Cases

Lack of parallelism in paragraphs in settlement agreement between government and contractor regarding amounts to which contractor was entitled, amounts he could pursue under value engineering change proposal claims, and attorney fees and costs he could pursue under Equal Access to Justice Act (EAJA) did not establish parties' intent that contractor would take settlement amount free from setoff, but not EAJA award; in context of agreement, contractor's right to "pursue" award meant government would pay award once it was established. 28 U.S.C.A. § 2412.

**[2] Judgment ⚷720**
228k720 Most Cited Cases

Prior appellate decision that government lacked right to setoff against settlement and interest owed to contractor under settlement agreement, based on contractor's assignment to his bank and bank's assignment to Small Business Administration (SBA), had res judicata effect as to government's setoff rights with respect to attorney fees awarded to contractor pursuant to Equal Access to Justice Act (EAJA), which contractor retained right to pursue under settlement agreement. 28 U.S.C.A. § 2412; Restatement of Restitution § 12.

***1294** George E. Graziadei (On the Briefs); and Scott Michael Cantor (Argued), Graziadei & Cantor, Ltd., Las Vegas, NV, Gerson B. Kramer (Argued), Chevy Chase, MD, for plaintiff-appellant.

Mark A. Melnick, Commercial Litigation Branch, Department of Justice, Washington, DC, for defendants-appellees.

Appeal from the United States District Court for the District of Nevada Howard D. McKibben, District Judge, Presiding. D.C. No. CV-94-00686-HDM.

Before: PREGERSON, NOONAN and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

This is a res judicata case regarding settlement of a government contract dispute.

**Facts**

The government hired Bianchi to sew garments for the military. In 1979 and 1980, it ***1295** contracted for Bianchi to make about 43,000 raincoats for the Navy, 27,000 women's jackets for the Air Force, and 125,000 men's coats. Bianchi borrowed money from Bank of America secured in part by an assignment of contract proceeds. The bank loan was guaranteed by the Small Business Administration. The bank went

through the proper steps to obtain government approval of the assignments and to make them binding upon the government.

Claims arose in all directions. Bianchi and the bank had a dispute in state court over whether the bank properly performed its duties under the loan agreement. Bianchi and the United States had a dispute in the Armed Services Board of Contract Appeals over whether the government owed him more money. Eventually the bank and the government had a dispute as well.

Bianchi's claim against the military was settled by stipulation. The stipulation, made in September 1988, provided that Bianchi would recover $617,500 plus interest, the government would recover nothing on its claims, and Bianchi reserved his rights to pursue "value engineering change proposal claims," and to pursue his Equal Access to Justice Act claim for legal fees and expenses related to his claims. [FN1] The Armed Services Board of Contract Appeals then issued a decision accepting the stipulation, and saying "the appeals are sustained" and "in the nature of a consent judgment, the Board makes a monetary award in the amount of $617,500.00 with interest from 18 June 1981." With more than seven years of interest, the government's obligation under this judgment was $1,141,220.83. The government paid Bianchi that amount of money.

FN1. Here is the stipulation in full:
The parties to the above-listed appeals agree to stipulate to the following decision by the Board:
"1. The parties agree that Mr. Maurice Bianchi, as the successor to M. Bianchi of California, is entitled to recover $617,500.00 on his claims in the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26505, 26506, 26513, 26642, 29932, 29933 and 29934; that the government is entitled to take nothing on its claims in the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933 and 29934; and that Mr. Bianchi is entitled to interest computed in accordance with Clauses L78 (Disputes (1979 MAR)) of the contracts, at the rates prescribed by the Secretary of the Treasury, under the Renegotiation Act, Public Law 92-41, on the principal amount of $617,500, such interest to run from June 19, 1981 until the date of payment; and that the parties waive their rights to seek reconsideration of this stipulated decision of the Board or to appeal that stipulated decision; "2. This settlement is without prejudice to Mr. Bianchi's right to pursue any and all Value Engineering Change Proposal Claims under his contracts with DPSC; and
"3. This settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act to recover whatever legal fees and litigation expenses to which he may be entitled in connection with these claims and appeals. The parties stipulate that the issues of prevailing party and substantial justification will be decided on the basis of the record made at the first trial. The parties agree that the application for legal fees and litigation expenses under the Equal Access to Justice Act will be submitted within thirty days of receipt by Appellant of the agreed-upon settlement program."
Except as noted above, Appellant and the government agree to stipulate to the dismissal of these appeals with prejudice.

Two years later, in 1990, Bank of America filed a complaint in the United States Claims Court against the government. The bank's complaint said that Bianchi owed the bank more than $1.1 million, so the government should have paid the money to the bank, not to Bianchi. The government's answer in the Claims Court claimed a right to setoff. The government claimed that because the Small Business Administration had already paid the bank on its 90% guarantee of Bianchi's loan, and Bianchi owed the SBA more than the amount he had been paid, the government was entitled to setoff whatever Bianchi owed the SBA against what the government owed the bank.

The government filed a third-party complaint against Bianchi in the Claims Court proceeding. In that complaint, the government said that it paid Bianchi his $1.1 million settlement in error, because he owed the Small Business Administration more than that. The complaint says "the SBA was entitled to the entire $1,141,220.83. Consequently that money was erroneously paid to Mr. Bianchi. Neither he nor the bank was entitled to it.... The government is entitled ***1296** to the repayment of the $1,141,220.83 erroneously paid by it to Mr. Bianchi."

The bank initially lost in the Claims Court. The court held that the government may recover funds erroneously paid, under *American National Bank and Trust v. United States,* 23 Cl.Ct. 542, 547 (1991) and *United States v. Wurts,* 303 U.S. 414, 415, 58 S.Ct. 637, 638, 82 L.Ed. 932 (1938). Because the government had paid Bianchi in error, Bianchi had to return the money. The bank was entitled to nothing on its assignment, because the SBA had already paid the guarantee, and the bank had assigned the notes to

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

the SBA. The Claims Court ruled that the government's erroneous payment to Bianchi had resulted from its own negligence, and it had not requested its money back until October of 1990, so interest was denied.

Bianchi appealed, and won. In a published decision, *Bank of America National Trust & Savings Association v. United States,* 23 F.3d 380 (Fed.Cir.1994), Bianchi won a determination that the government was not entitled to assert its claim against Bianchi at all. *Id.* at 384. The reason was that the government had settled on paying him $617,500 plus interest. The Federal Circuit said there is a strong policy of upholding and enforcing settlement agreements, and "the government's right to recoup erroneously paid funds cannot be invoked by the government as a means to circumvent a legal obligation." *Id.* at 383. The settlement was made at arms' length, there was no claim that Bianchi withheld material information, the government knew of the assignments to the bank and the bank's assignments to the SBA. The Federal Circuit noted that there was no evidence of any fraud, misdirection or concealment by Bianchi. "In the absence of any fraud, misdirection, or concealment, the government may not recover funds paid in good faith and to the satisfaction of the interested parties." *Id.*

The Federal Circuit pointed out that the government could easily have protected itself against liability to the bank, and perhaps did not because Bianchi would not have agreed to a settlement in which he would not receive the $617,500 plus interest. "[W]hatever the reason for its failure to protect itself, the government cannot now renege on its commitment to honor its settlement with Bianchi, into which it entered into voluntarily and with full knowledge of the facts." *Id.* The Federal Circuit considered whether the government could recover from its putatively mistaken payment by the indirect means of a third-party complaint on the bank's claim, even though the settlement had been incorporated in a final judgment, and decided that "the government should not be allowed to do indirectly what it is prohibited from doing directly." *Id.* at 384.

The bank prevailed against the government as well, based on the seniority of its claim. The Federal Circuit held that "the government's payment to Bianchi in settlement of the contract dispute was a payment under the contract that should have gone to the bank under the assignment." *Id.* at 384. The SBA contract had limited setoff rights, so that government rights against Bianchi could not be set off against the bank. *Id.* at 385.

Meanwhile, before the bank ever sued the government, Bianchi had litigated his claim for Equal Access to Justice attorney's fees and expenses before the Armed Services Board of Contract Appeals. After an opinion in 1989, and a remand for negotiation, the Board decided in a second opinion September 25, 1990, that Bianchi was entitled to $475,724.51 for legal fees and expenses. But the government did not send Bianchi the money.

Eventually, after complying with all of the demand procedures required by statutes and regulations, Bianchi filed an action in the United States District Court for the District of Nevada, to collect the $475,724.51 EAJA fees and expenses he had won in the Armed Services Board of Contract Appeals. This was money he had spent in the early '80s to make the government pay him for the raincoats and jackets. The district court granted summary judgment against Bianchi on this claim. Bianchi's appeal of this summary judgment is what we have before us now.

The district court decided that Bianchi's EAJA claim was sufficiently distinct from the claim ruled upon by the Federal Circuit, so it should be treated differently for purposes of setoff. The district court concluded that the government could use its claim for mistaken payment as a setoff against what it owed *1297 Bianchi on his successful $475,000 Equal Access to Justice Act award.

**Analysis**

The hard questions in this case relate tosetoff. When the government makes a mistaken agreement to settle a claim (if indeed the agreement or payment was mistaken), should it be allowed to recover the money by setting it off against that claim or another? We do not have to answer that question. The Federal Circuit did. Even if the settlement was negligently made, even though it was with the government, a deal is a deal. Though other questions are raised, this case finally turns on whether the Federal Circuit decision is res judicata on setoff against another part of the same deal. It is.

**I. Parole Evidence.**

The settlement with Bianchi, for $617,500 in new money, may not have been erroneous at all. Bianchi

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

submitted affidavits in opposition to summary judgment which tended to show that he and his lawyer had raised and discussed the SBA claims when they negotiated the $617,500 settlement. The affidavits indicated that the settlement was cut from $635,000 dollars to $617,500, in order to include a nominal amount satisfactory to the government to settle the SBA claims against Bianchi. In addition, the government had offered a $100,000 larger settlement that would include the Equal Access to Justice claim, or else had offered the lesser amount reserving Bianchi's right to pursue his Equal Access to Justice Act claim. Bianchi thought he would get more than $100,000, so he had turned down the $735,000 dollar offer to include EAJA fees and expenses. His $475,000 EAJA award shows he was right.

The district court held that this evidence should not be considered, under the parole evidence rule. Bianchi argues on appeal that it should be considered, because his affidavit and other materials show that the settlement stipulation was not a fully integrated agreement. Under Bianchi's theory, as evidenced by the affidavit and contemporaneous correspondence, the government's payment to him was not a mistake at all. The purpose was to pay him personally enough money to induce him to settle, and to pay that money without a silent setoff of what he owed the SBA on his defaulted and assigned bank loans.

We conclude that we do not have to decide whether the district court erred in excluding these materials under the parole evidence rule. Because the res judicata consequences of the Federal Circuit decision, combined with a fair reading of the stipulation and judgment before the Armed Services Board of Contract Appeals, are conclusive of the effect of the settlement agreement in favor of Bianchi, we need not decide whether the parole evidence should have been considered.

**II. The Settlement Agreement.**

[1] The stipulation the parties made is typical of the forms used to settle disputed claims in both directions, with specified rights reserved to allow one side to pursue additional amounts. The form is that (1) Bianchi "is entitled to recover" $617,500 plus interest, (2) "the government is entitled to take nothing on its claims," (3) the settlement is "without prejudice to" Bianchi's right to pursue "Value Engineering Change Proposal claims," and (4) the settlement is "without prejudice to" Bianchi's right to pursue an EAJA application to recover whatever fees and expenses he may be entitled to. Enormous numbers of claims are settled with similar forms every week, with the government and in innumerable private lawsuits about torts and contracts. We share the Federal Circuit's concern that "there is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into." *Bank of America,* 23 F.3d at 383.

Any honest and competent lawyer would understand this settlement agreement in the same way. It means Bianchi gets $617,500 plus interest, plus whatever he can win on his "Value Engineering Change Proposal claims," plus whatever he can win on his Equal Access to Justice Act claim. Attorney's fees claims often are broken out of a settlement, as in this one, because the parties cannot agree on what determinations a court will make on prevailing party, substantial justification, and amount, *see* 5 U.S.C. § 504, and each is willing to bear the risk of a less favorable determination than it expects.

*1298 For a lawyer to enter into such a settlement agreement, with the unstated intention that his client should not pay the money agreed to, would be sharp practice. The government argues from lack of parallelism in the phrasing of the different paragraphs of the settlement agreement that Bianchi is only entitled to the $617,500 without setoff, not the EAJA award. The settlement agreement said Bianchi "is entitled to recover" the $617,500, but only that it is "without prejudice to" his "right to pursue" his Equal Access to Justice Act claim "to recover" attorneys' fees and expenses, so it did not agree to pay the EAJA award. The government's theory is that it promised Bianchi could "recover" the $617,500, but not the EAJA award, which it only left Mr. Bianchi free to "pursue."

We reject the distinction. It is apparent from a reading of the stipulation in its entirety that the parties did not mean that the government would only pay the $617,500, but dispute payment of what Mr. Bianchi was found to be entitled to as an EAJA award. Had the government meant that, the agreement would have said so. The agreement says Bianchi is entitled "to recover" the $617,500 principal, and that he is "entitled to" interest, yet even though the agreement did not use the phrase "to recover" regarding Mr. Bianchi's entitlement to interest, neither side understood absence of the phrase to imply that he could not "recover" the interest without a setoff. The agreement does use

the phrase "to recover" in the EAJA provision, "right to pursue an application ... to recover." The phrase "to recover" is not in the Value Engineering Change proposal Claims paragraph, "right to pursue." Not a single one of the provisions is written in parallel phrasing with any other. The only plausible reading we can see for the slight differences in phrasing are lack of careful editing for parallelism, not an expressed mutual intention that even if Bianchi won an EAJA award, it would not be paid without a fight. In the context of this dispute, the word "pursue" meant that Bianchi had to win an EAJA award, but once the award was established, the government would pay it. In private actions where there is a right to attorneys' fees, lawyers frequently agree to settle for a principal amount and to allow one side to pursue an attorneys' fees award, meaning that they will pay it once entitlement to attorneys' fees and amount are determined. Were an insurance defense lawyer to enter into such a settlement agreement on behalf of an insurance company, and then claim that they only promised to allow pursuit of the money, not to pay it, the best the lawyer and insurer could hope for would be long- term distrust, and more likely they could expect bad faith litigation. Giving the settlement agreement so strained construction would encourage sharp practice. Thus we conclude that there is no difference in whether the government agreed to pay the $617,500 and whether it agreed to pay the EAJA award, once Mr. Bianchi had won a liquidated amount. The setoff issue is the same as to both. To the extent that the government had a claim against Bianchi for his unpaid SBA loans, the settlement agreement no more allowed the government to lie in the weeds with a setoff againstthe EAJA award than with the $617,500.

**III. The Federal Circuit Decision.**

[2] Although the Federal Circuit decision dealt only with the $617,500, not the EAJA award, the reason for the Federal Circuit result does not allow for a distinction between the one and the other. With respect to the EAJA attorney's fees, as with the principal and interest, the government acted with its eyes open. It had full knowledge of the assignment of Bianchi's right to payment to his bank, and of the bank's assignment to the SBA. The Federal Circuit decision establishes that there was no fraud, and the government made a commitment to pay Bianchi the money despite its potential entitlements against him. If the government mistakenly overlooked its rights (and it may not have), then its own negligent error does not entitle it to renege on its commitment. *See Restatement of Restitution* § 12 (unilateral mistake not grounds for restitution). Allowing the government to renege on its commitment because it negligently agreed to pay Bianchi more than it should have agreed to pay him "would seriously decrease the willingness of parties to settle litigation on mutually agreeable terms and thus weaken the efficacy of *1299 settlements generally." *Bank of America,* 23 F.3d at 384. Using the setoff against the attorney's fees would have exactly the same effect as allowing its use against the $617,500 or the interest, and "the government should not be allowed to do indirectly what it is prohibited from doing directly." *See id.*

Because its ratio decidendi does not allow for a distinction, we conclude that the Federal Circuit decision is res judicata. That decision established that the government was not entitled to a setoff against the $617,500 or the interest based on Bianchi's assignment to his bank and the bank's assignment to the SBA. The reasoning of the decision establishes that the assignments could not entitle the government to a setoff against the settlement at all. The meaning of that agreement, with respect to setoff, has already been conclusively determined by the Federal Circuit. *See Robi v. Five Platters, Inc.,* 838 F.2d 318, 321-22 (9th Cir.1988).

**Conclusion**

Although Bianchi's parole evidence suggests that the government intentionally relinquished whatever right it had to collect the SBA loan from the proceeds of Bianchi's award, we have assumed the contrary, because we are not deciding the parole evidence issue. Thus, we assume that the government negligently omitted to provide in the settlement agreement that it would set off its SBA entitlement against Bianchi's contract entitlement. Even so, it is nevertheless res judicata under the Federal Circuit decision that the government walked away from the money. We will not impose a strained reading on the settlement agreement that would enable the government to recover from its own negligence by sharp practice.

REVERSED.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

# EXHIBIT "10"

LAW OFFICES
BRAUDE & MARGULIES, P.C.
THE BRAWNER BUILDING
888 SEVENTEENTH STREET, N.W.
SUITE 500
WASHINGTON, D.C. 20006
(202) 293-2993
(202) 331-7916 FAX

[Saud]i Arabia Office
[P.O.] Box 59446
[A]uzha Bldg. 6th Floor
Riyadh, Saudi Arabia 11525
Telephone/Facsimile (966-1) 405-1291

United Arab Emirates Office
P.O. Box 43905
Abu Dhabi, U.A.E.
(971-2) 787222
Fax (971-2) 784001

September 9, 1998

Via Fax 215/737-5913 & U.S. Mail
Katherine Hallam, Esq.
Chief Trial Attorney (DSCP-GA)
Defense Supply Center Philadelphia
2800 South 20th Street
Philadelphia, PA 19145-5099

Re: M. Bianchi v. Wm J Perry, Sec'y of Defense, et al.

Dear Ms Hallam:

Last week Mr. Bianchi received his EAJA check, together with accompanying voucher documents.

The check in the amount of $ 475,724.51 represents the EAJA award made to him by the ASBCA in 1990.

The accompanying voucher documents, however, are clearly not correct representations of the circumstances of the present matter. Neither is there any recognition given to the fact that Mr. Bianchi, through my correspondence with you and with the Justice Department, has claimed that interest is due him under the Federal Setoff Statute, 31 USC § 3728(c) for the eight year period when the the government withheld payment of the ASBCA's judgment.

In case there is any doubt about the matter please accept this letter as Mr. Bianchi's demand for a decision from DPSC or its successor, recognizing his claim for an interest allowance under 31 USC § 3728(c) and a statement of reasons, if any, as why DPSC or DSCP believes such is not due.

For your information I enclose a copy of my letter to Mr. John Graham of DFAS, which describes in detail Mr. Bianchi's objections to the documentation received.

Very truly yours,

Gerson B. Kramer

United States Treasury 15-51/000

6551-64448225

Check No.

COLUMBUS CENTER

294366

3225 08/28/98

************FOUR-SEVEN--FIVE SEVEN---TWO--FOUR DOLLARS 51 CENTS

****** $475,724.51

Pay to the order of

MARURICE BIANCHI
1606 MARATHON DRIVE
LAS VEGAS NV 89108

VOID AFTER ONE YEAR

⑈65516⑈ ⑆000000518⑆ 64448225⑈

EXHIBIT "1"

# EXHIBIT "11"

NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED
MAY 24 1999
CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| MAURICE BIANCHI, fdba M. Bianchi of California, Plaintiff-Appellant, v. WILLIAM J. PERRY, Secretary of Defense; UNITED STATES DEPARTMENT OF DEFENSE; E. M. STRAW, Vice Admiral, Director of the Defense Logistics Agency; THE DEFENSE LOGISTICS AGENCY; HENRY R. GLISSON, Brigadier General, Commander of the Defense Personnel Support Center, a Division of the Defense Logistics Agency; THE DEFENSE PERSONNEL SUPPORT CENTER, Defendants-Appellees. | No. 96-15869<br>D.C. No. CV-94-00686-HDM<br><br>ORDER |

Before: PREGERSON, NOONAN and KLEINFELD, Circuit Judges.

Appellant Bianchi's application for fees and expenses under the Equal Access to Justice Act is GRANTED, in the amount of $67,961.24. The clerk is directed to enter judgment for that amount. His argument for additional amounts, though not without some basis, is rejected. Appellee's arguments for reductions

are rejected. Appellee's motion for leave to file a surreply is granted, and the surreply has been considered.

# EXHIBIT "12"

ARMED SERVICES BOARD OF CONTRACT APPEALS
SKYLINE SIX
5109 LEESBURG PIKE
FALLS CHURCH, VA 22041-3208

Telephone: (703) 756-8502

11 February 1993

RECEIVED
FEB , 3 1993

CERTIFIED MAIL
RECEIPT REQUESTED

Michael A. Hordell, Esq.
Laurel A. Heneghan, Esq.
Petrillo & Hordell
915 15th Street, N.W.
Seventh Floor
Washington, DC 20005

Counsel
Defense Personnel Support Center, DPSC-G
2800 South 20th Street
Philadelphia, PA 19101-8419
Attention: Stephanie Zimmt-Mack, Esq.
Patricia A. Papas, Esq.

Re: ASBCA No. 36518
Appeal of M. Bianchi of California
Under Contract No. DLA100-80-C-2972

Dear Counsel:

Enclosed is one authenticated copy of the Board's decision.

Very truly yours,

EDWARD S. ADAMKEWICZ
Recorder

Enclosure
as stated

RECEIVED

# CERTIFICATE OF FINALITY

ASBCA No. 36518 Appeal of M. Bianchi of California

TO BE COMPLETED BY CONTRACTOR. RETURN ORIGINAL to the Armed Services Board of Contract Appeals. (If completed by an attorney or firm representing contractor, original power of attorney must accompany this form.)

A. Address to which check should be sent:

B. Contractor Certification:

Contractor hereby certifies that:

(1) Contractor has not initiated and will not initiate any proceedings for review, reconsideration, or appeal of this award; and

(2) Contractor agrees to accept the amount awarded, plus any interest due in accordance with section 12 of the Contract Disputes Act of 1978, in full and final satisfaction of the award. Payment shall be a full discharge of the United States of all claims and demands arising out of the matters involved in the claim or controversy.

______________________________
(Typed Name and Signature)

______________________ ______________________________
(Date) (Title)

Please return within 10 days to avoid unnecessary delay in payment.

CERTIFICATE OF FINALITY

ASBCA No. 36518 Appeal of M. Bianchi of California

TO BE COMPLETED BY CONTRACTOR. RETURN ORIGINAL to the Armed Services Board of Contract Appeals. (If completed by an attorney or firm representing contractor, original power of attorney must accompany this form.)

A. Address to which check should be sent:

B. Contractor Certification:

Contractor hereby certifies that:

(1) Contractor has not initiated and will not initiate any proceedings for review, reconsideration, or appeal of this award; and

(2) Contractor agrees to accept the amount awarded, plus any interest due in accordance with section 12 of the Contract Disputes Act of 1978, in full and final satisfaction of the award. Payment shall be a full discharge of the United States of all claims and demands arising out of the matters involved in the claim or controversy.

(Typed Name and Signature)

(Date)

(Title)

Please return within 10 days to avoid unnecessary delay in payment.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| M. Bianchi of California | ) | ASBCA No. 36518 |
| Under Contract No. DLA100-80-C-2972 | ) | |

APPEARANCE(S) FOR THE APPELLANT: Michael A. Hordell, Esq.
Laurel A. Heneghan, Esq.
Petrillo & Hordell
Washington, DC

APPEARANCE(S) FOR THE GOVERNMENT: Thomas Hornak, Esq.
Chief Trial Attorney
Stephanie L. Zimmt-Mack, Esq.
Patricia A. Papas, Esq.
Trial Attorneys
Defense Personnel Support Center (DLA)
Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE BURG

The Government accepted a Value Engineering Change Proposal (VECP) submitted by appellant during performance of this contract. The parties were unable to agree either as to the per unit amount which was saved because of the VECP or the number of units to which the savings applied. When the contracting officer failed to issue a decision, appellant filed this appeal pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §605(c)(3). Appellant seeks $2,175,807.56 as instant, concurrent and future contract savings and $3,997,660.80 as collateral savings, for a total of $6,173,468.36.

FINDINGS OF FACT

1. Various findings of fact pertaining to this contract were the subject of a prior opinion of this Board on the motion for partial summary judgment filed in this appeal dated 2 March 1990 (unpublished) and in our opinion in ASBCA Nos. 37029 and 37071, 92-_ BCA ¶ ______, (decided 31 July 1992) and, to the extent to which we consider them relevant, they are adopted herein.

The Contract

2. On 23 June 1980, the Defense Personnel Support Center (DPSC) of Philadelphia, Pennsylvania, Defense Logistics Agency (DLA), awarded appellant Contract No. DLA100-80-C-2972 for the manufacture of 125,240 Man's Black All Weather Coat with removable lining at a unit price of $31.92 and a total contract price of $3,997,366.40. The coat was to be manufactured in accordance with Limited Purchase Description 12-77A (DES 12-77A), dated

1 November 1978, using patterns dated 21 September 1979 issued by the United States Army Natick Research and Development Laboratory (Natick).

3. DES 12-77A incorporated by reference a federal standard, FED-STD-751 – Stitches, Seams and Stitching. The solicitation incorporated by reference DPSC Form 3540, the DPSC Master Solicitation for Clothing and Textiles. The Master Solicitation included Clause J09, Value Engineering Incentive, January 1978, which provided (R4, tab 4 at 14-15):

J09 VALUE ENGINEERING INCENTIVE (DPSC 1978 Jan)

(a) Application. This clause applies to a Contractor developed and documented Value Engineering Change Proposal (VECP) which:

(i) requires a change to this contract to implement the VECP, and

(ii) reduces the overall costs to the cognizant Military Department without impairing essential functions or characteristics, provided that it is not based:

(A) solely on a change in deliverable end item quantities, or

(B) a change in R&D end item or test quantities due solely to results of previous testing under this contract, or

(C) solely on a change to the contract type.

(b) Documentation. As a minimum, the following information shall be submitted by the Contractor with each VECP.

(i) a description of the difference between the existing contract requirement and the proposed change, and the comparative advantages and disadvantages of each, justification when a function or characteristic of an item is being altered, and the effect of the change on the performance of the end item;

(ii) an analysis and itemization of the requirements of the contract which must be changed if the VECP is accepted and a recommendation as to how to make each change (e.g., a suggested specification revision);

(iii) a separate detailed cost estimate for both the existing contract requirement and the proposed change to provide an estimate of the reduction in costs, if any, that will result from acceptance of the VECP, taking into account the costs of development and implementation by the Contractor (including any amount attributable to subcontracts in accordance with paragraph (h) below);

(iv) a prediction of any effects the proposed change would have on collateral costs to the Military Department such as Government-furnished property costs, costs of related items, and costs of maintenance and operation.

(v) a statement of the time by which a contract modification accepting the VECP must be issued so as to obtain the maximum cost reduction, noting any effect on the contract completion time of delivery schedule, and

(vi) identification of any previous submission of the VECP, including the dates submitted, the agencies involved, the numbers of the Government contracts involved, and the previous actions by the Government, if known.

(c) Submission. VECPs shall be submitted to the Procuring Contracting Officer (PCO). When the contract is administered by other than the purchasing office, a copy of the VECP shall be submitted simultaneously to the Administrative Contracting Officer (ACO). VECPs shall be processed expeditiously, however, the Government shall not be liable for any delay in acting upon any VECP submitted pursuant to this clause. The Contractor has the right to withdraw, in whole or in part, any VECP not accepted by the Government within the period specified in the VECP.

(d) Acceptance. The Contracting Officer may accept, in whole or in part, by contract modification either before or within a reasonable time after performance has been completed under this contract any VECP submitted pursuant to this clause. Until a contract modification applies a VECP to this contract, the Contractor shall remain obligated to perform in accordance with the terms of the existing contract. Contract modifications made pursuant to this clause will so state. The decision of the Contracting Officer as to the acceptance of any VECP under this contract (<u>including the decision as to which clause is applicable to the proposal if this contract contains both a "Value Engineering Incentive" and a "Value Engineering Program Requirement" clause</u>) shall be final and shall not be subject to the "Disputes" clause of this contract.

(e) Sharing. If a VECP submitted by the Contractor pursuant to this clause is accepted, the Contractor shall share in savings realized by the Government in accordance with the following provisions:

(1) <u>Instant Contract</u>.

(i) Definitions:

(A) Instant contract savings to the Contractor (ICS) is the unit cost reduction times the number of units affected in the instant contract. The proposed unit cost reduction includes estimated allowable Contractor development and implementation costs (CC). The Contractor's development and implementation costs include any subcontractor development and implementation costs and subcontractor incentive payments (<u>see (h) below</u>). For purposes of this clause, Contractor development costs are those costs incurred after the

Contractor has identified a specific VE project and prior to acceptance by the Government.

(B) Government Costs (GC) are those DOD costs which directly result from development and implementation of the VECP, such as test and evaluation of the VECP, and any increased cost in DoD operations, maintenance, and logistics support.

* * *

(2) Concurrent Contracts.

(i) If the VECP accepted under this contract is also used on concurrent contracts of the purchasing office for essentially the same items, the Contractor shall be paid a share of any savings as calculated in (ii) below.

(ii) Calculations

(A) Determine the reduction in the price of each concurrent contract(s) as a result of incorporating the VECP.

(B) Subtract from the total amount in (A) any Government costs (GC) not yet offset (if GC was greater than ICS) in (e) (1) (ii) (C) or (D) above, and any increase in the instant contract price, i.e., if ICS was negative in (e) (1) (ii) (D), if the resulting number is positive, multiply it by 50% (25% if this is a VEPRC). Add this amount to the instant contract price.

(3) Future Contracts.

(i) Definition. The term unit cost reduction for future contract sharing shall be the unit cost reduction under this instant contract without deducting any cost of development or impletion [sic].

(ii) If the VECP accepted under this contract is used on future purchases of essentially the same item by the purchasing office, or its successor, the Contractor shall share in the savings on all affected end items scheduled for delivery not later than 3 years after acceptance of the first item incorporating the VECP, or until the originally scheduled delivery date of the last affected end item under the instant contract, whichever is later. When sharing on future contracts is expected, the Contractor shall be responsible for the following:

(A) Maintaining records adequate to support identification of the first delivered unit to which the VECP applies. These records are considered an integral part of contract documentation and shall be maintained for a period of three years after final payment on the contract under which the VECP was accepted.

(B) Annotating the DD-250, Material Inspection and Receiving Report, which applies to the initial unit covered by the VECP with the following statement:

"This is the initial unit delivered which incorporates VECP NO. ____________________, Contract Modification No. ____________________, dated ________________."

(iii) Calculations. At the time each eligible future contract is awarded:

(A) Determine the number of units scheduled to be delivered prior to expiration of the Contractor sharing period determined in (ii) above. Multiply this by the unit cost reduction as defined in (e) (3) (i).

(B) Subtract from the total amount in (A) any Government costs or instant contract increases not yet offset in (e) (1) (ii) (C) or (D), or in (e) (2) (ii) (B), or in other contracts awarded since acceptance of the VECP. If the resulting number is positive multiply it by 50% (25% if this is a VEPRC) and add the result to the instant contract price.

(f) Payment. The Contractor's concurrent and future contract shares should be paid upon modification of concurrent contracts or future contract award, or within six (6) months thereafter. However, any such payments are subject to the condition that to the extent the Government does not receive delivery of and accept all items on which the share is paid, the Contractor shall reimburse the Government the proportionate share of the payments. If this clause is modified to provide for lump sum payments, such payments shall be made upon modification of the instant contract.

4. On 24 June 1980, DES 12-77A was superseded by MIL-C-44030(GL) for Coat, All Weather, Man's Black, w/Removable Liner. The requirements of DES 12-77A were incorporated into this new specification. Appellant's contract was not required to be modified and was not modified to include MIL-C-44030 and continued to require production in accordance with the requirements of DES 12-77A.

The VECP Approval

5. On 9 September 1980, appellant submitted a VECP to modify DES 12-77A, which stated:

> Value Engineering Proposal Change recommendation to delete Operation 22C "Stitch sleeve lining to sleeve 1 inch from bottom of overedge seam of lining."
>
> Value Engineering Proposal Change recommendation; change 15-D from "Overedge stitch bottom rawedge [sic] of sleeve lining."
>
> Change to: Safety stitch sleeve lining to sleeve catching interlining.

> Result in Savings: 6¢ per coat.
>
> Changing this operation will not affect servability [sic] or appearance in any way.

(R4, tab 6)

6. By letter dated 18 September 1980, the contracting officer replied to appellant's letter as follows:

> This is to acknowledge receipt of your Value Engineering Change proposal dated 9 September 1980 submitted under contract DLA100-80-C-2972 for Raincoat, Man's, Black, LP/P DES 12-77A. Your proposal, hereinafter identified as VECP 8680, recommends overedging the bottom raw edge of the sleeve lining.
>
> To permit a proper and complete evaluation of your proposal we will require a separate detailed cost estimate for both the existing contract requirement and the proposed change to provide an estimate of the reduction in costs that will result from acceptance of your Value Engineering Change Proposal. The Value Engineering Incentive Clause (J09), copy attached, in your contract requires this information to be furnished by the proposer. This cost breakdown should also include indirect costs and percentages applied to direct labor and material costs. We request you furnish this information as soon as possible.
>
> We will promptly notify you of the results after completion of the evaluation. Your interest and participation in the Value Engineering Program is much appreciated.

(R4, tab 7)

7. Following a preliminary evaluation, the VECP was forwarded to Natick on 2 October 1980 for a decision of whether to approve this proposed change. The letter transmitting the VECP was as follows:

> SUBJECT: Value Engineering Change Proposal 8680, Raincoat, Man's Black, w/Removable Liner, LP/P DES 12-77A
>
> * * *
>
> 1. Attached is subject VECP from M. Bianchi of California proposing a change in construction of the sleeve on subject raincoat.

2. Our technical personnel have reviewed the proposal and believe the recommendation to combine two operations in one by using a safety stitch machine in overedging the bottom raw edge and stitching the lining to sleeve catching the interlining has merit. There is the possibility that the sleeve lining may finish slightly longer, however, the lining is required to be tacked to the outer sleeve and serviceability will not be affected.

3. Contractor's estimated unit savings of $.06 projected over the number of raincoats to be procured in FY 81 would result in annual savings of $41,459.

4. We request the proposal be evaluated and we be apprised of your decision by 21 October 1980.

(R4, tab 17)

8. On 15 October 1980, appellant responded to the contracting officer's 18 September 1980 letter and submitted the following information:

VECP #8680 recommends overedging the bottom raw edge of the sleeve lining by reference (A).

In evaluating the cost savings for the above subject VECP, the direct labor is as stated 6¢ per coat. We can only estimate 2¢ for indirect cost and 2¢ as a percentage to apply to direct labor and material cost. Total savings to the government of 10¢ (By reference B).

(R4, tab 8)

9. On 25 November 1980, Natick informed DPSC that VECP 8680 had been approved for use in DES 12-77A and its follow-on specification, MIL-C-44030(GL), both of which contained the same description for operations labelled 15d and 22d. Natick authorized changing both DES 12-77A and MIL-C-44030 as follows:

Page 20

Operation 15d. - Delete in its entirety and substitute:

"15d. Safety stitch bottom raw edge of sleeve lining to bottom of sleeve, catching interlining with not less than 3/8 inch seam.

| Stitch Type | Seam and Stitching Type | .... |
|---|---|---|
| 515, 516 or 519 | SSa-2 | .... |

* * *

Operation 22c - Delete Operation 22c and Re-Letter Operation 22d to 22c.

(R4, tab 17)

10. By letter dated 29 December 1980, the acting Chairman of the Clothing and Textile Branch, Technical and Quality Assurance Division of the Directorate of Clothing and Textiles sent an Inter-Office Memorandum listing five items to which VECP 8680 "can be made applicable." They were:

| | |
|---|---|
| Coat, All Weather, Mn's | MIL-C-44030 |
| Coat, All Weather, Wmn's | MIL-C-43972 |
| Coat, All Weather, Mn's (CG) | MIL-R-87003 |
| Coat, All Weather, Wmn's (CG) | MIL-R-87009 |
| Coat, All Weather, Mn's (AF) | MIL-R-87110 |

(R4, tab 19) The record contains no indication that, other than MIL-C-44030, any of the above-listed specifications were changed. At that time, DPSC did not have authority to change specifications. It made recommendations to various service offices responsible for issuance of specifications which then made the determination whether to make such changes. It often took a long time to incorporate various changes into a clothing specification. Items which were acquired frequently and/or in large quantities received more immediate attention. Prior to a specification change, a letter directive was issued modifying the specification to reflect the change or changes for a particular item. At Natick, an individual was assigned specific items which were not necessarily related either by use or type. It was that individual's responsibility to revise specifications once a value engineering change had been approved. There was no procedure whereby all other personnel were notified of a specific change for which another individual was responsible although it was possible they might learn about the change.

11. By Inter-Office Memorandum dated 30 December 1980, the Chief of the Technical and Quality Assurance Division of the Directorate of Clothing and Textiles requested that the following contracts be modified to incorporate VECP 8680:

| | |
|---|---|
| Centre Mfg. | DLA100-80-C-2485 |
| Centre Mfg. | DLA100-81-C-2225 |
| Centre Mfg. | DLA100-80-C-2782 |
| Centre Mfg. | DLA100-80-C-3401 |
| Major Coat | DLA100-80-C-2472 |
| MBOC | DLA100-80-C-2972 |

12. On 29 January 1981, Natick informed DPSC that findings from a follow-up evaluation of VECP 8680 indicated that a line tack in the lining of the sleeve should be added as an additional operation to MIL-C-44030(GL) and DES 12-77A to take-up the excess lining fabric. The Government considers that the line tack was an outgrowth of and resulted from VECP

8680. Appellant does not concur that this tack was required as a result of VECP 8680.

13. By letter dated 10 March 1981, the Chief of the Product Engineering Office, Directorate of Manufacturing, concluded the following:

> 1. Reference IOM, your Office, dated 19 February 1981, subject as above.
>
> 2. A direct labor savings of .0071 standard hours will be realized when sleeve lining is joined to sleeve with a safety stitch in lieu of overlock and single needle stitching.
>
> 3. Overhead and profit are not included in the above figure.

Handwritten on the document is the following:

> 0.0071 x $4.75/hour = 0.033725
> + 80% overhead = 0.060705
> + 20% G & A = <u>0.073</u> per unit

(R4, tab 12) While when or by whom the above calculation was made and placed on the letter has not been established in the record before us, it was apparently by someone in the Government prior to recommending an amount for finalized savings to the contracting officer. (See F/F 14)

14. On 20 March 1981, the Value Engineering Office of the Directorate of Clothing and Textiles recommended to the contracting officer that the savings be finalized at $.07 per unit, with appellant eligible for a 50% share of the savings, or $0.035 per unit.

15. On 31 March 1981 the contracting officer notified appellant that VECP 8680 had been accepted at a unit price yet to be established and that the contract would soon be modified. Unilateral Modification P00005, effective 31 March 1981, made no change in the contract price but provided, insofar as VECP 8680 was concerned:

> 1. Pursuant to the Changes Article and Value Engineering Clause J09, Specification MIL-C-44030 [DES 12.77A rather than the cited MIL specification was applicable to this contract] is changed as follows as a result of VECP #8680:
>
> a. Delete operation 15.d, "overedge the bottom raw edge of the sleeve lining".
>
> b. Change operation 22.c to read: "Safety stitch bottom sleeve lining to sleeve bottom catching interlining". [This is actually a paraphrase of the revised operation 15d. Operation 22c was eliminated. See Finding 9, *supra*]

2. As a result of the above accepted VECP, the CMT unit contract price of all units subsequent to and including the initial unit covered by the VECP is to be reduced by $.035 for payment purposes to reflect the Government's share of the savings.
3. Contractor is entitled to 50% of the unit savings or $.035 for all Coat, All Weather,,[sic] Man's, Black w/removable liner using the accepted change #8680 during the royalty period. The royalty period shall extend for a period of 3 years after accetpance [sic] of the first item incorporating the VECP.
4. Contractor is obligated to annotate the DD Form 250 which applies to the initial unit covered by the VECP #8680.

(R4, tab 2 at 15)

16. The initial unit manufactured under Contract 2972, as modified by VECP 8680, was delivered to and accepted by the Government on 6 April 1981. The applicable royalty period for VECP 8680, therefore, is 6 April 1981 through 5 April 1984. The contract payments to appellant for the instant contract were never adjusted to reflect savings attributable to VECP 8680.

17. By Modification P00007, dated 16 November 1981, the undelivered quantity of 87,094 units remaining on Contract 2972 was terminated for default.

VECP 8680

18. All stitches and seams used in construction of Government clothing are described in FED-STD-571 (January 25, 1965). Each type of stitch or seam is assigned a number. The stitches and seams used both before and after approval of VECP 8680 existed in FED-STD-571. Prior to incorporation of the change due to VECP 8680, DES 12-77A Operation 15d required seam and stitching type EFd-1 with a choice of 502, 503 or 504 stitch type. Operation 22c required seam and stitching type SSa-1 with a 301 stitch type. After the change resulting from VECP 8680, one operation replaced these two operations. Operation 22c was deleted in its entirety and Operation 15d was changed to require seam and stitching type SSa-2 with a choice of 515, 516 or 519 stitch type (F/F 9, supra).

19. A safety stitch is a term used to describe a family of stitches composed of rows of single needle joining stitches and rows of overedging stitches, formed simultaneously with one pass through a sewing machine. The combination of the joining and overedging operations results in a change in the seam type to a less complex and more cost effective seam. Stitches 515 through 519 are all in the family of safety stitches. They vary depending on the types of single needle stitch and the type of overedge stitch utilized. Stitch types 502, 503 and 504 originally contained in DES-12-77A are overedge stitches. Seam type EFd-1 refers to the type of stitching produced by overedging the cut edge of one ply of fabric. Operation 22c required stitching of the sleeve lining to the shell sleeve one inch from the bottom of the overedged seam of lining using stitch type 301, a single

needle stitch performed on a lock stitch, and seam type SSa-1. SSa-1 is the most frequently used seam type and is accomplished by laying two plies of fabric together and joining the plies a specified distance from their common cut edge with the single needle 301 stitch.

20. Prior to submittal of VECP 8680, DES 12-77A required the use of safety stitches in eight other operations during production of the All Weather coat which was the subject of that purchase description. These were:

15. Make lining (yoke).

a. Join front lining to front sleeve lining at armhole with a safety stitch. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

b. Position front edge of back sleeve lining and front edge of cape to shoulder edge of front lining and safety stitch with stitching continued the entire length of sleeve (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

c. Position back edge of cape and back edge of back sleeve lining to front edge of back lining and safety stitch to bottom of armhole. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

[d. Overedge stitch bottom raw edge of sleeve lining using Stitch type 502, 503 or 504 and seam EFd-1, prior to the change due to VECP 8680. See F/F 9 for incorporation of VECP 8680 using Stitch type 515, 516 or 519 and seam and stitching type SSa-2]

e. Close side seam of front and back lining and underarm seam of sleeve in one operation with a safety stitch. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

* * *

MAKE LINER

35. Attach front sleeve of liner to front of liner.

a. Position front sleeve to front of liner as indicated by marks on pattern and safety stitch around armhole. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

b. Position front edge of back sleeve to shoulder edge of front of liner and safety stitch with stitching continued the entire length of sleeve. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

> c. Position back edge of back sleeve to front edge of back liner and safety stitch to bottom armhole. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).
>
> d. Close side seams of front and back of liner and underarm seam of sleeve in one operation with a safety stitch. . . . (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

[Emphasis added] (R4, tab 5 at 19, 28-29)

The Claim

21. Appellant was not in agreement with the Government's calculated savings of $0.07 per unit and did not sign Modification P00005. No payments for VECP 8680 have ever been made to appellant. On 16 November 1987 appellant submitted a certified claim, received on 17 November 1987, for payment of its share of savings. No decision was issued by the contracting officer. When the contracting officer failed to respond to another request for a decision, appellant filed an appeal with this Board.

22. In its complaint, appellant contended that the savings as verified by the Government when it approved VECP 8680 did not include savings for indirect costs, contractor and Government furnished material or profit and alleged that the properly calculated savings for VECP 8680 were $0.164 per coat so that its share was $.082 per coat. Appellant, therefore, sought a royalty of "at least $63,502.52" for the instant contract and five other contracts because of utilization of VECP 8680 on "at least 774,421" units. Appellant further alleged on information and belief that the Government experienced collateral savings and savings on additional contracts about which it was not currently aware at the time of filing its complaint and that it would "amend its claim as further information concerning the government's use of this VECP becomes known." (Complaint, Para. 9-12)

23. Appellant's president reviewed 2,223 specifications utilized in the manufacture of military garments to determine those which were modified after VECP-8680 and which he concluded were the "mirror image" or were the "functional equivalent" of VECP 8680. Where no explanation or basis for the change was found for twenty specifications, he concluded that the change was because of VECP 8680. These specifications form the basis for appellant's claim for concurrent and future savings.[1/] On 15 February 1991 appellant supplied the Government with a list of those specifications for which it was claiming a share of savings. Appellant recognizes that it did not invent the safety stitch or introduce its use into Government specifications and seeks a share of savings for the Government's use of the safety stitch on garment locations where the safety stitch was not being used at the time of approval of VECP 8680. Based on calculations, discussed below, appellant alleges that it should receive instant and future contract savings from implementation of VECP 8680 of $2,175,807.56 for essentially the same item and $3,997,660.80 for collateral savings. Appellant also seeks interest.

The Government agrees that appellant is entitled to receive interest from 16 November 1987, but not prior to that date.[2/]

24. The specifications which appellant includes in its present claim are set forth below. A brief description of the operation(s) which appellant claims were due to its VECP is set forth under each item. Included are instances where a specification was issued using the safety stitch operation or was changed so that two operations were combined into one operation. Also included are instances where a lapped seam was required since appellant argues that a lapped type seam is functionally equivalent to the overedging operation described in VECP 8680. The lapped seam (LSC-2) is formed by folding an inside ply of material into an outside ply of material and then sewing the folds together, involving the combination of two operations — joining and edge protection.

| MILSPEC | ITEM | 1/2 UNIT SAVINGS | TOTAL NO. UNITS | TOTAL CONTR.SAVINGS |
|---|---|---|---|---|
| S-44093 | Shirt, Woman's, Long Sleeve, Polyester/Cotton<br>Make sleeve; join front to side body; join shoulder seams and back to front; set sleeves | $0.149 | 425,033 | $ 63,331 |
| S-44102 | Skirt, Woman's Classic Design Polyester/Wool<br>Make pocket and attach label; attach pocket | 0.033 | 84,417 | 2,786 |
| S-44090 | Shirt, Woman's Short Sleeve, Polyester/Cotton<br>Make sleeve underseam; join front to side body; join shoulder seams and back to side body; set sleeves | 0.149 | 926,028 | 137,978 |
| S-44092 | Slacks, Woman's Classic Design, Polyester/Wool<br>Make pocket and attach label | 0.033 | 256,648 | 8,469 |
| S-44039 | Shirt, Man's, Long Sleeve, Polyester/Cotton<br>Set sleeve to armhole; join side and underarm seams | 0.071 | 2,848,840 | 292,268 |

| | | | | |
|---|---|---|---|---|
| S-87169 | Shirt, Woman's, Utility<br>Set sleeves; join side seams and sleeve seams | 0.063 | 142,326 | 8,967 |
| L-44089 | Liner, Night, Camouflage Parka, Desert<br>Join liner (Lap seam) | 0.101 | 260,023 | 26,262 |
| T-44047 | Trousers, Combat, Woodland Camouflage<br>Make hip pockets; make and stitch side hanging pockets | 0.136 | 11,914,174 | 1,620,328 |
| J-87024 | Jacket, Insect Repellent<br>Amended spec 5/4/84 to permit alternate of using safety stitch to attach interlining and sleeve | 0.028 | 104,431 | 2,924 |
| S-44041 | Man's Short Sleeve Shirt<br>Set sleeves; join side and underarm seams | 0.054 | 3,032,442 | 163,752 |
| C-87093 | Coverall, Man's, Fire Retardant<br>Join back arm seam; set sleeve; stitch crotch seam | 0.110 | 163,260 | 17,959 |
| P-6279J | Parka, Extreme Cold Weather, Type N-3B<br>Join sleeve linings | .0.085 | 227,863 | 19,368 |
| S-29368A | Shirt, Woman's Long/Short Sleeve, Polyester/Cotton<br>Changed operation from: Make bust and front darts;<br>to: Assemble front and side panels (Alternate operation) | 0.027 | 108,408 | 2,927 |
| S-87005A | Skirt, Woman's, Dress<br>Added alternate zipper attachment with safety stitch | 0.014 | 1,435 | 20 |

| | | TOTAL NO. UNITS |
|---|---|---|
| O-44109 | Overall, Combat Vehicle Crewman's<br>Series of seams using safety stitch and lap seam; Make leg cuff-slide fastening openings; make front pockets openings, attach pockets; make thigh and shin pleats and close pockets | 10,383 |
| S-83234B | Skirt, Woman's Blue<br>Make pockets | 154,284 |
| S-0037951 | Smock, Medical Assistant's, Man's<br>Join Shoulder seams; make and set sleeves; join side and underarm seams | 55,512 |
| S-3649E | Shirt, Man's Tropical, Polyester/Wool<br>Set sleeves; close sides and sleeves | 1,440,407 |
| S-44110 | Slacks, Woman's Maternity Work Uniform<br>Join stretch panel | 153,640 |

25. Each of the above-listed specifications reflected a specification modification from two operations prior to the submittal of VECP 8680 to one operation or a new specification using a safety stitch machine with stitch type 515, 516, 517 or 519 and, in most instances, seam type SSa-2. A few operations required a lap seam or seam SSa-1 rather than the SSa-2. In some instances the safety stitch operation was an alternate method of construction rather than a mandatory method. If a bidder has both types of equipment or can afford the equipment necessary for using the safety stitch, the manufacturer will prepare an estimate using each method and select the least expensive in order to be competitive.

26. Appellant was unable to obtain sufficient information during discovery relating to delivery schedules and number of units procured for some of the specifications included in its claim (the last five items set forth in Finding 24). It, therefore, estimated the number of units procured during the royalty period from information for a later period provided by Government procurement centers (such as DLA) to a company named Information Handling Systems and compiled into a database called "Haystack". Using the information contained in Haystack for the years 1983 to 1991, appellant

calculated an average for each year and then used this average (multiplied by three) to estimate the number of units for each of the five items included in the "Total No. Units" column listed above with no dollar figure listed under "Total Contract Savings" (F/F 24). Appellant seeks the product of the amount we conclude appellant should receive per unit for those items multiplied by the number of estimated units. Appellant had included one other specification (making the 20 total - F/F 23) in its claim for future savings, MIL-C-87170. Since it was unable to obtain any information through either discovery or its own sources upon which it could base an estimate of units obtained during the royalty period, in its brief appellant stated it was not claiming any savings from that specification.

Quantification of the Contract Savings

27. A consultant to the apparel industries appeared for appellant. He calculated savings on direct labor and material for Contract 2972 by estimating the manufacturing time and material required for all operations prior to and after approval of VECP 8680. The difference represented the direct labor and material saved for each unit.

28. Using a sophisticated system of time/motion studies and a data base of production standards (expressed in Standard Allowed Minutes per piece) for similar types of garments, he calculated the Standard Allowed Minutes (SAM) savings to be 0.734, as follows:

| No. | Description | SAM |
|---|---|---|
| 15d | Overedge bottom of sleeve lining | 0.697 |
| 22c | Set Sleeve lining to sleeve | 1.271 |
| | Original Total Standard Minutes (SAM) | 1.968 |
| 15d | Combining operations per VECP 8680 | 1.234 |
| | Savings | 0.734 |

(Exh. 1073 at 19)

29. To calculate the Total Direct Labor Minutes Saved, appellant's expert added the Associated Direct Labor Factor and the Support Direct Labor Factor to the 0.734 SAM. He used 20 percent, based on experience with similar shops, to compute the Associated Direct Labor Factor. This included training of direct labor, repairs, relocation of direct labor personnel to balance the production line and machine downtime. He used 15 percent, based on experience with similar shops, to compute the Support Direct Labor Factor which included the direct supervisors, bundle girls, mechanics and quality assurance personnel. This was calculated as follows:

| | |
|---|---|
| Net Standard Minutes Saved | 0.734 |
| Associated Direct Labor Factor (20%) | 0.147 |
| Subtotal | 0.881 |

| | |
|---|---|
| Support Direct Labor Factor (15%) | 0.132 |
| Total Direct Labor Minutes Saved | 1.013 |

(Exh. 1073, p. 20)

30. After calculating the labor savings because of VECP 8680, appellant's expert estimated the amount of fabric, lining and interlining which in his opinion should have been saved as a result of the VECP. Operation 22c had required a seam allowance of 1 inch. When this operation was eliminated by VECP 8680, a pattern change to eliminate excess material and reduce the seam allowance to 3/8 inch was possible. This would have resulted in a savings of 5/8 inches for the Government furnished fabric, the lining and the interlining.

31. VECP 8680 did not include a suggestion that the lining be shortened, thereby saving fabric. In its submittal of estimated savings submitted on 15 October 1980, appellant estimated a savings for direct labor but none for material (F/F 8). Nor was there a change in the patterns to shorten the lining. Revision of Government patterns is a complicated matter and is not the responsibility of nor performed by DPSC. The cognizant Government office did not elect to change the patterns and testimony at the hearing by an individual who was not involved with approval of VECP 8680 by Natick nor with the requirement of addition of the line/tack (see F/F 12) was that this was so that there would be sufficient material so that if the sleeve had to be lengthened for the user there would be sufficient lining material. This same witness had drafted an all weather coat specification in 1977 which used an operation similar to that suggested by VECP 8680. However, it did not require the lining to be tacked to the sleeve shell. There was also testimony that the lining could have been left alone completely, "not putting any bar tack at all, leave it loose" (tr. 6-134). We conclude that the record fails to persuade us that the addition of the line tack was necessary because of VECP 8680.

32. Appellant's expert used what is termed the "square inch method" to calculate the total material which he concluded could have been saved as a result of VECP 8680, as follows:

| Part | Sq.Inch/ Sleeve | Saved Per Garment |
|---|---|---|
| GFM (Back and front sleeve material) | 10.313 | 20.626 |
| Lining (Back and front sleeve) | 10.131 | 20.626 |
| Nonwoven Interlining | 9.844 | 19.688 |

(Exh. 1073, p. 21)

33. Appellant's expert accounting witness quantified the claim using the savings in labor and material set forth above. He concluded that it would be appropriate to factor in an escalation rate for labor and material costs for the three-year period during which appellant was entitled to share in instant and future contract savings because it was a time when both were rising. Using Labor Force Employment and Earnings statistics for Apparel and Other Textile Products published by the U. S. Department of Commerce, Bureau of Economic Analysis, in the Survey of Current Business, he calculated a labor escalation of $0.333. He used the mid-point of appellant's performance under this contract, December 1980 as the starting point and the midpoint of the three year period, October 1982, as the date for the average labor rate for the three-year period. Adding the escalation rate to appellant's average labor rate of $4.00 during performance of this contract, he made the following computation:

| | | |
|---|---|---|
| Contractor Labor Rate/Hour for Contract 2972 [Based on a DCAA Audit report which took no exception to average incurred contract direct labor rate of $4.00 per hour submitted by appellant] | | $4.000 |
| Rate Escalation | | 0.333 |
| Escalated Contractor Labor Rate/Hour | | $4.333 |
| Labor Rate/Minute ($0.072/60) | | $0.072 |
| Total Direct Labor Minutes Saved [F/F 29] | | 1.013 |
| Total Direct Labor Savings per Garment | | $0.073 |
| Indirect Expense Savings per Garment [Based on DCAA recommended forward pricing rate] | @ 47.94% | $0.035 |

34. Appellant's accounting expert also calculated the dollars applicable to material savings. Using the Producer Price Index for Textile Products and Apparel published by the U. S. Department of Commerce, Bureau of Economic Analysis, in the Survey of Current Business, he estimated an escalation for fabric furnished by both the contractor and Government based on a midpoint of performance of the royalty period of October 1982. Applying these escalated fabric costs to the estimated square inch savings/sleeve (F/F 31), he estimated savings for contractor supplied fabric (lining and interlining) of $0.026 per garment and Government furnished material savings of $0.038 per garment (exh. 1029 at 3-6, 8-9).

35. Appellant used 47.94 percent as its indirect expense rate. This was the recommended Defense Contract Audit Agency (DCAA) rate for appellant's calendar year 1980. While the overhead experienced by appellant during 1981 was higher than this due to problems encountered by appellant and its cessation of operations during 1981, in developing the unit savings,

because of lack of historical data, appellant made no increase in this rate. The Government used 80 percent for overhead and 20 percent for G&A, a total of 100 percent (F/F 13). The 1980 indirect expense rate was lower than that experienced by appellant in 1981. No audit was performed by the Government for 1981. We conclude that the rate used by the contracting officer in her unilateral determination of the instant contract savings is the appropriate rate to use in determining instant contract savings.

36. Appellant included a profit factor of 11.9 percent in estimating its price for this contract. In estimating the amount of savings for VECP 8680, appellant calculated profit on its costs, excluding GFM, at this 11.9 percent. ASPR 1-1703.1 (d), in effect at the time of award of the subject contract, provided:

> On instant and future contracts the contractor's profit or fee shall be excluded when calculating the net savings.

37. Summarizing the various savings, appellant's accounting expert calculated that the savings were as follows:

| | |
|---|---|
| Contractor Furnished Materials Savings | $0.026 |
| Direct Labor Savings | 0.073 |
| Indirect Expense Savings | 0.035 |
| Other Direct Cost Savings | 0.000 |
| Subtotal | $0.134 |
| Profit | 0.016 |
| Government Furnished Material Savings | 0.038 |
| Total Savings/Garment | $0.188 |
| Contractor Assigned Savings (50%) | $0.094 |

38. The contractor assigned savings of $0.094 was multiplied by 837,329 units estimated as delivered during the royalty period to claim a total savings for items obtained using MIL-C-44030 of $78,709. Appellant used the services of a consultant to determine the quantity of units delivered under the instant contract and other contracts using MIL-C-44030 for which it concludes that the VECP was made applicable. The consultant reviewed contract procurement history records from Government records obtained during discovery and information from a commercially available database known as "Haystack" (see F/F 26). Neither of these sources had complete information but by combining them and making certain assumptions based on available information as to delivery schedules, he reached the following conclusions about deliveries of the Man's All Weather Coat w/Removable Liner produced using MIL-C-44030 or DES 12.77A (exh. 1041, p. 1):

| Cont.No. DLA100- | Manufacturer Name | Award Date | Quantity | Qty in Royalty Per |
|---|---|---|---|---|
| 80-C-2485 | Centre Mfg Co. | Jan-80 | 125,840 | 0 |
| 80-C-2972 | M Bianchi of Calif. | Jun-80 | 125,240 | 22,000 |
| 81-C-2227 | Major Coat Co. | Oct-80 | 58,976 | 28,976 |
| 81-C-2773 | Centre Mfg Co. | Feb-81 | 91,176 | 91,176 |
| 81-C-2773* | Centre Mgf Co. | Feb-81 | 91,184 | 91,184 |
| 81-C-3451 | Centre Mfg Co. | Sep-81 | 156,776 | 156,776 |
| 81-C-3451* | Centre Mfg Co. | Sep-81 | 78,384 | 78,384 |
| 82-C-0562 | Centre Mfg Co. | May 82 | 218,591 | 218,591 |
| 83-C-0649 | Centre Mfg Co. | May-83 | 123,858 | 123,858 |
| 84-C-0285 | Centre Mfg Co. | Dec-83 | 174,028 | 26,384 |
| TOTALS | | | 1,244,053 | 837,329 |

*/ Option quantities

The record contains no information concerning utilization of VECP 8680 in contracts other than DLA100-80-C-2485 for which modifications were suggested by the Chief of the Technical and Quality Assurance Division of the Directorate of Clothing and Textiles because of VECP 8680 (F/F 11).

39. In developing this appeal, appellant was at a disadvantage since, other than information available through sources such as Haystack, all of the information it needed was in the possession of the Government.3/ The Government now argues that the above information concerning concurrent contracts fails to reflect items which were rejected or variations (decreases) delivered in quantities permitted under the contracts. We conclude that under the circumstances the information in the record, summarized above, presents a fair basis for determining the quantity of similar coats delivered during the royalty period.

40. Under the J09, Value Engineering Incentive clause paragraph (e)(2) (F/F 3), savings attributable to concurrent contracts are determined using the reduction in price of each concurrent contract. VECP 8680 was a mandatory change which was incorporated into the concurrent and future contracts using MIL-C-44030(GL). At the same time that VECP 8680 was added to the contracts, the line tack was also added. The prices negotiated with Centre and Major on their contracts combined those two changes. That resulted in an increase, rather than a decrease, in contract price so that the Government's position is that there were no concurrent or future savings for the contracts, other than appellant's, listed above in F/F 38. We have concluded in F/F 31 that this record has failed to establish that the addition of the line tack was required by VECP 8680. We, therefore, conclude that the per unit saving we determine is applicable to the instant contract is a reasonable per unit savings for the contracts under which the same garment was manufactured during the savings period.

41. Paragraph (e)(3)(iii) of the Value Engineering Incentive clause (F/F 3) permits the Government to reduce the future contract savings for

certain stated reasons. Based on concerns that the Government might argue that it was not entitled to the amount determined for instant contract savings on future items, appellant "reengineered" the items included in its claim for future contract savings. The same detailed and extensive method was used for determining the instant contract unit savings and the reengineered unit savings for each contract for which appellant seeks inclusion in savings resulting from VECP 8680. The reengineered per unit savings for which appellant concluded it had sufficient information to make the computation are set forth in F/F 24. Appellant seeks recovery for the last five specifications at the amount we conclude it is entitled to receive for instant contract savings because of its inability to "reengineer" savings for those specifications. Whether instant contract savings or recalculated savings for a future contract are used in determining quantum is a matter left to us for decision in this appeal.

42. The Government does not challenge the methodology used by appellant in its calculations. Its objections essentially challenge whether appellant is entitled to recover for savings resulting from the inclusion of the safety stitch in other specifications as future savings under this contract (which issue will be discussed, <u>infra</u>) and quantification of some of the items.

43. The Value Engineering Incentive clause in appellant's contract did not provide for collateral savings. The standard Armed Services Procurement Regulation (ASPR) clause contained a provision for collateral savings, such as savings relating to handling of materials, storage of particular goods, shipment of particular goods, etc., with a maximum of $100,000 or the price of the contract on which the VECP is submitted, whichever is greater. Since appellant was unable to obtain any information during discovery which it could use in determining collateral savings to the Government from VECP 8680, it seeks its contract price of $3,997,366.40 (F/F 2) as collateral savings from approval of this VECP.

44. ASPR 1-1703.2 (1 July 1976), in effect at the time of award of the subject contract, entitled "Collateral Savings" provides that the Collateral Savings clause "may be excluded from a contract or class of contracts when the HPA [Head of the Procuring Activity] determines that the cost of computing and tracking collateral savings will exceed benefits to be derived." In accordance with the foregoing, the DPSC Contracting Manual instructs the Clothing and Textile Directorate to exclude the collateral savings provision from the Value Engineering Incentive clause because the head of the activity had determined that the cost of tracking collateral savings would exceed the benefits to be derived from acceptance of a VECP, and the collateral savings provision was therefore omitted from the contract (tr. 5/39, 80). The standard Value Engineering Incentive clause, <u>supra</u>, contains, at subparagraph (e)(4) the provision concerning Collateral Savings and includes the provision that

> . . . The determination of the amount of collateral savings, if any, will be made solely by the Government and not be subject to the "Disputes" clause of this contract.

## DECISION

### Jurisdictional Issue

In its posthearing brief, the Government argues that the Board lacks jurisdiction to consider appellant's claim for those specifications which appellant alleges were revised because of VECP 8680 other than the specification for the all weather coat since that portion of the claim based on those specifications (F/F 24) was never submitted to the contracting officer for final decision. While a motion to dismiss for lack of jurisdiction based on a similar argument was denied in our opinion in ASBCA Nos. 37029 and 37071, supra, we reiterate our conclusion that appellant's claim contained all the information available to it at the time of filing and that the enlargement of its claim is the result of information obtained during discovery from information unavailable until supplied by the Government. The increase in dollars did not result from new claims, new legal theories, or new factual bases for recovery. While the Government's argument and request that these additional specifications be remanded to the contracting officer was not captioned as a motion to dismiss, we consider it such and deny the motion.

### Essentially the Same Item

The major dispute, which has permeated this appeal throughout, is the question of what constitutes "essentially the same item." It is of utmost importance in this appeal since it determines the number of units to which a relatively small per unit savings (09.4¢ according to appellant, 03.2¢ according to the Government) will apply and establish appellant's share of contract savings because of acceptance of VECP 8680. It has clouded all efforts to resolve this dispute by settlement, and was the subject of our earlier opinion on the Motion for Partial Summary Judgment where we concluded that this question was a factual one which must be determined taking into consideration the VECP involved and the items involved in the particular claim. Appellant has created many volumes of detailed analyses to quantify those specifications which it considers were changed because of acceptance of VECP 8680. Before we reach consideration of these materials, however, we must first determine whether each specification included in appellant's claim meets the definition of "essentially the same item" as used in the Value Engineering Incentive clause, J09 (F/F/3) under which a share of savings on both concurrent and future contracts for essentially the same items is awarded.

#### Appellant's Position

Appellant uses a very broad interpretaion of both what approval of VECP 8680 actually includes and what constitutes "essentially the same item" as used in J09. Its position, in defining the term, is that the safety stitch operation recommended by VECP 8680 is not restricted to any garment or material; it is only confined to the edge of two pieces of fabric going together. Therefore, even though VECP 8680 was submitted on the raincoat specification to cover specific operations involving the raincoat lining, i.e., overedging the lining and then joining it to the sleeve, appellant

maintains that the focus of VECP 8680 was to combine the two separate operations of overedging and joining into a single operation using the safety stitch and that any garment utilizing such operation would qualify as essentially the same items. Appellant also argues that VECP 8680 included the combination of operations that are the functional equivalent of the overedging and joining operations described in VECP 8680 on essentially the same items. Functionally equivalent operations would be the (1) protection of raw edges using a lapped type seam and (2) sewing of multiple single needle rows using a lock stitch (F/F 24). In appellant's view, the safety stitch is not restricted to any seam and can be used on all garments and is essentially the same operation with respect to all garments without regard to the type of garment involved or, as long as compatible materials are used, to the type of material involved and does not require the use of any specific machine.

Appellant maintains that the objective of VECP 8680 was to improve productivity and save material where two or more plies of fabric are joined together and where one or more of the plies is "neatened" or protected from unravelling. The intent is achieved by (1) combining the two specific operations of overedging and joining, or (2) combining the two sewing operations (with multiple steps) that are the functional equivalent of the overedging and joining operations specified for the raincoat. While appellant recognizes that the VECP 8680 was framed in terms of the operations included in the specification applicable to its contract, it maintains that this was because it had to submit the VECP in terms of its application to the garment involved in its contract because of the format required. It asserts that the VECP was broader than that and "[i]f the articles can use the concept or its functional equivalent and have benefitted from appellant's proposal or its functional equivalent, the articles should be considered essentially the same and a royalty sharing based upon the cost savings the Government has enjoyed is appropriate" (app. br. at 125).

The Government's Position

The Government interprets the language in the Value Engineering Incentive clause in a much narrower fashion. Its position is that the language in paragraphs (e)(2)(i) (sharing in savings on concurrent contracts) and (e)(3)(ii) (F/F 3) (sharing in savings on future contracts) which speaks of purchases of "essentially the same item" means an item which serves the same function and has the same fabrication. Therefore, in the case before us, savings are applicable only to purchases of all-weather coats which required the use of the safety stitch in attaching the sleeve lining to the sleeve of the coat. In addition, where the requirement is an alternate method of construction, savings are payable only in those instances where the alternate using the safety stitch was actually used.

Conclusion

We cannot accept the position of either party. In our view, appellant's position is too broad and the Government's position is too narrow. We agree with appellant that application of the Value Engineering Incentive clause

must be liberally interpreted, since its purpose is to encourage contractors to make suggestions which will save the Government money by allowing them to share in such savings. However, the clause itself indicates that there are limits in both the period for such savings and the item procured. Therefore, we must examine the facts for each particular situation. We cannot make a broad statement that is generically applicable.

While we recognize that the decision in M. Bianchi of California, ASBCA Nos. 37029 and 37071, supra, rejected appellant's position that any item packed in a shipping container (box) was "essentially the same item" as used in the J09 clause similar to the one in the instant appeal, and concluded that most of the items were not even remotely similar to the woman's pantsuit purchased under the contract involved in that appeal, the question is factual and must be considered based on the garment and the VECP.

We are not persuaded by appellant's argument that the term should be defined to include any application of the safety stitch to any item of clothing. The safety stitch was not a new or novel operation. It was even used in other operations in the specification which was involved in this contract (F/F 20). As a matter of fact, many of the applications for which appellant claims entitlement are more similar to the operations which were already in the specification prior to submittal of VECP 8680 and we cannot accept appellant's argument that its submittal "reminded" the Government it should consider using the stitch in other specifications and applications. The fact that the safety stitch is incorporated into manufacture of the garment indicates that the Government has already concluded that it would meet the functional and other requirements of the garment. Otherwise, it would not have designated the use of the stitch. Appellant could have expressed its submittal in broader terms and specified its application to the instant contract. It did not do so. We, therefore, conclude that recovery for savings under this VECP would only apply to items which reflected the change appellant had suggested.

Nor are we persuaded by the Government's reliance on dicta in our opinion in Tennier Industries, Inc., ASBCA No. 29464, 86-3 BCA ¶ 19,046. That case concluded that the contractor was not entitled to any savings because the Government was already testing the subject of its proposal. The Board was not faced with the question before us and did not consider the term "essentially the same item" when it concluded that two sleeping bags were not "one and the same." In our view, "one and the same" is a different conclusion from "essentially the same." At best, the conclusions which the Government draws from that opinion are based on dicta.

We also limit our consideration to 6 April 1981 through 5 April 1984, the period during which appellant would share in savings. This would eliminate any consideration of MIL-J-87024. Appellant's claim included 104,431 jackets delivered during the royalty period. However, this was prior to issuance of the amendment to the specification on 4 May 1984 which appellant alleges resulted in incorporation of VECP 8680 (F/F 24). Examining each of the remaining eighteen operations for which appellant seeks a share of savings (F/F 24), we conclude that none can be attributed to VECP 8680. We eliminate the operations requiring the use of a lap seam

(F/F 24) since that is a different type of seam than the seam recommended by appellant. We also eliminate those specifications which require the use of the stitch and seam in VECP 8680 which join other seams, such as side seams, or the setting of the sleeve into the garment or other operations unrelated to that suggested by appellant in its VECP.

We, therefore, conclude that appellant is not entitled to recover instant or future contract savings for any of the nineteen items included in its claim as set forth in F/F 24.

## Quantum

Having reached the conclusions set forth above, we must consider the per unit savings resulting from incorporation of the safety stitch operation approved as VECP 8680 and the number of units to which those savings should be applied. We have already concluded that the instant contract savings should not be reduced by the cost of adding the line or bar tack as implementation costs for the VECP (F/F 31). The record failed to establish that VECP 8680 required such inclusion.

### Direct Labor Savings

Appellant introduced extensive evidence of costs before and after the changes resulting from VECP 8680. It seeks both savings in labor and in material. We have set forth the after-the-fact computations in F/F 27-37. Included in appellant's computation was a calculation of escalation of costs over the three-year savings period. The Government argues that there is no provision in the Value Engineering Incentive clause for escalation of costs. That clause, F/F 3, is silent about this question. It neither permits or prohibits increases due to escalation of costs over the payment period. It permits the savings and recognizes that this may include some estimates. See, for example, paragraph (e)(1)(i)(A).

While it may be proper to use escalation when estimating the amount of instant contract savings prospectively pursuant to paragraph (e)(1)(i)(A) of the Value Engineering Incentive clause, the instant contract savings here are calculated on appellant's actual, experienced labor rate of $4.00 per hour. This already reflects any labor rate escalation which may have occurred during contract performance. Since the clause provides that future contract savings are calculated using "instant contract savings," there is no provision for escalation during the royalty period beyond what may have been reflected in instant contract savings.

### Contractor and Government Furnished Material Savings

Appellant also seeks savings for material because of the approved VECP. While it recognizes that there were no actual material savings (F/F 31), it argues that there should have been new patterns issued and savings in material would have resulted. We have already concluded that a line tack because of the excess fabric length was not established as a result of implementing VECP 8680 (F/F 3). By the same token, we conclude that

appellant's recovery is limited by the proposal which it made when submitting the VECP. It could have included a recommendation that the patterns be adjusted and that this would save fabric. It did not do so. Therefore, we do not consider it part of VECP 8680. The proposal as submitted by appellant was sketchy at best and did not contain all the documentation required by the clause (F/F 3 at (b)). The Government requested additional information which, when provided, also lacked the type of detail appellant supplied as proof for this hearing. If appellant considered that there would be a saving of fabric, it could have said so. Its submittal and additional response both addressed direct labor savings. There was no reference to direct material savings. The only reference to material was to 2¢ savings "as a percentage to apply to direct labor and material cost." It is not clear just what appellant meant by that, but it is clear that in estimating a 10¢ savings, in addition to the above 2¢, appellant estimated 6¢ for direct labor and 2¢ for overhead (F/F 8). We conclude that there is no basis for including an amount for unrealized fabric savings on the basis that there could have been such savings had patterns been changed.

Indirect Expenses

The DCAA recommended rate for 1980 of 47.94 percent was used by appellant in calculating instant contract savings because of lack of historical data for 1981 (F/F 35). We conclude that overhead for 1981 was greater than that for 1980. The Government had used 100 percent and this amount was accepted by the contracting officer in making the determination of unit savings as a result of VECP 8680. We conclude that the 47.94 percent did not reflect the 1981 overhead and accept the amount used by the contracting officer in determining unit savings. Cf. S. W. Electronics & Manufacturing Corp. v United States, 655 F.2d 1078 (Ct. Cl. 1981).

Profit; Concurrent Contract Savings; Future Contract Savings

Appellant seeks profit of 11.9 percent. It recognizes that it is not entitled to profit on instant contract savings but argues that it is entitled to them on concurrent and future contract savings. We do not agree. Concurrent contract savings should be based on the actual negotiated savings under those contracts. Since, in the instant case, the Government negotiated those contracts with two changes, for one of which (the line tack) we have concluded this VECP should not be charged, we conclude that instant contract savings would be a reasonable jury verdict amount to apply to concurrent contract savings. Future contract savings are also based on instant contract savings unless the Government determines that there should be an adjustment. It made none and we see no basis for doing so as to the items for which we conclude appellant should recover.

Appellant also states that the 11.9 percent is included in instant contract savings not as profit on savings but as part of its estimate of acquisition savings. We consider this a euphemism for profit and unallowable pursuant to ASPR 1-1706.1 (F/F 36). We are also not persuaded by appellant's argument that the prohibition on profit pertains only to appellant's contracts and not to contracts of third parties. Since, by the

clause, concurrent contract savings are the negotiated savings to the concurrent contractor and future contract savings are, with certain exceptions, based upon the instant contract savings, we conclude that the prohibition of profit pertains to all savings permitted under the clause.

Instant Contract Savings

Considering all of the above, after eliminating those items in appellant's calculation which we have determined should not be included, we conclude that, based upon this record, the instant contract savings resulting for VECP 8680 was $0.14 (14¢) per unit. Contractor assigned savings, 50 percent of this amount, would be $0.07 (7¢) per unit. Multiplying $0.07 by the 837,329 units we have concluded was a reasonable number (F/F 38), we conclude appellant is entitled to the following as contract savings for instant, concurrent and future contracts:

$0.07 x 837,329 = $58,613.03

Collateral Savings

The Value Engineering Incentive clause included in this contract, J09 (F/F 3), did not contain the provision for collateral savings resulting from acceptance of a value engineering change proposal. ASPR 1-1703.2 (1 July 1976) permits such exclusion when the head of the procuring activity determines that the cost of computing and tracking collateral savings would exceed the benefits derived from the change (F/F 44). Appellant argues that the record fails to contain the requisite documentation for this determination so collateral savings should be awarded. By the same token, appellant failed to submit the requisite prediction of any collateral savings as required by J09 paragraph (b)(iv), the Value Engineering Incentive clause in the contract (F/F 3). We conclude that the unrebutted testimony that the DPSC Manual instructing that the collateral savings clause not be included because of a determination by the agency head is sufficient for purposes of this record.

Appellant is not entitled to recover collateral savings which it seeks ($3,997,660.80).

Interest

Appellant seeks interest from six months after approval of VECP 8680 since J09(f) requires payment of concurrent and future savings within six months of modification of concurrent or future contracts. That paragraph makes no provision for interest. It is well established that payment by the Government of interest is only permitted by contract, statute or regulation. Here there is no such provision. Interest is payable pursuant to the Contract Disputes Act from the date of receipt of the claim until paid. While the parties agree that that date was 16 November 1987, the facts indicate the claim was not received until 17 November 1987. Appellant is entitled to interest on any amount due from 17 November 1987 at the applicable rates.

Summary

The parties submitted well written and extensive briefs. We have considered all of the arguments which they included but, in order to not prolong an already lengthy opinion, we have not addressed them all directly. Those we have not discussed will not change the results we have reached. Because of the conclusions we have reached, we need not consider appellant's Motion to Strike Government Exhibits 28-38.

We have concluded that appellant's definition of its VECP was far broader and more extensive than the VECP 8680 which it submitted and which was approved. We have further concluded that under the record of this appeal recovery is limited to the all-weather coats which incorporated VECP 8680.

Since this appeal concerns determination of quantum, we have discussed the various elements which appellant included in calculating its claim and have concluded that the per unit savings were $0.14 per unit of which appellant is entitled to receive $0.07. Applying this to the number of units, we have concluded that appellant's share of savings is $58,613.03. Interest on amounts due appellant should be computed from 17 November 1987.

The appeal is sustained in the amount of $58,613.03 plus interest on amounts due appellant from 17 November 1987 and denied as to the rest.

Dated: 10 February 1993

RUTH C. BURG
Administrative Judge
Member of the Armed Services
Board of Contract Appeals

I concur

V. JOHN RIISMANDEL
Administrative Judge
Acting Chairman, Armed Services
Board of Contract Appeals

I concur

WILLIAM J. RUBERRY
Administrative Judge
Vice Chairman, Armed Services
Board of Contract Appeals

NOTES

1. Initially appellant included 21 specifications in its claim. Upon obtaining additional information from the Government, which was the sole party with appropriate information, appellant refined its claim to the 20 specifications included in its brief. Appellant supplied the Government with a list of the specifications on 15 February 1991. On the first day of the hearing, the Government offered Exhibits 28-38, Limited Purchase Descriptions issued prior to VECP incorporating certain changes which were included in subsequent specifications upon which appellant relied for eleven of the specifications included in its claim. They were received in evidence over appellant's objection. On 6 September 1991, appellant filed a written Motion to Strike these exhibits as hearsay based on the Government's failure to authenticate or identify these documents pursuant to the Federal Rules of Evidence, or, in the alternative, a Motion for the Imposition of Discovery Sanctions to preclude for failure to acknowledge the existence of this information or produce it during discovery despite repeated discovery requests for such information.

2. We recognize that the Government, in its response to appellant's proposed Finding 332, indicated that it did not dispute interest from 16 February 1987. However, we conclude that this was a typographical error, since that date is unrelated to any dates involved in this appeal and other parts of the Government's reply brief (including in its conclusion at page 88).

3. During preparation of its appeal appellant had great difficulty in obtaining information concerning other Government contracts and information which was solely in the Government's possession. There were numerous motions to compel directed to a former Government counsel assigned to this appeal and, ultimately, severe sanctions were imposed because of failure to comply with Board orders concerning discovery. Present counsel were very cooperative and should in no way be tarred by action of prior counsel.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 36518, Appeal of M. Bianchi of California, rendered in conformance with the Board's Charter.

Dated: 11 FEB 1993

EDWARD S. ADAMKEWICZ
Recorder, Armed Services
Board of Contract Appeals

# EXHIBIT "13"

ARMED SERVICES BOARD OF CONTRACT APPEALS
SKYLINE 6
5109 LEESBURG PIKE
FALLS CHURCH VA 22041-3208
Telephone: (703) 681-8502

REPLY TO ATTENTION OF

29 December 2000

CERTIFIED MAIL
RECEIPT REQUESTED

Michael W. Clancy, Esq.
Holland & Knight LLP
2100 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20037-3202

Kathleen D. Hallam, Esq.
Chief Trial Attorney
Defense Supply Center - Philadelphia
DSCP-GA
PO Box 60530
Philadelphia, PA 19145-0530

Re: ASBCA No. 37029
Appeal of M. Bianchi of California
Under Contract No. DLA100-80-C-2290

Dear Counsel:

Enclosed is one authenticated copy of the Board's decision.

The Board has received the following instructions from the Department of the Treasury for processing payment of awards from the Judgment Fund. If the parties do not contemplate an appeal or motion for reconsideration but plan to use the Judgment Fund for payment of the monetary award, the U.S. Treasury requires that the government agency concerned submit completed copies of the following forms:

Printed on Recycled Paper

- FMS Form 195: Judgment Fund Payment Request;
- FMS Form 196: Judgment Fund Award data Sheet;
- FMS 197A: Voucher for Payment;
- FMS 198: Judgment Fund Award Data Sheet Additional Deductions (if applicable);
- Certificates of Finality from the government agency and the contractor/appellant; and
- A copy of the Board's decision.

Copies of the appropriate documents are enclosed for use by the parties. The Government, using FMS Form 195 as a transmittal letter, should send the completed forms to:

Judgment Fund Section
Financial Management Service
Department of the Treasury
Room 6F03
3700 East-West Highway
Hyattsville, MD 20782

Telephone: (202) 874-6664

Very truly yours,

EDWARD S. ADAMKEWICZ
Recorder

Enclosures.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| M. Bianchi of California | ) | ASBCA No. 37029 |
| | ) | |
| Under Contract No. DLA100-80-C-2290 | ) | |

APPEARANCE FOR THE APPELLANT: Michael W. Clancy, Esq.
Holland & Knight LLP
Washington, DC

APPEARANCE FOR THE GOVERNMENT: Kathleen D. Hallam, Esq.
Chief Trial Attorney
Defense Supply Center
Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE SHACKLEFORD
ON REMAND FROM THE COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

This appeal is on remand from the Court of Appeals for the Federal Circuit (CAFC). Appellant filed a brief on quantum, the Government filed a response to appellant's brief and, finally, appellant filed a reply brief on quantum. The appeal has been the subject of numerous opinions both at the Board and at the CAFC,[1] and while familiarity with those decisions is presumed it is appropriate to set forth a brief review of the facts and the decided cases so as to put the remand in perspective.

Bianchi was awarded a contract in 1979 to supply Air Force women's pantsuit coats in accordance with Purchase Description ENEU 78-7, which was later superseded by MIL-C-87160. The contract included a Value Engineering Incentive (VEI) clause, pursuant to which Bianchi submitted two Value Engineering Change Proposals (VECP), one recommending the contract requirement for five coats per box be changed to 10 or 20 coats with a corresponding increase in the depth of the boxes (VECP 1180), while the other proposed eliminating wasted space in the packing boxes by changing the number of coats per box from the contract requirement of five per box to 10 coats per box with no change in box dimensions (VECP 8780). The VECPs were not accepted by the contracting officer.

In 1980, another contractor, Vi-Mil, was awarded a contract for the same item of clothing as Bianchi, and pursuant to the VEI clause in its contract, Vi-Mil submitted a

VECP proposing a change in the number of coats to be packed in each box. The Government accepted Vi-Mil's VECP in modified form.

Subsequently, in 1988, Bianchi filed claims for royalties under its previously rejected VECPs, and, after a contracting officer failed to issue decisions, appeals were made to this Board and docketed as ASBCA Nos. 37029 (VECP 1180) and 37071 (VECP 8780). While the Government conceded at trial that the Bianchi VECPs were constructively accepted when the Vi-Mil VECP was accepted, the Board, nevertheless, denied the appeals on the basis that the Bianchi contract was complete and the relationship had ended when the Vi-Mil VECP was accepted and thus there was no basis for constructive acceptance. *Bianchi II*. On appeal to the CAFC, the Board's decision was vacated as to entitlement and remanded to the Board to allow Bianchi to obtain discovery and present evidence on (1) the allegation that its VECPs were rejected in bad faith and (2) the allegation that Bianchi's VECPs were constructively accepted prior to termination of its own contractual relationship with the Government. *Bianchi III*.

Pursuant to the remand we held that the contractual relationship between Bianchi and the Government still existed at the time of the acceptance of the Vi-Mil VECP and thus we granted the appeals as to entitlement and proceeded to decide quantum. We held as to Bianchi's VECP 8780, in ASBCA No. 37071, for reasons not herein relevant, that Bianchi was not entitled to any royalties. As to Bianchi's VECP 1180, we held in ASBCA No. 37029, that the royalty period was contemporaneous with the royalty period of Vi-Mil (22 June 1984 to 21 June 1987), that the number of garments on which the royalty should be computed was also the same quantity as under the Vi-Mil contract (38,815), and that the royalty, or share of savings allowed was $.3185 per garment. The total award was $12,362.58 plus Contract Disputes Act interest. *Bianchi IV*.

On motion for reconsideration in ASBCA No. 37029, Bianchi questioned both our selection of the royalty period and our determination of the number of garments subject to the royalty. We rejected Bianchi's argument that DAC 76-26 mandated a different, more lucrative royalty period. As to the number of garments subject to the royalty, we set forth several different contentions appellant had taken in these proceedings as to the number of garments on which to base compensation. We stated that of the number sought on reconsideration, 106,550, when reduced by the number delivered internally from the DPSC Directorate of Manufacturing, which were not subject to royalty payments, "only 54,773 items remain[ed] in appellant's . . . calculation." *Bianchi V*. We thus affirmed our figure of 38,815 garments. *Bianchi V*.[2]

Bianchi appealed to the CAFC. The Court affirmed our determination of the royalty period, rejected Bianchi's contention that DAC 76-26 mandated a different more lucrative royalty period, and affirmed our exclusion of royalties on garments obtained from intra-agency sources. Bianchi's final basis for appeal was that substantial evidence

did not support the Board's determination that Bianchi was entitled to receive royalties on only 38,815 garments. On that issue the Court questioned the Board's explanation as to why the evidence of the number of garments subject to the royalty propounded by Bianchi and its expert witnesses was less credible than the number obtained from the Vi-Mil royalty payment. The Court stated in part as follows:

> In the absence of any support for the 38,815 figure other than that it was derived from the Vi-Mil recovery, and in the absence of any explanation for the rejection of the figures proffered by Bianchi, we are unable to determine why the Board selected the number of garments on which the Vi-Mil recovery was based rather than the number of garments calculated by Bianchi's expert. It may be that there is some flaw in the numbers adduced by Bianchi, but the Board did not point to any such flaw, and the government in its brief and oral argument did not do so either. Without some indication of why the Board chose the government's figure rather than Bianchi's, we are unable to determine whether the Board's selection of 38,815 as the number of garments subject to the VECP is supported by substantial evidence. Accordingly, we vacate the Board's order as to quantum and remand the case to the Board for further proceedings on the quantum issue, including an explanation for the Board's determination as to the number of garments subject to the VECP.

To resolve the remand, we make additional findings of fact relative to the number of garments subject to royalty payments for Bianchi. The numbering of these additional findings continues from where we left off in *Bianchi IV*.

<u>Findings of Fact on Number of Garments Delivered During Royalty Period</u>

36. Modification No. P00011 to the Vi-Mil contract, which was part of the evidentiary record made at trial (ex. A-1036 at 3) and P00012 to the Vi-Mil contract (Gov't cross motion for summary judgment, attach. 1), which was not, both evidence the number of garments subject to royalties under that contract. Modification No. P00012 was dated 3 October 1986, over eight months prior to the expiration of the Vi-Mil royalty period.

37. The database upon which appellant relied for determination of the number of garments delivered during a given royalty period was prepared by appellant's expert witness, Mr. James W. Sutherland (Sutherland) (tr. 2/8). Sutherland, an expert in the computer analysis of data, amassed procurement data on several different garments

procured by DPSC, including the women's pantsuit coat at issue here. He used the same methodology for all of the garment types. (Tr. 2/38; exs. A-1000-02)

38. The underlying data used by Sutherland came from two sources. DPSC provided documents to Bianchi's owner who in turn gave those documents to Sutherland. Sutherland also received data from the HAYSTACK database, a procurement information source maintained by Information Handling Systems (IHS), a commercial establishment. HAYSTACK included procurement information from multiple government sources, including DPSC. (Tr. 2/8-10)

39. Sutherland created a Total Procurement Database for each garment by combining information from IHS' HAYSTACK with information provided by DPSC (tr. 2/31-32). He was careful to eliminate duplicate records (tr. 2/32) and when he did not have information on a scheduled or actual delivery he used normal procurement lead time (the period between contract award and date of first scheduled delivery) to predict the most likely deliveries for a particular contract (tr. 2/33-34).

40. Following is a matrix depicting the quantities delivered during the Vi-Mil royalty period per Vi-Mil's P00011 and P00012 and the corresponding data for the same royalty period using data from the documents in the front cover of appellant's exhibit 1001 for Mil-C-87160, but excluding purchases with a prefix of SCO100 which are intra-agency transfers (tr. 2/65) not subject to royalties.

Comparison of Data Bases for Quantities Delivered During Royalty Period
(22 June 1984 to 21 June 1987)

| Contract Number | Quantities Per Vi-Mil P00011and12 | Quantities Per Bianchi Data[3] |
|---|---|---|
| DLA100-84-M-CB20 | 608 | 0 |
| DLA100-84-M-CB45 | 706 | 705 |
| DLA100-84-C-0724 | 4,440 | 4,365 |
| DLA100-84-C-0751 | 1,606 | 1,575 |
| DLA100-85-M-CA32 | 660 | 660 |
| DLA100-85-C-0339 | 7,050 | 7,050 |
| DLA100-85-C-0376 | 4,425 | 4,425 |
| DLA100-85-C-0742 | 19,320 | 20,971 |
| DLA100-85-M-CA32 | 0 | 660 |
| DLA100-85-C-0339 | 0 | 150 |
| DLA100-85-C-0339 | 0 | 3,525 |
| DLA100-85-M-CA41 | 0 | 660 |
| DLA100-83-C-0563 | 0 | 6,686 |
| Totals | 38,815 | 51,432 |

41. Except for the 608 garments purchased under Contract DLA100-84-M-CB20 (CB20) which was not included in Bianchi's data, the remaining contracts and quantities under the Vi-Mil modifications closely track corresponding data from Bianchi. The Bianchi data includes five additional groups of purchases not included under the Vi-Mil modifications, and while we do not know why that anomaly exists, we observe that Vi-Mil P00012 was executed over eight months prior to the end of the royalty period, much of the data was not subject to cross examination at trial and we have no evidence of how the Vi-Mil data was compiled.

42. We now find that the Bianchi underlying data generated by Sutherland on delivery of Air Force women's pantsuit coats is credible and may be used for determining the number delivered during the Vi-Mil royalty period. Thus, we add the quantity under contract CB20 not included in the Bianchi data to the quantity computed by Bianchi to yield a total of 52,040 (51,432 + 608) women's pantsuit coats delivered during the applicable royalty period and incorporating the constructively accepted Bianchi VECP 1180. At a royalty share of $.3185 per garment, the Bianchi royalty payment computes to $16,574.74.

DECISION

The CAFC remanded this appeal to us to explain the Board's determination of the number of garments subject to the VECP. We previously found the Vi-Mil quantities more reliable primarily because, unlike the Bianchi data, they were the subject of bilateral agreements and appeared to be undisputed by the parties to those agreements. Having reexamined that determination, we now decide that Bianchi's data is more reliable and determine that Bianchi is entitled to recover for a total of 52,040 garments (finding 42) at $.3185 per garment for a total of $16,574.74 together with CDA interest from 3 March 1988 until paid. *See Bianchi IV* at 141,863.

Appellant makes additional arguments, characterizing language in several of the Court and Board opinions as *dicta* with respect to what constitutes "essentially the same item" and thus urging us to include garments other than the women's pantsuit coat produced in accordance with Mil-C-87160 to calculate the royalty payments. These arguments are without merit, they go beyond the scope of the remand and they involve matters already decided and either not appealed or affirmed by the CAFC in the various decisions previously issued in this case.

The appeal is sustained as to quantum as set forth above, and, in all other respects, it is denied.

Dated: 28 December 2000

RICHARD SHACKLEFORD
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

EUNICE W. THOMAS
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

NOTES

1 *M. Bianchi of California*, ASBCA Nos. 36518, 37029, 37071, 37395, 37798, unpublished opinion dated 2 March 1990 (*Bianchi I*); *M. Bianchi of California*, ASBCA Nos. 37029, 37071, 93-1 BCA ¶ 25,309 (*Bianchi II*); *Bianchi v. Perry*, 31 F.3d 1163 (Fed. Cir. 1994) (*Bianchi III*); *M. Bianchi of California*, ASBCA Nos. 37029, 37071, 96-2 BCA ¶ 28,410 (*Bianchi IV*), *aff'd on recon.*, 97-1 BCA ¶ 28,767 (*Bianchi V*); *Bianchi v. Cohen*, No. 97-1394 (Fed. Cir. December 3, 1998) (*Bianchi VI*).

2 The number 54,773 was incorrect. It should have been 51,342.

3 We recognize that there is a discrepancy between this total and the corrected total in footnote 2. In *Bianchi V* we relied on an attachment to appellant's motion for reconsideration, which attachment was apparently created for the motion. For Contract No. DLA100-85-C-0339 on line 12 of that attachment, 60 garments are shown to have been delivered, 30 in October and 30 in November 1985. Here, we relied on appellant's trial exhibit 1001 which showed on the same line, for the same contract, 150 garments delivered, 30 per month from October 1985 to February 1986.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 37029, Appeal of M. Bianchi of California, rendered in conformance with the Board's Charter.

Dated: 29 DEC 2000

EDWARD S. ADAMKEWICZ
Recorder, Armed Services
Board of Contract Appeals

# CERTIFICATE OF FINALITY

ASBCA No. 37029 Appeal of M. Bianchi of California

TO BE COMPLETED BY CONTRACTOR. SUBMIT ORIGINAL TO THE GOVERNMENT'S ATTORNEY. (If completed by an attorney or firm representing contractor, original power of attorney must accompany this form.)

A. Payee Taxpayer Identification Number, SSN, or EIN:

B. Address to which check or electronic fund transfer should be sent:

C. Contractor Certification:

Contractor hereby certifies that:

(1) Contractor has not initiated and will not initiate any proceedings for review, reconsideration, or appeal of this award; and

(2) Contractor agrees to accept the amount awarded, with Contract Disputes Act interest from 3 March 1988 until paid, in full and final satisfaction of the award. Payment shall be a full discharge of the United States of all claims and demands arising out of the matters involved in the claim or controversy.

______________________________
(Signature)

______________________________
(Typed Name)

______________ ______________________________
(Date) (Title)

Please submit within 10 days to avoid unnecessary delay in payment.

# EXHIBIT "14"

**DEFENSE LOGISTICS AGENCY**
**HEADQUARTERS**
8725 JOHN J. KINGMAN ROAD, SUITE 2533
FORT BELVOIR, VIRGINIA 22060-6221

IN REPLY REFER TO DG

March 31, 2003

Scott Michael Cantor, Esq.
Graziadei & Cantor, Ltd.
302 East Carson Avenue, Suite 400
Las Vegas, Nevada 89101

Dear Mr. Cantor:

I am responding to your letters of February 20, 2003, and March 6, 2003, regarding payment of Armed Services Board of Contract Appeals (ASBCA) award under contract Nos. DLA100-80-C-2290 and DLA100-80-C-2972.

You make demand for the production of assignment documents and the name of the contracting officer for these contracts. In all the cases involving your client, regardless of fora, the following facts have been undisputed. In 1979 and 1980, the Defense Personnel Support Center awarded three contracts to M. Bianchi of California for military clothing. Bianchi assigned those contracts to the Bank of America as collateral for money loaned. The Bank properly notified the Government of this assignment under the Assignment of Claims Act. DLA is not making any claim that there are additional assignments to the Bank.

In reference to your demand for production of documents, you know that the Bank of America v. United States v. Bianchi, 23 F.3d 380 (Fed Cir 1994), Bianchi v. Perry, 140F.3d 1294 (9[th] Circuit, April 9, 1998), and Bianchi v. Walker, 163 F.3d 564; (9[th] Circuit, December 11, 1998) were all prosecuted/defended by the Department of Justice (DOJ), not DLA. Any request for such documents must be submitted to DOJ.

On August 23, 2000, DLA and representatives from DSCP met with Mr. Bianchi and his attorneys. At the end of the meeting, Mr. Bianchi, in front of his attorney, Mr. Clancy, broached the issue of overpayment to the Bank. Mr. Clancy acknowledged that he was not fully aware of all the details regarding the overpayment. Mr. Bianchi indicated that his accountant and his attorney in Las Vegas could help resolve this issue. DLA contacted you and requested documentation showing the satisfaction to the Bank. On September 15, 2000, you responded to that request by letter stating: "we do not intend to do so...". Although Mr. Bianchi originally promised that his accountant and attorney would offer proof to show that the Bank was overpaid, you refused to follow through with that promise. Your client, not DLA, is in privity of contract with the Bank and should have copies of those documents in his possession or should be able to obtain them.

Under the Department of Defense Financial Management Regulations (DoDFMR), the Government is obligated to continue to make payment to the assignee until it receives a

cancellation or release of the assignment. It is incumbent upon the assignor to ensure that the Government receives the release of the assignment documents. See 10 DoDFMR Chapter 3.

In addition, the arguments in your letters are the same arguments you made on behalf of your client in *Bianchi v. Walker*, id. There you claimed that payment to the Bank of America under the U.S. Courts of Appeals for the Federal Circuit discharged the assignment and any further recovery by the Bank would put it in a position to receive double recovery. Id. at 570. You also argued that Bianchi was entitled to direct payment as a result of decision in the *Bank of America National Trust and Saving Association v. United States and M.L. Bianchi*, supra. With regard to those arguments, the court was not persuaded and ruled:

> Bianchi's arguments are without merit. The Bank's award in Bank of America was based on Bianchi's compromise of certain contract claims in the settlement agreement. As stated above, the VECP provision was not included in this compromise. Therefore, just as Bianchi's rights to pursue this award were not foreclosed, neither were the Bank's rights as assignee of the underlying contract. We conclude that the district court was not precluded from determining that the Bank was entitled, as Bianchi's assignee, to be awarded the amount owed by the Government on the VECP contracts. The claim presented in this matter was not presented to the Federal Circuit in Bank of America. Supra. at 570.

I respectfully request that you provide documentation per the DoDFMR evidencing the assignment is cancelled or satisfied. Otherwise, DLA will follow the ruling of the Ninth Circuit and respect the rights of the assignee under our contracts with your client.

Finally, you know Ms. Sarah DiDonato was the contracting officer who testified for the Government regarding these contracts. She was also the contracting officer that informed you payment was made directly to the Bank. There is no current ACO or PCO for the subject contracts as the files have been retired.

Should you have any additional questions, please contact me at (703) 767-6080.

Sincerely,

Mary L. Clarke

Mary Clarke
Associate General Counsel

# EXHIBIT "15"

Graziadei & Cantor, Ltd.

GEORGE E. GRAZIADEI
SCOTT MICHAEL CANTOR

PLEASE REFER TO:

September 11, 2000

Bruce Baird
Defense Logistics Agency
8725 John J. Kingman Road, #2533
Fort Belvoir, Virginia 22061

Re: Claims of Maurice L. Bianchi

Dear Mr. Baird:

As you are aware, I am one of the attorneys with one of the law firms representing the interests of Maurice L. Bianchi in respect to various claims against the United States Government and the manner in which Mr. Bianchi has been abused by various agencies and attorneys employed by the United States Government in his efforts to collect awards and judgments previously rendered him by Courts of competent jurisdiction.

At the conclusion of the meeting before Mr. Lees attended by Mr. Bianchi and his counsel, Mr. Clancy, and your staff attorney, Mary Clark, and representatives of the agency (because of your representatives' conduct, I hesitate to characterize that conference as an Alternative Dispute Resolution Conference despite the fact that Mr. Bianchi agreed to participate at your request as an alternative to Congressional Reference legislation), Mr. Bianchi raised the issue of his outstanding ASBCA VECP award in the principal amount of $58,600.00 in conversation with Mary Clark. Mr. Bianchi's purpose was to determine the position of your agency in regard to the payment of that award and the position of your agency in regard to the strong evidence that the award was paid to a third-party by virtue of a false claim within the meaning of the False Claims Act. Ms. Clark advised Mr. Bianchi, in the presence of Mr. Clancy, that she had discussed the issue of the false claim allegations with those accused of perpetuating the false claim, that is a representative of the third-party and Mr. Mark Melnick of the Commercial Litigation Branch of the Department of Justice, and that the third-party has been paid and that Mr. Bianchi would not be paid the money "under any circumstance." Mr. Bianchi advised Mary Clark of the Court of Federal Claims Judgment which

effected an extinguishment of the Bank's claim in the matter of, *Bank of America v. United States Court of Federal Claims*, 23 F.3d 38 (Fed. Cir. 1994), to assure himself that Ms. Clark was aware of the underlying Court Judgment which effected the extinguishment of the third-party's claim prior to your agency paying it (for the second time) upon that claim. Ms. Clark, while indicating that Mr. Bianchi would be paid "under no circumstance" acknowledged that she was aware of the Judgment which Mr. Bianchi referenced.

Based upon our review and research, the appropriate resolution of this claim is apparent. Therefore, we would appreciate you articulating for us, in writing, the position of your Agency and why you believe it is inappropriate that Mr. Bianchi be paid the claim to which both the Federal and Ninth Circuit Courts of Appeals have indicated he is entitled.

We await your written reply within ten (10) days.

Sincerely,

GRAZIADEI & CANTOR, LTD.

SCOTT MICHAEL CANTOR, ESQ.

SMC:sd

cc: Honorable Harry Reid, United States Senate;
Honorable Jeff Sessions, United States Senate,
Attn: Mr. Scott Douglas;
Honorable Jim Gibbons, House of Representatives;
Mr. Maurice Bianchi;
Mr. Michael Clancy, Esq.

Graziadei & Cantor, Ltd.

GEORGE E. GRAZIADEI
SCOTT MICHAEL CANTOR

PLEASE REFER TO:

September 15, 2000

VIA FACSIMILE (703-767-6091) & U.S. MAIL

Mary Clarke
Defense Logistics Agency
8725 John J. Kingman Road, #2533
Fort Belvoir, Virginia 22061

Re: VECP #8680; Maurice L. Bianchi

Dear Ms. Clarke:

I was surprised to receive your voice mail on Tuesday, last, in response to my telephone call of several weeks ago. Thank you for returning my call.

I was somewhat puzzled by your message as it regards the allegation that the Bank has been overpaid. Mr. Michael Clancy, of the law firm of Holland & Knight, has corresponded with you and discussed the aspect of this false claim with you, at some length, as has Mr. Bianchi. At the conclusion of the conference attended by Mr. Bianchi, Mr. Clancy, you, and representatives of the Defense Logistics Agency before Mr. Lees (because of the Government's conduct in that conference I hesitate to characterize it is an Alternative Dispute Resolution Conference), Mr. Bianchi asked you questions concerning his claim to the above-referenced VECP award.

Specifically, Mr. Bianchi asked you if you, yourself, were holding up the payment of the award to him and you acknowledged that you were. When Mr. Bianchi asked you the basis for that withholding, you indicated that you had spoken with Mr. Melnick of the Commercial Litigation Division of the Department of Justice and with someone from the Bank at issue and that Mr. Bianchi would not be paid the VECP award previously awarded him. You also acknowledged to Mr. Bianchi that you were aware of the Court of Federal Claims Judgment which forms the basis of the false claim allegation.

Under the circumstances, I was somewhat surprised to hear your request that we provide you with documentation in support of

Mary Clarke
September 15, 2000
Page two

the allegation that the Bank has been overpaid.

Allow me to reiterate that which has been advanced by Mr. Bianchi and his attorneys many times before.

1. The basis of the Bank's claims were certain assignments and notes from Mr. Bianchi to it.

2. The Bank fully litigated its entitlement pursuant to those assignments and notes in the Court of Federal Claims litigation captioned, "Bank of America v. United States", Case No. 90-3961-C.

3. Judge Hodges ruled in the Court of Claims litigation, as a matter of law, as to the extent of the Bank's permissible recovery pursuant to the assignments and notes by an Opinion and Order entered April 6, 1995.

4. Based upon the legal holding that the Bank was entitled to recover pursuant to the assignments and notes only those funds which were utilized for purposes of contract performance, the Court of Federal Claims awarded the Bank a Judgment entered on or about July 28, 1995.

5. That by an Unopposed Motion, filed August 9, 1995, the Bank attached interest to the Judgment (although the statutory basis for the allowance of the interest appears to be non-existent or, if existent, is somewhat abstruse). A corrected Judgment, including the interest, was entered August 22, 1995.

6. Pursuant to the provisions of 28 U.S.C. §2517(b) and 28 U.S.C. §2519 the Bank's recovery in the Court of Federal Claims litigation extinguished the assignments and notes.

7. After the Bank recovered the Judgment in the Court of Federal Claims, the Bank brought a Motion for Summary Judgment in the action brought by Mr. Bianchi in the nature of mandamus in the United States District Court for the District of Nevada as case No. CV-S-94-00747-LDG-(RJJ).

8. Despite the fact that the Bank had recovered all sums that it was entitled to recover pursuant to the assignments and notes by virtue of the Court of Federal Claims Judgment and because that Judgment acted to extinguish the assignments and notes from Mr. Bianchi to the Bank as a matter of law, the Government should have opposed the Motion for Summary Judgment on the grounds that the Bank had been paid all that it was entitled to recover.

9. The attorney handling the Court of Federal Claims litigation for the United States was the same attorney handling the defense of Mr. Bianchi's Complaint in the nature of mandamus, was aware of the Bank's recovery in the Court of Federal Claims litigation and should have been aware of the statutory provisions which effected an extinguishment of the assignments and notes. Nevertheless, the United States failed to oppose the Bank's Motion for Summary Judgment in any meaningful way and, specifically, failed to raise the issue of the extinguishment of the assignments and notes.

Succinctly, the Bank's prior recovery of all that it was entitled to recover in the Court of Federal Claims litigation by a Judgment in its favor extinguished the assignments and notes upon which it based its later entitlement to Mr. Bianchi's VECP award.

It is my understanding that you have already been made aware of, and possess all the documents necessary to assess, the basis of the False Claims Act Violation or you have access to those documents, including published opinions. Mr. Bianchi and his attorneys have already provided copies of the documentation to you and/or your predecessors and/or other attorneys representing the Agency and we do not intend to do so again as each time we have done so, the Agency fails to act or address the claim.

The efficacy of our position is well established by the history of the case and the law applicable to the facts of the case. We have, and we continue, to consider the Government's failure to honor the VECP award to Mr. Bianchi as an act of bad-faith, in controvention of a Judgment of a Court of competent jurisdiction and in violation of the False Claims Act, 31 U.S.C. § 3729.

Sincerely,

GRAZIADEI & CANTOR, LTD.

SCOTT MICHAEL CANTOR, ESQ.

SMC:sd

cc: Honorable Harry Reid, United States Senate;
Honorable Jeff Sessions, United States Senate,
Attn: Mr. Scott Douglas;
Honorable Jim Gibbons, House of Representatives;
Mr. Michael Clancy, Esq.;
Mr. Maurice Bianchi

received
10-2-00

# Graziadei & Cantor, Ltd.

GEORGE E. GRAZIADEI
SCOTT MICHAEL CANTOR

PLEASE REFER TO:

October 2, 2000

VIA FACSIMILE (703-767-6091) & U.S. MAIL

Mary Clarke
Defense Logistics Agency
8725 John J. Kingman Road, #2533
Fort Belvoir, Virginia 22061

Re: ASBCA Judgment in favor of Maurice L. Bianchi

Dear Ms. Clarke:

This letter will confirm my return of your telephone message of September 19, 2000, in response to my correspondence to you under date of September 15, 2000.

In our telephone conversation of September 19, 2000, you advised me that you believe my letter of September 15, 2000, contains factual inaccuracies and, specifically, is inaccurate with respect to the discussions between you and Mr. Bianchi as I have referenced them in that letter. You have further indicated, despite my suggestion that if you believe the letter was inaccurate you should respond to those inaccuracies in writing, that you do not intend to do so.

While you take issue with Mr. Bianchi's version of the conversation following the aborted ADR on August 23, 2000, I have spoken directly with Mr. Michael Clancy, Esq., who was present during that conversation. Mr. Clancy recalls the conversation as Mr. Bianchi related it to me and as I have set forth in my letter of September 15, 2000, to you.

Moreover, in our conversation, you indicated that you were not the decision-maker with respect to DLA'S refusal to pay the ASBCA Judgment as referenced in my letter of September 15, 2000. However, you did acknowledge that, while the decision to not pay the Judgment was not your's, you wrote that which you termed to be a "decision" to DLA regarding the DLA'S obligation to pay the Judgment. With all due respect, I believe that your response to me is disingenuous unless it is your position that in your communication to the DLA decision-maker, you recommended payment

of the ASBCA Judgment and that your recommendation was overruled by the decision-maker.

You also shared with me your interpretation of the holding of the Ninth Circuit Court of Appeals in *Bianchi v. Walker*, 163 F.3d 564 (9th Cir. 1998). I believe that a simple reading of the decision belies your interpretation. In any event, the purpose of Mr. Bianchi's latest communications with you was to assure that you were fully apprised of the grounds in support of the allegation that the Bank has been paid pursuant to a false claim within the meaning of the False Claims Act. Even assuming that your erroneous interpretation of the *Walker* Decision has merit, the fact that the Bank was paid pursuant to a false claim, at the expense of paying Mr. Bianchi the ASBCA Judgment that the Ninth Circuit indicated should be paid to him in *Bianchi v. Perry*, 140 F.3d 1294 (9th Cir. 1998), and that the Federal Circuit Court of Appeals indicated should be paid to him irrespective of the Government's obligation to the Bank, (see, *Bank of America v. United States*, 23 F.3d 380 (1994)), trumps any reliance upon the payment to the third-party Bank.

Further, although not a subject of our September 19, 2000, telephone conversation, it is necessary that I advise you that Mr. Bissell of the Department of Defense has indicated that he was informed that Mr. Bianchi is not entitled to payment of the Judgment because Mr. Bianchi was in breach of the underlying DLA contracts. As you are well aware, the issue of Mr. Bianchi's alleged breach was resolved in Mr. Bianchi's favor by the September 1988, Stipulation to Board Decision which formed the basis of the ASBCA Judgment in his favor. We would appreciate you correcting Mr. Bissell's misapprehension concerning this fact.

Sincerely,

GRAZIADEI & CANTOR, LTD.

[signature]

SCOTT MICHAEL CANTOR, ESQ.

SMC:sd

cc: Honorable Harry Reid, United States Senate;
Honorable Jeff Sessions, United States Senate,
Attn: Mr. Scott Douglas;
Honorable Jim Gibbons, House of Representatives;
Mr. Maurice Bianchi
Mr. Michael Clancy, Esq.

DEFENSE LOGISTICS AGENCY
HEADQUARTERS
8725 JOHN J. KINGMAN ROAD, SUITE 2533
FT. BELVOIR, VIRGINIA 22060-6221

DG

October 6, 2000

Honorable Jim Gibbons
House of Representatives
Washington, DC 20515

Dear Congressman Gibbons:

This responds to your letter of July 17, 2000, to the Honorable J.S. Gansler, Under Secretary of Defense, on behalf of your constituent, Mr. Maurice Bianchi. Your letter has been forwarded to me for direct reply.

Your letter requests further details concerning the reluctance of the Defense Logistics Agency (DLA) to pay Mr. Bianchi a $58,613.03 judgment in his favor by the Armed Services Board of Contract Appeals (ASBCA). M. Bianchi of California, ASBCA No. 36518, 93-2 BCA ¶ 25,801 (February 10, 1993). As previously explained, DLA paid the ASBCA judgment to Mr. Bianchi's assignee bank rather than to Mr. Bianchi, following the decision of the Ninth Circuit Court of Appeals in Bianchi v. Walker, 163 F.3d 564 (9th Cir. 1998). That payment, in our view, entirely satisfied any claim Mr. Bianchi had to the money.

The ASBCA judgment in question stems from a $6,173,468.36 Value Engineering Change Proposal (VECP) claim that Mr. Bianchi had submitted under a 1980 contract with DLA (Contract No. DLA100-80-C-2972). The contract was awarded to Mr. Bianchi by the Defense Personnel Support Center (DPSC), a subordinate field activity of DLA. The ASBCA found that Mr. Bianchi was entitled to $58,613.03 of the amount claimed. See M. Bianchi of California, ASBCA No. 36518, *supra*. Government officials subsequently hesitated paying Mr. Bianchi the amount of the ASBCA judgment directly. This was because of concern about the prior rights of Mr. Bianchi's assignee bank--the Bank of America, and the possible prior rights of the Small Business Administration (SBA) as the guarantor of Mr. Bianchi's indebtedness to the Bank of America.

As a result of the Government's hesitation in paying, Mr. Bianchi filed an action in the District Court of Nevada to compel the Government to pay him. The Government interpleaded the Bank of America, seeking a determination from the Court as to whom the Government should pay, Mr. Bianchi or the Bank. The Court found that the Bank was entitled to the money. Disappointed with this result, Mr. Bianchi appealed the District Court's decision to the Ninth Circuit Court of Appeals. The Court of Appeals affirmed the lower court's decision that the Bank was entitled to the money. Bianchi v. Walker, *supra*. Considering Walker entirely dispositive of the issue, the Government, in lieu of paying Mr Bianchi, paid the Bank of America the $58,613.03 ASBCA judgment in question, plus applicable interest.

Federal Recycling Program Printed on Recycled Paper

Received Oct-17-00 06:15pm From- To-HOLLAND & KNIGHT LLP Page 02

Notwithstanding the Walker decision, Mr. Bianchi still remains convinced that he too should be paid the amount of the ASBCA judgment. He argues that the Government must make such a double payment because this happened before in Bank of America v. United States v. Bianchi, 23 F.3d 380 (Fed. Cir. 1994); he also believes the decision of the Court of Appeals for the Ninth Circuit in Bianchi v. Perry, 140 F.3d 1294 (9th Cir. 1998) supports his view the Government should pay twice. We respectfully disagree with Mr. Bianchi on all points. Nothing in our reading of these two cases persuades us that the Government must now, as Mr. Bianchi demands, essentially twice pay him $58,613.03 on the same VECP claim. And we know of nothing else in the law or equity on the facts at hand that would authorize or compel the Government to make such a duplicate payment to him.

We believe the decisions in Bank of America and Perry, which involve different claims, do not serve to counteract the specific ruling in Walker that we have followed. We believe that the Government satisfied the ASBCA judgment in question when it paid $58,613.03 plus applicable interest to the Bank of America, as directed by the Walker court. In our view, Mr. Bianchi is not entitled to any further recovery. As a matter of information, the assigned Department of Justice attorney shares these views. The enclosed Supplemental Information paper will more fully explain our views on this matter.

I trust that this information will be helpful in responding to your constituent.

Sincerely,

BRUCE W. BAIRD
General Counsel

Enclosure

SUPPLEMENTAL INFORMATION
BIANCHI CLAIMS

_Background_

In September of 1988, Mr. Bianchi and DLA, through its field activity, the Defense Personnel Support Center (DPSC), entered into a Settlement Agreement resolving a number of claims that had been pending before the ASBCA. The ASBCA incorporated the Settlement Agreement into a "Stipulation to Board Decision." That stipulated Settlement Agreement provided in pertinent part:

1. Mr. Bianchi, as the successor to M. Bianchi of California, is entitled to recover $617,500.00 on his claims...;
2. The settlement is without prejudice to Mr. Bianchi's right to pursue any and all Value Engineering Change Proposal Claims under his contracts with DPSC; and
3. The settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act to recover whatever legal fees and litigation expenses to which he may be entitled in connection with these claims and appeals.

The Government has made payment under each of the three paragraphs of the Settlement Agreement; however, the payment has flowed differently in each case. This is because each paragraph involved different court rulings. The Government believes it should follow the court ruling directly applicable to each different claim. Each paragraph of the Settlement Agreement is addressed below (not in numerical order).

**Paragraph 1 of the Settlement Agreement**
_Bank of America v. United States v. Bianchi_, *23 F.3d 380 (Fed. Cir. 1994)*

Under Paragraph 1 of the Settlement Agreement, the Government essentially paid twice, once to the Bank of America and once to Mr. Bianchi. This came about because of confusion about the proper payee due to an assignment of claims, and because of a specific court decision.

Initially, the Government paid Mr. Bianchi $1,141,220.00 ($617,500 plus interest) based on the Settlement Agreement. However, the Bank of America brought an action in the Court of Federal Claims, claiming it was entitled to this money pursuant to Mr. Bianchi's assignment of claims with the Bank. In response, the Government joined Mr. Bianchi as a third party defendant, seeking to recover the money that the Government paid to him. The Government further asserted that the Small Business Administration (SBA), as guarantor of Mr. Bianchi's indebtedness to the Bank, stood ahead of the Bank in right to payment of the $1,141,220.00, and sought the judgment of the Court to that effect as against the Bank.

The Court of Federal Claims granted summary judgment in favor of the Government and against the Bank and Mr. Bianchi. _Bank of America National Trust and Savings v. United States of America v. Maurice L. Bianchi_, No. 90-3961C, 1992 U.S. Claims LEXIS 213 (Ct. Cl. October

16, 1992). The Bank and Mr. Bianchi each appealed the decision to the United States Court of Appeals for the Federal Circuit. On appeal, the Federal Circuit reversed the lower court decision, holding that Paragraph 1 of the Settlement Agreement obligated the Government to pay the $1,141,220.00 directly to Mr. Bianchi. The Court apparently reasoned that, since the Government knew (or should have known) of Bianchi's assignment of claims to the Bank when it executed the settlement agreement, the Government should have expressly and specifically addressed the effect of the assignment in the agreement. The Court further held that the Bank had assignments earlier in time than SBA's assignments and that therefore the Government was obligated to pay the Bank ahead of the SBA. In short, the Court came to the anomalous conclusion that Mr. Bianchi was entitled to retain the $1,141,220.00 which the Government had paid him and that the Bank was also entitled to be paid $1,141,220.00. Bank of America v. United States v. Bianchi, *supra*.

Although the Government was distressed at having to pay twice, especially since Mr. Bianchi too was aware of the assignment, the Government followed the direction of the court, and considers the matter closed with respect to Paragraph 1 of the Settlement Agreement.

**Paragraph 3 of the Settlement Agreement**
*Bianchi v. Perry, 140 F.3d 1294 (9th Cir. 1998)*

Under Paragraph 3 of the Settlement Agreement, the Government paid Mr. Bianchi for attorney's fees under the Equal Access to Justice Act. The Government paid Mr. Bianchi in this case, not the Bank, because of the specific court ruling involved, Bianchi v. Perry, *supra*.

This payment came about because Mr. Bianchi, as allowed by this paragraph, had filed a claim for attorney's fees. Out of his original $1,998,720.15 claim later reduced to $925,441.83, the ASBCA awarded Mr. Bianchi $475,724.00. Application Under Equal Access to Justice Act - M. Bianchi of California, ASBCA Nos. 26363, et al., 91-1 BCA ¶ 23,445 (September 20, 1990). Government officials hesitated paying Mr. Bianchi the attorney's fees judgment because of concern about prior rights of Mr. Bianchi's assignee bank--the Bank of America, as well as the possibility of prior rights of the SBA as the guarantor of Mr. Bianchi's indebtedness to the Bank. Consequently, Mr. Bianchi filed a writ of mandamus in District Court of Nevada to compel payment from the Government.

The District Court granted summary judgment in favor of the Government, but this decision was reversed on appeal by the Court of Appeals for the Ninth Circuit. The Ninth Circuit construed the settlement agreement as precluding the Government from offsets against Mr. Bianchi's attorney's fees judgment. Bianchi v. Perry, *supra*. Following this decision, the Government paid Mr. Bianchi the ASBCA judgment of $475,724.00 plus interest.

It is noted that in the Perry case, the Ninth Circuit Court, citing Bank of America National Trust and Savings Association v. United States v. Bianchi, *supra* stated:

> This is a res judicata case regarding settlement of a Government contract.... Though other questions are raised, this case finally turns on whether

> the Federal Circuit decision is res judicata, on setoff against another part of the same deal.

Perry, *supra* at 1298. The Ninth Circuit Court went on to state:

> Because its ratio decidendi does not allow for a distinction, we conclude that the Federal Circuit [referring to Bank of America v. United States v. Bianchi, *supra*] decision is res judicata. That decision established that the Government was not entitled to a setoff against the $617,500 or the interest based on Bianchi's assignment to his bank and the bank's assignment to the SBA. The reasoning of the decision establishes that the assignments could not entitle the Government to a setoff against the settlement at all. The meaning of that agreement, with respect to setoff, has already been conclusively determined by the Federal Circuit.

*Id.* at 1299.

Thus, although the Government still questions the Court's conclusions with regard to setoff,[1] it paid Mr., Bianchi, consistent with the court decision on that claim.

**Paragraph 2 of the Settlement Agreement**
*Bianchi v. Walker, 163 F.3d. 564 (9th Cir. 1998)*

As ostensibly permitted by paragraph two of the agreement, Mr. Bianchi filed three VECP claims against the Government. In the first case decided, Mr. Bianchi filed a claim for $6,173,468.36 that resulted in the ASBCA judgment of $58,613.03. M. Bianchi of California, ASBCA No. 36518. The ASBCA found Mr. Bianchi's second VECP "claims totaling approximately $180 million to be wholly without merit." M. Bianchi of California, ASBCA Nos. 37395 et al, 94-1 BCA 26,417 (Sept. 30, 1993). The ASBCA has not reached a decision on Mr. Bianchi's third VECP claim. The first one for $58,613.03 is the subject of this inquiry.

As noted in the cover letter accompanying this attachment, the Ninth Circuit in Walker indicated the Government should pay the Bank as assignee. As directed by the Walker court, the Government did so. Mr. Bianchi remains convinced he is entitled to receive a duplicate payment from the Government for that judgment, apparently because double payment was allowed in Bank of America v. Bianchi (the case involving Paragraph 1 of the Settlement Agreement), and because direct payment to Mr. Bianchi was allowed in Perry (the case involving Paragraph 3 of the Settlement Agreement).

---

[1] DLA remains of the view that the settlement agreement could not reasonably be viewed as an affirmative or express waiver of Government set-off rights or obligations under the Contract Disputes Act, 41 USC 601, the Debt Collection Act of 1932, 31 USC 3701, or the Assignment of Claims Act. Courts generally require an overt act or clear expression of intent for forfeiture of a statutory right. There was no such act or express intention here. Indeed, the settlement agreement, to which the Bank was not even a party, was silent on the Bank's rights under Mr Bianchi's assignment of claims to it. In addition, there were common law rights of set-off to consider. Compare, Kearfott Guidance & Navigation Corp., ASBCA No. 49263, 99-2 BCA ¶ 30,518 (August 4, 1999). In DLA's view, in the final analysis DPSC officials simply lacked authority, apparent or otherwise, to waive set-off rights belonging to the Bank or the SBA.

The Government, in contrast, believes its payment to the Bank was proper, first because that was what the Walker court told the Government to do, second because that decision was later than the Perry decision, and third, because the later Walker decision distinguished if not implicitly reversed its decision earlier in the year in Bianchi v. Perry, *supra*. The following excerpts are pertinent:

> Bianchi's contention that the Government was required to pay the money due on the VECP claims was not presented to the Court of Federal Claims or the Federal Circuit in Bank of America. Therefore, Bianchi's reliance on the doctrine of res judicata is misplaced.
>
> *The Federal Circuit's decision was limited to an analysis of Bianchi's right to retain the amount the Government agreed to pay to settle the pending ASBCA claims pursuant to the first paragraph of the settlement agreement underlining ours. It did not determine whether the Government was required to pay Bianchi any amount he might recover under the reservation-of-rights provisions of the second paragraph of the settlement agreement* [emphasis ours], notwithstanding the Bank's rights under its assignment agreement with Bianchi....
>
> Bianchi also maintains that this court's decision in Bianchi v. Perry, 140 F.3d 1294 (9th Cir. 1998) is res judicata on the question whether the Bank is entitled to recover the amount owing on the VECP claim pursuant to the assignment agreement. This contention lacks merit. Bianchi v. Perry cannot serve as a bar to the Bank's claim because it was not a party or privy to that action.

*Id.* at 569-570. The views expressed by the Ninth Circuit Court of Appeals in the Walker case about the effect of the stipulated Settlement Agreement are completely congruent with DLA's own views.

Thus, concerning Paragraph 2 of the Settlement Agreement, DLA paid in accordance with the court decision, and sees no reason or authority for paying twice.

*Concerns about Overpayment of the Bank*

Regarding concerns that the Government possibly overpaid the Bank of America, the lead attorney for the Department of Justice closest to the above mentioned litigation informs us that he has no reason for believing that the Government overpaid the Bank or that Mr. Bianchi's debt to the Bank has yet been fully satisfied. Although we ourselves have asked, we have received nothing from Mr. Bianchi or his attorneys that would suggest that the Government overpaid the bank debt or that the bank debt is fully satisfied. In this regard, we are aware of the August 14, 1995, Order reducing the Bank's recovery in Bank of America v. United States v. Bianchi, *supra* to $717,009.94. The Court in that case, however, did not indicate that all of Mr. Bianchi's loans were included in the Order. In this connection, it our understanding that the Bank made a number of loans to Mr. Bianchi.

On August 23, 2000, DLA representatives met with Mr. Bianchi, his attorneys and his accountant. At the conclusion of the meeting, Mr. Bianchi, in front of his attorney, Mr. Michael Clancy, broached the issue of overpayment to the bank. Mr. Clancy indicated that he was not completely familiar with the details regarding the asserted overpayment. Mr. Bianchi indicated that his accountant and his Las Vegas attorney, Mr. Scott Cantor, had such knowledge and could help resolve the issue. Subsequently, a DLA representative contacted Mr. Cantor and requested that he provide documentation evidencing that the debt to Bank had been satisfied. On September 15, 2000, Mr. Cantor responded by letter stating: "we do not intend to do so. . .".

It is noted that in the Walker case, *supra*, Mr. Bianchi advanced similar arguments about the Bank having been fully paid. We note in this regard that the Ninth Circuit found as follows:

> Bianchi claims that the district court was not aware of the prior judgment in the Bank of America case in which the Government was held liable to the Bank for a certain sum. Bianchi claims that this payment discharged the assignment and any further recovery by the Bank would put it in a position to receive double recovery. Bianchi's arguments are without merit. The bank's award in Bank of America was based on Bianchi's compromise of certain contract claims in the settlement agreement. As stated above, the VECP provision was not included in this compromise. Therefore, just as Bianchi's right to pursue this award is not foreclosed, neither were the Bank's rights as assignee of the underlying contract.

*Id.* at 570.

*Conclusion*

Based on the separate court decisions involving the three separate paragraphs of the Settlement Agreement, we believe that we have properly discharged our obligations. Any delay in payment was based on Government concern about the proper party to pay and about outstanding indebtedness to SBA. We also believe that the Government satisfied the ASBCA judgment in question when it paid $58,613.03 plus applicable interest to the Bank of America. In our view, Mr. Bianchi is not entitled to any further recovery. As a matter of information, as noted in the letter accompanying this attachment, the assigned Department of Justice attorney shares these views.

Law Offices

# HOLLAND & KNIGHT LLP

2100 Pennsylvania Avenue, N.W.
Suite 400
Washington, D.C. 20037-3202

202-955-3000
FAX 202-955-5564
www.hklaw.com

Atlanta
Boston
Bradenton
Chicago
Fort Lauderdale
Jacksonville
Lakeland
Los Angeles
Melbourne
Miami
New York
Northern Virginia
Orlando
Providence
St. Petersburg
San Antonio
San Francisco
Seattle
Tallahassee
Tampa
Washington, D.C.
West Palm Beach

International Offices:
Buenos Aires*
Mexico City
Tel Aviv*
Tokyo
*Representative Office

MICHAEL W. CLANCY
202-467-7064

Internet Address:
mclancy@hklaw.com

October 20, 2000

**VIA FACSIMILE**

Wade Thompson
Legislative Assistant
Office of Representative Jim Gibbons
100 Cannon House Office Building
Washington, D.C. 20515

Re: M. Bianchi

Dear Wade:

I have reviewed the Defense Logistics Agency ("DLA") letter dated October 6, 2000, which states that it is responding to Congressman Gibbons' July 17, 2000, letter.

DLA's two-page letter and five-page enclosure, as we briefly discussed yesterday, are not a fair or accurate characterization of the Bianchi/DLA cases and are replete with misstatements. In fact, DLA simply reasserts arguments that have been rejected repeatedly by two federal circuit courts: the U.S. Court of Appeals for the Federal Circuit[1] and the U.S. Court of Appeals for the Ninth Circuit. Here is the "bottom line":

In 1988, twelve years ago, the parties entered a simple, straightforward three-paragraph settlement agreement entitled Stipulation to Board Decision. Paragraph 1 provided for the payment of the principal amount of $617,500 for certain contract claims plus interest, which brought the total amount of the payment for Mr. Bianchi to $1,141,220.83. Paragraph 2 of the Stipulation provided that this "settlement is without prejudice to Mr. Bianchi's right to pursue any and all Value Engineering Change Proposal ["VECP"] Claims under

[1] Moreover, DLA also sought a rehearing before the U.S. Court of Appeals for the Federal Circuit and that rehearing was denied.

his contracts with DPSC [a subordinate organization within DLA]." Paragraph 3 provided that this "settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act ["EAJA"] to recover whatever legal fees and litigation expenses to which he may be entitled in connection with" the litigation.

First, in 1992, DLA and the Department of Justice tried to renege on paragraph 1 of the Stipulation and reclaim the payment of $1 141,220.83. This improper action by the Government was rejected by the Federal Circuit and the Government's request for a rehearing also was denied. *See* Bank of America v. United States v. Bianchi, 23 F.3d. 380 (Fed. Cir. 1994). Specifically, the Federal Circuit ruled that "... the government cannot now renege on its commitment to honor its settlement with Bianchi, into which it entered voluntarily and with full knowledge of the facts." **Notably, this statement by the Court is *not* included in DLA's seven-page submission to Congressman Gibbons.**

Next, DLA and the Department of Justice attempted to renege on paragraph 3 of the Stipulation (*i.e.* the provision for attorney fees under EAJA). Once again, the Government's wrongful conduct was rejected by the federal court - this time by the Ninth Circuit Court of Appeals in Bianchi v. Perry, 140 F.3d. 1294 (9th Cir. 1998). The Court ruled that a "deal is a deal" and ordered the Government to pay Mr. Bianchi the EAJA judgment awarded to Mr. Bianchi by the Armed Services Board of Contract Appeals ("ASBCA") eight years earlier. Further, the Ninth Circuit observed that the Government's position in refusing to pay Mr. Bianchi, if asserted in other types of cases (e.g., one involving settlement of insurance claims), would be attacked as bad faith. *See* Bianchi v. Perry at p. 1298. **Again, as noted above, DLA's seven-page submission to Congressman Gibbons conspicuously *omits* any discussion of these statements by the Court.**

The Government argues in DLA's letter that these prior federal court decisions are limited only to paragraphs 1 and 3 of the parties' Stipulation, and are not applicable to paragraph 2 (the VECP provision), which requires payment of the $58,613.03 ASBCA judgment. This argument is blatantly flawed since it completely ignores the Ninth Circuit's statement (quoted in the second paragraph of Congressman Gibbons' July 17, 2000 letter) that the Stipulation can only be "honest[ly]" understood to mean that Bianchi is entitled to be paid "whatever he can win on his Value Engineering Change Proposal claims."

DLA's letter also ignores the Court's reasoning in Perry that rejected the identical argument made by DLA in its effort to avoid payment of the EAJA judgment to Mr. Bianchi. Specifically, the Court stated:

Wade Thompson
October 20, 2000
Page 3

> The setoff is the same as to both [*i.e.*, the paragraph 1 payment of $617,500 and the paragraph 3 provisions on EAJA]. To the extent, that the government had a claim against Bianchi for his unpaid SBA loans, the settlement agreement no more allowed the government to lie in the weeds with a setoff against the EAJA award than with the $617,500. Bianchi v. Perry at p. 1298 (emphasis added).[2]

It is Mr. Bianchi's position that the same logic and rationale applies to paragraph 2 of the Stipulation concerning VECP claims. The government is no more allowed "to lie in the weeds with a setoff against" the VECP judgment than with the $617,500 or the EAJA judgment. DLA's position, in light of the two federal court decisions, is disingenuous, unfair, and, as indicated by the Court in Perry, dishonest and tantamount to bad faith.

Mr. Bianchi could continue to litigate by filing suit in the Court of the Federal Claims. That approach, however, is time consuming, expensive and unjustified given the clear precedent set by the previous decisions.

As noted above, DLA's seven-page submission contains a number of misstatements. This letter does not purport to identify them all, but I think it is appropriate to highlight a few of those misstatements to further enforce the disingenuous of DLA's submission to Congressman Gibbons.

First, on the bottom page of the "Supplemental Information" memorandum, DLA states that the Government paid Mr. Bianchi "the ASBCA [EAJA] judgement of $475,724.00 plus interest" [emphasis added]. That is a false statement. The truth is that DLA specifically refused to pay Mr. Bianchi interest for DLA's wrongful eight-year delay in payment (which amounts to approximately $250,000). Instead, legislation will be necessary to compensate Mr. Bianchi for the Government's wrongful, bad faith conduct in delaying payment for eight years.

Second, DLA asserts on page 3 of the Supplemental Information memorandum that certain VECP claims were "wholly without merit." DLA, however, fails to inform Congressman Gibbons that DLA formally accepted and implemented Mr. Bianchi's VECPs through bilateral and unilateral contract

---

[2] The Ninth Circuit noted that Mr. Bianchi settled for less money in order to satisfy the SBA's alleged claims and the Federal Circuit commented that Mr. Bianchi obviously would not have settled if the settlement amount was to be paid to the Bank of America or the SBA. That is, the parties negotiated a complete settlement and the Government cannot now renege on that settlement.

modifications and corresponding specification changes, but DLA has never paid Mr. Bianchi any amount for those VECPs.

A third example of the misinformation provided by DLA relates to Mr. Cantor's September 15, 2000, letter to Mary Clarke at DLA, which is discussed on the last page of DLA's Supplemental Information memorandum. Mr. Cantor's letter, a copy of which is enclosed (DLA failed to furnish a copy to Congressman Gibbons), provides a point by point account on pages 2 and 3 that explains clearly how the Bank was overpaid. DLA seems intent on being deliberately obtuse on this issue.

In sum, the courts have repeatedly rejected the Government's arguments yet DLA and apparently the DOJ lawyer, who has been on the losing side of both the Federal Circuit and Ninth Circuit cases, will not admit defeat. As I mentioned in our telephone conversation, another letter to DLA would not be productive in resolving the issues relating to DLA's failure to pay the $58,613.03 judgment. A meeting with senior DOD officials appears to be the next step.

Prior to such a meeting, however, the priority is the ADR on the pending ASBCA case. There is no valid, reasonable basis for DLA's failure to honor Secretary Gansler's commitment to Congressman Gibbons that DLA would work aggressively to resolve the issues through ADR. Likewise, there is no valid, reasonable basis for DLA's withdrawal of its offer and DLA's refusal to allow Mr. Bianchi the opportunity to consider the offer and to accept or reject the offer.

As always, Maury deeply appreciates your efforts and Congressman Gibbons' assistance with these issues. I look forward to talking with you soon regarding the ADR.

Best regards,

Holland & Knight LLP

Michael W. Clancy

Michael W. Clancy

cc: M. Bianchi

Enclosure

# EXHIBIT "16"

DEFENSE LOGISTICS AGENCY
HEADQUARTERS
8725 JOHN J. KINGMAN ROAD, SUITE 2533
FORT BELVOIR, VIRGINIA 22060-6221

IN REPLY REFER TO DG

SEP 10 2002

Scott Michael Cantor, Esq.
Graziadei & Cantor, Ltd.
302 East Carson Avenue, Suite 400
Las Vegas, NV 89101

Re: ASBCA Nos. 37029 & 37071
Federal Circuit Case No. 01-1319
Claims of Maurice Bianchi, fdba M. Bianchi of California

Dear Mr. Cantor:

I am responding to your letters dated July 29, 2002, and August 23, 2002, which were addressed to Mr. Bruce Baird, General Counsel of the Defense Logistic Agency. In those letters, you demanded direct payment to your client of the award under the above-cited ASBCA cases. After reviewing your letters and the documents available to me, I cannot agree with your conclusions of facts or law.

In all the cases involving your client, regardless of fora, the following facts have been undisputed. In 1979 and 1980, the Defense Personnel Support Center awarded three contracts to M. Bianchi of California for military clothing. Bianchi assigned those contracts to the Bank of America as collateral for money loaned. The Bank properly notified the Government of this assignment under the Assignment of Claims Act.

Under the Department of Defense Financial Management Regulations (DoDFMR), the Government is obligated to continue to make payment to the assignee until it receives a cancellation or release of the assignment. It is incumbent upon the assignor to ensure that the Government receives the release of the assignment documents. See 10 DoDFMR Chapter 3.

In addition, the arguments in your letter are the same arguments you made on behalf of your client in *Bianchi v. Walker*, 163 F.3d 564 (9th Cir. 1998). There you claimed that payment to the Bank of America, under the U.S. Court of Appeals for the Federal Circuit, discharged the assignment and any further recovery by the Bank would put it in a position to receive double recovery (Id. at 570). You also argued that Bianchi was entitled to direct payment as a result of the decision in the *Bank of America National Trust and Saving Association v. United Sates and M.L. Bianchi*, 23 F.3d 380 (Fed. Cir. April 29, 1994). With regard to those arguments, the court was not persuaded and ruled:

> Bianchi's arguments are without merit. The Bank's award in Bank of America was based on Bianchi's compromise of certain contract claims in the settlement agreement. As stated above, the VECP provision was not included in this compromise. Therefore, just as Bianchi's rights to pursue this award were not foreclosed, neither were the Bank's rights as assignee of the underlying contract. We conclude that the district court was not precluded from determining that the Bank was entitled, as Bianchi's assignee, to be awarded the amount owed by the Government on the VECP contracts. The claim presented in this matter was not presented to the Federal Circuit in Bank of America. *Bianchi v. Walker*, supra at 570.

I respectfully request that you provide evidence per the DoDFMR that the assignment is cancelled or satisfied. Otherwise, DLA will follow the ruling of the Ninth Circuit and respect the rights of the assignee under our contracts with your client.

Should you have any additional questions, please contact me at (703) 767-6080.

Sincerely,

MARY E. CLARKE
Associate General Counsel
Procurement

cc: Bruce Baird

Graziadei & Cantor, Ltd.

September 17, 2002

GEORGE E. GRAZIADEI
SCOTT MICHAEL CANTOR

PLEASE REFER TO:

VIA FACSIMILE (703-767-6091) & U.S. MAIL

Bruce Baird, Esq.
General Counsel, Office of the General Counsel
Defense Logistics Agency
8725 John J. Kingman Road, #2533
Fort Belvoir, Virginia 22061

Re: ASBCA Nos. 37029 & 37071 (consolidated)
Federal Circuit Case No. 01-1319
Claims of Maurice Bianchi fdba M. Bianchi of California

Dear Mr. Baird:

We are in receipt of correspondence above the signature of Mary Clarke, Associate General Counsel for Procurement, dated September 10, 2002, a copy of which is enclosed. In all candor, given your Agency's positions in this matter and its disregard of, not only relevant law but the uncontradicted facts, your position was not unanticipated.

By your counsel's letter, you are attempting to shift the burden to Mr. Bianchi to prove facts that are within the knowledge of the Defense Logistics Agency. If there were any notes or assignments which were extant at the time that the Government paid Mr. Bianchi's award to Bank of America, or if Bank of America had made demand for payment of that award, such information is in the possession of the Defense Logistics Agency. Despite repeated requests, both telephonically and in writing, that you produce any such extant notes, assignments and/or demands, you have failed to do so. By Clarke's letter, you now attempt to shift the burden to Mr. Bianchi to prove that the assignments were canceled or satisfied without providing any information as to which assignments you claim to have been extant at the time that you paid Mr. Bianchi's award to the Bank.

In any event, we have demonstrated to you, repeatedly, that the notes and assignments upon which the Bank's claim was based were extinguished, as a matter of law, by the Bank receiving its Judgment in the United States Court of Federal Claims. Again, you have failed to address this issue.

We have also reviewed the Department of Defense Financial Management Regulations and specifically Chapter 3 thereof. It is clear that pursuant to those regulations, it is the burden of your Agency to give proper notice of the disposition of the

302 East Carson Avenue, Suite 400 • Las Vegas, Nevada 89101 • Telephone (702) 477-7733

Bank's claims in the United States Court of Federal Claims and the effect of that disposition, that is, the extinguishment of the notes and assignments upon which the Bank's claim was based. Again, you attempt to shift the burden to Mr. Bianchi.

Your reliance on the two cited Circuit Decisions to justify your Agency's unlawful actions is erroneous. *Bank of America National Trust & Savings Association v. United States*, 23 F.3d 380 (Fed. Cir. 1994) was decided prior to the Bank receiving its award in the United States Court of Federal Claims which, as a matter of law, extinguished the notes and assignments upon which the Bank based its claims. *Bianchi v. Walker* simply stood for the proposition that the forum in which to decide these claims was the United States Court of Federal Claims (the Circuit Decision in *Walker* did not reject Mr. Bianchi's claim; it simply indicated that he had to bring an enforcement action in a different forum). In fact, the Bank litigated its claims based upon the assignments and notes in the United States Court of Federal Claims and received its Judgment which, by operation of law, extinguished the notes and assignments upon which those claims were based. Thus, it is clear, both as a matter of fact and as a matter of law, that at the time that your Agency paid Mr. Bianchi's awards to Bank of America, there were no extant assignments and notes upon which to base that payment. You have failed, and continue to fail, to demonstrate otherwise.

I have written to you, repeatedly, concerning your Agency's bad-faith and the bad-faith of counsel representing your Agency's position. Ms. Clarke's letter is another example, in a long line of examples, demonstrating that bad-faith. Your defenses to Mr. Bianchi's claims and your position with regard to the facts are transparent.

Sincerely,

GRAZIADEI & CANTOR, LTD.

SCOTT MICHAEL CANTOR, ESQ.

SMC:sd

Enclosure

cc: Mr. Bianchi
Honorable Senator Harry Reid
Honorable Congresswoman Shelley Berkley
Honorable Congressman Jim Gibbons
Mary Clarke, Esq.
Edward S. Adamkewicz, Recorder, ASBCA

SEP-17-2002(TUE) 12:51 GRAZIADEI & CANTOR, LTD (FAX)7024770020 P.001

Transaction Report

Send

Transaction(s) completed

| No. | TX Date/Time | Destination | Duration | P. | Result | Mode |
|---|---|---|---|---|---|---|
| 330 | SEP-17 12:49 | 17037676091 | 0'01'33" | 004 | OK | N ECM |

Baird

# Graziadei & Cantor, Ltd.

September 17, 2002

GEORGE E. GRAZIADEI
SCOTT MICHAEL CANTOR

PLEASE REFER TO:

VIA FACSIMILE (703-767-6091) & U.S. MAIL

Bruce Baird, Esq.
General Counsel, Office of the General Counsel
Defense Logistics Agency
8725 John J. Kingman Road, #2533
Fort Belvoir, Virginia 22061

Re: ASBCA Nos. 37029 & 37071 (consolidated)
Federal Circuit Case No. 01-1319
Claims of Maurice Bianchi fdba M. Bianchi of California

Dear Mr. Baird:

We are in receipt of correspondence above the signature of Mary Clarke, Associate General Counsel for Procurement, dated September 10, 2002, a copy of which is enclosed. In all candor, given your Agency's positions in this matter and its disregard of, not only relevant law but the uncontradicted facts, your position was not unanticipated.

By your counsel's letter, you are attempting to shift the burden to Mr. Bianchi to prove facts that are within the knowledge of the Defense Logistics Agency. If there were any notes or assignments which were extant at the time that the Government paid Mr. Bianchi's award to Bank of America, or if Bank of America had made demand for payment of that award, such information is in the possession of the Defense Logistics Agency. Despite repeated requests, both telephonically and in writing, that you produce any such extant notes, assignments and/or demands, you have failed to do so. By Clarke's letter, you now attempt to shift the burden to Mr. Bianchi to prove that the assignments were canceled or satisfied without providing any information as to which assignments you claim to have been extant at the time that you paid Mr. Bianchi's award to the Bank.

In any event, we have demonstrated to you, repeatedly, that the notes and assignments upon which the Bank's claim was based were extinguished, as a matter of law, by the Bank receiving its

DEFENSE LOGISTICS AGENCY
HEADQUARTERS
8725 JOHN J. KINGMAN ROAD, SUITE 2533
FORT BELVOIR, VIRGINIA 22060-6221

IN REPLY REFER TO DG

March 31, 2003

Scott Michael Cantor, Esq.
Graziadei & Cantor, Ltd.
302 East Carson Avenue, Suite 400
Las Vegas, Nevada 89101

Dear Mr. Cantor:

This is to notify you that as General Counsel of the Defense Logistics Agency, I am the Agency's legal representative with respect to the various demands you have made for the direct payment of $16,574.74 plus interest to your client, M. Bianchi of California, for the award under ASBCA No. 37029; Appeal of M. Bianchi of California.

You are requested to address any future questions regarding your client's claim to my staff attorney, Mary Clarke. You are specifically requested to refrain from corresponding with or otherwise communicating with the Director of the Agency with respect to this claim.

Professional Conduct Rule 182, concerning communication with a person represented by counsel, contained in Part III of the Nevada Supreme Court Rules for the Government of the Legal Profession, specifically states: "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."

The substantive requests set forth in your letters of February 20, 2003, and March 6, 2003, are being answered by separate letter by Ms. Clarke.

Sincerely,

[signature]

BRUCE W. BAIRD
General Counsel

# Graziadei & Cantor, Ltd.

GEORGE E. GRAZIADEI
SCOTT MICHAEL CANTOR

PLEASE REFER TO:

April 22, 2003

U.S. MAIL AND FACSIMILE TRANSMISSION - (703-767-6090)

Mary Clarke
Associate General Counsel
Defense Logistics Agency
8725 John J. Kingman Road, Suite 2533
Fort Belvoir, Virginia 22060-6221

Re: Demand for payment of Armed Services Board of Contract Appeals awards Under Contract Nos. DLA 100-80-C-2290 and DLA 100-80-C-2972

Dear Ms. Clarke:

I am in receipt of your remarkable correspondence of March 31, 2003. In response, please be advised, as follows.

Your position is disingenuous. DLA is well aware that Bank of America litigated its right to all sums it was due pursuant to Bianchi's notes and assignments to it. As you are further aware, the United States Court of Federal Claims ruled that the Bank was entitled to recover under those notes and assignments only those monies which the Bank could demonstrate were provided for contract performance. The Bank provided evidence and litigated that issue receiving, first, a Judgment and, then, a Corrected Judgment adding interest to the amount which the Bank proved had been provided for contract performance. Although you are well aware of this litigation history and should have copies of the Judgments in your file, enclosed, please find the following:

1. The Decision of Judge Hodges of the United States Court of Federal Claims which, as a matter of law, limited the Bank's recovery under the assignments and notes to those sums which the Bank could prove were provided for contract performance;

302 East Carson Avenue, Suite 400 • Las Vegas, Nevada 89101 • Telephone (702) 477-7733

2. The Judgment of the United States Court of Federal Claims. awarding the Bank the money it was entitled to receive under the assignments and notes;

3. The Corrected Judgment of the United States Court of Federal Claims adding interest to the amount awarded to the Bank.

In the second paragraph of your March 31, 2003, letter, you admit that DLA has made no claim that there are any additional assignments to the Bank, other than those which were clearly extinguished as a matter of law upon the Bank receiving judgment in the United States Court of Federal Claims. Despite numerous discussions and letters on this subject, your agency has yet to articulate any logical or reasonable rationale for ignoring the clear mandate of the United States Court of Appeals for the Federal Circuit in *Bank of America v. United States*, 23 F.3d 380, that the Government had incurred liability to both the Bank and to Mr. Bianchi. As of this date, the Government has yet to articulate any rationale for withholding the payment to Mr. Bianchi other than stating that to do so would constitute a duplicate payment, a fact which was resolved in Mr. Bianchi's favor, as a matter of law, by the United States Court of Appeals for the Federal Circuit.

As you are well aware, the provisions of the United States Code provide that once the Bank has recovered the sums which it was entitled to recover in that litigation, the Judgment extinguished the underlying notes and assignments (which by law, in any event, became merged in the Judgment).

These documents, taken together, conclusively demonstrate that the Bank's entitlement to receipt of any sums pursuant to the notes and assignments was extinguished, as a matter of law, no later than the entry of the Corrected Judgment in its favor. Your attention is drawn, one further time, to the provisions of 28 U.S.C. §2517 and 28 U.S.C. §2519.

Parenthetically, your claim that the request for production of the documents which, by your letter you acknowledge do not exist, should be directed to the Department of Justice, is disingenuous. The Department of Justice attorney represented in open Court on numerous occasions that he was representing the interests of your agency in that litigation.

Your statements regarding the holding of the Ninth Circuit Court in *Walker* is unavailing. As you are well aware, the issue in that litigation was not whether the Bank's claims were extinguished but whether the Bank was entitled to payment under the terms of the assignments (without regard for its pending claims in the Court of Federal Claims later resolved in the Bank's favor, thus, extinguishing the notes and assignments). You have quoted a portion of the Circuit Court's Decision which simply held that the jurisdiction of the District Court was not precluded and the Court could determine that the Bank, as assignee, was entitled to the award of the amount owed by the Government on the VECP contracts. That Decision, at the same time, indicated that Mr. Bianchi was free to pursue his claims in the United States Court of Federal Claims, rather than by way of a mandamus action in the United States District Court, a fact which you conveniently ignore. Moreover, you continue to ignore the clear, unambiguous holding in *Bank of America v. U.S.*, 23 F.3d 380, that the Government incurred distinct liability to <u>both</u> Mr. Bianchi <u>and</u> the Bank under separate and independent legal grounds.

Insofar as the issue of whether or not the notes and assignments were extinguished was not before the Ninth Circuit in the *Walker* case, its decision does not pertain to the extinguishment and satisfaction of the notes and assignments. That extinguishment followed as a matter of law from the receipt of the Bank's Judgment in the United States Court of Federal Claims and/or by the Corrected Judgment, copies of which are enclosed.

In the fourth paragraph of your March 31, 2003, letter, you claim that at the failed Alternative Dispute Resolution Conference on August 23, 2000, Mr. Clancy and Mr. Bianchi indicated that evidence of the over-payment would be provided by me. You then quote, entirely out of context, one clause of one sentence contained in my September 15, 2000, letter to your agency in order to make it appear as though Mr. Bianchi and his counsel were failing to cooperate in providing the requested documentation. Your assertion and implications are without merit. That which by my letter Mr. Bianchi indicated he did not intend to do was to accept the intellectually dishonest premise that the burden was upon him to prove that the notes and assignments had been "released". My letter made it very clear that the assignments were not "released" but were extinguished by operation of law, a fact of which you and your agency representatives are well aware and continue to ignore. Moreover, Mr. Bianchi, having read your correspondence of March 31, 2003, has indicated that you have grossly mischaracterized the conversation between him, Mr. Clancy and you at that meeting. Mr. Clancy was well-versed in the issue of over payment.

Those proofs have been provided to you on numerous occasions. They consist of, in and among other things, the documents enclosed herein demonstrating that, as a matter of law, the Bank was entitled to recover under those notes and assignments only those sums which the Bank could prove were provided for contract performance and that, having received a judgment for that sum and the interest accrued thereon, the underlying notes and assignments were extinguished. Contrary to your letter, it was your representation at the failed Alternative Dispute Resolution Conference that it was necessary for you to contact Debbie Young, counsel for Bank of America, to obtain the Bank's consent to pay Mr. Bianchi the awards which are due him pursuant to the mandate of the United States Court of Appeals for the Federal Circuit.

Therefore, I shall put the issue to you directly and succinctly: there is no need to obtain releases of the notes and assignments; the notes and assignments were extinguished by operation of law.

We have contacted the Department of Defense Office of Financial Management and have been informed that, contrary to your assertion, it was the obligation of counsel for the United States to obtain and produce releases which would have flowed from the litigation by which the Bank receiving its judgment against the United States, litigation to which Mr. Bianchi was no longer a party. In fact, we were told very directly that Mr. Bianchi had "no right" to do that which you are suggesting he is required to do by regulations, insofar as the Government was represented by counsel and had personal knowledge of the extinguishment of the underlying notes and assignments. Indeed, the representative of that office indicated that it was the burden of Government counsel to notify the Department of the action or contingency which resulted in the extinguishment of the assignments and notes.

Sandra DiDonato was contacted and asked to verify whether she was the PCO for the subject contracts. Her reply was non-responsive and her signature block indicated her to be a recruiter, not a PCO. Therefore, we inquired of your agency. Insofar as the contracts have never been "Z'ed-out", your retiring of the files was premature and they should be reopened. Why you would retire a file on an executory contract is somewhat abstruse to us. In any event, because the PCO must issue a final decision in this case, because no final decision has been issued, because you indicate that there is no PCO assigned to the subject contracts and because the contracts were retired prematurely, the suggestions in your letter of are no moment and evidence further bad faith on the part of the Government in denying Mr.

Bianchi's claims.

It is interesting to note that the Government's course of conduct in this matter is consistent with conduct which Mr. Bianchi was advised by Special Agents of the Federal Bureau of Investigation including, without limitation, Stanley Fullerton, Maurice Welsh, Joe Ford and others, he should expect in his efforts to obtain satisfaction of the monies due him by your Agency. Although Operation Thimble, the investigation to which those Special Agents were assigned, resulted in numerous prosecutions, the conduct toward Mr. Bianchi has not changed and your Agency continues to rely on factually incorrect, legally invalid and intellectually dishonest rationalizations to obstruct his receipt of the payments due him under his awards.

Sincerely,

GRAZIADEI & CANTOR, LTD.

SCOTT MICHAEL CANTOR, ESQ.

SMC:sd

Enclosures

cc: Mr. Bianchi
Honorable Senator Harry Reid
Honorable Congresswoman Shelley Berkley
Vice-Admiral Keith Lippert
Bruce Baird, Esq.
Edward S. Adamkewicz, Recorder, ASBCA

# EXHIBIT "17"

ORIGINAL

# In the United States Court of Federal Claims

No. 90-3961C

(Filed: April 6, 1995)

FILED
APR 6 1995
U.S. COURT OF FEDERAL CLAIMS

* * * * * * * * *

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, *

Plaintiff, *

v. *

UNITED STATES OF AMERICA, *

Defendant and Third-Party Plaintiff, *

v. *

MAURICE L. BIANCHI, *

Third Party Defendant. *

* * * * * * * * *

THIS OPINION WILL NOT BE PUBLISHED

A TRUE COPY: 1/31/97
TEST:
DAVID A. LAMPEN
Clerk, U.S. Court of Federal Claims
By ______ Deputy Clerk

Michael L. Burack, Washington, D.C., for plaintiff.

Mark A. Melnick, United States Department of Justice, Washington, D.C., for defendant.

Robert A. Brunette, La Canada Flintridge, California, for third party defendant.

**OPINION & ORDER**

HODGES, Judge.

Bank of America seeks to recover money that defendant erroneously paid third party defendant contrary to Bank of America's assignment rights. This case is before the court

on remand from the Federal Circuit.[1] The parties filed cross motions for summary judgment after that decision, and defendant seeks to reopen discovery. We deny defendant's motions and grant plaintiff's motion in part.

## FACTS

In 1979 and 1980 the Defense Logistics Agency awarded three contracts to Bianchi to manufacture coats and jackets. Bianchi assigned the rights to the proceeds of the contracts to the Bank of America after award. The Bank notified the contracting officer and the disbursing officer in accordance with the Assignment of Claims Act. 31 U.S.C. § 3727 (1988), 41 U.S.C. § 15 (1988).

Later in 1980, the Bank sought to restructure its relationship with Bianchi, and received 90% loan guarantees from the Small Business Administration to support its loans. Bianchi defaulted on his loans in 1981 and SBA paid the guaranteed amounts. In return for the SBA payments, the Bank assigned its interest in the guaranteed loan agreement with Bianchi to SBA.

Bianchi's Defense Logistics Agency contracts were either completed or terminated by July 8, 1981. The events surrounding the contract terminations led Bianchi to institute a series of claims against DLA. In September 1988, Bianchi's claims against the Government were settled for $617,000 plus interest from June 18, 1981 until payment. The

---

[1] See Bank of America National Trust and Savings Association v. United States v. Bianchi, 23 F.3d 380 (Fed. Cir. 1994).

Armed Services Board of Contract Appeals issued a decision pursuant to the settlement and that decision was forwarded to the General Accounting Office (GAO) for payment.

Defendant paid Bianchi $1,141,220 in November 1988 despite the Bank's assignment rights. In June 1990, the Bank demanded the settlement amount erroneously paid to Bianchi. The Government requested repayment from Bianchi, but Bianchi refused.

Bank of America filed suit in this court seeking the settlement monies. We ruled that the Bank had no claim against defendant because it had assigned its rights to SBA in exchange for the 90% loan guarantee. SBA later paid Bank of America the 90% when Bianchi defaulted. The Court of Appeals for the Federal Circuit held defendant liable to the Bank for the settlement paid to Bianchi by mistake. Bank of America, 23 F.3d at 385.

The Bank loaned money to Bianchi for contract performance before his contracts were terminated. After termination, it financed Bianchi's prosecution of his claims against the Government. Bianchi's indebtedness to the Bank related to performance loans as of November 1994 totals $1,094,421, including interest.

## DISCUSSION

Summary judgment is appropriate in this matter. Defendant has had ample opportunity for discovery but has not shown that material facts are in dispute. It is clear that defendant is liable to the Bank for money it erroneously paid to Bianchi. See Bank of America, 23 F.3d at 385. Facts and issues in California state court proceedings between the Bank and Bianchi do not affect this case. The sole issue is the amount of the Bank's damages.

The Bank has produced affidavits which set forth the amount of money loaned to Bianchi during contract performance. The amounts loaned remained unpaid through November 1988 when defendant erroneously paid Bianchi pursuant to the parties' settlement and ASBCA decision.

The intent of the Assignment of Claims Act is to facilitate performance of government contracts by making contractors' assignments independent of other financial agreements. Central Bank v. United States, 345 U.S. 639 (1953). Bianchi's debt to Bank of America exceeds the $1,141,220 settlement improperly paid to Bianchi by the Government. However, the Bank's rights to the assigned proceeds are limited under the Assignment of Claims Act. 31 U.S.C. § 3727, 41 U.S.C. § 15. Loans used for purposes other than contract performances are not protected by the Act. Coleman v. United States, 158 Ct. Cl. 490, 496 (1962). The Act specifically prohibits assignments that do not comply with its provisions. American Nat. Bank & Trust Co. of Chicago v. United States, 22 Cl. Ct. 7, 16 (1990).

An assignment is defeated if the lender has reason to know that the loan proceeds will not be used in completion of the government contract. First National City Bank v. United States, 212 Ct. Cl. 357 (1977). To prove the existence of a valid statutory assignment, a bank must show that it loaned money or made money available for contract performance. If Bank of America did not loan money for performance of the contract, the assignment is not valid. American Nat. Bank, 22 Cl. Ct. at 16 (citations omitted). The Bank can recover only the contract-related loans it made to Bianchi. When the Government erroneously pays the contractor instead of the assignee, the assignee may recover only that

amount which was disbursed to the contractor-assignor in contravention of the valid assignment. See Maryland Small Business Fin. Auth. v. United States, 4 Cl. Ct. 76, 80 (1983).

Bank of America loaned money to Bianchi before his government contracts had ended. These loans satisfied the statutory requirements for a valid assignment, and the Bank may recover these amounts. When the Bank loaned money to Bianchi after the contract period was completed, it knew that such loans were not available for use in contract performance. That money was used to prosecute Bianchi's legal claims against the Government. Such assignments did not comply with the Act, and the Bank cannot recover those amounts from defendant.

Because the validity of the Bank's assignments was limited, it was not entitled to recover the full amount of the $1.14 million contract proceeds settlement from DLA in 1988. The Bank may collect from that settlement only the amount that it can trace to loans made before contract termination.

Bank of America seeks recovery of accrued interest, but it cites no contract or statutory provision permitting it to collect interest. Interest on a claim against the United States is permissible only pursuant to a contract or an Act of Congress expressly providing for such payments. 28 U.S.C. § 2516(a); First National City Bank, 212 Ct. Cl. at 371. The United States is immune from an interest award in absence of express congressional intent. Library of Congress v. Shaw, 478 U.S. 310, 314 (1986). To recover interest on an implied or express contract, the Bank must prove that the Government agreed to assume liability for accrued interest. See Maryland Small Business Fin. Auth., 4 Cl. Ct. at 80. The Bank has

provided no evidence of such assumption of liability by defendant. Bank of America is not entitled to the full $1.09 million that it estimates had accrued as of November 1994 because this figure includes more than six years' interest.

## CONCLUSION

The Bank will provide evidence of the amount owed on qualified loans as of November 1988 and the legal basis for its claim of interest no later than April 17. Defendant's response will be due on or before April 28.

Plaintiff's motion for summary judgment is GRANTED-IN-PART. Defendant's cross motion for summary judgment is DENIED. Defendant's motion to reopen discovery is DENIED.

Robert H. Hodges, Jr.
Judge

# EXHIBIT "18"

GAO
United States
General Accounting Office
Washington, D.C. 20548

Office of the General Counsel

Z-2889398

August 26, 1994

Mr. George E. Graziadei, Esq.
Graziadei & Cantor, Ltd.
302 East Carson Avenue, Suite 400
Las Vegas, Nevada 89101

Dear Mr. Graziadei:

This responds to your letters of July 1, 1994, and August 12, 1994 (the latter having been received on August 17), requesting that this Office certify payment pursuant to 31 U.S.C. § 1304 and 41 U.S.C. § 612 of the award of $58,613.03, plus interest, by the Armed Services Board of Contract Appeals (ASBCA) in favor of your client, Maurice Bianchi, in ASBCA No. 36518 (Contract No. DLA100-80-C-2972). We understand that this decision was appealed to and affirmed by the United States Court of Appeals for the Federal Circuit, (No. 93-1402, Feb. 16, 1994). We also understand that the time for further appeals in this matter has now run without any having been filed. Consequently, we are legally able to proceed with the certification of payment of this award as you requested. You will be interested to know that this letter was prepared in consultation with Mr. Neill Martin-Rolsky of our Office of General Counsel.

As you know, 31 U.S.C. § 1304 established the permanent, indefinite appropriation, commonly known as the Judgment Fund, which is used to pay many judgments, compromise settlements and administrative awards rendered against the United States. Section 1304 also charges this Office with the responsibility to certify payment of qualifying awards from that appropriation in accordance with the criteria specified in that act. You may also be aware that 31 U.S.C. § 3728 simultaneously directs this Office to collect debts claimed to be owed to the United States by withholding from payments made under section 1304 all amounts necessary to recover debts owed to the United States by its judgment creditors. This act normally directs us to seek the judgment creditor's consent to such withholdings. If consent is given, the withholding ripens into a setoff and the debt is discharged to the extent of the amount recovered thereby. If consent is denied, the statute directs us to take the withholding anyway (along with an extra amount sufficient to cover the costs of bringing a civil action) and to have a civil action brought against the judgment creditor to adjudicate the underlying debt--if such an action has not already been brought. In the event that the alleged debt is finally adjudged by the courts to be without merit, either in whole or in part, the amounts withheld but found not owing are to be repaid, with six (6) percent interest. Section 3728 is a mandatory statute and affords us very little discretion in these matters. Cf., e.g.,

A-52266, July 29, 1941; 37 Op. Att'y Gen. 215, 217-18 (1933). See also Eastern Transport Co. V. United States, 159 F.2d 349, 352 (2d Cir. 1947).

In this regard, we have been informed by the Defense Logistics Agency (DLA) and the Small Business Administration (SBA) that they have debt claims against Mr. Bianchi. DLA believes that Mr. Bianchi owes it $1,141,220.83. DLA's claim arises from its conclusion that Mr. Bianchi was not legally entitled to receive a payment in that amount made previously to him in settlement of some litigation between him and DLA in 1988. SBA claims that it is owed $1,875,869.31. It bases this claim on defaulted loan guarantees made to the Bank of America, as secured by liens on your client's assets. As you know, the sum and substance of DLA's and SBA's positions in this regard, as well as those of your client, were described in considerable detail in submissions made by the parties to the ASBCA (in anticipation of its referral of the present matter to this Office), as well as in court filings by the parties. Copies of these materials were forwarded by the Board with its submission to us, as well as by you, your client, and your client's other counsel. (For your information, we are enclosing copies of relevant correspondence that we received from the agencies which you do not appear to have previously received.) Pursuant to 31 U.S.C. § 3728, DLA and SBA are requesting that this Office setoff the amounts awarded to Mr. Bianchi under ASBCA No. 36518 in order to partially recover the amounts they claim to be owed by him.

Among other things, your client maintains that these claims of DLA and SBA have already been finally adjudicated by the Court of Appeals for the Federal Circuit adversely to the government's position. Consequently, you, your client, and your client's other counsel have separately urged us not to comply with these setoff requests.

We have also been advised by the Department of Justice that, while it agrees with you that the Federal Circuit did reject one of the government's bases for these claims against Mr. Bianchi, it does not believe that it or the Court of Federal Claims have fully or finally adjudicated all of the government's bases for these claims. Justice is continuing to actively pursue these aspects of the government's case in court, as is evidenced by its "Status Report" of July 8, 1994, for the Court of Federal Claims. For this reason, Justice also suggests that setoff under section 3728 would be appropriate in this case. (A copy of the letter we received from Justice in this regard is also attached for your information.)

As noted above, once informed of the existence of a debt claim against a judgment creditor, this Office is required to pursue setoff of that claim under 31 U.S.C. § 3728. Moreover, as was also noted above, our responsibilities under the act do not include the authority to weigh the competing claims of your client and the Justice Department with respect to whether the Federal Circuit finally adjudicated all of the government's claims in this matter. In view of the extensive written

submissions already made to this Office, the courts, and the ASBCA, by yourself, your client and your client's other counsel, we believe it unnecessary to formally seek your client's consent to the requested setoffs in this case. It is clear to us that your client disputes these debts and would not agree to setoff. For these reasons, we are initiating a withholding against the amounts due your client under ASBCA No. 36518. Obviously, since the agencies' claims far exceed the amount due your client in this regard, there is no balance to be certified for payment to your client at this time.[1]

By copy of this letter, we are also notifying Justice of our action in this regard in order to assure that it continues to pursue litigation appropriate to accomplishing a final judicial resolution of the agencies' debt claims against your client. Should your client ultimately triumph with respect to both of these claims, the withheld amounts will then be certified by this Office for payment from the Judgment Fund, along with the interest specified in section 3728. Please feel free to contact us if you have any further questions in this regard.

Sincerely,

Ken Schutt

Ken Schutt
Assistant Chief of Claims Group

Enclosures

cc: Mr. Neill Martin-Rolsky, GAO
Mr. Mark Melnick, DOJ
Mr. Thomas Hornak, DLA
Mr. Joel Meese, SBA

[1]The total amount withheld is $90,164.12, which represents the principal amount of $58,613.03, plus interest under the Contract Disputes Act from November 17, 1987 to date.

U. S. SMALL BUSINESS ADMINISTRATION
LOS ANGELES DISTRICT OFFICE
330 N. BRAND
GLENDALE, CALIFORNIA 91203-2308

August 24, 1994

Neill Martin-Rolsky
Senior Attorney
Office of the General Counsel
U.S. General Accounting Office
441 G. St., N.W.
Washington, D.C. 20548

Re: M. Bianchi of California

Dear Mr. Martin-Rolsky:

M. Bianchi of California is indebted to the U.S. Small Business Administration (SBA) in the amount of $1,875,869.31 (including principal and interest) by reason of two SBA guaranteed loans made by the Bank of America to M. Bianchi of California. Both of these loans were secured by liens on the assets of M. Bianchi of California.

M. Bianchi of California defaulted on both loans and SBA pursuant to its guaranty purchased the guaranteed portion (90%) of both loans from the Bank of America. Bank of America then assigned both the notes and collateral documents securing those notes to the SBA.

To the extent permitted by law it is requested that any funds owed by another agency of the United States to M. Bianchi of California be offset against those amounts still owed to the SBA.

If you have any questions please call me at (818) 552-3257.

Sincerely,

Joel K. Meese

Joel K. Meese
Attorney

**DEFENSE LOGISTICS AGENCY**
DEFENSE PERSONNEL SUPPORT CENTER
2800 SOUTH 20TH STREET
PHILADELPHIA, PENNSYLVANIA 19101-8419

IN REPLY REFER TO

DPSC-GA

August 23, 1994

Neil Martin-Rolsky
Senior Attorney
Office of General Counsel
US General Accounting Office
441 G. Street NW
Washington, DC 20548

RE: Appeal of M. Bianchi of California
ASBCA No. 36518
Under Contract DLA100-80-C-2972

Dear Mr. Martin-Rolsky:

Kindly allow this letter confirm our telephone conversations wherein I advised you that DPSC has requested and continues to request the Comptroller General offset any monies due M. Bianchi of California (Bianchi) against Bianchi's debt to the United States.

Sincerely,

THOMAS J. HORNAK
Chief Trial Attorney

U.S. Department of Justice

MAMelnick:
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

Telephone:
(202) 307-6288

Washington, D.C. 20530

August 1, 1994

Mr. Neill Martin-Rolsky
Senior Attorney
Office of the General Counsel
General Accounting Office
441 G Street, N.W.
Washington, D.C. 20548

Re: Bank of America v. United States,
<u>Fed. Cl. No. 90-3961C</u>

Dear Mr. Martin-Rolsky:

During our telephone conversation yesterday, you informed me that you are addressing a judgment in excess of $58,000 entered in favor of Maurice Bianchi against the Defense Logistics Agency (DLA) by the Armed Services Board of Contract Appeals (ASBCA). I am writing to inform you that Mr. Bianchi remains a third party defendant in the United States Court of Federal Claims litigation referred to above. In this litigation, the government is asserting a contingent claim against Mr. Bianchi in response to a claim against the government by the Bank of America that the government should have paid in excess of a million dollars to the bank rather than to Mr. Bianchi in settlement of separate ASBCA appeals brought by Mr. Bianchi. The government is claiming that in the event it mistakenly paid Mr. Bianchi rather than the bank, Mr. Bianchi is indebted to the government for the amount of any judgment entered in favor of the bank against the government up to the total amount of the mistaken payment made to Mr. Bianchi. The action remains pending.

Because this third party claim by the government against Mr. Bianchi could potentially lead to a judgment against Mr. Bianchi far in excess of his ASBCA judgment against the Government, this litigation could very well determine whether it is necessary to pay anything to Mr. Bianchi. Thus, in addressing Mr. Bianchi's ASBCA judgment, you should note that the Government is asserting a superior claim against him that is not final.

Please do not hesitate to contact me with any additional questions or comments.

Very truly yours,

MARK A. MELNICK
Attorney
Commercial Litigation Branch
Civil Division

# EXHIBIT "19"

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| Maurice L. Bianchi, Plaintiff, v. The United States, Defendant | ) ) ) ) ) ) ) ) | Case No.. 98-794C (Chief Judge Smith) |

## PLAINTIFF'S AMENDED AND SUPPLEMENTAL COMPLAINT

For his Amended and Supplemental Complaint, Plaintiff, Maurice L. Bianchi, an individual formerly doing business as an individual proprietorship known as M. Bianchi of California, alleges as follows:

Mark the allegations of plaintiff's prior complaint filed on October 15, 1998, as Count I, then Add as Count II the following allegations:

### Count II

24. As a part of its decision in Bank of America v. United States, Maurice L. Bianchi, Third party, the Court of Appeals for the Federal Circuit awarded court costs to Maurice L. Bianchi. Thereafter, Bianchi's attorney filed for and the Court of Appeals allowed as costs to Bianchi the sum of $ 1,870.04. The judgment of the Court of Appeals was entered on April 29, 1994 and the mandate issued on June 30, 1994.

25. Bianchi, by counsel, sought to collect the cost award but payment of this award was not forthcoming. Payment of this judgment was refused as a part of the Government's asserted right to offset claimed debts owed to it by Bianchi.

26. Following the issuance of the decision of the Court of Appeals for the Ninth Circuit in Bianchi v. Perry, 140 F3d 1294 on April 9, 1998, Bianchi, by counsel, renewed efforts to collect the judgment on costs awarded to him. In the course of these efforts Bianchi also raised the issue of recompense for the four year delay in payment of the cost award judgment.

27. Post judgment interest upon the judgments of the Court of Appeals for the Federal Circuit is allowable under the provisions of 28 U.S.C. § 1961(c)(2) at the rate and as computed in accordance with the provisions of 28 U.S.C. §1961(a) and (b).

28. Interest also is allowable under the provisions of 31 U.S. C. §3728(c), on judgments whose payment is delayed by reason of an erroneous withholding by the Government.

28. By letter dated September 18, 1998 the authorized representative of the United States in this matter wrote to the Judgment Fund Group of the Department of the Treasury certifying for payment the award of the judgment in the amount of $1870.04, plus any statutory interest.

29. In line with the suggestion of Justice Department counsel contained in the above letter, plaintiff's counsel sent a separate letter to the Judgment Fund Group requesting payment of the judgment together with interest thereon as indicated by the 28 U.S.C. §1961(c)(2 or 31 U.S.C. §3728(c).

30. On or about October ? 1998, plaintiff received a check dated October 7, 1998 in the amount of $ 1870.04. No explanation or reasons were given for the failure to pay interest on the judgment of Court of Appeals for the Federal Circuit for the period between the issuance of the judgment and the date of payment.

Wherefore plaintiff demands judgment in his favor for the amount of interest upon the judgment of the Court of Appeals for the Federal Circuit from June 30, 1994 to October 7, 1998, as provided by the laws of the United States and for such other relief as to the Court may seem just and lawful.

Respectfully submitted.

Gerson B. Kramer, Esq.
Braude & Margulies. PC
The Brawner Building
888 Seventeenth Street, NW
Suite 500
Washington, DC 20006
Ph: (301) 293-2993
Fax: (301) 331-7916

Of counsel:
Herman M. Braude, Esq.
Braude & Margulies. PC
The Brawner Building
888 Seventeenth Street, NW
Suite 500
Washington, DC 20006
Ph: (301) 293-2993
Fax: (301) 331-7916

George E. Graziadei, Esq.
Scott Michael Cantor, Esq.
Graziadei & Cantor, Ltd.
302 East Carson Avenue, Suite 400
Las Vegas, NV 89101
Ph: (702) 477-7733
Fax: (702) 477-0020

Dated: Jan 4, 1999

Certificate of Service

I hereby certify under penalty of perjury, that on this 4th day of January 1999 Icaused to be mailed (first class, postage prepaid copies of Plaintiff's Amended and Supplemental Complaint addressed as follows:

Jan M. Folena, Esq.
Trial Attorney
Commercial Litigation Branch
Civil Division, Dept. of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, NW
Washington, DC 20530

[signature]

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MAURICE L. BIANCHI,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 98-794C<br>(Judge Firestone) |

OFFER OF JUDGMENT

Pursuant to RCFC 68, defendant makes this offer of judgment, to allow judgment to be entered against defendant in the total amount of $454.06 in full settlement of Count II of the complaint filed by plaintiff, Maurice Bianchi, including dismissal of Count II with prejudice, with all parties to bear their own costs, attorney fees, and expenses.

Respectfully submitted,

DAVID W. OGDEN
Acting Assistant Director

DAVID M. COHEN
Director

KIRK T. MANHARDT
Assistant Director

JAN M. FOLENA
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor, 1100 L. St., N.W.
Tele: (202) 307-6289

Attorneys for Defendant

OF COUNSEL:

KATHLEEN D. HALLAM
Defense Supply Center
Philadelphia, PA

June 25, 1999

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 25th day of June, 1999, I caused to be hand-delivered a copy of "DEFENDANT'S OFFER OF JUDGMENT" addressed as follows:

Gerson B. Kramer, Esquire
BRAUDE & MARGULIES, PC
The Brawner Building
888 17th Street, NW
Suite 500
Washington, DC 20006

Ena M. Goddard

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MAURICE L. BIANCHI, Plaintiff, v. THE UNITED STATES, Defendant. | No. 98-794C (Judge Firestone) |

JOINT STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Rule 41(a)(1)(B) of the Rules of the United States Court of Federal Claims, the parties have agreed and hereby stipulate that a Count II of this action is dismissed with prejudice, with each party to bear its own costs, attorney fees, and expenses. The parties agree and hereby stipulate that this is a partial dismissal limited only to Count II of this action.

Respectfully submitted,

DAVID W. OGDEN
Acting Assistant Attorney General

DAVID M. COHEN
Director

KIRK T. MANHARDT
Assistant Director
Authorized Representative of
the Attorney General

GERSON B. KRAMER
BRAUDE & MARGULIES
The Brawner Building
888 17th Street, NW
Suite 500
Washington, D.C. 20006
Attorney for Plaintiff

JAN M. FOLENA
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Fl., 1100 L Street
Washington, D.C. 20530
Tele: (202) 307-6289

Attorneys for Defendant

June ____, 1999

June ____, 1999

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this ___ day of June, 1999, I caused to be hand-delivered a copy of "JOINT STIPULATION OF DISMISSAL WITH PREJUDICE" addressed as follows:

Gerson B. Kramer, Esquire
BRAUDE & MARGULIES, PC
The Brawner Building
888 17th Street, NW
Suite 500
Washington, DC 20006

______________________

# EXHIBIT "20"

United States Treasury 15-51/000 P 130,154,310

Check No.

10 07 98 24 PHILADELPHIA, PA 2038 55964967

Z2963018 M1 FMS CAB 00CB14FY99 20180002

Pay to the order of

MAURICE L BIANCHI
C/O DEPARTMENT OF JUSTICE
ATTN MARK MELNICK
1100 L STREET NW
WASHINGTON DC 20530

$***1870*04

VOID AFTER ONE YEAR

⑆000000518⑆ 559649673⑈ 011098

**WARNING** - DO NOT CASH CHECK WITHOUT NOTING U.S. TREASURY WATERMARK

HOLD TO LIGHT TO VERIFY WATERMARK

Forgery of endorsements on Treasury Checks is a [illegible] crime. Maximum penalty is [illegible] fine and [illegible] imprisonment. (3-97)

# EXHIBIT "21"

11/25/2003 08:37 7025571843 BIANCHI PAGE 42

# In the United States Court of Federal Claims

---

**MAURICE L. BIANCHI,** **No. 98-794 C**

*vs.*

**THE UNITED STATES**

At the Court of Federal Claims held in the City of Washington, D.C., on the 1st day of July, A.D. 1999, judgment was entered as follows: Plaintiff shall recover of and from the United States the sum of $454.06, in full settlement of Count II of the complaint. All parties shall bear their own costs, attorney fees and expenses.

A true copy of record.

In testimony whereof I have hereunto set my hand
And affixed the seal of said Court at Washington, D.C.,
This 2nd day of July, A.D. 1999.

Margaret M. Earnest, Clerk of Court

*Attest:*

Loren A. Smith, Chief Judge

[illegible]
Braude & Margulies, P.C.
888 17th St., NW, The Brawner Bldg., Suite 500
Washington, DC 20006

# UNITED STATES TREASURY DEPARTMENT
## JUDGMENT FUND GROUP

## INSTRUCTIONS FOR OBTAINING PAYMENT OF JUDGMENTS OF THE UNITED STATES COURT OF FEDERAL CLAIMS AGAINST THE UNITED STATES

1. Statutory authority: 28 U.S.C. §§2516, 2517; 31 U.S.C. §1304

2. Requirement of finality. The Treasury Department is not authorized to certify a judgment until it is final. A judgment is final for payment purposes when the appellate process is completed, or when the Treasury Department is advised in writing that no further review will be sought.

3. Procedures. Payment requires two submissions--one from the Justice Department and one from the plaintiff.

   (a) The Justice Department submission consists of a brief letter stating that no further review will be sought and that judgment may therefore be paid.

   (b) The plaintiff's submission must consist of the following:

      (1) A letter signed by the plaintiff and dated after the date of the judgment, requesting payment and indicating the address to which the check should be sent (plaintiff or plaintiff's counsel); OR

      (2) If the letter is submitted by plaintiff's counsel and requests that the check be sent to counsel, it must be accompanied by a power of attorney dated after the date of the judgment. (A power of attorney executed prior to the date of the judgment is acceptable if it specifically authorizes transmission of the check to counsel on plaintiff's behalf.)

      (3) The original transcript of judgment, obtained from the Clerk of the Court (to accompany either (1) or (2)).

      Note: Unless the time limit for appeals has expired, the request for payment should also state that no further review will be sought.

4. Mailing address. Submissions for payment and related correspondence should be addressed to:

5.

Judgment Fund Group
Department of the Treasury
Financial Management Service
Prince George's Metro Center 2
3700 East-West Highway
Mailstop 6D37
Hyattsville, MD 20782
Main telephone # (202) 874-6664

If Treasury's file number is known (e.g., from prior correspondence), it should be indicated on any subsequent correspondence.

6. Designation of payee. A judgment check will be made payable to the plaintiff and to the plaintiff only, unless the judgment itself specifies otherwise.

7. Post-judgment interest If there is a possibility of the Government's appealing, it may be desirable for plaintiff to file a copy of the judgment with the Treasury Department as soon as possible after its issuance, to preserve any possible entitlement to post-judgment interest. See 28 U.S.C. §2516(b) and 31 U.S.C. §1304(b).



Check No.

02 03 99 89 PHILADELPHIA, PA - 2038 57136944

Z2963018 M1 MC99040361 20180002

Pay to the order of

MAURICE L BIANCHI
C/O DOJ
1100 L STREET NW
WASHINGTON, DC 20530

$****454*06

VOID AFTER ONE YEAR

Z2963018

⑈2038 3⑈ ⑆000000518⑆ 571369447⑈ 010299

COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MAURICE L. BIANCHI, Plaintiff, | ) | |
| v. | ) | No. 98-794C (Judge Firestone) |
| THE UNITED STATES, Defendant. | ) | |

OFFER OF JUDGMENT

Pursuant to RCFC 68, defendant makes this offer of judgment, to allow judgment to be entered against defendant in the total amount of $454.06 in full settlement of Count II of the complaint filed by plaintiff, Maurice Bianchi, including dismissal of Count II with prejudice, with all parties to bear their own costs, attorney fees, and expenses.

Respectfully submitted,

DAVID W. OGDEN
Acting Assistant Director

DAVID M. COHEN
Director

KIRK T. MANHARDT
Assistant Director

JAN M. FOLENA
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor, 1100 L. St., N.W.
Tele: (202) 307-6289

Attorneys for Defendant

OF COUNSEL:

KATHLEEN D. HALLAM
Defense Supply Center
Philadelphia, PA

June 25, 1999

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 25th day of June, 1999, I caused to be hand-delivered a copy of "DEFENDANT'S OFFER OF JUDGMENT" addressed as follows:

Gerson B. Kramer, Esquire
BRAUDE & MARGULIES, PC
The Brawner Building
888 17th Street, NW
Suite 500
Washington, DC 20006

Ena M. Goddard