6.

Bianchi v. United States,
No. 98-794C (Fed. Cl.)

United States Court of Federal Claims.

**Maurice L. BIANCHI, Plaintiff,**
**v.**
**The UNITED STATES, Defendant.**

**No. 98-794C.**

Feb. 14, 2000.

Contractor filed action seeking interest under the Federal Offset Statute on an award of attorney fees to contractor pursuant to a settlement with contracting agency. On government's motion to dismiss, and plaintiff's cross motion for summary judgment, the Court of Federal Claims, Firestone, J., held that: (1) Federal Offset Statute, pursuant to which interest is to be paid by the Secretary of the Treasury if the government loses an action to recover a debt or recovers less than the amount withheld as offset, was not applicable to afford interest to contractor on award of attorney fees under the Equal Access to Justice Act (EAJA) which was held by contracting agency as offset, and (2) EAJA does not provide for interest on an award of attorney fees where the award in used by agency as on offset against a debt of the awardee.

Plaintiff's motion denied; defendant's motion granted.

West Headnotes

**[1] United States 🔑110**
393k110

The jurisdiction of the Court of Federal Claims to award interest on a claim against the United States depends upon the extent to which the United States has waived its sovereign immunity. 28 U.S.C.A. § 2516.

**[2] United States 🔑110**
393k110

Waiver of sovereign immunity to permit an award of interest against the United States must be strictly construed, and the Court of Federal Claims may not enlarge the waiver beyond what the language requires.

**[3] Statutes 🔑188**
361k188

Where the words of a statute are plain, the words are controlling.

**[4] Statutes 🔑230**
361k230

Where Congress amends a statute, it is presumed to be aware of the original enactment and to intend to alter it.

**[5] United States 🔑110**
393k110

Federal Offset Statute, pursuant to which interest is to be paid by the Secretary of the Treasury if the government loses an action to recover a debt or recovers less than the amount withheld as offset, was not applicable to afford interest to contractor on award of attorney fees under the Equal Access to Justice Act (EAJA) which was held by contracting agency as offset; where by law payments must come from an agency's appropriation, the Federal Offset Statute does not apply. 28 U.S.C.A. § 2412; 31 U.S.C.A. § 3728.

**[6] United States 🔑147(4)**
393k147(4)

Equal Access to Justice Act (EAJA) does not provide for interest on an award of attorney fees where the award in used by agency as on offset against a debt of the awardee. 28 U.S.C.A. § 2412(f).

***363** Gerson B. Kramer, Washington, DC, for Plaintiff. George E. Graziadei, and Scott Michael Cantor, Las Vegas, NV, of Counsel.

Jan M. Folena, U.S. Department of Justice, Washington, DC, with whom were Acting Assistant Attorney General David W. Ogden, Director David M. Cohen, and Assistant Director Kirk T. Manhardt, for Defendant. Kathleen D. Hallam, Defense Supply Center, Philadelphia, PA, of Counsel.

## OPINION

FIRESTONE, Judge.

This case comes before the court on the defendant's motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(4) of the Rules of the United States Court of Federal Claims. At issue is whether the plaintiff is entitled to interest on an award of attorney fees, which the government refused to pay pending the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

outcome of litigation on other claims against the plaintiff. The government contends that sovereign immunity bars the plaintiff's claim for interest. The plaintiff contends that the ***364** Federal Offset Statute, 31 U.S.C. § 3728 (1994 & Supp. II 1996), provides the necessary waiver of immunity and mandates that interest be paid.

**FACTUAL BACKGROUND**

The facts are not in dispute and may be summarized as follows. This case is the latest in a series of cases arising from contracts for military clothing entered into between Mr. Bianchi and the Defense Logistics Agency ("DLA") in 1979 and 1980. Numerous problems led to termination of the contracts. Litigation over the contracts before the Armed Services Board of Contract Appeals ("ASBCA") led to a settlement between Mr. Bianchi and the DLA for $1,141,220.83, including interest. Under the terms of the settlement agreement Mr. Bianchi reserved his right to pursue a value engineering claim and a claim for attorney fees under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 (1994 & Supp. II 1996). The present action concerns the $475,724.51 EAJA award Mr. Bianchi eventually obtained from the ASBCA on September 25, 1990.

Shortly after the government paid the $1,141,220.83 to Mr. Bianchi, Bank of America ("Bank") sued the United States in this court, claiming that it was owed the money paid to Mr. Bianchi under various assignment agreements between the Bank and Mr. Bianchi. *See Bank of America Nat'l Trust & Sav. Ass'n v. United States,* No. 90-3961C, 1992 WL 677195 *1 (Ct.Cl. Oct.16, 1992). In response, the United States claimed that the Bank was not owed the money because the loans had been guaranteed by the Small Business Administration ("SBA"). *See id.* The United States contended that the SBA was due the money. *See id.* The United States then filed a third-party complaint against Mr. Bianchi in the same action seeking to recover the $1,141,220.83 on behalf of the SBA. *See id.* While the litigation over the $1,141,220.83 settlement award was pending, the DLA refused to pay Mr. Bianchi the $475,724.51 EAJA award. In correspondence with Mr. Bianchi, the DLA explained that the DLA (which was responsible for paying the EAJA award) was holding the EAJA award as an offset against the $1,141,220.83 the United States believed Mr. Bianchi owed the SBA.

Eventually, the Federal Circuit heard these competing claims. *See Bank of America Nat'l Trust & Sav. Ass'n v. United States,* 23 F.3d 380 (Fed.Cir.1994). The Federal Circuit ruled that the United States would have to pay Bank of America $1,141,220.83, in accordance with the terms of the Bank's assignment with Mr. Bianchi. *See id.* at 385. The Circuit rejected the United States' argument that the SBA was owed the funds due to the Bank on the grounds that the Bank's assignment rights were superior to the SBA's rights and were not subject to an offset. *See id.* at 384-85. The Circuit also held that the United States, having voluntarily agreed to settle Mr. Bianchi's contract claims, could not "recover the settlement award through a third-party complaint filed in the Court of Federal Claims." *Id.* at 384. Thus, the Circuit held that Mr. Bianchi did not have to repay his settlement to the United States. *See id.*

Arguing that the settlement before the ASBCA did not free Mr. Bianchi from paying the SBA guaranteed loan amounts from the value engineering and EAJA awards, the DLA continued to hold Mr. Bianchi's EAJA award as an offset. In response, Mr. Bianchi filed actions in federal district court in Nevada to compel the government to pay him his value engineering and EAJA awards. [FN1] The EAJA case reached the Ninth Circuit, which held that the offsets were improper given the Federal Circuit's decision in *Bank of America* and that Mr. Bianchi must be paid his EAJA award. *See Bianchi v. Perry,* 140 F.3d 1294 (9th Cir.1998). On August 28, 1998, the DLA paid Mr. Bianchi the $475,724.51 EAJA award from the DLA's agency account in Columbus, Ohio. Mr. Bianchi did not receive interest on the award.

FN1. Mr. Bianchi's value engineering award was litigated separately and is not now before this court. *See Bianchi v. Walker,* 163 F.3d 564 (9th Cir.1998).

On October 15, 1998, Mr. Bianchi filed the present action seeking interest on his award of attorney fees under the Federal Offset ***365** Statute, 31 U.S.C. § 3728(c). [FN2] The Federal Offset Statute provides, in relevant part: "[i]f the Government loses a civil action to recover a debt or recovers less than the amount the Comptroller General [now, the Secretary of the Treasury] [FN3] withholds under this section, the Comptroller General shall pay the plaintiff the balance and interest of 6 percent for the time the money is withheld." *Id.*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FN2. Mr. Bianchi filed an amended complaint on January 6, 1999, which made an additional claim against the United States. Mr. Bianchi's second count sought interest on the Federal Circuit's award of $1,870.04 in costs in *Bank of America,* 23 F.3d at 380. On June 30, 1999, the parties entered into a joint stipulation of dismissal with prejudice of Count II.

FN3. The Federal Offset Statute has been revised twice since its original enactment to reflect Congress' transfer of authority over the payment of claims from the Secretary of the Treasury to the Comptroller General, *see* Budget and Accounting Act, 42 Stat. 20 (1921), 31 U.S.C. § 71 (1964) and Act of March 3, 1933, ch. 212, § 13, 47 Stat. 1516, 31 U.S.C. § 227 (1964), and then, back to the Secretary of the Treasury, *see* Pub.L. No. 104-53, § 211, 31 U.S.C. § 501 note (Supp. II 1996) and 31 U.S.C. § 3728 (Supp. II 1996). At the time the DLA attempted to offset Mr. Bianchi's EAJA award in 1994, authority under the Federal Offset Statute was vested in the Comptroller General. However, in this case it is irrelevant which version of the statute is applied because, as explained below, Mr. Bianchi could not collect his EAJA award from the Comptroller General or the Secretary of the Treasury. EAJA expressly states that payment of EAJA awards is to be made by the agency. *See* 5 U.S.C. § 504(d).

The government moved to dismiss the claim for interest on the EAJA award on June 30, 1999. On July 30, 1999, Mr. Bianchi filed a cross motion for summary judgment. The court held oral argument on these motions on February 1, 2000.

## DISCUSSION

### A. Standard of Review

In deciding a motion to dismiss for lack of subject matter jurisdiction, the court must accept as true the allegations of fact made by the plaintiff, and it must construe those facts favorably to the plaintiff. *See Morris v. United States,* 33 Fed.Cl. 733, 741 (1995). Ultimately, however, the burden is on the plaintiff to establish jurisdiction by a preponderance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988).

### B. Sovereign Immunity

[1][2] The sole issue to be decided in this case is whether the United States has waived its sovereign immunity to allow for the payment of interest on the EAJA award the DLA withheld as an offset. The jurisdiction of the Court of Federal Claims to award interest depends upon the extent to which the United States has waived its sovereign immunity. Congress has expressly provided that "[i]nterest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof." 28 U.S.C. § 2516 (1994); *see also Library of Congress v. Shaw,* 478 U.S. 310, 314, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). As with any waiver of sovereign immunity the waiver must be strictly construed and the court may "not enlarge the waiver beyond what the language requires." *Library of Congress,* 478 U.S. at 317, 106 S.Ct. 2957 (citing *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 685-86, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983)). As the Supreme Court stated in *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 818, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988), "a court may not ..., *even in the interest of justice,* extend its jurisdiction where none exists." (Emphasis added).

It is against this backdrop that the court must determine whether the Federal Offset Statute authorizes interest in this case. At issue is whether the Federal Offset Statute allows for interest where the payment request is not presented to the Comptroller General (or now, the Secretary of Treasury) as the Federal Offset Statute provides, *see* 31 U.S.C. § 3728, but instead the payment request is presented to the responsible agency, as EAJA expressly provides, *see* 5 U.S.C. § 504(d). In particular, EAJA § 504(d)(4) provides that "[f]ees and other expenses awarded under this subsection shall be paid by any agency over which the party prevails ***366** *from any funds made available to the agency* by appropriation or otherwise." (Emphasis added).

In support of his claim for interest, Mr. Bianchi first contends the that the Federal Offset Statute provides for interest because it was the basis for the DLA's offset authority. Mr. Bianchi argues that the Federal Offset Statute is the only authority provided to agencies to offset "judgments" such as a final EAJA award. Mr. Bianchi asserts that agencies do not have any common law right to offset "judgments."

The government contends that Mr. Bianchi is mistaken in his assumption that the Federal Offset

Statute is the government's sole authority to offset judgments. The government notes that the Federal Circuit has expressly determined that the government maintains a common law right to offset that is separate from any statutory authority. *See Cecile Indus., Inc. v. Cheney,* 995 F.2d 1052, 1053 (Fed.Cir.1993) ("Indisputably, the Government has long enjoyed the right to offset contract debts to the United States against contract payments due to the debtor."); *see also Amoco Prod. Co. v. Fry,* 118 F.3d 812, 817 (D.C.Cir.1997) ("[T]he federal government has long possessed the right of offset at common law.") (citations omitted). The government contends that the DLA had a common law right to offset the ASBCA's EAJA award to satisfy the SBA debt and that it did not have to depend on the Federal Offset Statute.

[3] Whether the DLA has common law offset authority is an intriguing question, but it is not a question before this court. Rather, the only question this court needs to resolve is whether the Federal Offset Statute provided the DLA with that authority, such that Mr. Bianchi is entitled to interest. [FN4] The Federal Offset Statute identifies only the Comptroller General (now the Secretary of Treasury) as having payment authority. Thus, the Federal Offset Statute did not cover the actions of the DLA. Where the words of a statute are plain, the words are controlling. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Accordingly, unless the court can find some basis for ignoring the words of the Federal Offset Statute, the statute does not apply to the offset here and cannot provide the necessary waiver of sovereign immunity.

FN4. Whether in the absence of the Federal Offset Statute, the DLA properly offset the EAJA award under a common law right is not at issue in this case. Either the DLA properly relied upon common law authority for the offset or its action was not lawful. In either of those situations, interest is not available because there has not been an express waiver of sovereign immunity.

Mr. Bianchi argues that the plain terms of the Federal Offset Statute are not controlling because the statute has been construed to extend to government officials not named in the statute. Mr. Bianchi identifies several cases [FN5] in which interest was awarded even though the then-Federal Offset Statute named the Secretary of Treasury as the responsible official, but the claims were instead presented to the Comptroller General. *See United States v. La Grange Grocery Co.,* 31 F.2d 297, 298-99 (N.D.Ga.1929); *Standard Dredging Co. v. United States,* 71 Ct.Cl. 218, 240, 1930 WL 2458 (1930). At issue in those cases was an apparent conflict between the Budget and Accounting Act of 1921, 42 Stat. 20, 31 U.S.C. § 71 (1964), which had transferred authority to pay judgments against the United States from the Secretary of Treasury to the Comptroller General, and the Federal Offset Statute, which had not yet ***367** been amended to reflect this transfer of authority. As such, in order to give continued meaning to the Federal Offset Statute, the courts decided that when the Comptroller General pays a judgment or withholds payment under the Budget and Accounting Act, the Comptroller General is acting on behalf of the Secretary of Treasury. *See id.* Mr. Bianchi's contention that the same reasoning should apply to offsets made by agency heads with respect to EAJA awards is without merit. Contrary to Mr. Bianchi's contentions, the situations are not parallel.

FN5. Plaintiff cites: *United States v. La Grange Grocery Co.,* 31 F.2d 297 (N.D.Ga.1929); *Standard Dredging Co. v. United States,* 71 Ct.Cl. 218, 1930 WL 2458 (1930); Mohawk Condensed Milk Co. v. United States, 70 Ct.Cl. 671, 48 F.2d 682 (1930); *Mohawk Condensed Milk Co. v. United States,* 70 Ct.Cl. 671, 48 F.2d 682 (1930); *James Stewart v. United States,* 71 Ct.Cl. 126, 1930 WL 2441 (1930); *Lloyd-Smith v. United States,* 71 Ct.Cl. 74, 44 F.2d 990 (1930); *Chicago, I. & L.R. Co. v. United States,* 78 Ct.Cl. 96, 1933 WL 1914 (1933); *Briggs & Turivas,* 72 Ct.Cl. 674, 53 F.2d 140 (1931); *Helvetia Milk Condensing Co. v. United States,* 74 Ct.Cl. 142, 56 F.2d 676 (1932); *Highland Milk Condensing Co. v. United States,* 74 Ct.Cl. 267, 56 F.2d 682 (1932); *Richmond F. & P.R. Co. v. McCarl,* 62 F.2d 203 (D.C.Cir.1932); *Helvetia Milk Condensing Co. v. United States,* 77 Ct.Cl. 743, 3 F.Supp. 662 (1933); and *American Potash Co. v. United States,* 80 Ct.Cl. 160, 8 F.Supp. 717 (1934).

In each of the cases Mr. Bianchi relies upon, the payments were to be made from the United States Treasury and not from a specific agency appropriation. Thus, at issue in those cases was how to deal with the transfer of administration over such payments from the Secretary of Treasury to the Comptroller General where Congress failed to change

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

the Federal Setoff Statute. As the government explains in its brief, judgments presented to either the Comptroller General or the Secretary of Treasury under the Federal Offset Statute are not paid for out of an individual agency's appropriation, but from the Treasury (now the Judgment Fund). [FN6] In changing the person responsible for administration of payment of judgments, Congress was not changing the government's obligation to pay judgments from the Treasury. In both instances, the payments were to come from the same source. In contrast, by statute, EAJA awards may not be paid for from what is now the Judgment Fund, but must be paid for from agency appropriations. *See* 5 U.S.C. § 504(d).

FN6. Congress established the Judgment Fund in 1956 to provide a permanent appropriation, separate and apart from any individual agency appropriation, from which judgments against the United States could be paid. *See* 31 U.S.C. § 1304 (1994 & Supp. II 1996).

When EAJA was first enacted, it provided that awards could be paid out of the Judgment Fund as a fallback if the agency failed to pay the award. As originally enacted, the statute provided "[i]f not paid by any agency, the fees and other expenses shall be paid in the same manner as the payment of final judgments is made in accordance with sections 2414 and 2517 of this title." Pub.L. No. 96-481, § 204, 94 Stat. 2321 (1980). Payments under sections 2414 and 2517 of Title 31 are made out of the Judgment Fund. *See* 31 U.S.C. § 1304. Thus, under the original EAJA, it was not mandatory that EAJA awards be paid out of the offending agency's own funds.

[4][5] However, when Congress reauthorized EAJA in 1985, it amended section 504(d) by removing the Judgment Fund as a source of payment and making agencies solely responsible for EAJA awards. The reason for this change was discussed by Senator Grassley, the bill's sponsor, who explained that under the amended act, "[agencies] are sure to think twice before acting contrary to a small business person's or an individual's rights. This is even more true with the passage of this bill, which provides for the fees payment out of the offending agency's budget." 131 Cong. Rec. S9991-02 (1985). It is well recognized that where Congress amends a statute, it is presumed to be aware of the original enactment and to intend to alter it. *See* 1A Norman J. Singer, *Sutherland's Statutory Construction,* § 22.30 at 266 (5th ed.1992, 1993). Accordingly, even if the court were inclined to find some flexibility in the Federal Offset Statute, EAJA precludes the court from reading the statute to include situations where an EAJA award is presented for payment. [FN7] Where by law payments must come from the agency's appropriation, the Federal Offset Statute plainly does not apply.

FN7. In view of the foregoing, Mr. Bianchi's contention that Congress is assumed to have enacted EAJA knowing about the Federal Offset Statute and intending to include EAJA awards within its ambit is without merit. If Congress had intended to include EAJA awards within the Federal Offset Statute it would have done so expressly.

[6] In addition, Mr. Bianchi's contention that interest on his EAJA award is appropriate under EAJA without regard to the Federal Offset Statute is also without merit. In enacting EAJA, Congress expressly provided for interest on EAJA awards in certain limited circumstances. The EAJA interest provision states in relevant part:

> ***368** If the United States appeals an award of costs or fees ... made against the United States under this section, and the award is affirmed ... interest ... shall run from the date of the award through the date of the mandate of affirmance.

28 U.S.C. § 2412(f) (1994). Thus, while EAJA provides for interest where the government loses a challenge to either the amount or entitlement to an EAJA award, the statute clearly does not provide for interest where, as in this case, the award is used as an offset against another debt.

Where, as here, Congress provides an express waiver of sovereign immunity with regard to interest payments for certain EAJA awards, the court may not assume that its failure to include interest where an EAJA award is used as an offset was a simple oversight. To the contrary, the court must assume that the decision was intentional. As the Federal Circuit recently stated, "[w]e are without power to rewrite a Congressional enactment to make it fit a case for which it was clearly not intended, no matter how compelling the case, particularly in light of the Supreme Court's mandate that Congress must expressly consent to an award of interest." *International Bus. Machines v. United States*, 201 F.3d 1367, 1374 (Fed.Cir.2000) (citing *Library of Congress,* 478 U.S. at 314, 106 S.Ct. 2957). The fact that EAJA provides for interest in some circumstances but not in others, indicates that Congress was aware of the necessity for an express waiver and intentionally declined to waive immunity

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

in those instances where it remained silent.

Mr. Bianchi's claim that not allowing interest would be contrary to Congress' purpose in enacting EAJA is equally unavailing. The Federal Circuit has recognized that EAJA is "a fee shifting statute not a damage award statute." *Chiu v. United States,* 948 F.2d 711, 721 (Fed.Cir.1991). "Clearly, the statute does not contemplate full recoupment....It even more clearly does not contemplate recoupment of delay damages." *Chiu,* 948 F.2d at 721 (citing *Pierce v. Underwood,* 487 U.S. 552, 573, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)).

Similarly, Mr. Bianchi's concern that if interest is not allowed agencies may ignore their EAJA obligations is misguided. Mr. Bianchi fails to separate out his entitlement to payment from his right to interest. There is no question that Mr. Bianchi was entitled to and did receive his EAJA award. The Ninth Circuit determined that Mr. Bianchi was entitled to the EAJA award and the agency has paid Mr. Bianchi. Whether Mr. Bianchi is also entitled to interest on that award is a separate question that is dependent on an express waiver of sovereign immunity, which the court concludes is not present here.

**CONCLUSION**

In view of the foregoing, Mr. Bianchi's motion for summary judgment is **DENIED** and the government's motion to dismiss is **GRANTED**. Each party to bear its own costs.

46 Fed.Cl. 363

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

7.

U.S. Armed Services Board of Contract Appeals, ASBCA No. 37029

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| M. Bianchi of California | ) | ASBCA No. 37029 |
| | ) | |
| Under Contract No. DLA100-80-C-2290 | ) | |

APPEARANCE FOR THE APPELLANT: Michael W. Clancy, Esq.
Holland & Knight LLP
Washington, DC

APPEARANCE FOR THE GOVERNMENT: Kathleen D. Hallam, Esq.
Chief Trial Attorney
Defense Supply Center
Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE SHACKLEFORD
ON REMAND FROM THE COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

This appeal is on remand from the Court of Appeals for the Federal Circuit (CAFC). Appellant filed a brief on quantum, the Government filed a response to appellant's brief and, finally, appellant filed a reply brief on quantum. The appeal has been the subject of numerous opinions both at the Board and at the CAFC,[1] and while familiarity with those decisions is presumed it is appropriate to set forth a brief review of the facts and the decided cases so as to put the remand in perspective.

Bianchi was awarded a contract in 1979 to supply Air Force women's pantsuit coats in accordance with Purchase Description ENEU 78-7, which was later superseded by MIL-C-87160. The contract included a Value Engineering Incentive (VEI) clause, pursuant to which Bianchi submitted two Value Engineering Change Proposals (VECP), one recommending the contract requirement for five coats per box be changed to 10 or 20 coats with a corresponding increase in the depth of the boxes (VECP 1180), while the other proposed eliminating wasted space in the packing boxes by changing the number of coats per box from the contract requirement of five per box to 10 coats per box with no change in box dimensions (VECP 8780). The VECPs were not accepted by the contracting officer.

In 1980, another contractor, Vi-Mil, was awarded a contract for the same item of clothing as Bianchi, and pursuant to the VEI clause in its contract, Vi-Mil submitted a

VECP proposing a change in the number of coats to be packed in each box. The Government accepted Vi-Mil's VECP in modified form.

Subsequently, in 1988, Bianchi filed claims for royalties under its previously rejected VECPs, and, after a contracting officer failed to issue decisions, appeals were made to this Board and docketed as ASBCA Nos. 37029 (VECP 1180) and 37071 (VECP 8780). While the Government conceded at trial that the Bianchi VECPs were constructively accepted when the Vi-Mil VECP was accepted, the Board, nevertheless, denied the appeals on the basis that the Bianchi contract was complete and the relationship had ended when the Vi-Mil VECP was accepted and thus there was no basis for constructive acceptance. *Bianchi II.* On appeal to the CAFC, the Board's decision was vacated as to entitlement and remanded to the Board to allow Bianchi to obtain discovery and present evidence on (1) the allegation that its VECPs were rejected in bad faith and (2) the allegation that Bianchi's VECPs were constructively accepted prior to termination of its own contractual relationship with the Government. *Bianchi III.*

Pursuant to the remand we held that the contractual relationship between Bianchi and the Government still existed at the time of the acceptance of the Vi-Mil VECP and thus we granted the appeals as to entitlement and proceeded to decide quantum. We held as to Bianchi's VECP 8780, in ASBCA No. 37071, for reasons not herein relevant, that Bianchi was not entitled to any royalties. As to Bianchi's VECP 1180, we held in ASBCA No. 37029, that the royalty period was contemporaneous with the royalty period of Vi-Mil (22 June 1984 to 21 June 1987), that the number of garments on which the royalty should be computed was also the same quantity as under the Vi-Mil contract (38,815), and that the royalty, or share of savings allowed was $.3185 per garment. The total award was $12,362.58 plus Contract Disputes Act interest. *Bianchi IV.*

On motion for reconsideration in ASBCA No. 37029, Bianchi questioned both our selection of the royalty period and our determination of the number of garments subject to the royalty. We rejected Bianchi's argument that DAC 76-26 mandated a different, more lucrative royalty period. As to the number of garments subject to the royalty, we set forth several different contentions appellant had taken in these proceedings as to the number of garments on which to base compensation. We stated that of the number sought on reconsideration, 106,550, when reduced by the number delivered internally from the DPSC Directorate of Manufacturing, which were not subject to royalty payments, "only 54,773 items remain[ed] in appellant's . . . calculation." *Bianchi V.* We thus affirmed our figure of 38,815 garments. *Bianchi V.*[2]

Bianchi appealed to the CAFC. The Court affirmed our determination of the royalty period, rejected Bianchi's contention that DAC 76-26 mandated a different more lucrative royalty period, and affirmed our exclusion of royalties on garments obtained from intra-agency sources. Bianchi's final basis for appeal was that substantial evidence

did not support the Board's determination that Bianchi was entitled to receive royalties on only 38,815 garments. On that issue the Court questioned the Board's explanation as to why the evidence of the number of garments subject to the royalty propounded by Bianchi and its expert witnesses was less credible than the number obtained from the Vi-Mil royalty payment. The Court stated in part as follows:

> In the absence of any support for the 38,815 figure other than that it was derived from the Vi-Mil recovery, and in the absence of any explanation for the rejection of the figures proffered by Bianchi, we are unable to determine why the Board selected the number of garments on which the Vi-Mil recovery was based rather than the number of garments calculated by Bianchi's expert. It may be that there is some flaw in the numbers adduced by Bianchi, but the Board did not point to any such flaw, and the government in its brief and oral argument did not do so either. Without some indication of why the Board chose the government's figure rather than Bianchi's, we are unable to determine whether the Board's selection of 38,815 as the number of garments subject to the VECP is supported by substantial evidence. Accordingly, we vacate the Board's order as to quantum and remand the case to the Board for further proceedings on the quantum issue, including an explanation for the Board's determination as to the number of garments subject to the VECP.

To resolve the remand, we make additional findings of fact relative to the number of garments subject to royalty payments for Bianchi. The numbering of these additional findings continues from where we left off in *Bianchi IV*.

<u>Findings of Fact on Number of Garments Delivered During Royalty Period</u>

36. Modification No. P00011 to the Vi-Mil contract, which was part of the evidentiary record made at trial (ex. A-1036 at 3) and P00012 to the Vi-Mil contract (Gov't cross motion for summary judgment, attach. 1), which was not, both evidence the number of garments subject to royalties under that contract. Modification No. P00012 was dated 3 October 1986, over eight months prior to the expiration of the Vi-Mil royalty period.

37. The database upon which appellant relied for determination of the number of garments delivered during a given royalty period was prepared by appellant's expert witness, Mr. James W. Sutherland (Sutherland) (tr. 2/8). Sutherland, an expert in the computer analysis of data, amassed procurement data on several different garments

procured by DPSC, including the women's pantsuit coat at issue here. He used the same methodology for all of the garment types. (Tr. 2/38; exs. A-1000-02)

38. The underlying data used by Sutherland came from two sources. DPSC provided documents to Bianchi's owner who in turn gave those documents to Sutherland. Sutherland also received data from the HAYSTACK database, a procurement information source maintained by Information Handling Systems (IHS), a commercial establishment. HAYSTACK included procurement information from multiple government sources, including DPSC. (Tr. 2/8-10)

39. Sutherland created a Total Procurement Database for each garment by combining information from IHS' HAYSTACK with information provided by DPSC (tr. 2/31-32). He was careful to eliminate duplicate records (tr. 2/32) and when he did not have information on a scheduled or actual delivery he used normal procurement lead time (the period between contract award and date of first scheduled delivery) to predict the most likely deliveries for a particular contract (tr. 2/33-34).

40. Following is a matrix depicting the quantities delivered during the Vi-Mil royalty period per Vi-Mil's P00011 and P00012 and the corresponding data for the same royalty period using data from the documents in the front cover of appellant's exhibit 1001 for Mil-C-87160, but excluding purchases with a prefix of SCO100 which are intra-agency transfers (tr. 2/65) not subject to royalties.

Comparison of Data Bases for Quantities Delivered During Royalty Period
(22 June 1984 to 21 June 1987)

| Contract Number | Quantities Per Vi-Mil P00011and12 | Quantities Per Bianchi Data[3] |
|---|---|---|
| DLA100-84-M-CB20 | 608 | 0 |
| DLA100-84-M-CB45 | 706 | 705 |
| DLA100-84-C-0724 | 4,440 | 4,365 |
| DLA100-84-C-0751 | 1,606 | 1,575 |
| DLA100-85-M-CA32 | 660 | 660 |
| DLA100-85-C-0339 | 7,050 | 7,050 |
| DLA100-85-C-0376 | 4,425 | 4,425 |
| DLA100-85-C-0742 | 19,320 | 20,971 |
| DLA100-85-M-CA32 | 0 | 660 |
| DLA100-85-C-0339 | 0 | 150 |
| DLA100-85-C-0339 | 0 | 3,525 |
| DLA100-85-M-CA41 | 0 | 660 |
| DLA100-83-C-0563 | 0 | 6,686 |
| Totals | 38,815 | 51,432 |

41. Except for the 608 garments purchased under Contract DLA100-84-M-CB20 (CB20) which was not included in Bianchi's data, the remaining contracts and quantities under the Vi-Mil modifications closely track corresponding data from Bianchi. The Bianchi data includes five additional groups of purchases not included under the Vi-Mil modifications, and while we do not know why that anomaly exists, we observe that Vi-Mil P00012 was executed over eight months prior to the end of the royalty period, much of the data was not subject to cross examination at trial and we have no evidence of how the Vi-Mil data was compiled.

42. We now find that the Bianchi underlying data generated by Sutherland on delivery of Air Force women's pantsuit coats is credible and may be used for determining the number delivered during the Vi-Mil royalty period. Thus, we add the quantity under contract CB20 not included in the Bianchi data to the quantity computed by Bianchi to yield a total of 52,040 (51,432 + 608) women's pantsuit coats delivered during the applicable royalty period and incorporating the constructively accepted Bianchi VECP 1180. At a royalty share of $.3185 per garment, the Bianchi royalty payment computes to $16,574.74.

## DECISION

The CAFC remanded this appeal to us to explain the Board's determination of the number of garments subject to the VECP. We previously found the Vi-Mil quantities more reliable primarily because, unlike the Bianchi data, they were the subject of bilateral agreements and appeared to be undisputed by the parties to those agreements. Having reexamined that determination, we now decide that Bianchi's data is more reliable and determine that Bianchi is entitled to recover for a total of 52,040 garments (finding 42) at $.3185 per garment for a total of $16,574.74 together with CDA interest from 3 March 1988 until paid. *See Bianchi IV* at 141,863.

Appellant makes additional arguments, characterizing language in several of the Court and Board opinions as *dicta* with respect to what constitutes "essentially the same item" and thus urging us to include garments other than the women's pantsuit coat produced in accordance with Mil-C-87160 to calculate the royalty payments. These arguments are without merit, they go beyond the scope of the remand and they involve matters already decided and either not appealed or affirmed by the CAFC in the various decisions previously issued in this case.

The appeal is sustained as to quantum as set forth above, and, in all other respects, it is denied.

Dated: 28 December 2000

RICHARD SHACKLEFORD
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

EUNICE W. THOMAS
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

NOTES

1 *M. Bianchi of California*, ASBCA Nos. 36518, 37029, 37071, 37395, 37798, unpublished opinion dated 2 March 1990 (*Bianchi I*); *M. Bianchi of California*, ASBCA Nos. 37029, 37071, 93-1 BCA ¶ 25,309 (*Bianchi II*); *Bianchi v. Perry*, 31 F.3d 1163 (Fed. Cir. 1994) (*Bianchi III*); *M. Bianchi of California*, ASBCA Nos. 37029, 37071, 96-2 BCA ¶ 28,410 (*Bianchi IV*), *aff'd on recon.*, 97-1 BCA ¶ 28,767 (*Bianchi V*); *Bianchi v. Cohen*, No. 97-1394 (Fed. Cir. December 3, 1998) (*Bianchi VI*).

2 The number 54,773 was incorrect. It should have been 51,342.

3 We recognize that there is a discrepancy between this total and the corrected total in footnote 2. In *Bianchi V* we relied on an attachment to appellant's motion for reconsideration, which attachment was apparently created for the motion. For Contract No. DLA100-85-C-0339 on line 12 of that attachment, 60 garments are shown to have been delivered, 30 in October and 30 in November 1985. Here, we relied on appellant's trial exhibit 1001 which showed on the same line, for the same contract, 150 garments delivered, 30 per month from October 1985 to February 1986.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 37029, Appeal of M. Bianchi of California, rendered in conformance with the Board's Charter.

Dated: 29 DEC 2000

EDWARD S. ADAMKEWICZ
Recorder, Armed Services
Board of Contract Appeals