Maurice L. Bianchi
1608 Marathon Drive
Las Vegas, Nevada 89108
(702) 646-7977

April 4, 1994

Thomas Hornak, Esq.
Chief Trial Attorney
Defense Logistics Agency
Defense Contract Administration
Service Region, Philadelphia
2800 S. 20th Street
Philadelphia, PA 19101-8419

Telefax (215) 737-5913

Dear Mr. Hornak:

Please refer to my letter dated March 23, 1994. I have given you more than ample time to find out if you had a legal right to hold up the two awards that you are holding up. EAJA award under ASBCA Numbers 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934 for $475,724.51 plus interest and, Case No. 93-1402 8680/36518 for $58,613.03 plus interest.

I am extending the time to April 4, 1994 close of business in Philadelphia, PA time before I turn this over to my attorneys for processing.

Please respond via Telefax to (702) 597-1843. A non response will be considered your position to withhold payment without authority.

Regards

Maurice L. Bianchi

Maurice L. Bianchi

# Graziadei & Cantor, Ltd.

GEORGE E. GRAZIADEI
SCOTT MICHAEL CANTOR

August 12, 1994

PLEASE REFER TO

CERTIFIED MAIL/RETURN RECEIPT

GB 4761-4

K. Schutt
U.S. General Accounting Office
Claims Division
441 G Street, N.W.
Washington, D.C. 20548

Re: ASBCA No. 36518/Contract No. DLA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
U.S. Court of Appeals for the Federal Circuit/
Case No.93-1402

Dear Mr. Schutt:

Reference is made to the correspondence of June 27, 1994, directed to your attention from Edward S. Adamkewicz, Armed Services Board of Contract Appeals Recorder. Over a month has passed and Mr. Bianchi has not yet received payment pursuant to the direction and decision of the Board and pursuant to the Order of the U. S. Court of Appeals for the Federal Circuit under Case No. 93-1402.

Demand is hereby made that you issue payment to Mr. Bianchi for the sum of $58,613.03 together with interest from November 17, 1987, to date, in compliance with the Order of the Board (ASBCA No. 36518) and Court of Appeals (Case No. 93-1402) within ten (10) days of your receipt of this request. Failure to do so will result in the filing of a Complaint in the nature of Mandamus in the U.S. District Court for the District of Nevada.

Thank you for your expected prompt attention to the foregoing concern.

Sincerely,

GRAZIADEI & CANTOR, LTD.

GEORGE E. GRAZIADEI, ESQ.

GEG:sd

2

cc: Maurice L. Bianchi
1608 Marathon Drive
Las Vegas, Nevada 89108

... East Carson Avenue, Suite 400 • Las Vegas, Nevada 89101 • Telephone (702) 477-7733 • Telecopier (702) 477-0020

RECEIVED
AUG 31 1 31 PM '94
CAROL C. FITZGERALD
BY ____ DEPUTY

GEORGE E. GRAZIADEI, ESQ.
Nevada Bar Number 001775
SCOTT MICHAEL CANTOR, ESQ.
Nevada Bar Number 001713
302 E. Carson Avenue, Suite 400
Las Vegas, Nevada 89101
(702) 477-7733
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

MAURICE BIANCHI fdba as M. BIANCHI OF CALIFORNIA,

Plaintiff,

vs.

CHARLES BOUSHER, Comptroller General of the United States of America, THE UNITED STATES GENERAL ACCOUNTING OFFICE and DOES I through XX, inclusive,

Defendants.

CASE NO.

CV-S-94-00747-LDG (RJJ)

## COMPLAINT IN THE NATURE OF MANDAMUS

I.

**JURISDICTION AND VENUE**

1. This is an action to compel officers of the United States to perform their duties pursuant to 28 U.S.C. Section 1361. This Court has jurisdiction pursuant to 28 U.S.C. Section 1361, 28 U.S.C. Section 1346 and 28 U.S.C. Section 1331.

2. Venue is proper in the United States District Court for the District of Nevada pursuant to 28 U.S.C. Section 1391(e)(3).

/ / /

/ / /

II.

PARTIES

3. MAURICE BIANCHI is a resident of the State of Nevada who formerly conducted a proprietorship under the name and style of M. BIANCHI OF CALIFORNIA.

4. The Defendant, CHARLES BOUSHER, is the duly appointed, qualified and acting Comptroller General of the United States of America.

5. The Defendant, THE UNITED STATES GENERAL ACCOUNTING OFFICE, is an instrumentality of THE UNITED STATES OF AMERICA, headed by the Comptroller General.

6. That the true names or capacities, whether corporate or associate, individual or otherwise, of Defendants DOE I through XX, inclusive, are unknown to Plaintiff who, therefore, sues said Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein as a DOE is legally responsible in some manner for the events and happenings herein referred to and proximately caused injury and damages thereby to Plaintiff as hereinafter alleged.

III.

ALLEGATIONS AND CLAIM FOR RELIEF

7. Plaintiff, MAURICE BIANCHI, formerly conducted business as M. BIANCHI OF CALIFORNIA, and made a claim pursuant to the Contract Disputes Act, 41 U.S.C. Section 605(c)(3).

8. That on or about February 10, 1993, the Armed Services Board of Contract Appeals, hereinafter referred to as "ASBCA", rendered a Final Opinion granting Plaintiff an award of

$58,613.03, plus interest from November 17, 1987. A copy of that Opinion rendered pursuant to 41 U.S.C. Section 607(e) is attached hereto and made a part hereof as Exhibit "1".

9. That on February 23, 1994, Plaintiff submitted a Certificate of Finality pursuant to Rule 28(e) of the ASBCA Rules (1980). The Government failed to submit a certificate of finality pursuant to said Rule.

10. On June 27, 1994, the Recorder of the Armed Services Board of Contract Appeals notified the Defendant, THE UNITED STATES GENERAL ACCOUNTING OFFICE of the ASBCA Decision awarding the sum of $58,613.03 to the Plaintiff on February 10,1993, and certified said award for review and payment.

11. The Final Opinion of the ASBCA was made pursuant to an Appeal by Plaintiff of a Value Engineering Change Proposal, (VECP), to the Armed Services Board of Contract Appeals, pursuant to the Contract Disputes Act, 41 U.S.C. Section 605.

12. That pursuant to 31 U.S.C. Section 1304 and 41 U.S.C. Section 612, the Defendants are required to promptly pay the award under the Decision of the ASBCA.

13. That there are no debts due and owing to the United States Government as a set-off pursuant to 31 U.S.C. Section 3728.

14. Despite the Final Opinion of the ASBCA, the Defendants have failed and refused to pay the Plaintiff the sums awarded to him pursuant to that Final Opinion.

15. That on August 12, 1994, the Plaintiff, through counsel, made demand upon Defendant, THE UNITED STATES GENERAL ACCOUNTING OFFICE, for payment of the amount of the award,

namely to wit, $58,613.03, together with interest for payment of the sums awarded. A copy of that correspondence is attached hereto and made a part hereof as Exhibit "2".

16. The Defendants, CHARLES BOUSHER, Comptroller General of the United States of America and THE UNITED STATES GENERAL ACCOUNTING OFFICE, have failed and refuse to pay the Plaintiff the sums awarded to him pursuant to that Final Opinion of the ASBCA, or any interest accruing thereon, and continues to so refuse.

17. That it has been necessary for the Plaintiff to engage services of counsel to prosecute this claim and he is entitled to a reasonable attorneys' fee and costs incurred under the Equal Access to Justice Act, 28 U.S.C. Section 2412.

WHEREFORE Plaintiff prays this Court as follows:

1. For a judgment and order directing the Defendants, and each of them, to forthwith pay the Plaintiff any and all sums awarded to the Plaintiff pursuant to the Final Opinion of the ASBCA, Exhibit "1" hereto, together with interest thereon from November 17, 1987;

2. For attorneys' fees and costs of suit incurred pursuant to 28 U.S.C. 2412;

/ / /

/ / /

/ / /

3. For such other and further relief as to the Court seems just and proper in the premises.

DATED this 31 of August, 1994.

Respectfully submitted,

GRAZIADEI & CANTOR, LTD.

BY: [signature]

GEORGE E. GRAZIADEI, ESQ.
SCOTT MICHAEL CANTOR, ESQ.
302 E. Carson Avenue, Suite 400
Las Vegas, Nevada 89101
Attorneys for Plaintiff
MAURICE BIANCHI

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| M. Bianchi of California | ) | ASBCA No. 35518 |
| | ) | |
| Under Contract No. DLA100-80-C-2972 | ) | |

APPEARANCE(S) FOR THE APPELLANT: Michael A. Hordell, Esq.
Laurel A. Heneghan, Esq.
Petrillo & Hordell
Washington, DC

APPEARANCE(S) FOR THE GOVERNMENT: Thomas Hornak, Esq.
Chief Trial Attorney
Stephanie L. Zimmt-Mack, Esq.
Patricia A. Papas, Esq.
Trial Attorneys
Defense Personnel Support Center (DLA)
Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE BURG

The Government accepted a Value Engineering Change Proposal (VECP) submitted by appellant during performance of this contract. The parties were unable to agree either as to the per unit amount which was saved because of the VECP or the number of units to which the savings applied. When the contracting officer failed to issue a decision, appellant filed this appeal pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §605(c)(3). Appellant seeks $2,175,807.56 as instant, concurrent and future contract savings and $3,997,660.80 as collateral savings, for a total of $6,173,468.36.

FINDINGS OF FACT

1. Various findings of fact pertaining to this contract were the subject of a prior opinion of this Board on the motion for partial summary judgment filed in this appeal dated 2 March 1990 (unpublished) and in our opinion in ASBCA Nos. 37029 and 37071, 92-_ BCA ¶ ______, (decided 31 July 1992) and, to the extent to which we consider them relevant, they are adopted herein.

The Contract

2. On 23 June 1980, the Defense Personnel Support Center (DPSC) of Philadelphia, Pennsylvania, Defense Logistics Agency (DLA), awarded appellant Contract No. DLA100-80-C-2972 for the manufacture of 125,240 Man's Black All Weather Coat with removable lining at a unit price of $31.92 and a total contract price of $3,997,366.40. The coat was to be manufactured in accordance with Limited Purchase Description 12-77A (DES 12-77A), dated

1 November 1978, using patterns dated 21 September 1979 issued by the United States Army Natick Research and Development Laboratory (Natick).

3. DES 12-77A incorporated by reference a federal standard, FED-STD-751 - Stitches, Seams and Stitching. The solicitation incorporated by reference DPSC Form 3540, the DPSC Master Solicitation for Clothing and Textiles. The Master Solicitation included Clause J09, Value Engineering Incentive, January 1978, which provided (R4, tab 4 at 14-15):

> J09 VALUE ENGINEERING INCENTIVE (DPSC 1978 Jan)
>
> (a) Application. This clause applies to a Contractor developed and documented Value Engineering Change Proposal (VECP) which:
>
> (i) requires a change to this contract to implement the VECP, and
>
> (ii) reduces the overall costs to the cognizant Military Department without impairing essential functions or characteristics, provided that it is not based:
>
> (A) solely on a change in deliverable end item quantities, or
>
> (B) a change in R&D end item or test quantities due solely to results of previous testing under this contract, or
>
> (C) solely on a change to the contract type.
>
> (b) Documentation. As a minimum, the following information shall be submitted by the Contractor with each VECP.
>
> (i) a description of the difference between the existing contract requirement and the proposed change, and the comparative advantages and disadvantages of each, justification when a function or characteristic of an item is being altered, and the effect of the change on the performance of the end item;
>
> (ii) an analysis and itemization of the requirements of the contract which must be changed if the VECP is accepted and a recommendation as to how to make each change (e.g., a suggested specification revision);
>
> (iii) a separate detailed cost estimate for both the existing contract requirement and the proposed change to provide an estimate of the reduction in costs, if any, that will result from acceptance of the VECP, taking into account the costs of development and implementation by the Contractor (including any amount attributable to subcontracts in accordance with paragraph (h) below);
>
> (iv) a prediction of any effects the proposed change would have on collateral costs to the Military Department such as Government-furnished property costs, costs of related items, and costs of maintenance and operation.

(v) a statement of the time by which a contract modification accepting the VECP must be issued so as to obtain the maximum cost reduction, noting any effect on the contract completion time of delivery schedule, and

(vi) identification of any previous submission of the VECP, including the dates submitted, the agencies involved, the numbers of the Government contracts involved, and the previous actions by the Government, if known.

(c) Submission. VECPs shall be submitted to the Procuring Contracting Officer (PCO). When the contract is administered by other than the purchasing office, a copy of the VECP shall be submitted simultaneously to the Administrative Contracting Officer (ACO). VECPs shall be processed expeditiously, however, the Government shall not be liable for any delay in acting upon any VECP submitted pursuant to this clause. The Contractor has the right to withdraw, in whole or in part, any VECP not accepted by the Government within the period specified in the VECP.

(d) Acceptance. The Contracting Officer may accept, in whole or in part, by contract modification either before or within a reasonable time after performance has been completed under this contract any VECP submitted pursuant to this clause. Until a contract modification applies a VECP to this contract, the Contractor shall remain obligated to perform in accordance with the terms of the existing contract. Contract modifications made pursuant to this clause will so state. The decision of the Contracting Officer as to the acceptance of any VECP under this contract (<u>including the decision as to which clause is applicable to the proposal if this contract contains both a "Value Engineering Incentive" and a "Value Engineering Program Requirement" clause</u>) shall be final and shall not be subject to the "Disputes" clause of this contract.

(e) Sharing. If a VECP submitted by the Contractor pursuant to this clause is accepted, the Contractor shall share in savings realized by the Government in accordance with the following provisions:

(1) <u>Instant Contract</u>.

(i) Definitions:

(A) Instant contract savings to the Contractor (ICS) is the unit cost reduction times the number of units affected in the instant contract. The proposed unit cost reduction includes estimated allowable Contractor development and implementation costs (CC). The Contractor's development and implementation costs include any subcontractor development and implementation costs and subcontractor incentive payments (<u>see (h) below</u>). For purposes of this clause, Contractor development costs are those costs incurred after the

Contractor has identified a specific VE project and prior to acceptance by the Government.

(B) Government Costs (GC) are those DOD costs which directly result from development and implementation of the VECP, such as test and evaluation of the VECP, and any increased cost in DoD operations, maintenance, and logistics support.

* * *

(2) Concurrent Contracts.

(i) If the VECP accepted under this contract is also used on concurrent contracts of the purchasing office for essentially the same items, the Contractor shall be paid a share of any savings as calculated in (ii) below.

(ii) Calculations

(A) Determine the reduction in the price of each concurrent contract(s) as a result of incorporating the VECP.

(B) Subtract from the total amount in (A) any Government costs (GC) not yet offset (if GC was greater than ICS) in (e) (1) (ii) (C) or (D) above, and any increase in the instant contract price, i.e., if ICS was negative in (e) (1) (ii) (D), if the resulting number is positive, multiply it by 50% (25% if this is a VEPRC). Add this amount to the instant contract price.

(3) Future Contracts.

(i) Definition. The term unit cost reduction for future contract sharing shall be the unit cost reduction under this instant contract without deducting any cost of development or impletion [sic].

(ii) If the VECP accepted under this contract is used on future purchases of essentially the same item by the purchasing office, or its successor, the Contractor shall share in the savings on all affected end items scheduled for delivery not later than 3 years after acceptance of the first item incorporating the VECP, or until the originally scheduled delivery date of the last affected end item under the instant contract, whichever is later. When sharing on future contracts is expected, the Contractor shall be responsible for the following:

(A) Maintaining records adequate to support identification of the first delivered unit to which the VECP applies. These records are considered an integral part of contract documentation and shall be maintained for a period of three years after final payment on the contract under which the VECP was accepted.

(B) Annotating the DD-250, Material Inspection and Receiving Report, which applies to the initial unit covered by the VECP with the following statement:

"This is the initial unit delivered which incorporates VECP NO. ____________________, Contract Modification No. ____________________, dated ____________________."

(iii) Calculations. At the time each eligible future contract is awarded:

(A) Determine the number of units scheduled to be delivered prior to expiration of the Contractor sharing period determined in (ii) above. Multiply this by the unit cost reduction as defined in (e) (3) (i).

(B) Subtract from the total amount in (A) any Government costs or instant contract increases not yet offset in (e) (1) (ii) (C) or (D), or in (e) (2) (ii) (B), or in other contracts awarded since acceptance of the VECP. If the resulting number is positive multiply it by 50% (<u>25% if this is a VEPRC</u>) and add the result to the instant contract price.

(f) Payment. The Contractor's concurrent and future contract shares should be paid upon modification of concurrent contracts or future contract award, or within six (6) months thereafter. However, any such payments are subject to the condition that to the extent the Government does not receive delivery of and accept all items on which the share is paid, the Contractor shall reimburse the Government the proportionate share of the payments. If this clause is modified to provide for lump sum payments, such payments shall be made upon modification of the instant contract.

4. On 24 June 1980, DES 12-77A was superseded by MIL-C-44030(GL) for Coat, All Weather, Man's Black, w/Removable Liner. The requirements of DES 12-77A were incorporated into this new specification. Appellant's contract was not required to be modified and was not modified to include MIL-C-44030 and continued to require production in accordance with the requirements of DES 12-77A.

<u>The VECP Approval</u>

5. On 9 September 1980, appellant submitted a VECP to modify DES 12-77A, which stated:

> Value Engineering Proposal Change recommendation to delete Operation 22C "Stitch sleeve lining to sleeve 1 inch from bottom of overedge seam of lining."
>
> Value Engineering Proposal Change recommendation; change 15-D from "Overedge stitch bottom rawedge [sic] of sleeve lining."
>
> Change to: Safety stitch sleeve lining to sleeve catching interlining.

> Result in Savings: 6¢ per coat.
>
> Changing this operation will not affect servability [sic] or appearance in any way.

(R4, tab 6)

6. By letter dated 18 September 1980, the contracting officer replied to appellant's letter as follows:

> This is to acknowledge receipt of your Value Engineering Change proposal dated 9 September 1980 submitted under contract DLA100-80-C-2972 for Raincoat, Man's, Black, LP/P DES 12-77A. Your proposal, hereinafter identified as VECP 8680, recommends overedging the bottom raw edge of the sleeve lining.
>
> To permit a proper and complete evaluation of your proposal we will require a separate detailed cost estimate for both the existing contract requirement and the proposed change to provide an estimate of the reduction in costs that will result from acceptance of your Value Engineering Change Proposal. The Value Engineering Incentive Clause (J09), copy attached, in your contract requires this information to be furnished by the proposer. This cost breakdown should also include indirect costs and percentages applied to direct labor and material costs. We request you furnish this information as soon as possible.
>
> We will promptly notify you of the results after completion of the evaluation. Your interest and participation in the Value Engineering Program is much appreciated.

(R4, tab 7)

7. Following a preliminary evaluation, the VECP was forwarded to Natick on 2 October 1980 for a decision of whether to approve this proposed change. The letter transmitting the VECP was as follows:

> SUBJECT: Value Engineering Change Proposal 8630, Raincoat, Man's Black, w/Removable Liner, LP/P DES 12-77A
>
> * * *
>
> 1. Attached is subject VECP from M. Bianchi of California proposing a change in construction of the sleeve on subject raincoat.

2. Our technical personnel have reviewed the proposal and believe the recommendation to combine two operations in one by using a safety stitch machine in overedging the bottom raw edge and stitching the lining to sleeve catching the interlining has merit. There is the possibility that the sleeve lining may finish slightly longer, however, the lining is required to be tacked to the outer sleeve and serviceability will not be affected.

3. Contractor's estimated unit savings of $.06 projected over the number of raincoats to be procured in FY 81 would result in annual savings of $41,459.

4. We request the proposal be evaluated and we be apprised of your decision by 21 October 1980.

(R4, tab 17)

8. On 15 October 1980, appellant responded to the contracting officer's 18 September 1980 letter and submitted the following information:

VECP #8680 recommends overedging the bottom raw edge of the sleeve lining by reference (A).

In evaluating the cost savings for the above subject VECP, the direct labor is as stated 6¢ per coat. We can only estimate 2¢ for indirect cost and 2¢ as a percentage to apply to direct labor and material cost. Total savings to the government of 10¢ (By reference B).

(R4, tab 8)

9. On 25 November 1980, Natick informed DPSC that VECP 8680 had been approved for use in DES 12-77A and its follow-on specification, MIL-C-44030(GL), both of which contained the same description for operations labelled 15d and 22d. Natick authorized changing both DES 12-77A and MIL-C-44030 as follows:

Page 20

Operation 15d. – Delete in its entirety and substitute:

"15d. Safety stitch bottom raw edge of sleeve lining to bottom of sleeve, catching interlining with not less than 3/8 inch seam.

| Stitch Type | Seam and Stitching Type | |
|---|---|---|
| 515, 516 or 519 | SSa-2 | .... |

* * *

Operation 22c - Delete Operation 22c and Re-Letter Operation 22d to 22c.

(R4, tab 17)

10. By letter dated 29 December 1980, the acting Chairman of the Clothing and Textile Branch, Technical and Quality Assurance Division of the Directorate of Clothing and Textiles sent an Inter-Office Memorandum listing five items to which VECP 8680 "can be made applicable." They were:

| | |
|---|---|
| Coat, All Weather, Mn's | MIL-C-44030 |
| Coat, All Weather, Wmn's | MIL-C-43972 |
| Coat, All Weather, Mn's (CG) | MIL-R-87003 |
| Coat, All Weather, Wmn's (CG) | MIL-R-87009 |
| Coat, All Weather, Mn's (AF) | MIL-R-87110 |

(R4, tab 19) The record contains no indication that, other than MIL-C-44030, any of the above-listed specifications were changed. At that time, DPSC did not have authority to change specifications. It made recommendations to various service offices responsible for issuance of specifications which then made the determination whether to make such changes. It often took a long time to incorporate various changes into a clothing specification. Items which were acquired frequently and/or in large quantities received more immediate attention. Prior to a specification change, a letter directive was issued modifying the specification to reflect the change or changes for a particular item. At Natick, an individual was assigned specific items which were not necessarily related either by use or type. It was that individual's responsibility to revise specifications once a value engineering change had been approved. There was no procedure whereby all other personnel were notified of a specific change for which another individual was responsible although it was possible they might learn about the change.

11. By Inter-Office Memorandum dated 30 December 1980, the Chief of the Technical and Quality Assurance Division of the Directorate of Clothing and Textiles requested that the following contracts be modified to incorporate VECP 8680:

| | |
|---|---|
| Centre Mfg. | DLA100-80-C-2485 |
| Centre Mfg. | DLA100-81-C-2225 |
| Centre Mfg. | DLA100-80-C-2782 |
| Centre Mfg. | DLA100-80-C-3401 |
| Major Coat | DLA100-80-C-2472 |
| MBOC | DLA100-80-C-2972 |

12. On 29 January 1981, Natick informed DPSC that findings from a follow-up evaluation of VECP 8680 indicated that a line tack in the lining of the sleeve should be added as an additional operation to MIL-C-44030(GL) and DES 12-77A to take-up the excess lining fabric. The Government considers that the line tack was an outgrowth of and resulted from VECP

8680. Appellant does not concur that this tack was required as a result of VECP 8680.

13. By letter dated 10 March 1981, the Chief of the Product Engineering Office, Directorate of Manufacturing, concluded the following:

> 1. Reference IOM, your Office, dated 19 February 1981, subject as above.
>
> 2. A direct labor savings of .0071 standard hours will be realized when sleeve lining is joined to sleeve with a safety stitch in lieu of overlock and single needle stitching.
>
> 3. Overhead and profit are not included in the above figure.

Handwritten on the document is the following:

> 0.0071 x $4.75/hour = 0.033725
> + 80% overhead = 0.060705
> + 20% G & A = <u>0.073</u> per unit

(R4, tab 12) While when or by whom the above calculation was made and placed on the letter has not been established in the record before us, it was apparently by someone in the Government prior to recommending an amount for finalized savings to the contracting officer. (See F/F 14)

14. On 20 March 1981, the Value Engineering Office of the Directorate of Clothing and Textiles recommended to the contracting officer that the savings be finalized at $.07 per unit, with appellant eligible for a 50% share of the savings, or $0.035 per unit.

15. On 31 March 1981 the contracting officer notified appellant that VECP 8680 had been accepted at a unit price yet to be established and that the contract would soon be modified. Unilateral Modification P00005, effective 31 March 1981, made no change in the contract price but provided, insofar as VECP 8680 was concerned:

> 1. Pursuant to the Changes Article and Value Engineering Clause J09, Specification MIL-C-44030 [DES 12.77A rather than the cited MIL specification was applicable to this contract] is changed as follows as a result of VECP #8680:
>
> a. Delete operation 15.d, "overedge the bottom raw edge of the sleeve lining".
>
> b. Change operation 22.c to read: "Safety stitch bottom sleeve lining to sleeve bottom catching interlining". [This is actually a paraphrase of the revised operation 15d. Operation 22c was eliminated. See Finding 9, <u>supra</u>]

2. As a result of the above accepted VECP, the CMT unit contract price of all units subsequent to and including the initial unit covered by the VECP is to be reduced by $.035 for payment purposes to reflect the Government's share of the savings.
3. Contractor is entitled to 50% of the unit savings or $.035 for all Coat, All Weather,,[sic] Man's, Black w/removable liner using the accepted change #8680 during the royalty period. The royalty period shall extend for a period of 3 years after accetpance [sic] of the first item incorporating the VECP.
4. Contractor is obligated to annotate the DD Form 250 which applies to the initial unit covered by the VECP #8680.

(R4, tab 2 at 15)

16. The initial unit manufactured under Contract 2972, as modified by VECP 8680, was delivered to and accepted by the Government on 6 April 1981. The applicable royalty period for VECP 8680, therefore, is 6 April 1981 through 5 April 1984. The contract payments to appellant for the instant contract were never adjusted to reflect savings attributable to VECP 8680.

17. By Modification P00007, dated 16 November 1981, the undelivered quantity of 87,094 units remaining on Contract 2972 was terminated for default.

<u>VECP 8680</u>

18. All stitches and seams used in construction of Government clothing are described in FED-STD-571 (January 25, 1965). Each type of stitch or seam is assigned a number. The stitches and seams used both before and after approval of VECP 8680 existed in FED-STD-571. Prior to incorporation of the change due to VECP 8680, DES 12-77A Operation 15d required seam and stitching type EFd-1 with a choice of 502, 503 or 504 stitch type. Operation 22c required seam and stitching type SSa-1 with a 301 stitch type. After the change resulting from VECP 8680, one operation replaced these two operations. Operation 22c was deleted in its entirety and Operation 15d was changed to require seam and stitching type SSa-2 with a choice of 515, 516 or 519 stitch type (F/F 9, <u>supra</u>).

19. A safety stitch is a term used to describe a family of stitches composed of rows of single needle joining stitches and rows of overedging stitches, formed simultaneously with one pass through a sewing machine. The combination of the joining and overedging operations results in a change in the seam type to a less complex and more cost effective seam. Stitches 515 through 519 are all in the family of safety stitches. They vary depending on the types of single needle stitch and the type of overedge stitch utilized. Stitch types 502, 503 and 504 originally contained in DES-12-77A are overedge stitches. Seam type EFd-1 refers to the type of stitching produced by overedging the cut edge of one ply of fabric. Operation 22c required stitching of the sleeve lining to the shell sleeve one inch from the bottom of the overedged seam of lining using stitch type 301, a single

needle stitch performed on a lock stitch, and seam type SSa-1. SSa-1 is the most frequently used seam type and is accomplished by laying two plies of fabric together and joining the plies a specified distance from their common cut edge with the single needle 301 stitch.

20. Prior to submittal of VECP 8680, DES 12-77A required the use of safety stitches in eight other operations during production of the All Weather coat which was the subject of that purchase description. These were:

15. Make lining (yoke).

a. Join front lining to front sleeve lining at armhole with a <u>safety stitch</u>. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

b. Position front edge of back sleeve lining and front edge of cape to shoulder edge of front lining and <u>safety stitch</u> with stitching continued the entire length of sleeve (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

c. Position back edge of cape and back edge of back sleeve lining to front edge of back lining and <u>safety stitch</u> to bottom of armhole. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

[d. Overedge stitch bottom raw edge of sleeve lining using Stitch type 502, 503 or 504 and seam EFd-1, prior to the change due to VECP 8680. See F/F 9 for incorporation of VECP 8680 using Stitch type 515, 516 or 519 and seam and stitching type SSa-2]

e. Close side seam of front and back lining and underarm seam of sleeve in one operation with a <u>safety stitch</u>. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

* * *

<u>MAKE LINER</u>

35. Attach front sleeve of liner to front of liner.

a. Position front sleeve to front of liner as indicated by marks on pattern and <u>safety stitch</u> around armhole. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

b. Position front edge of back sleeve to shoulder edge of front of liner and <u>safety stitch</u> with stitching continued the entire length of sleeve. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

c. Position back edge of back sleeve to front edge of back liner and safety stitch to bottom armhole. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

d. Close side seams of front and back of liner and underarm seam of sleeve in one operation with a safety stitch. . . . (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

[Emphasis added] (R4, tab 5 at 19, 28-29)

The Claim

21. Appellant was not in agreement with the Government's calculated savings of $0.07 per unit and did not sign Modification P00005. No payments for VECP 8680 have ever been made to appellant. On 16 November 1987 appellant submitted a certified claim, received on 17 November 1987, for payment of its share of savings. No decision was issued by the contracting officer. When the contracting officer failed to respond to another request for a decision, appellant filed an appeal with this Board.

22. In its complaint, appellant contended that the savings as verified by the Government when it approved VECP 8680 did not include savings for indirect costs, contractor and Government furnished material or profit and alleged that the properly calculated savings for VECP 8680 were $0.164 per coat so that its share was $.082 per coat. Appellant, therefore, sought a royalty of "at least $63,502.52" for the instant contract and five other contracts because of utilization of VECP 8680 on "at least 774,421" units. Appellant further alleged on information and belief that the Government experienced collateral savings and savings on additional contracts about which it was not currently aware at the time of filing its complaint and that it would "amend its claim as further information concerning the government's use of this VECP becomes known." (Complaint, Para. 9-12)

23. Appellant's president reviewed 2,223 specifications utilized in the manufacture of military garments to determine those which were modified after VECP-8680 and which he concluded were the "mirror image" or were the "functional equivalent" of VECP 8680. Where no explanation or basis for the change was found for twenty specifications, he concluded that the change was because of VECP 8680. These specifications form the basis for appellant's claim for concurrent and future savings.[1] On 15 February 1991 appellant supplied the Government with a list of those specifications for which it was claiming a share of savings. Appellant recognizes that it did not invent the safety stitch or introduce its use into Government specifications and seeks a share of savings for the Government's use of the safety stitch on garment locations where the safety stitch was not being used at the time of approval of VECP 8680. Based on calculations, discussed below, appellant alleges that it should receive instant and future contract savings from implementation of VECP 8680 of $2,175,807.56 for essentially the same item and $3,997,660.80 for collateral savings. Appellant also seeks interest.

The Government agrees that appellant is entitled to receive interest from 16 November 1987, but not prior to that date.[2/]

24. The specifications which appellant includes in its present claim are set forth below. A brief description of the operation(s) which appellant claims were due to its VECP is set forth under each item. Included are instances where a specification was issued using the safety stitch operation or was changed so that two operations were combined into one operation. Also included are instances where a lapped seam was required since appellant argues that a lapped type seam is functionally equivalent to the overedging operation described in VECP 8680. The lapped seam (LSC-2) is formed by folding an inside ply of material into an outside ply of material and then sewing the folds together, involving the combination of two operations -- joining and edge protection.

| MILSPEC | ITEM | 1/2 UNIT SAVINGS | TOTAL NO. UNITS | TOTAL CONTR.SAVINGS |
|---|---|---|---|---|
| S-44093 | Shirt, Woman's, Long Sleeve, Polyester/Cotton<br>Make sleeve; join front to side body; join shoulder seams and back to front; set sleeves | $0.149 | 425,033 | $ 63,331 |
| S-44102 | Skirt, Woman's Classic Design Polyester/Wool<br>Make pocket and attach label; attach pocket | 0.033 | 84,417 | 2,786 |
| S-44090 | Shirt, Woman's Short Sleeve, Polyester/Cotton<br>Make sleeve underseam; join front to side body; join shoulder seams and back to side body; set sleeves | 0.149 | 926,028 | 137,978 |
| S-44092 | Slacks, Woman's Classic Design, Polyester/Wool<br>Make pocket and attach label | 0.033 | 256,648 | 8,469 |
| S-44039 | Shirt, Man's, Long Sleeve, Polyester/Cotton<br>Set sleeve to armhole; join side and underarm seams | 0.071 | 2,848,840 | 292,268 |

| | | | | |
|---|---|---|---|---|
| S-87169 | Shirt, Woman's, Utility<br>Set sleeves; join side seams and sleeve seams | 0.063 | 142,326 | 8,967 |
| L-44089 | Liner, Night, Camouflage Parka, Desert<br>Join liner (Lap seam) | 0.101 | 260,023 | 26,262 |
| T-44047 | Trousers, Combat, Woodland Camouflage<br>Make hip pockets; make and stitch side hanging pockets | 0.136 | 11,914,174 | 1,620,328 |
| J-87024 | Jacket, Insect Repellent<br>Amended spec 5/4/84 to permit alternate of using safety stitch to attach interlining and sleeve | 0.028 | 104,431 | 2,924 |
| S-44041 | Man's Short Sleeve Shirt<br>Set sleeves; join side and underarm seams | 0.054 | 3,032,442 | 163,752 |
| C-87093 | Coverall, Man's, Fire Retardant<br>Join back arm seam; set sleeve; stitch crotch seam | 0.110 | 163,260 | 17,959 |
| P-6279J | Parka, Extreme Cold Weather, Type N-3B<br>Join sleeve linings | .0.085 | 227,863 | 19,368 |
| S-29368A | Shirt, Woman's Long/Short Sleeve, Polyester/Cotton<br>Changed operation from: Make bust and front darts;<br>to: Assemble front and side panels (Alternate operation) | 0.027 | 108,408 | 2,927 |
| S-87005A | Skirt, Woman's, Dress<br>Added alternate zipper attachment with safety stitch | 0.014 | 1,435 | 20 |

| | | TOTAL NO. UNITS |
|---|---|---|
| O-44109 | Overall, Combat Vehicle Crewman's<br>Series of seams using safety stitch and lap seam; Make leg cuff-slide fastening openings; make front pockets openings, attach pockets; make thigh and shin pleats and close pockets | 10,383 |
| S-83234B | Skirt, Woman's Blue<br>Make pockets | 154,284 |
| S-0037951 | Smock, Medical Assistant's, Man's<br>Join Shoulder seams; make and set sleeves; join side and underarm seams | 55,512 |
| S-3649E | Shirt, Man's Tropical, Polyester/Wool<br>Set sleeves; close sides and sleeves | 1,440,407 |
| S-44110 | Slacks, Woman's Maternity Work Uniform<br>Join stretch panel | 153,640 |

25. Each of the above-listed specifications reflected a specification modification from two operations prior to the submittal of VECP 8630 to one operation or a new specification using a safety stitch machine with stitch type 515, 516, 517 or 519 and, in most instances, seam type SSa-2. A few operations required a lap seam or seam SSa-1 rather than the SSa-2. In some instances the safety stitch operation was an alternate method of construction rather than a mandatory method. If a bidder has both types of equipment or can afford the equipment necessary for using the safety stitch, the manufacturer will prepare an estimate using each method and select the least expensive in order to be competitive.

26. Appellant was unable to obtain sufficient information during discovery relating to delivery schedules and number of units procured for some of the specifications included in its claim (the last five items set forth in Finding 24). It, therefore, estimated the number of units procured during the royalty period from information for a later period provided by Government procurement centers (such as DLA) to a company named Information Handling Systems and compiled into a database called "Haystack". Using the information contained in Haystack for the years 1983 to 1991, appellant

calculated an average for each year and then used this average (multiplied by three) to estimate the number of units for each of the five items included in the "Total No. Units" column listed above with no dollar figure listed under "Total Contract Savings" (F/F 24). Appellant seeks the product of the amount we conclude appellant should receive per unit for those items multiplied by the number of estimated units. Appellant had included one other specification (making the 20 total - F/F 23) in its claim for future savings, MIL-C-87170. Since it was unable to obtain any information through either discovery or its own sources upon which it could base an estimate of units obtained during the royalty period, in its brief appellant stated it was not claiming any savings from that specification.

Quantification of the Contract Savings

27. A consultant to the apparel industries appeared for appellant. He calculated savings on direct labor and material for Contract 2972 by estimating the manufacturing time and material required for all operations prior to and after approval of VECP 8680. The difference represented the direct labor and material saved for each unit.

28. Using a sophisticated system of time/motion studies and a data base of production standards (expressed in Standard Allowed Minutes per piece) for similar types of garments, he calculated the Standard Allowed Minutes (SAM) savings to be 0.734, as follows:

| No. | Description | SAM |
|---|---|---|
| 15d | Overedge bottom of sleeve lining | 0.697 |
| 22c | Set Sleeve lining to sleeve | 1.271 |
| | Original Total Standard Minutes (SAM) | 1.968 |
| 15d | Combining operations per VECP 8680 | 1.234 |
| | Savings | 0.734 |

(Exh. 1073 at 19)

29. To calculate the Total Direct Labor Minutes Saved, appellant's expert added the Associated Direct Labor Factor and the Support Direct Labor Factor to the 0.734 SAM. He used 20 percent, based on experience with similar shops, to compute the Associated Direct Labor Factor. This included training of direct labor, repairs, relocation of direct labor personnel to balance the production line and machine downtime. He used 15 percent, based on experience with similar shops, to compute the Support Direct Labor Factor which included the direct supervisors, bundle girls, mechanics and quality assurance personnel. This was calculated as follows:

| | |
|---|---|
| Net Standard Minutes Saved | 0.734 |
| Associated Direct Labor Factor (20%) | 0.147 |
| Subtotal | 0.881 |

| | |
|---|---|
| Support Direct Labor Factor (15%) | 0.132 |
| Total Direct Labor Minutes Saved | 1.013 |

(Exh. 1073, p. 20)

30. After calculating the labor savings because of VECP 8680, appellant's expert estimated the amount of fabric, lining and interlining which in his opinion should have been saved as a result of the VECP. Operation 22c had required a seam allowance of 1 inch. When this operation was eliminated by VECP 8680, a pattern change to eliminate excess material and reduce the seam allowance to 3/8 inch was possible. This would have resulted in a savings of 5/8 inches for the Government furnished fabric, the lining and the interlining.

31. VECP 8680 did not include a suggestion that the lining be shortened, thereby saving fabric. In its submittal of estimated savings submitted on 15 October 1980, appellant estimated a savings for direct labor but none for material (F/F 8). Nor was there a change in the patterns to shorten the lining. Revision of Government patterns is a complicated matter and is not the responsibility of nor performed by DPSC. The cognizant Government office did not elect to change the patterns and testimony at the hearing by an individual who was not involved with approval of VECP 8680 by Natick nor with the requirement of addition of the line tack (see F/F 12) was that this was so that there would be sufficient material so that if the sleeve had to be lengthened for the user there would be sufficient lining material. This same witness had drafted an all weather coat specification in 1977 which used an operation similar to that suggested by VECP 8680. However, it did not require the lining to be tacked to the sleeve shell. There was also testimony that the lining could have been left alone completely, "not putting any bar tack at all, leave it loose" (tr. 6-134). We conclude that the record fails to persuade us that the addition of the line tack was necessary because of VECP 8680.

32. Appellant's expert used what is termed the "square inch method" to calculate the total material which he concluded could have been saved as a result of VECP 8680, as follows:

| Part | Sq.Inch/ Sleeve | Saved Per Garment |
|---|---|---|
| GFM (Back and front sleeve material) | 10.313 | 20.626 |
| Lining (Back and front sleeve) | 10.131 | 20.626 |
| Nonwoven Interlining | 9.844 | 19.688 |

(Exh. 1073, p. 21)

33. Appellant's expert accounting witness quantified the claim using the savings in labor and material set forth above. He concluded that it would be appropriate to factor in an escalation rate for labor and material costs for the three-year period during which appellant was entitled to share in instant and future contract savings because it was a time when both were rising. Using Labor Force Employment and Earnings statistics for Apparel and Other Textile Products published by the U. S. Department of Commerce, Bureau of Economic Analysis, in the Survey of Current Business, he calculated a labor escalation of $0.333. He used the mid-point of appellant's performance under this contract, December 1980 as the starting point and the midpoint of the three year period, October 1982, as the date for the average labor rate for the three-year period. Adding the escalation rate to appellant's average labor rate of $4.00 during performance of this contract, he made the following computation:

| | |
|---|---|
| Contractor Labor Rate/Hour for Contract 2972 [Based on a DCAA Audit report which took no exception to average incurred contract direct labor rate of $4.00 per hour submitted by appellant] | $4.000 |
| Rate Escalation | 0.333 |
| Escalated Contractor Labor Rate/Hour | $4.333 |
| Labor Rate/Minute ($0.072/60) | $0.072 |
| Total Direct Labor Minutes Saved [F/F 29] | 1.013 |
| Total Direct Labor Savings per Garment | $0.073 |
| Indirect Expense Savings per Garment @ 47.94% [Based on DCAA recommended forward pricing rate] | $0.035 |

34. Appellant's accounting expert also calculated the dollars applicable to material savings. Using the Producer Price Index for Textile Products and Apparel published by the U. S. Department of Commerce, Bureau of Economic Analysis, in the Survey of Current Business, he estimated an escalation for fabric furnished by both the contractor and Government based on a midpoint of performance of the royalty period of October 1982. Applying these escalated fabric costs to the estimated square inch savings/sleeve (F/F 31), he estimated savings for contractor supplied fabric (lining and interlining) of $0.026 per garment and Government furnished material savings of $0.038 per garment (exh. 1029 at 3-6, 8-9).

35. Appellant used 47.94 percent as its indirect expense rate. This was the recommended Defense Contract Audit Agency (DCAA) rate for appellant's calendar year 1980. While the overhead experienced by appellant during 1981 was higher than this due to problems encountered by appellant and its cessation of operations during 1981, in developing the unit savings,

because of lack of historical data, appellant made no increase in this rate. The Government used 80 percent for overhead and 20 percent for G&A, a total of 100 percent (F/F 13). The 1980 indirect expense rate was lower than that experienced by appellant in 1981. No audit was performed by the Government for 1981. We conclude that the rate used by the contracting officer in her unilateral determination of the instant contract savings is the appropriate rate to use in determining instant contract savings.

36. Appellant included a profit factor of 11.9 percent in estimating its price for this contract. In estimating the amount of savings for VECP 8680, appellant calculated profit on its costs, excluding GFM, at this 11.9 percent. ASPR 1-1703.1 (d), in effect at the time of award of the subject contract, provided:

> On instant and future contracts the contractor's profit or fee shall be excluded when calculating the net savings.

37. Summarizing the various savings, appellant's accounting expert calculated that the savings were as follows:

| | |
|---|---|
| Contractor Furnished Materials Savings | $0.026 |
| Direct Labor Savings | 0.073 |
| Indirect Expense Savings | 0.035 |
| Other Direct Cost Savings | 0.000 |
| Subtotal | $0.134 |
| Profit | 0.016 |
| Government Furnished Material Savings | 0.038 |
| Total Savings/Garment | $0.188 |
| Contractor Assigned Savings (50%) | $0.094 |

38. The contractor assigned savings of $0.094 was multiplied by 837,329 units estimated as delivered during the royalty period to claim a total savings for items obtained using MIL-C-44030 of $78,709. Appellant used the services of a consultant to determine the quantity of units delivered under the instant contract and other contracts using MIL-C-44030 for which it concludes that the VECP was made applicable. The consultant reviewed contract procurement history records from Government records obtained during discovery and information from a commercially available database known as "Haystack" (see F/F 26). Neither of these sources had complete information but by combining them and making certain assumptions based on available information as to delivery schedules, he reached the following conclusions about deliveries of the Man's All Weather Coat w/Removable Liner produced using MIL-C-44030 or DES 12.77A (exh. 1041, p. 1):

| Cont.No. DLA100- | Manufacturer Name | Award Date | Quantity | Qty in Royalty Per |
|---|---|---|---|---|
| 80-C-2485 | Centre Mfg Co. | Jan-80 | 125,840 | 0 |
| 80-C-2972 | M Bianchi of Calif. | Jun-80 | 125,240 | 22,000 |
| 81-C-2227 | Major Coat Co. | Oct-80 | 58,976 | 28,976 |
| 81-C-2773 | Centre Mfg Co. | Feb-81 | 91,176 | 91,176 |
| 81-C-2773* | Centre Mgf Co. | Feb-81 | 91,184 | 91,134 |
| 81-C-3451 | Centre Mfg Co. | Sep-81 | 156,776 | 156,776 |
| 81-C-3451* | Centre Mfg Co. | Sep-81 | 78,384 | 78,384 |
| 82-C-0562 | Centre Mfg Co. | May 82 | 218,591 | 218,591 |
| 83-C-0649 | Centre Mfg Co. | May-83 | 123,858 | 123,858 |
| 84-C-0285 | Centre Mfg Co. | Dec-83 | 174,028 | 26,384 |
| TOTALS | | | 1,244,053 | 837,329 |

*/ Option quantities

The record contains no information concerning utilization of VECP 8680 in contracts other than DLA100-80-C-2485 for which modifications were suggested by the Chief of the Technical and Quality Assurance Division of the Directorate of Clothing and Textiles because of VECP 8680 (F/F 11).

39. In developing this appeal, appellant was at a disadvantage since, other than information available through sources such as Haystack, all of the information it needed was in the possession of the Government.3/ The Government now argues that the above information concerning concurrent contracts fails to reflect items which were rejected or variations (decreases) delivered in quantities permitted under the contracts. We conclude that under the circumstances the information in the record, summarized above, presents a fair basis for determining the quantity of similar coats delivered during the royalty period.

40. Under the J09, Value Engineering Incentive clause paragraph (e)(2), (F/F 3), savings attributable to concurrent contracts are determined using the reduction in price of each concurrent contract. VECP 8680 was a mandatory change which was incorporated into the concurrent and future contracts using MIL-C-44030(GL). At the same time that VECP 8680 was added to the contracts, the line tack was also added. The prices negotiated with Centre and Major on their contracts combined those two changes. That resulted in an increase, rather than a decrease, in contract price so that the Government's position is that there were no concurrent or future savings for the contracts, other than appellant's, listed above in F/F 38. We have concluded in F/F 31 that this record has failed to establish that the addition of the line tack was required by VECP 8680. We, therefore, conclude that the per unit saving we determine is applicable to the instant contract is a reasonable per unit savings for the contracts under which the same garment was manufactured during the savings period.

41. Paragraph (e)(3)(iii) of the Value Engineering Incentive clause (F/F 3) permits the Government to reduce the future contract savings for

certain stated reasons. Based on concerns that the Government might argue that it was not entitled to the amount determined for instant contract savings on future items, appellant "reengineered" the items included in its claim for future contract savings. The same detailed and extensive method was used for determining the instant contract unit savings and the reengineered unit savings for each contract for which appellant seeks inclusion in savings resulting from VECP 8680. The reengineered per unit savings for which appellant concluded it had sufficient information to make the computation are set forth in F/F 24. Appellant seeks recovery for the last five specifications at the amount we conclude it is entitled to receive for instant contract savings because of its inability to "reengineer" savings for those specifications. Whether instant contract savings or recalculated savings for a future contract are used in determining quantum is a matter left to us for decision in this appeal.

42. The Government does not challenge the methodology used by appellant in its calculations. Its objections essentially challenge whether appellant is entitled to recover for savings resulting from the inclusion of the safety stitch in other specifications as future savings under this contract (which issue will be discussed, infra) and quantification of some of the items.

43. The Value Engineering Incentive clause in appellant's contract did not provide for collateral savings. The standard Armed Services Procurement Regulation (ASPR) clause contained a provision for collateral savings, such as savings relating to handling of materials, storage of particular goods, shipment of particular goods, etc., with a maximum of $100,000 or the price of the contract on which the VECP is submitted, whichever is greater. Since appellant was unable to obtain any information during discovery which it could use in determining collateral savings to the Government from VECP 8680, it seeks its contract price of $3,997,366.40 (F/F 2) as collateral savings from approval of this VECP.

44. ASPR 1-1703.2 (1 July 1976), in effect at the time of award of the subject contract, entitled "Collateral Savings" provides that the Collateral Savings clause "may be excluded from a contract or class of contracts when the HPA [Head of the Procuring Activity] determines that the cost of computing and tracking collateral savings will exceed benefits to be derived." In accordance with the foregoing, the DPSC Contracting Manual instructs the Clothing and Textile Directorate to exclude the collateral savings provision from the Value Engineering Incentive clause because the head of the activity had determined that the cost of tracking collateral savings would exceed the benefits to be derived from acceptance of a VECP, and the collateral savings provision was therefore omitted from the contract (tr. 5/39, 80). The standard Value Engineering Incentive clause, supra, contains, at subparagraph (e)(4) the provision concerning Collateral Savings and includes the provision that

> . . . The determination of the amount of collateral savings, if any, will be made solely by the Government and not be subject to the "Disputes" clause of this contract.

## DECISION

### Jurisdictional Issue

In its posthearing brief, the Government argues that the Board lacks jurisdiction to consider appellant's claim for those specifications which appellant alleges were revised because of VECP 8680 other than the specification for the all weather coat since that portion of the claim based on those specifications (F/F 24) was never submitted to the contracting officer for final decision. While a motion to dismiss for lack of jurisdiction based on a similar argument was denied in our opinion in ASBCA Nos. 37029 and 37071, supra, we reiterate our conclusion that appellant's claim contained all the information available to it at the time of filing and that the enlargement of its claim is the result of information obtained during discovery from information unavailable until supplied by the Government. The increase in dollars did not result from new claims, new legal theories, or new factual bases for recovery. While the Government's argument and request that these additional specifications be remanded to the contracting officer was not captioned as a motion to dismiss, we consider it such and deny the motion.

### Essentially the Same Item

The major dispute, which has permeated this appeal throughout, is the question of what constitutes "essentially the same item." It is of utmost importance in this appeal since it determines the number of units to which a relatively small per unit savings (09.4¢ according to appellant, 03.2¢ according to the Government) will apply and establish appellant's share of contract savings because of acceptance of VECP 8680. It has clouded all efforts to resolve this dispute by settlement, and was the subject of our earlier opinion on the Motion for Partial Summary Judgment where we concluded that this question was a factual one which must be determined taking into consideration the VECP involved and the items involved in the particular claim. Appellant has created many volumes of detailed analyses to quantify those specifications which it considers were changed because of acceptance of VECP 8680. Before we reach consideration of these materials, however, we must first determine whether each specification included in appellant's claim meets the definition of "essentially the same item" as used in the Value Engineering Incentive clause, J09 (F/F/3) under which a share of savings on both concurrent and future contracts for essentially the same items is awarded.

### Appellant's Position

Appellant uses a very broad interpretaion of both what approval of VECP 8680 actually includes and what constitutes "essentially the same item" as used in J09. Its position, in defining the term, is that the safety stitch operation recommended by VECP 8680 is not restricted to any garment or material; it is only confined to the edge of two pieces of fabric going together. Therefore, even though VECP 8680 was submitted on the raincoat specification to cover specific operations involving the raincoat lining, i.e., overedging the lining and then joining it to the sleeve, appellant

maintains that the focus of VECP 8680 was to combine the two separate operations of overedging and joining into a single operation using the safety stitch and that any garment utilizing such operation would qualify as essentially the same items. Appellant also argues that VECP 8680 included the combination of operations that are the functional equivalent of the overedging and joining operations described in VECP 8680 on essentially the same items. Functionally equivalent operations would be the (1) protection of raw edges using a lapped type seam and (2) sewing of multiple single needle rows using a lock stitch (F/F 24). In appellant's view, the safety stitch is not restricted to any seam and can be used on all garments and is essentially the same operation with respect to all garments without regard to the type of garment involved or, as long as compatible materials are used, to the type of material involved and does not require the use of any specific machine.

Appellant maintains that the objective of VECP 8680 was to improve productivity and save material where two or more plies of fabric are joined together and where one or more of the plies is "neatened" or protected from unravelling. The intent is achieved by (1) combining the two specific operations of overedging and joining, or (2) combining the two sewing operations (with multiple steps) that are the functional equivalent of the overedging and joining operations specified for the raincoat. While appellant recognizes that the VECP 8680 was framed in terms of the operations included in the specification applicable to its contract, it maintains that this was because it had to submit the VECP in terms of its application to the garment involved in its contract because of the format required. It asserts that the VECP was broader than that and "[i]f the articles can use the concept or its functional equivalent and have benefitted from appellant's proposal or its functional equivalent, the articles should be considered essentially the same and a royalty sharing based upon the cost savings the Government has enjoyed is appropriate" (app. br. at 125).

The Government's Position

The Government interprets the language in the Value Engineering Incentive clause in a much narrower fashion. Its position is that the language in paragraphs (e)(2)(i) (sharing in savings on concurrent contracts) and (e)(3)(ii) (F/F 3) (sharing in savings on future contracts) which speaks of purchases of "essentially the same item" means an item which serves the same function and has the same fabrication. Therefore, in the case before us, savings are applicable only to purchases of all-weather coats which required the use of the safety stitch in attaching the sleeve lining to the sleeve of the coat. In addition, where the requirement is an alternate method of construction, savings are payable only in those instances where the alternate using the safety stitch was actually used.

Conclusion

We cannot accept the position of either party. In our view, appellant's position is too broad and the Government's position is too narrow. We agree with appellant that application of the Value Engineering Incentive clause

must be liberally interpreted, since its purpose is to encourage contractors to make suggestions which will save the Government money by allowing them to share in such savings. However, the clause itself indicates that there are limits in both the period for such savings and the item procured. Therefore, we must examine the facts for each particular situation. We cannot make a broad statement that is generically applicable.

While we recognize that the decision in M. Bianchi of California, ASBCA Nos. 37029 and 37071, supra, rejected appellant's position that any item packed in a shipping container (box) was "essentially the same item" as used in the J09 clause similar to the one in the instant appeal, and concluded that most of the items were not even remotely similar to the woman's pantsuit purchased under the contract involved in that appeal, the question is factual and must be considered based on the garment and the VECP.

We are not persuaded by appellant's argument that the term should be defined to include any application of the safety stitch to any item of clothing. The safety stitch was not a new or novel operation. It was even used in other operations in the specification which was involved in this contract (F/F 20). As a matter of fact, many of the applications for which appellant claims entitlement are more similar to the operations which were already in the specification prior to submittal of VECP 8680 and we cannot accept appellant's argument that its submittal "reminded" the Government it should consider using the stitch in other specifications and applications. The fact that the safety stitch is incorporated into manufacture of the garment indicates that the Government has already concluded that it would meet the functional and other requirements of the garment. Otherwise, it would not have designated the use of the stitch. Appellant could have expressed its submittal in broader terms and specified its application to the instant contract. It did not do so. We, therefore, conclude that recovery for savings under this VECP would only apply to items which reflected the change appellant had suggested.

Nor are we persuaded by the Government's reliance on dicta in our opinion in Tennier Industries, Inc., ASBCA No. 29464, 86-3 BCA ¶ 19,046. That case concluded that the contractor was not entitled to any savings because the Government was already testing the subject of its proposal. The Board was not faced with the question before us and did not consider the term "essentially the same item" when it concluded that two sleeping bags were not "one and the same." In our view, "one and the same" is a different conclusion from "essentially the same." At best, the conclusions which the Government draws from that opinion are based on dicta.

We also limit our consideration to 6 April 1981 through 5 April 1984, the period during which appellant would share in savings. This would eliminate any consideration of MIL-J-87024. Appellant's claim included 104,431 jackets delivered during the royalty period. However, this was prior to issuance of the amendment to the specification on 4 May 1984 which appellant alleges resulted in incorporation of VECP 8680 (F/F 24). Examining each of the remaining eighteen operations for which appellant seeks a share of savings (F/F 24), we conclude that none can be attributed to VECP 8680. We eliminate the operations requiring the use of a lap seam

(F/F 24) since that is a different type of seam than the seam recommended by appellant. We also eliminate those specifications which require the use of the stitch and seam in VECP 8680 which join other seams, such as side seams, or the setting of the sleeve into the garment or other operations unrelated to that suggested by appellant in its VECP.

We, therefore, conclude that appellant is not entitled to recover instant or future contract savings for any of the nineteen items included in its claim as set forth in F/F 24.

## Quantum

Having reached the conclusions set forth above, we must consider the per unit savings resulting from incorporation of the safety stitch operation approved as VECP 8680 and the number of units to which those savings should be applied. We have already concluded that the instant contract savings should not be reduced by the cost of adding the line or bar tack as implementation costs for the VECP (F/F 31). The record failed to establish that VECP 8680 required such inclusion.

### Direct Labor Savings

Appellant introduced extensive evidence of costs before and after the changes resulting from VECP 8680. It seeks both savings in labor and in material. We have set forth the after-the-fact computations in F/F 27-37. Included in appellant's computation was a calculation of escalation of costs over the three-year savings period. The Government argues that there is no provision in the Value Engineering Incentive clause for escalation of costs. That clause, F/F 3, is silent about this question. It neither permits or prohibits increases due to escalation of costs over the payment period. It permits the savings and recognizes that this may include some estimates. See, for example, paragraph (e)(1)(i)(A).

While it may be proper to use escalation when estimating the amount of instant contract savings prospectively pursuant to paragraph (e)(1)(i)(A) of the Value Engineering Incentive clause, the instant contract savings here are calculated on appellant's actual, experienced labor rate of $4.00 per hour. This already reflects any labor rate escalation which may have occurred during contract performance. Since the clause provides that future contract savings are calculated using "instant contract savings," there is no provision for escalation during the royalty period beyond what may have been reflected in instant contract savings.

### Contractor and Government Furnished Material Savings

Appellant also seeks savings for material because of the approved VECP. While it recognizes that there were no actual material savings (F/F 31), it argues that there should have been new patterns issued and savings in material would have resulted. We have already concluded that a line tack because of the excess fabric length was not established as a result of implementing VECP 8680 (F/F 3). By the same token, we conclude that

appellant's recovery is limited by the proposal which it made when submitting the VECP. It could have included a recommendation that the patterns be adjusted and that this would save fabric. It did not do so. Therefore, we do not consider it part of VECP 8680. The proposal as submitted by appellant was sketchy at best and did not contain all the documentation required by the clause (F/F 3 at (b)). The Government requested additional information which, when provided, also lacked the type of detail appellant supplied as proof for this hearing. If appellant considered that there would be a saving of fabric, it could have said so. Its submittal and additional response both addressed direct labor savings. There was no reference to direct material savings. The only reference to material was to 2¢ savings "as a percentage to apply to direct labor and material cost." It is not clear just what appellant meant by that, but it is clear that in estimating a 10¢ savings, in addition to the above 2¢, appellant estimated 6¢ for direct labor and 2¢ for overhead (F/F 8). We conclude that there is no basis for including an amount for unrealized fabric savings on the basis that there could have been such savings had patterns been changed.

Indirect Expenses

The DCAA recommended rate for 1980 of 47.94 percent was used by appellant in calculating instant contract savings because of lack of historical data for 1981 (F/F 35). We conclude that overhead for 1981 was greater than that for 1980. The Government had used 100 percent and this amount was accepted by the contracting officer in making the determination of unit savings as a result of VECP 8680. We conclude that the 47.94 percent did not reflect the 1981 overhead and accept the amount used by the contracting officer in determining unit savings. Cf. S. W. Electronics & Manufacturing Corp. v United States, 655 F.2d 1078 (Ct. Cl. 1981).

Profit; Concurrent Contract Savings; Future Contract Savings

Appellant seeks profit of 11.9 percent. It recognizes that it is not entitled to profit on instant contract savings but argues that it is entitled to them on concurrent and future contract savings. We do not agree. Concurrent contract savings should be based on the actual negotiated savings under those contracts. Since, in the instant case, the Government negotiated those contracts with two changes, for one of which (the line tack) we have concluded this VECP should not be charged, we conclude that instant contract savings would be a reasonable jury verdict amount to apply to concurrent contract savings. Future contract savings are also based on instant contract savings unless the Government determines that there should be an adjustment. It made none and we see no basis for doing so as to the items for which we conclude appellant should recover.

Appellant also states that the 11.9 percent is included in instant contract savings not as profit on savings but as part of its estimate of acquisition savings. We consider this a euphemism for profit and unallowable pursuant to ASPR 1-1706.1 (F/F 36). We are also not persuaded by appellant's argument that the prohibition on profit pertains only to appellant's contracts and not to contracts of third parties. Since, by the

clause, concurrent contract savings are the negotiated savings to the concurrent contractor and future contract savings are, with certain exceptions, based upon the instant contract savings, we conclude that the prohibition of profit pertains to all savings permitted under the clause.

Instant Contract Savings

Considering all of the above, after eliminating those items in appellant's calculation which we have determined should not be included, we conclude that, based upon this record, the instant contract savings resulting for VECP 8680 was $0.14 (14¢) per unit. Contractor assigned savings, 50 percent of this amount, would be $0.07 (7¢) per unit. Multiplying $0.07 by the 837,329 units we have concluded was a reasonable number (F/F 38), we conclude appellant is entitled to the following as contract savings for instant, concurrent and future contracts:

$0.07 x 837,329 = $58,613.03

Collateral Savings

The Value Engineering Incentive clause included in this contract, J09 (F/F 3), did not contain the provision for collateral savings resulting from acceptance of a value engineering change proposal. ASPR 1-1703.2 (1 July 1976) permits such exclusion when the head of the procuring activity determines that the cost of computing and tracking collateral savings would exceed the benefits derived from the change (F/F 44). Appellant argues that the record fails to contain the requisite documentation for this determination so collateral savings should be awarded. By the same token, appellant failed to submit the requisite prediction of any collateral savings as required by J09 paragraph (b)(iv), the Value Engineering Incentive clause in the contract (F/F 3). We conclude that the unrebutted testimony that the DPSC Manual instructing that the collateral savings clause not be included because of a determination by the agency head is sufficient for purposes of this record.

Appellant is not entitled to recover collateral savings which it seeks ($3,997,660.80).

Interest

Appellant seeks interest from six months after approval of VECP 8680 since J09(f) requires payment of concurrent and future savings within six months of modification of concurrent or future contracts. That paragraph makes no provision for interest. It is well established that payment by the Government of interest is only permitted by contract, statute or regulation. Here there is no such provision. Interest is payable pursuant to the Contract Disputes Act from the date of receipt of the claim until paid. While the parties agree that that date was 16 November 1987, the facts indicate the claim was not received until 17 November 1987. Appellant is entitled to interest on any amount due from 17 November 1987 at the applicable rates.

Summary

The parties submitted well written and extensive briefs. We have considered all of the arguments which they included but, in order to not prolong an already lengthy opinion, we have not addressed them all directly. Those we have not discussed will not change the results we have reached. Because of the conclusions we have reached, we need not consider appellant's Motion to Strike Government Exhibits 28-38.

We have concluded that appellant's definition of its VECP was far broader and more extensive than the VECP 8680 which it submitted and which was approved. We have further concluded that under the record of this appeal recovery is limited to the all-weather coats which incorporated VECP 8680.

Since this appeal concerns determination of quantum, we have discussed the various elements which appellant included in calculating its claim and have concluded that the per unit savings were $0.14 per unit of which appellant is entitled to receive $0.07. Applying this to the number of units, we have concluded that appellant's share of savings is $58,613.03. Interest on amounts due appellant should be computed from 17 November 1987.

The appeal is sustained in the amount of $58,613.03 plus interest on amounts due appellant from 17 November 1987 and denied as to the rest.

Dated: 10 February 1993

RUTH C. BURG
Administrative Judge
Member of the Armed Services
Board of Contract Appeals

I concur

V. JOHN RIISMANDEL
Administrative Judge
Acting Chairman, Armed Services
Board of Contract Appeals

I concur

WILLIAM J. RUBERRY
Administrative Judge
Vice Chairman, Armed Services
Board of Contract Appeals

# Graziadei & Cantor, Ltd.

GEORGE E. GRAZIADEI
SCOTT MICHAEL CANTOR

August 12, 1994

PLEASE REFER TO:

CERTIFIED MAIL/RETURN RECEIPT

GB 4761-4

K. Schutt
U.S. General Accounting Office
Claims Division
441 G Street, N.W.
Washington, D.C. 20548

Re: ASBCA No. 36518/Contract No. DLA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
U.S. Court of Appeals for the Federal Circuit/
Case No.93-1402

Dear Mr. Schutt:

Reference is made to the correspondence of June 27, 1994, directed to your attention from Edward S. Adamkewicz, Armed Services Board of Contract Appeals Recorder. Over a month has passed and Mr. Bianchi has not yet received payment pursuant to the direction and decision of the Board and pursuant to the Order of the U. S. Court of Appeals for the Federal Circuit under Case No. 93-1402.

Demand is hereby made that you issue payment to Mr. Bianchi for the sum of $58,613.03 together with interest from November 17, 1987, to date, in compliance with the Order of the Board (ASBCA No. 36518) and Court of Appeals (Case No. 93-1402) within ten (10) days of your receipt of this request. Failure to do so will result in the filing of a Complaint in the nature of Mandamus in the U.S. District Court for the District of Nevada.

Thank you for your expected prompt attention to the foregoing concern.

Sincerely,

GRAZIADEI & CANTOR, LTD.

GEORGE E. GRAZIADEI, ESQ.

GEG:sd

cc: Maurice L. Bianchi
1608 Marathon Drive
Las Vegas, Nevada 89108



302 East Carson Avenue, Suite 400 • Las Vegas, Nevada 89101 • Telephone (702) 477-7733 • Telecopier (702) 477-0020

(160)

(1) Payee(s): Bank of America National Trust and Savings Assoc.

(2) Mailing addresss: U.S. Dept. of Justice
1100 L St. NW, Rm. 7010
Wash, DC 20530
Attn: Mark A. Melnick

PAID DEC 2 3 1999

(3) Taxpayer Identification No., SSN, or EIN 409.99.9999

(4) Principal: $58,613.03

* (5) Interest: $51,726.91

(6) Total Amount: $110,339.94

(7) Electronic Funds Transfer (EFT) Information:

(a) Payee Account Name: ______ (e) Bank Name and Address: ______

(b) ABA Bank # (9 digits): ______

(c) Payee Account #: ______

(d) Checking: ______ Savings: ______

(8) Agency address for reimbursement purposes: Kathleen Hallam (GSCP-6A)
Defense Logistics Agency
700 Robbins Ave, Bldg. 36/3
Philadelphia, PA 19111-5093

(9) Contract #: DLA100-80-C-2972 9700

*WIRE TRANSFER/CHECK SHOULD BE DATED 12/23/99. IF THIS IS NOT POSSIBLE PLEASE RETURN THE VOUCHER FOR RECOMPUTATION OF INTEREST.

20 x 1743

I certify there is due and payable from the appropriations indicated the amount of $ 110,339.94, signature [signature]
For: Dir. Financial Accounting and Services Division, Financial Management Service, U.S. Dept. Of Treasury
Date: DEC 17 [illegible]

DEFENSE LOGISTICS AGENCY
HEADQUARTERS
8725 JOHN J. KINGMAN ROAD, SUITE 2533
FT. BELVOIR, VIRGINIA 22060-6221

DG

October 6, 2000

Honorable Jim Gibbons
House of Representatives
Washington, DC 20515

Dear Congressman Gibbons:

This responds to your letter of July 17, 2000, to the Honorable J.S. Gansler, Under Secretary of Defense, on behalf of your constituent, Mr. Maurice Bianchi. Your letter has been forwarded to me for direct reply.

Your letter requests further details concerning the reluctance of the Defense Logistics Agency (DLA) to pay Mr. Bianchi a $58,613.03 judgment in his favor by the Armed Services Board of Contract Appeals (ASBCA). M. Bianchi of California, ASBCA No. 36518, 93-2 BCA ¶ 25,801 (February 10, 1993). As previously explained, DLA paid the ASBCA judgment to Mr. Bianchi's assignee bank rather than to Mr. Bianchi, following the decision of the Ninth Circuit Court of Appeals in Bianchi v. Walker, 163 F.3d 564 (9th Cir. 1998). That payment, in our view, entirely satisfied any claim Mr. Bianchi had to the money.

The ASBCA judgment in question stems from a $6,173,468.36 Value Engineering Change Proposal (VECP) claim that Mr. Bianchi had submitted under a 1980 contract with DLA (Contract No. DLA100-80-C-2972). The contract was awarded to Mr. Bianchi by the Defense Personnel Support Center (DPSC), a subordinate field activity of DLA. The ASBCA found that Mr. Bianchi was entitled to $58,613.03 of the amount claimed. See M. Bianchi of California, ASBCA No. 36518, *supra*. Government officials subsequently hesitated paying Mr. Bianchi the amount of the ASBCA judgment directly. This was because of concern about the prior rights of Mr. Bianchi's assignee bank--the Bank of America, and the possible prior rights of the Small Business Administration (SBA) as the guarantor of Mr. Bianchi's indebtedness to the Bank of America.

As a result of the Government's hesitation in paying, Mr. Bianchi filed an action in the District Court of Nevada to compel the Government to pay him. The Government interpleaded the Bank of America, seeking a determination from the Court as to whom the Government should pay, Mr. Bianchi or the Bank. The Court found that the Bank was entitled to the money. Disappointed with this result, Mr. Bianchi appealed the District Court's decision to the Ninth Circuit Court of Appeals. The Court of Appeals affirmed the lower court's decision that the Bank was entitled to the money. Bianchi v. Walker, *supra*. Considering Walker entirely dispositive of the issue, the Government, in lieu of paying Mr Bianchi, paid the Bank of America the $58,613.03 ASBCA judgment in question, plus applicable interest.

Federal Recycling Program Printed on Recycled Paper

Received Oct-17-00 06:15pm From- To-HOLLAND & KNIGHT LLP Page 02

Notwithstanding the Walker decision, Mr. Bianchi still remains convinced that he too should be paid the amount of the ASBCA judgment. He argues that the Government must make such a double payment because this happened before in Bank of America v. United States v. Bianchi, 23 F.3d 380 (Fed. Cir. 1994); he also believes the decision of the Court of Appeals for the Ninth Circuit in Bianchi v. Perry, 140 F.3d 1294 (9th Cir. 1998) supports his view the Government should pay twice. We respectfully disagree with Mr. Bianchi on all points. Nothing in our reading of these two cases persuades us that the Government must now, as Mr. Bianchi demands, essentially twice pay him $58,613.03 on the same VECP claim. And we know of nothing else in the law or equity on the facts at hand that would authorize or compel the Government to make such a duplicate payment to him.

We believe the decisions in Bank of America and Perry, which involve different claims, do not serve to counteract the specific ruling in Walker that we have followed. We believe that the Government satisfied the ASBCA judgment in question when it paid $58,613.03 plus applicable interest to the Bank of America, as directed by the Walker court. In our view, Mr. Bianchi is not entitled to any further recovery. As a matter of information, the assigned Department of Justice attorney shares these views. The enclosed Supplemental Information paper will more fully explain our views on this matter.

I trust that this information will be helpful in responding to your constituent.

Sincerely,

[signature]

BRUCE W. BAIRD
General Counsel

Enclosure

# SUPPLEMENTAL INFORMATION
# BIANCHI CLAIMS

*Background*

In September of 1988, Mr. Bianchi and DLA, through its field activity, the Defense Personnel Support Center (DPSC), entered into a Settlement Agreement resolving a number of claims that had been pending before the ASBCA. The ASBCA incorporated the Settlement Agreement into a "Stipulation to Board Decision." That stipulated Settlement Agreement provided in pertinent part:

1. Mr. Bianchi, as the successor to M. Bianchi of California, is entitled to recover $617,500.00 on his claims...;
2. The settlement is without prejudice to Mr. Bianchi's right to pursue any and all Value Engineering Change Proposal Claims under his contracts with DPSC; and
3. The settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act to recover whatever legal fees and litigation expenses to which he may be entitled in connection with these claims and appeals.

The Government has made payment under each of the three paragraphs of the Settlement Agreement; however, the payment has flowed differently in each case. This is because each paragraph involved different court rulings. The Government believes it should follow the court ruling directly applicable to each different claim. Each paragraph of the Settlement Agreement is addressed below (not in numerical order).

**Paragraph 1 of the Settlement Agreement**
*Bank of America v. United States v. Bianchi, 23 F.3d 380 (Fed. Cir. 1994)*

Under Paragraph 1 of the Settlement Agreement, the Government essentially paid twice, once to the Bank of America and once to Mr. Bianchi. This came about because of confusion about the proper payee due to an assignment of claims, and because of a specific court decision.

Initially, the Government paid Mr. Bianchi $1,141,220.00 ($617,500 plus interest) based on the Settlement Agreement. However, the Bank of America brought an action in the Court of Federal Claims, claiming it was entitled to this money pursuant to Mr. Bianchi's assignment of claims with the Bank. In response, the Government joined Mr. Bianchi as a third party defendant, seeking to recover the money that the Government paid to him. The Government further asserted that the Small Business Administration (SBA), as guarantor of Mr. Bianchi's indebtedness to the Bank, stood ahead of the Bank in right to payment of the $1,141,220.00, and sought the judgment of the Court to that effect as against the Bank.

The Court of Federal Claims granted summary judgment in favor of the Government and against the Bank and Mr. Bianchi. Bank of America National Trust and Savings v. United States of America v. Maurice L. Bianchi, No. 90-3961C, 1992 U.S. Claims LEXIS 213 (Ct. Cl. October

Received Oct-17-00 06:15pm From- To-HOLLAND & KNIGHT LLP Page 04

16, 1992). The Bank and Mr. Bianchi each appealed the decision to the United States Court of Appeals for the Federal Circuit. On appeal, the Federal Circuit reversed the lower court decision, holding that Paragraph 1 of the Settlement Agreement obligated the Government to pay the $1,141,220.00 directly to Mr. Bianchi. The Court apparently reasoned that, since the Government knew (or should have known) of Bianchi's assignment of claims to the Bank when it executed the settlement agreement, the Government should have expressly and specifically addressed the effect of the assignment in the agreement. The Court further held that the Bank had assignments earlier in time than SBA's assignments and that therefore the Government was obligated to pay the Bank ahead of the SBA. In short, the Court came to the anomalous conclusion that Mr. Bianchi was entitled to retain the $1,141,220.00 which the Government had paid him and that the Bank was also entitled to be paid $1,141,220.00. Bank of America v. United States v. Bianchi, *supra*.

Although the Government was distressed at having to pay twice, especially since Mr. Bianchi too was aware of the assignment, the Government followed the direction of the court, and considers the matter closed with respect to Paragraph 1 of the Settlement Agreement.

**Paragraph 3 of the Settlement Agreement**
*Bianchi v. Perry, 140 F.3d 1294 (9th Cir. 1998)*

Under Paragraph 3 of the Settlement Agreement, the Government paid Mr. Bianchi for attorney's fees under the Equal Access to Justice Act. The Government paid Mr. Bianchi in this case, not the Bank, because of the specific court ruling involved, Bianchi v. Perry, *supra*.

This payment came about because Mr. Bianchi, as allowed by this paragraph, had filed a claim for attorney's fees. Out of his original $1,998,720.15 claim later reduced to $925,441.83, the ASBCA awarded Mr. Bianchi $475,724.00. Application Under Equal Access to Justice Act - M. Bianchi of California, ASBCA Nos. 26363, et al., 91-1 BCA ¶ 23,445 (September 20, 1990). Government officials hesitated paying Mr. Bianchi the attorney's fees judgment because of concern about prior rights of Mr. Bianchi's assignee bank--the Bank of America, as well as the possibility of prior rights of the SBA as the guarantor of Mr. Bianchi's indebtedness to the Bank. Consequently, Mr. Bianchi filed a writ of mandamus in District Court of Nevada to compel payment from the Government.

The District Court granted summary judgment in favor of the Government, but this decision was reversed on appeal by the Court of Appeals for the Ninth Circuit. The Ninth Circuit construed the settlement agreement as precluding the Government from offsets against Mr. Bianchi's attorney's fees judgment. Bianchi v. Perry, *supra*. Following this decision, the Government paid Mr. Bianchi the ASBCA judgment of $475,724.00 plus interest.

It is noted that in the Perry case, the Ninth Circuit Court, citing Bank of America National Trust and Savings Association v. United States v. Bianchi, *supra* stated:

> This is a res judicata case regarding settlement of a Government contract.... Though other questions are raised, this case finally turns on whether

Received Oct-17-00 06:15pm From- To-HOLLAND & KNIGHT LLP Page 05

the Federal Circuit decision is res judicata, on setoff against another part of the same deal.

Perry, *supra* at 1298. The Ninth Circuit Court went on to state:

> Because its ratio decidendi does not allow for a distinction, we conclude that the Federal Circuit [referring to Bank of America v. United States v. Bianchi, *supra*] decision is res judicata. That decision established that the Government was not entitled to a setoff against the $617,500 or the interest based on Bianchi's assignment to his bank and the bank's assignment to the SBA. The reasoning of the decision establishes that the assignments could not entitle the Government to a setoff against the settlement at all. The meaning of that agreement, with respect to setoff, has already been conclusively determined by the Federal Circuit.

*Id.* at 1299.

Thus, although the Government still questions the Court's conclusions with regard to setoff,[1] it paid Mr., Bianchi, consistent with the court decision on that claim.

**Paragraph 2 of the Settlement Agreement**
*Bianchi v. Walker, 163 F.3d. 564 (9th Cir. 1998)*

As ostensibly permitted by paragraph two of the agreement, Mr. Bianchi filed three VECP claims against the Government. In the first case decided, Mr. Bianchi filed a claim for $6,173,468.36 that resulted in the ASBCA judgment of $58,613.03. M. Bianchi of California, ASBCA No. 36518. The ASBCA found Mr. Bianchi's second VECP "claims totaling approximately $180 million to be wholly without merit." M. Bianchi of California, ASBCA Nos. 37395 et al, 94-1 BCA 26,417 (Sept. 30, 1993). The ASBCA has not reached a decision on Mr. Bianchi's third VECP claim. The first one for $58,613.03 is the subject of this inquiry.

As noted in the cover letter accompanying this attachment, the Ninth Circuit in Walker indicated the Government should pay the Bank as assignee. As directed by the Walker court, the Government did so. Mr. Bianchi remains convinced he is entitled to receive a duplicate payment from the Government for that judgment, apparently because double payment was allowed in Bank of America v. Bianchi (the case involving Paragraph 1 of the Settlement Agreement), and because direct payment to Mr. Bianchi was allowed in Perry (the case involving Paragraph 3 of the Settlement Agreement).

---

[1] DLA remains of the view that the settlement agreement could not reasonably be viewed as an affirmative or express waiver of Government set-off rights or obligations under the Contract Disputes Act, 41 USC 601, the Debt Collection Act of 1932, 31 USC 3701, or the Assignment of Claims Act. Courts generally require an overt act or clear expression of intent for forfeiture of a statutory right. There was no such act or express intention here. Indeed, the settlement agreement, to which the Bank was not even a party, was silent on the Bank's rights under Mr Bianchi's assignment of claims to it. In addition, there were common law rights of set-off to consider. Compare, Kearfott Guidance & Navigation Corp., ASBCA No. 49263, 99-2 BCA ¶ 30,518 (August 4, 1999). In DLA's view, in the final analysis DPSC officials simply lacked authority, apparent or otherwise, to waive set-off rights belonging to the Bank or the SBA.

Received Oct-17-00 06:15pm From- To-HOLLAND & KNIGHT LLP Page 05

The Government, in contrast, believes its payment to the Bank was proper, first because that was what the Walker court told the Government to do, second because that decision was later than the Perry decision, and third, because the later Walker decision distinguished if not implicitly reversed its decision earlier in the year in Bianchi v. Perry, *supra*. The following excerpts are pertinent:

> Bianchi's contention that the Government was required to pay the money due on the VECP claims was not presented to the Court of Federal Claims or the Federal Circuit in Bank of America. Therefore, Bianchi's reliance on the doctrine of res judicata is misplaced.
>
> *The Federal Circuit's decision was limited to an analysis of Bianchi's right to retain the amount the Government agreed to pay to settle the pending ASBCA claims pursuant to the first paragraph of the settlement agreement underlining ours. It did not determine whether the Government was required to pay Bianchi any amount he might recover under the reservation-of-rights provisions of the second paragraph of the settlement agreement* [emphasis ours], notwithstanding the Bank's rights under its assignment agreement with Bianchi....
>
> Bianchi also maintains that this court's decision in Bianchi v. Perry, 140 F.3d 1294 (9th Cir. 1998) is res judicata on the question whether the Bank is entitled to recover the amount owing on the VECP claim pursuant to the assignment agreement. This contention lacks merit. Bianchi v. Perry cannot serve as a bar to the Bank's claim because it was not a party or privy to that action.

*Id.* at 569-570. The views expressed by the Ninth Circuit Court of Appeals in the Walker case about the effect of the stipulated Settlement Agreement are completely congruent with DLA's own views.

Thus, concerning Paragraph 2 of the Settlement Agreement, DLA paid in accordance with the court decision, and sees no reason or authority for paying twice.

*Concerns about Overpayment of the Bank*

Regarding concerns that the Government possibly overpaid the Bank of America, the lead attorney for the Department of Justice closest to the above mentioned litigation informs us that he has no reason for believing that the Government overpaid the Bank or that Mr. Bianchi's debt to the Bank has yet been fully satisfied. Although we ourselves have asked, we have received nothing from Mr. Bianchi or his attorneys that would suggest that the Government overpaid the bank debt or that the bank debt is fully satisfied. In this regard, we are aware of the August 14, 1995, Order reducing the Bank's recovery in Bank of America v. United States v. Bianchi, *supra* to $717,009.94. The Court in that case, however, did not indicate that all of Mr. Bianchi's loans were included in the Order. In this connection, it our understanding that the Bank made a number of loans to Mr. Bianchi.

Received Oct-17-00 05:15pm From- To-HOLLAND & KNIGHT LLP Page 07

On August 23, 2000, DLA representatives met with Mr. Bianchi, his attorneys and his accountant. At the conclusion of the meeting, Mr. Bianchi, in front of his attorney, Mr. Michael Clancy, broached the issue of overpayment to the bank. Mr. Clancy indicated that he was not completely familiar with the details regarding the asserted overpayment. Mr. Bianchi indicated that his accountant and his Las Vegas attorney, Mr. Scott Cantor, had such knowledge and could help resolve the issue. Subsequently, a DLA representative contacted Mr. Cantor and requested that he provide documentation evidencing that the debt to Bank had been satisfied. On September 15, 2000, Mr. Cantor responded by letter stating: "we do not intend to do so. . .".

It is noted that in the Walker case, *supra*, Mr. Bianchi advanced similar arguments about the Bank having been fully paid. We note in this regard that the Ninth Circuit found as follows:

> Bianchi claims that the district court was not aware of the prior judgment in the Bank of America case in which the Government was held liable to the Bank for a certain sum. Bianchi claims that this payment discharged the assignment and any further recovery by the Bank would put it in a position to receive double recovery. Bianchi's arguments are without merit. The bank's award in Bank of America was based on Bianchi's compromise of certain contract claims in the settlement agreement. As stated above, the VECP provision was not included in this compromise. Therefore, just as Bianchi's right to pursue this award is not foreclosed, neither were the Bank's rights as assignee of the underlying contract.

*Id.* at 570.

*Conclusion*

Based on the separate court decisions involving the three separate paragraphs of the Settlement Agreement, we believe that we have properly discharged our obligations. Any delay in payment was based on Government concern about the proper party to pay and about outstanding indebtedness to SBA. We also believe that the Government satisfied the ASBCA judgment in question when it paid $58,613.03 plus applicable interest to the Bank of America. In our view, Mr. Bianchi is not entitled to any further recovery. As a matter of information, as noted in the letter accompanying this attachment, the assigned Department of Justice attorney shares these views.

Received Oct-17-00 06:15pm From- To-HOLLAND & KNIGHT LLP Page 08

R. VAUGHN GOURLEY, ESQ.
Nevada Bar No. 503
STEPHENS, GOURLEY & BYWATER
3636 North Rancho Drive
Las Vegas, Nevada 89130
(702) 656-2355 Telephone
(702) 656-2776 Facsimile
Attorneys for Plaintiff

FILED
MAR 1 8 2004
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

MAURICE L. BIANCHI, fdba M. BIANCHI OF CALIFORNIA,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

Docket No.: 04- 440C

**COMPLAINT**

For his Complaint, Plaintiff Maurice L. Bianchi ("Bianchi"), formally doing business as an individual proprietorship known as M. Bianchi of California, alleges and avers as follows:

**JURISDICTION**

1. That jurisdiction regarding this suit is founded upon Title 28, United States Code, Section 1491. That jurisdiction is further founded upon the decision rendered by the United States Court of Appeals for the Ninth Circuit in Bianchi v. Walker, (9th Cir. 1998) 163 F.3d 564, 569, Paragraph VI, wherein the Court of Appeals held that only the Court of Federal Claims can resolve the issue as to whether or not the United States Government is liable to pay Bianchi for his Value Engineering Change Proposal awards. (Exhibit "1")

**BACKGROUND**

2. That the Plaintiff's claims arise under a Stipulation to Board Decision (Stipulation) (Exhibit "2") as entered on September 27, 1988 before the U.S. Armed Services Board of Contract Appeals, ("ASBCA") ASBCA No. 26362, et al, pursuant to Contract Nos. DLA100-79-C-2894, DLA100-80-C-2290, and DLA100-80-C-2972, which stipulation reads in pertinent part:

> ".......1. The parties agree that Mr. Maurice Bianchi, as the successor to M. Bianchi of California, is entitled to recover $617,500.00 on his claims in the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933 and 29934; that the government is entitled to take nothing on its claims in the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933 and 29934; that Mr. Bianchi is entitled to interest computed in accordance with Clauses L78 (Disputes (1979 MAR)) of the contracts, at the rates prescribed by the Secretary of the Treasury, under the Renegotiation Act, Public Law 92-41, on the principal amount of $617,500, such interest to run from June 18, 1981 until the date of payment; and that the parties waive their rights to seek reconsideration of this stipulated decision of the Board or to appeal that stipulated decision.
>
> 2. This settlement is without prejudice to Mr. Bianchi's right to pursue any and all value engineering change proposal claims under his contracts with DPSC; and
>
> 3. This settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act to recover whatever legal fees and litigation expenses to which he may be entitled in connection with these claims and appeals. That Parties stipulate that the issues of prevailing party and substantial justification will be decided on the basis of the record made at the first trial. The Parties agree that the application for legal fees and litigation expenses under the Equal Access to Justice Act will be submitted within thirty (30) days of receipt by Appellant of the agreed upon settlement payment."

3. Pursuant to the Stipulation, the United States specifically agreed to pay Bianchi the principal amount of Six Hundred Seventeen Thousand Five Hundred Dollars ($617,500.00) with interest, to run from June 18, 1981 until date of payment. (Exhibit "2"). Furthermore, the

Parties to the Stipulation also agreed to waive their rights to seek reconsideration of the stipulated decision of the board, or to appeal the stipulated decision. (Exhibit "2"). Bianchi's entitlement to recover the Six Hundred Seventeen Thousand Five Hundred Dollars ($617,500.00) on his claims related to the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934. (Exhibit "2")

4. Moreover, the United States, pursuant to the terms of the Stipulation, was entitled to take nothing on its $2.5 Million Dollar ($2,500,000.00) claim in relation to the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934. (Exhibit "2"; Exhibit "6", page 3,paragraph 1).

5. Furthermore, Bianchi was also entitled to interest computed in accordance with clause L78 (entitled disputes (1979 MAR)) of the contracts, and at the rates prescribed by the Secretary of the Treasury, under the Renegotiation Act, Public Law 92-41, on the principal amount of Six Hundred Seventeen Thousand Five Hundred Dollars ($617,500.00), with such interest to run from June 1981 until payment. (Exhibit "2").

6. That pursuant to the Stipulation, Bianchi was paid the sum of approximately $1,141,000.00. (Exhibit "3").

7. Thereafter the Bank of America, NT&SB, then sued to recover money which it claimed was erroneously paid to Bianchi by the United States, in the U.S. Claims Court, Case No. 90-3961C (Exhibit "4"). Pursuant to that opinion, Bianchi was ordered to repay the United States the sum of $1,141,220.83. The Court further ordered the dismissal of the Bank of America, NT&SB. Subsequently, Bianchi appealed the decision of the U.S. Claims Court, Case No. 90-3961C, to the U.S. Court of Appeals for the Federal Circuit, Case No. 93-5059, 5060.

8. The United States Court of Appeals, Case No. 93-5059, 5060, then reversed the lower court's judgment in favor of the United States against Bianchi, as well as reversed the judgment in favor of the United States against the Bank of America, NT&SB. (Exhibit "5")

9. Bianchi subsequently timely applied for attorney's fees before the Armed Services Board of Contract Appeals ("ASBCA") pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504 ("EAJA"), and was awarded approximately $475,724.51 in September of 1990. (Exhibit "6"). Despite Bianchi's April 4, 1994 correspondence to Thomas Hornak (DLA), Bianchi's Counsel's May 13, 1998 correspondence to the Commanding Officer of the Defense. Personnel Support Center (DLA), the September 4, 1998 correspondence from Bianchi's legal counsel to the Defense Finance & Accounting Office, and the September 9, 1998 correspondence from Bianchi's legal counsel to Katherine Hallan, Chief Trial Attorney, Defense Supply Center Philadelphia (DLA), regarding the unequivocal and clear order of the U.S. Armed Services Board of Contract Appeals awarding Bianchi over $475,000.00 under the EAJA, the United States refused to pay and did fail to pay Bianchi's attorney's fees for over 8 years. (Exhibit "7").

10. After complying with all of the demand procedures required by all applicable federal statues and regulations, Bianchi then filed an action in the U.S. District Court for the District of Nevada, entitled Maurice Bianchi, dba M. Bianchi of California v. William J. Perry, Secretary of Defense, et al, Case No. CV-S-94-0686-HDM (RJJ), in order to collect the $475,724.51 EAJA Judgment that Bianchi was previously awarded. The U.S. District Court (Nevada), CV-S-94-0686-HDM (RJJ) subsequently granted summary judgment against Bianchi on his EAJA Judgment. (Exhibit "8") Bianchi then appealed this decision to the U.S. Court of Appeals for the Ninth Circuit, as Case No. 96-15869, and entitled Bianchi v. Perry, 140 F.3d 1294 (9th Cir. 1998). On April 9, 1998, the U.S. Court of Appeals in reversing the U.S. District Court's decision was highly critical of the Government's lawyer handling the case, holding:

> ".......Any honest and competent lawyer would understand this settlement agreement in the same way. It means Bianchi gets $617,500.00 plus interest, plus whatever he can win on his "Value Engineering Change Proposal claims," plus whatever he can win on his Equal Access to Justice Act claim. Attorney's fees claims often are broken out of a settlement, as in this one, because the parties

> cannot agree on what determinations a court will make on prevailing party, substantial justification, and amount, see 5.U.S.C., § 504, and each is willing to bear the risk of a less favorable determination than it expects."
>
> "For a lawyer to enter into such a settlement agreement, with the unstated intention that his client should not pay the money agreed to, would be sharp practice. The government argues from lack of parallelism in the phrasing of the different paragraphs of the settlement agreement that Bianchi is only entitled to the $617,500.00 without setoff, not the EAJA award. The settlement agreement said Bianchi "is entitled to recover" $617,500.00, but only that it is "without prejudice to" his "right to pursue" his Equal Access to Justice Act claim "to recover" attorneys' fees and expenses, so it did not agree to pay the EAJA award.
>
> The government's theory is that it promised Bianchi could "recover" the $617,500.00, but not the EAJA award, which it only left Mr. Bianchi free to "pursue".
>
> We reject the distinction. It is apparent from a reading of the stipulation in its entirety that the parties did not mean that the government would only pay the $617,500.00, but dispute payment of what Mr. Bianchi was found to be entitled to as an EAJA award. Had the government meant that, the agreement would have said so. The agreement says Bianchi is entitled "to recover" the $617,500.00 principal, and that he is "entitled to" interest, yet even though the agreement did not use the phrase "to recover" regarding Mr. Bianchi's entitlement to interest, neither side understood absence of the phrase to imply that he could not "recover" the interest without a setoff. The Agreement does use the phrase "to recover" in the EAJA provision, "right to pursue an application..... to recover". The phrase "to recover" is not in the Value Engineering Change Proposal Claims paragraph, "right to pursue." Not a single one of the provisions is written in parallel phrasing with any other. The only plausible reading we can see for the slight differences in phrasing are lack of careful editing for parallelism, not an expressed mutual intention that even if Bianchi won an EAJA award, it would not be paid without a fight. ".....Were an insurance defense lawyer to enter into such a settlement agreement on behalf of an insurance company, and then claim that they only promised to allow pursuit of the money, not to pay it, the best the lawyer and insurer could hope for would be long-term distrust, and more likely, they could expect bad faith litigation. Giving the settlement agreement so strained construction would encourage sharp practice.....". (Exhibit "9")

11. The U.S. Court of Appeals also mandated the payment of the EAJA Judgment ($475,724.51) rendered in ASBCA No. 26362, et al. for attorney's fees. The United States ultimately paid Bianchi's EAJA award, as referenced by Bianchi's Legal Counsel's September 9, 1998 correspondence to Katherine Hallan, Chief Trial Attorney, Defense Supply Center

Philadelphia (DLA), and the United States Treasury Check, dated August 28, 1998, check number 3225. (Exhibit "10").

12. Subsequently, Bianchi applied for an additional EAJA award with the U.S. Court of Appeals for the Ninth Circuit, in Bianchi v. Perry, Case No. 96-15869, regarding the attorney's fees incurred in pursuing the original ASBCA EAJA award. Bianchi was granted a judgment on the second EAJA award of $67,961.24 on May 24, 1999. (Exhibit "11")

13. Pursuant to the 1988 Stipulation, Bianchi was also entitled to pursue all of his then outstanding Value Engineering Change Proposal Claims. ("VECP") (Exhibit "2")

14. On February 10, 1993, the U.S. Armed Services Board of Contract Appeals awarded Bianchi a judgment, on one of his VECP claims, (ASBCA No. 36518) in the amount of $58,613.03, plus interest under the Contract Dispute Act of 1978 ("CDA"), 10 U.S.C. § 2410, from November 17, 1987. (Exhibit "12").

15. And, on December 28, 2000, the U.S. Armed Services Board of Contract Appeals awarded Bianchi another judgment, in another of his VECP Claims, (ASBCA No. 37029, et al), in the amount $16,574.74, plus CDA interest from March 3, 1988. (Exhibit "13").

16. Under correspondence dated December 29, 2000, the U.S. Armed Services Board of Contract Appeals provided Bianchi with an authenticated copy of its decision awarding the $16,574.74, together with CDA interest, and the ASBCA stated that:

> "...The Board has received the following instructions from the Department of the Treasury for processing payment of awards from the judgment fund. If the Parties do not contemplate an appeal or motion for reconsideration but plan to use the judgment fund for payment of the monetary award, the US Treasury requires that the government agency concerned submit completed copies of the following forms:
>
> - FMS Form 195: Judgment Fund Payment Request;
> - FMS Form 196: Judgment Fund Award Data Sheet;
> - FMS Form 197A: Voucher for Payment;
> - FMS Form 198: Judgment Award Data Sheet Additional Deductions (if applicable);

- Certificates of Finality from the Government Agency and the Contractors/Appellant; and
- A copy of the Board's decision.

Copies of the appropriate documents are enclosed for use by the Parties. The government using FMS Form 195 as a transmittal letter, should send completed forms to: Judgment Funds Section Financial Management Service, Department of the Treasury, Room 6F03 3700 East-West Highway Hyattsville, Maryland 20782." [Emphasis Added] (Exhibit "13").

17. That despite the prior decisions, judgments and awards by the ASBCA in favor of Bianchi, the United States, by and through the Defenses Logistics Agency ("DLA") has failed and refused to pay the VECP awards to Bianchi in the amounts of $58,613.03 and $16,574.74 respectively, and any CDA interest due on said VECP awards. Instead the DLA has denied that it was liable by alleging unsupported or undocumented so-called setoff amounts to the VECP awards, in favor of the Bank of America, NT&SB. Yet, as recent as March 31, 2003, legal counsel for the DLA stated to Bianchi that the:

"DLA is not making any claim that there are additional assignments to the Bank." (Paragraph 2, Exhibit "14").

Thus, the United States admitted to Bianchi that no documentation exists that would support its withholding of payments on the Bianchi VECP Awards. Nor can the DLA substantiate any other assignment from Bianchi, which would allow the DLA to pay or disburse these award amounts directly to the Bank of America, NT&SB, or to any other third party. (See Exhibit "14"). At the present time, no documentation exists or has been produced by the United States to Bianchi which would allow, or does allow, the DLA to set off any amounts against Bianchi's VECP awards, including any and all demand documentation produced and/or made by the Bank of America, NT&SB, to the United States and to the DLA.

18. Numerous demands have been made by Bianchi upon the DLA and its counsel requesting copies of any and all documents evidencing any setoff amounts pursuant to the alleged Bianchi assignments and notes under the appropriate Federal Assignments of Claims Act

provisions, or any other documentation supporting the withholding of the payment of Bianchi's VECP awards, and the subsequent DLA payment of the same to the Bank of America, NT&SB. Such demands, and responses from the United States to the same, include the following: Letter dated September 11, 2000 from Attorney Scott Cantor to Bruce Baird, DLA; Letter dated September 15, 2000 from Attorney Scott Cantor to Mary Clarke, DLA; Letter dated October 6, 2000 from Attorney Bruce Baird to Congressman Jim Gibbons; Letter dated October 20, 2000 from Attorney Michael Clancy to Wade Thompson, Legislative Assistant to Congressman Jim Gibbons; Letter dated September 10, 2002 from Attorney Mary Clarke (DLA), to Attorney Scott Cantor; Letter dated September 17, 2002 to Attorney Bruce Baird (DLA) from Attorney Scott Cantor; Letter dated March 31, 2003 from Attorney Bruce Baird (DLA) to Attorney Scott Cantor; Letter dated April 22, 2003 from Attorney Scott Cantor to Mary Clarke (DLA). (Exhibits "15" and "16").

19. Pursuant to Title 28, United States Code, Section 1494, and pursuant to the decision by the U.S. Court of Appeals for the Ninth Circuit in Bianchi v. Walker v. Bank of America, (9th Cir. 1998) 163 F.3d 564, (Exhibit "1"), this Court has exclusive jurisdiction to determine and order the payment of any and all the amounts due and owing to Bianchi from the United States by reason of the above-described unsettled accounts of the United States owing to Bianchi. Moreover: (1) Bianchi has applied to the proper department of the United States for the payment of his VECP awards; (2) three years has now elapsed from the date of such application without payment; and, (3) no suit upon the same has been brought by the United States.

20. Bianchi has, over the last three years, made numerous written and oral demands upon and requests for payment to the DLA regarding his VECP awards, and all interest relating thereto, (pursuant to Title 28, U.S.C, § 1494), all without settlement or payment by the United

States, in contradiction of this Court's prior decisions and those of the Federal Circuits. (Exhibits "15" & "16")

21. Title 28, U.S.C., Section 1494, states:

> "Accounts of Officers, Agents or Contractors. The United States Court of Federal Claims shall have jurisdiction to determine the amount, if any, due to or from the United States by reason of any unsettled account of any officer or agent of, or contractor with, the United States, or a guarantor, surety or personal representative of any such officer, agent or contractor, and to render judgment thereof, where - (1) Claimant or the person he represents has applied to the proper department of the government for settlement of the account; (2) Three years have elapsed from the date of such application without settlement; and (3) No suit upon the same has been brought by the United States."

**CLAIMS**

22. Despite repeated requests for payment by Bianchi, the DLA has failed and refused to pay the awards and interest, or to even produce evidence and/or documentation that would dispute the payment of Bianchi's VECP awards, with interest, directly to Bianchi, despite repeated requests by Bianchi for said documentation. Moreover, the DLA made a number of material misrepresentations to Congressman Jim Gibbons in its October 6, 2000 correspondence including but not limited to stating that the Bank of America had received over $1,141,000.00 and that Bianchi had also received interest on the EAJA Award of $475,000.00. Both statements were untrue and mislead Congressman Gibbons. (Exhibits "15" and "16").

23. There is now due and owing to Bianchi the undisputed sums of $58,613.03 and $16,574.74, plus all applicable Contracts Dispute Act ("CDA") interest from the specified dates of the awards dealing with these VECP awards, plus any and all reasonable attorney's fees and costs under the EAJA, and pursuant to any and all applicable federal statutes, laws and/or contracts at issue.

24. The United States is not entitled to claim any setoff amounts against the VECP awards due and owing to Bianchi, as based upon the prior decisions of this Court and those of

the Federal Circuits, due to the absence of and non-production of any evidence and/or documentation required to establish and/or assert any legal claim or right to setoff by way of lawful and valid assignments or notes under the CDA and/or FAC, or any other federal statutes and/or documentation.

25. The prohibition against the United States' right to a setoff as against the Bianchi awards is further evidenced by the documents as contained in Exhibits "15" & "16", as well as by this Court's decision in Bank of America vs. United States vs. Bianchi, Case No. 90-3961C, as decided on April 6, 1995. (Exhibit "17"), which expressly held that any assignments evidencing setoff amounts must be directly related to loaned money or money made available for specific contract performance, and that any monies loaned for any reason other than the direct performance of the contract invalidates any purported assignments relating thereto.

26. The VECP awards to Bianchi are not subject to any valid assignments or notes in favor of the Bank of America, NT&SB. Moreover, the United States has completely and fully satisfied all of Bianchi's Assignments in favor of the Bank of America, by a full accounting and payment to the Bank of America, NT&SB, in the Court of Federal Claims, Case No. 90-3961C, and entitled: Bank of America, et. al. vs. the United States of America vs. Bianchi.

27. That under this Court's decision (Case No. 90-3961C), this Court held that the Bank of America, NT&SB, had been paid in full for any and all prior claims against Bianchi on any of their valid written assignments and notes under the FAC that were pled in this Court under written declarations and evidence as filed with this Court by the Bank of America, NT&SB. Moreover, under said Court decision, neither the Bank of America, NT&SB, nor the United States, is entitled to any amounts or rights of setoff pursuant to these fully discharged assignments and/or notes in regards to Bianchi's outstanding VECP awards of $58,613.03 and $16,574.74, respectively, and all interest relating thereto. (Exhibit "4").

28. Upon information and belief, and subsequent to this Court's decision (as above-referenced), and during the pendency of the Ninth Circuit Court of Appeals decision in Bianchi vs. Walker, (9th Cir. 1998), 163 F.3d 564, the Bank of America, NT&SB, knowingly failed to withdraw the appeal to the Ninth Circuit, nor advise them of the fully paid and discharged Bianchi assignments and notes, as directed by this Court's decision in Bank of America, et al. vs. the United States of America vs. Bianchi, Case No. 90-3961C. Therefore, the United States wrongfully paid the Bank of America, NT&SB, Bianchi's VECP award of $58,613.03, plus interest, and Bianchi's additional VECP award of $16,574.74, plus interest, all in direct violation of this Court's prior Orders and Decisions, as well as the Orders and Decisions of the U.S. Court of Appeals for the Federal Circuit, as evidenced by written correspondence from counsel for the General U.S. Accounting Office, the Defense Logistics Agency, the Department of Justice, and the SBA as follows: GAO letter dated August 26, 1994 to Attorney George Graziadei from GAO Assistant Chief of Claims Group, Ken Schutt; correspondence dated August 24, 1994 from SBA Attorney Joel Meese to GAO Senior Attorney Neill Martin-Rolsky; letter dated August 23, 1994 to GAO Senior Attorney Neill Martin-Rolsky from DLA Chief Trial Attorney Thomas Hornak; correspondence dated August 1, 1994 to GAO Senior Attorney Neill Martin-Rolsky from DOJ Division Attorney Mark Melnick. (Exhibit "18").

29. And, the United States has maintained Mr. Mark Melnick as its legal counsel throughout all of the proceedings before the U.S. Court of Federal Claims, (Case No. 90-3961C); the U.S. Court of Appeals for the Federal Circuit, (Case No. 93-5059-5060), the remand from the U.S. Court of Appeals for the Federal Circuit to this Court, (Case No. 90-3961C), and the subsequent actions before this Court under Case No. 90-3961C. This same legal counsel is fully aware of the finality and payment of $341,140.05 to the Bank of America on that Complaint, including interest payments in full and final settlement and satisfaction of all of Bianchi's prior

assignments to the Bank of America, NT&SB, for a total of $717,009.94 paid by the United States to the Bank of America, NT&SB, as of August 22, 1995. That the same assistant U.S. Attorney was also maintained throughout the legal proceedings in the U.S. District Court for the District of Nevada, (Case No. CV-S-94-0686-HDM (RJJ)) and the subsequent Appeal to the Ninth Circuit Court of Appeals, in Bianchi v. Walker, (9th Cir. 1998), 163 F.3d 564. That said assistant U.S. Attorney had full knowledge of the payments as ordered by this Court to be paid to the Bank of America, NT&SB, which, as a matter of law and this Court's Orders, fully discharged any obligations claimed by the United States under the prior Bianchi assignments in favor of the Bank of America, NT&SB.

30. The United States damaged Bianchi by allowing the Bank of America, NT&SB, to proceed with improper pleadings and improper demands for continued payments on the discharged FAC assignments as setoffs against monies owed by the United States to Bianchi.

31. And, said United States counsel failed to withdraw the interpleader of the Bank of America, in either the U.S. District Court (Nevada), Bianchi v. Walker, CV-S-94-0686-HDM (RJJ), or in the subsequent appeal to the Ninth Circuit Court of Appeals in Walker, (9th Cir. 1998) 163 F.3d 564, all in violation of the civil False Claims Act, 31 U.S.C. § 3729, knowing that the Bank of America, NT&SB, had been fully paid by the United States under Bianchi's prior assignments and notes, and pursuant to this Court's Orders in Case No. 90-3961C, and the orders of the Court of Appeals for the Federal Circuit, in Case No. 93-5059-5060.

32. Under the decisions and orders of the U.S. Court of Federal Claims, and the U.S. Court of Appeals for the Federal Circuit, the United States has no setoff rights against Bianchi. However, the United States, by and through Mark Melnick, Assistant U.S. Attorney, knowingly elected to wrongfully pay the Bank of America, NT&SB, the monies due to Bianchi, and to maintain the interpleader action in the U.S. District Court for the District of Nevada, and in the

U.S. Court of Appeals for the Ninth Circuit, all in violation of the prior Decisions and Orders of this Court of Appeals for the Federal Circuit. (Exhibit "18")

33. That the United States has no setoff amounts applicable to Bianchi's VECP awards and all interest and/or attorney's fees to which Bianchi is currently to be paid. The United States is now required, and must be ordered by this Court to immediately contact the United States Treasury, and inform it that the United States holds no valid claims under the Bianchi assignments and notes in favor of the Bank of America, NT&SB, and that there is no right to setoff to any of the awards so claimed by Bianchi, as based upon this Court's prior decision, in Case No. 90-3961C. (Exhibit "4"). Despite correspondence from the DLA stating that Bianchi must contact the United States Treasury, and inform the United States Treasury, that there are no more assignments and notes applicable to Bianchi's VECP Claims and awards; that that responsibility is the sole and direct responsibility of the United States, and not that of Bianchi. (Exhibit "13").

34. Bianchi subsequently amended and supplemented his original Complaint on October 15, 1998 in the United States Court of Federal Claims, Case No. 98-794C in order to bring a claim for the payment of costs awarded to Bianchi in the sum of $1,870.04, as issued as part of the judgment of the Court of Appeals for the Federal Circuit, wherein the Court of Appeals awarded Bianchi the sum of $1,870.04 for and as costs in its judgment entered on April 29, 1994 and pursuant to the Court's mandate as issued on June 30, 1994. Bianchi, by and through his counsel, then sought to collect the costs award, but the payment of this award was not forthcoming by the United States, and the United States continued to refuse to pay the same, even though authorization for payment of the costs award had been represented by the United States on September 18, 1998. The withholding of the payment of the costs award had occurred since June 30, 1994. (Exhibit "19")

35. Thereafter on or after October 1998, and over four years later, and after Bianchi had been required to amend his original Complaint in Case No. 98-794C, in order to bring the costs award claim as well, Bianchi finally received a check from the United States in the amount of $1,870.04. (Exhibit "20") However said payment did not include interest or attorney's fees on the judgment of the Court of Appeals for the Federal Circuit for the period between issuance of the judgment and the date of payment.

36. In addition, the Court of Federal Claims, in Case No. 98-794C, then entered judgment on Count II of the amended and supplemental Complaint of Bianchi, allowing Bianchi to recover of and from the United States the additional sum of $454.06 in full settlement of Count II of the Complaint. (Exhibit "21"). That said judgment, including an offer of judgment by the United States to allow judgment to be entered against it in the amount of $454.06 in full settlement of count II of the Complaint as filed by Bianchi, and Bianchi's required efforts to continue to pursue the United States for the payment of monies previously awarded by the Court, further evidences bad faith on the part of the United States in its failure to comply with the orders of this Court and of the Court of Appeals for the Federal Circuit, as well as other judgments and decisions as rendered by the Ninth Circuit Court of Appeals, in favor of Bianchi.

WHEREFORE, Bianchi now demands judgment in his favor from this Court ordering the payment from the United States of his VECP awards in the amounts of $58,613.03 and $16,574.74 respectively, as well as for legal interest due and owing him under the CDA, as required by law and/or statute, and/or by the VECP awards, for the period of time during which the payments were withheld, and has been withheld, and for such other and further relief as the Court may deem just and lawful under the premises, regarding the monies wrongfully withheld from Bianchi.

Dated this 3rd day of March, 2004.

Respectfully Submitted,

STEPHENS, GOURLEY & BYWATER

R. VAUGHN GOURLEY, ESQ.
Nevada Bar No. 503
3636 North Rancho Drive
Las Vegas, Nevada 89130
(702) 656-2355 Telephone
(702) 656-2776 Facsimile
Attorneys for Plaintiff

Of Counsel:

George E. Graziadei, Esq.
Nevada Bar No. 1775
Scott Michael Cantor, Esq.
Nevada Bar No. 1713
Graziadei & Cantor, Ltd.
302 East Carson Avenue, Suite 400
Las Vegas, Nevada 89101
(702) 477-7733 Telephone
(702) 477-0020 Facsimile

**VERIFICATION**

STATE OF Nevada )
) ss
COUNTY OF Clark )

Maurice L. Bianchi, being first duly sworn, under penalty of perjury, deposes and says:

That he is the Plaintiff in the above entitled action; that he has read the foregoing Complaint and knows the contents thereof, and that the same is true of his own knowledge, except for those matters therein stated on information and belief, and as to those matters he believes them to be true.

Maurice Bianchi

MAURICE L. BIANCHI

SUBSCRIBED and SWORN to before me this 3rd day of March, 2004.

Paula Marie Timmons

NOTARY PUBLIC in and for said County and State

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
PAULA MARIE TIMMONS
Appt. No. 99-59308-1
My Appt. Expires Sept. 29, 2007

JUL-27-2004 12:20 DSCP CRDC 215 737 2486 P.01/2

SF1034 - EDP PUBLIC VOUCHERS FOR PURCHASES AND SERVICES OTHER THAN PERSONAL

US DEPARTMENT, BUREAU, OR
ESTABLISHMENT AND LOCATION
FINANCE & ACCOUNTING OFFICE
PO BOX 182204
COLUMBUS, OHIO 43218-2204

DTE VOU PREP
06/27/02
CONTRACT NO
SC0100-2CTROYAL

PAYMENT NO. 001
TYPE: FINAL

VOUCHER NUM
263603

PAID BY
PAUL W PERRY
DFAS-CO
06/27/02
6355

PAYEE'S NAME AND ADDRESS
BANK OF AMERICA
ATTN NYDIA MIRANDA-SENA
MAIL CODE CA5-704-05-11
315 MONTGOMERY STREET
SAN FRANCISCO CA 94104-1866

| INVOICE NUMBER | MDSE AMOUNT | INTEREST/ (DISCOUNT) | DAYS LATE | INT RATE % | FREIGHT | AMOUNT |
|---|---|---|---|---|---|---|
| CTROYAL | 44807.22 | 0.00 | 0 | 0.0000% | 0.00 | 44807.22 |

021771441040006 WCD: LSCBA
PREPARED BY: SIC

VOUCHER SUBTOTAL: 44807.22
TAX WITHHELD: 0.00
EXCHANGE RATE/DIFFERENCE: 0.00

TOTAL PAYMENT: 44807 22

AUT-CER: MILLSAP, KAREN

I CERTIFY THIS VOUCHER CORRECT AND PROPER FOR CHECK PAYMENT
06/27/02 PAUL W PERRY DISBURSING OFFICER

DATE AUTHORIZED CERTIFYING OFFICER TITLE

ACCOUNTING CLASSIFICATION

97X4930.5CP1 49-0000 P 2630 033181 US S43800 00S438 SC01002CTROYAL
28232.48

97X4930.5CT0 49-0000 P 2630 033150 US S76000 00S760 SC01002CTROYAL
16574.74

CHECK NUMBER 01775565

1

DEFENSE LOGISTICS AGENCY
DEFENSE CONTRACT ADMINISTRATION SERVICES REGION, LOS ANGELES
11099 SOUTH LA CIENEGA BLVD.
LOS ANGELES, CALIFORNIA 90045

NO II

IN REPLY REFER TO DCRL-FCCD (C. Hill/AV/(213) 833-2762/wb) 27 Mar 80

SUBJECT: Contract DLA100-80-C2290 with
Branchi M of Calif

Bank of America
ATTN: J. Caputo
2001 S Main St
Santa Ana, CA 92707

Notice of Assignment, executed by Disbursing Office (copy enclosed) for retention in your files.

Sincerely,

C. PEDERSEN
LCDR, SC, USN,
Accounting and
Finance Officer

RECEIVED APR 1980 Bank of America #51