EXHIBIT 5

# ASSIGNMENT OF CLAIMS UNDER GOVERNMENT CONTRACT

For VALUE RECEIVED, the undersigned M. Bianchi of California, (1) a sole proprietorship of Maurice L. Bianchi (hereinafter referred to as "Assignor") hereby assigns, transfers and sets over unto Bank of America National Trust and Savings Association, a National Banking Association having its principal place of business in San Francisco, California, and branches throughout the State of California, (hereinafter referred to as "Bank"), all the moneys now due or hereinafter to become due from the United States of America under

Contract No. DLA100 80C 2290 (2)

Letter Contract No. ——— (2) and any superseding Definitive Contract of the same number dated ——— for cutting and sewing of 27,000 coats (3) entered by Assignor and Defense Personnel Support Center (4).

Any married woman who signs as Assignor below hereby expressly agrees to the liability of her separate property.

Assignor hereby constitutes and appoints said Bank the true and lawful attorney, irrevocable, of Assignor, to demand, receive and enforce payments and to give receipts, releases and satisfactions, either in the name of Assignor or in the name of the Bank, in the same manner and with the same effect as Assignor could do if this assignment had not been made.

Assignor covenants that Assignor will receive all moneys advanced hereunder by the Bank as a trust fund to be first applied to the payment of claims of laborers, materialmen, sub-contractors, and other expenditures arising out of the performance of said contract, and until such payments have been made Assignor will not use any part of said advances for any other purpose; and the said Assignor does hereby represent and warrant unto said Bank that no payments have been received on account of said contract, and that Assignor has not heretofore assigned or assigned said contract or any rights or interest therein or thereto.

This assignment is made pursuant to the Assignment of Claims Act of 1940.

IN WITNESS WHEREOF, Assignor has executed this assignment in several originals this 22 day of February 1980.

Maurice L Bianchi

(5) M. Bianchi of California a sole proprietorship of Maurice L. Bianchi

## INSTRUCTIONS

(1) Insert name of Assignor and whether a corporation, partnership, or individual doing business under a trade name. Name must correspond with that in the contract.

(2) Insert number of contract; delete line not applicable.

(3) Insert object of contract.

(4) Insert name of contracting party whether the United States or agency or department thereof.

(5) Signature of Assignor must correspond with that in contract. If a corporation, affix corporate seal.

Signature of Assignor should be acknowledged before a Notary Public. See forms of acknowledgment on the reverse hereof.

A true copy of this assignment must accompany each original copy of the notice of assignment. For form of notice and the number of the parties with whom such notices should be filed, see accompanying form "Notice of Assignment."

000200

cc: Chad Hill
FDCDA

EXHIBIT 11

# ASSIGNMENT OF CLAIMS UNDER GOVERNMENT CONTRACT

For VALUE RECEIVED, the undersigned M. Bianchi of California (1)

a Sole Proprietorship of Maurice L. Bianchi

(hereinafter referred to as "Assignor") hereby assigns, transfers and sets over unto Bank of America National Trust and Savings Association, a National Banking Association having its principal place of business in San Francisco, California, and branches throughout the State of California, (hereinafter referred to as "Bank"), all the moneys now due or hereinafter to become due from the United States of America under

Contract No. DLA 100-80-C-2972 (2)

Letter Contract No. — (2) and any superseding Definitive Contract of the same number C.M.T. 125;240 each, Govt. all weather dated June 23, 1980 for mens black with removable liner (3) executed by

Assignor and Defense Personnel Support Center (4)

Any married woman who signs as Assignor below hereby expressly assents to the liability of her separate property.

Assignor hereby constitutes and appoints said Bank the true and lawful attorney, irrevocable, of Assignor, to demand, receive and enforce payments and to give receipts, releases and satisfactions, either in the name of Assignor or in the name of the Bank, in the same manner and with the same effect as Assignor could do if this assignment had not been made.

Assignor covenants that Assignor will receive all moneys advanced hereunder by the Bank as a trust fund to be first applied to the payment of claims of laborers, materialmen, sub-contractors, and other expenditures arising out of the performance of said contract, and until such payments have been made Assignor will not use any part of said advances for any other purpose; and the said Assignor does hereby represent and warrant unto said Bank that no payments have been received on account of said contract, and that Assignor has not heretofore alienated or assigned said contract or any rights or interest therein or thereto.

This assignment is made pursuant to the Assignment of Claims Act of 1940.

IN WITNESS WHEREOF, Assignor has executed this assignment in several originals this

14th day of August, 1980.

(1) Maurice L. Bianchi DBA
M. Bianchi of California

INSTRUCTIONS

(1) Insert name of Assignor and whether a corporation, partnership, or individual doing business under a trade name. Name must correspond with that in the contract.

(2) Insert number of contract; delete line not applicable.

(3) Insert object of contract.

... United States or agency or department thereof.

000201 BA CO:::

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of --<br><br>M. Bianchi of California<br><br>Under Contract Nos. DLA100-79-C-2894<br>DLA100-80-C-2290<br>DLA100-80-C-2972 | ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934 |

APPEARANCES FOR THE APPELLANT: D. Michael Fitzhugh, Esq.
McKenna, Conner & Cuneo
Washington, D. C.

APPEARANCES FOR THE GOVERNMENT: Michael J. McGonigle, Esq.
Chief Trial Attorney
Defense Personnel Support Center (DLA)
Philadelphia, Pennsylvania

OPINION BY ADMINISTRATIVE JUDGE BURG

The parties to the above-listed appeals have agreed to the following stipulation:

> The parties agree that Mr. Maurice Bianchi, as the successor to M. Bianchi of California, is entitled to recover $617,500.00 on his claims in the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934; that the Government is entitled to take nothing on its claims in the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934; that Mr. Bianchi is entitled to interest computed in accordance with Clauses L78 (Disputes (1979 MAR)) of the contracts, at the rates prescribed by the Secretary of the Treasury, under the Renegotiation Act, Public Law 92-41, on the principal amount of $617,500, such interest to run from June 18, 1981 until the date of payment; and that the parties waive their rights to seek reconsideration of this stipulated decision of the Board or to appeal that stipulated decision;

This settlement is without prejudice to Mr. Bianchi's right to pursue any and all Value Engineering Change Proposal Claims under his contracts with DPSC; and

This settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act to recover whatever legal fees and litigation expenses to which he may be entitled in connection with these claims and appeals. The parties stipulate that the issues of prevailing party and substantial justification will be decided on the basis of the record made at the first trial. The parties agree that the application for legal fees and litigation expenses under the Equal Access to Justice Act will be submitted within thirty days of receipt by Appellant of the agreed-upon settlement payment.

DECISION

It is the Board's decision, pursuant to 41 U.S.C. § 607(d), § 612(b), and the parties' stipulation and agreement, that the appeals are sustained. In the nature of a consent judgment the Board makes a monetary award in the amount of $617,500 with interest from 18 June 1981.

Dated: 29 September 1988

RUTH C. BURG
Administrative Judge
Member of the Armed Services
Board of Contract Appeals

I concur

WILLIAM J. RUBERRY
Administrative Judge
Acting Chairman, Armed Services
Board of Contract Appeals

I concur

ALAN M. SPECTOR
Administrative Judge
Vice Chairman, Armed Services
Board of Contract Appeals

000203

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934, Appeals of M. Bianchi of California, rendered in conformance with the Board's Charter.

Dated:

JOE D. MILLER
Recorder, Armed Services
Board of Contract Appeals

000204

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| M. Bianchi of California | ) | ASBCA No. 36518 |
| | ) | |
| Under Contract No. DLA100-80-C-2972 | ) | |

APPEARANCE(S) FOR THE APPELLANT: Michael A. Hordell, Esq.
Laurel A. Heneghan, Esq.
Petrillo & Hordell
Washington, DC

APPEARANCE(S) FOR THE GOVERNMENT: Thomas Hornak, Esq.
Chief Trial Attorney
Stephanie L. Zimmt-Mack, Esq.
Patricia A. Papas, Esq.
Trial Attorneys
Defense Personnel Support Center (DLA)
Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE BURG

The Government accepted a Value Engineering Change Proposal (VECP) submitted by appellant during performance of this contract. The parties were unable to agree either as to the per unit amount which was saved because of the VECP or the number of units to which the savings applied. When the contracting officer failed to issue a decision, appellant filed this appeal pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §605(c)(3). Appellant seeks $2,175,807.56 as instant, concurrent and future contract savings and $3,997,660.80 as collateral savings, for a total of $6,173,468.36.

FINDINGS OF FACT

1. Various findings of fact pertaining to this contract were the subject of a prior opinion of this Board on the motion for partial summary judgment filed in this appeal dated 2 March 1990 (unpublished) and in our opinion in ASBCA Nos. 37029 and 37071, 92-_ BCA ¶ ______, (decided 31 July 1992) and, to the extent to which we consider them relevant, they are adopted herein.

The Contract

2. On 23 June 1980, the Defense Personnel Support Center (DPSC) of Philadelphia, Pennsylvania, Defense Logistics Agency (DLA), awarded appellant Contract No. DLA100-80-C-2972 for the manufacture of 125,240 Man's Black All Weather Coat with removable lining at a unit price of $31.92 and a total contract price of $3,997,366.40. The coat was to be manufactured in accordance with Limited Purchase Description 12-77A (DES 12-77A), dated

1 November 1978, using patterns dated 21 September 1979 issued by the United States Army Natick Research and Development Laboratory (Natick).

3. DES 12-77A incorporated by reference a federal standard, FED-STD-751 - Stitches, Seams and Stitching. The solicitation incorporated by reference DPSC Form 3540, the DPSC Master Solicitation for Clothing and Textiles. The Master Solicitation included Clause J09, Value Engineering Incentive, January 1978, which provided (R4, tab 4 at 14-15):

> J09 VALUE ENGINEERING INCENTIVE (DPSC 1978 Jan)
>
> (a) Application. This clause applies to a Contractor developed and documented Value Engineering Change Proposal (VECP) which:
>
> (i) requires a change to this contract to implement the VECP, and
>
> (ii) reduces the overall costs to the cognizant Military Department without impairing essential functions or characteristics, provided that it is not based:
>
> (A) solely on a change in deliverable end item quantities, or
>
> (B) a change in R&D end item or test quantities due solely to results of previous testing under this contract, or
>
> (C) solely on a change to the contract type.
>
> (b) Documentation. As a minimum, the following information shall be submitted by the Contractor with each VECP.
>
> (i) a description of the difference between the existing contract requirement and the proposed change, and the comparative advantages and disadvantages of each, justification when a function or characteristic of an item is being altered, and the effect of the change on the performance of the end item;
>
> (ii) an analysis and itemization of the requirements of the contract which must be changed if the VECP is accepted and a recommendation as to how to make each change (<u>e.g., a suggested specification revision</u>);
>
> (iii) a separate detailed cost estimate for both the existing contract requirement and the proposed change to provide an estimate of the reduction in costs, if any, that will result from acceptance of the VECP, taking into account the costs of development and implementation by the Contractor (<u>including any amount attributable to subcontracts in accordance with paragraph (h) below</u>);
>
> (iv) a prediction of any effects the proposed change would have on collateral costs to the Military Department such as Government-furnished property costs, costs of related items, and costs of maintenance and operation.

C00206

(v) a statement of the time by which a contract modification accepting the VECP must be issued so as to obtain the maximum cost reduction, noting any effect on the contract completion time of delivery schedule, and

(vi) identification of any previous submission of the VECP, including the dates submitted, the agencies involved, the numbers of the Government contracts involved, and the previous actions by the Government, if known.

(c) Submission. VECPs shall be submitted to the Procuring Contracting Officer (PCO). When the contract is administered by other than the purchasing office, a copy of the VECP shall be submitted simultaneously to the Administrative Contracting Officer (ACO). VECPs shall be processed expeditiously, however, the Government shall not be liable for any delay in acting upon any VECP submitted pursuant to this clause. The Contractor has the right to withdraw, in whole or in part, any VECP not accepted by the Government within the period specified in the VECP.

(d) Acceptance. The Contracting Officer may accept, in whole or in part, by contract modification either before or within a reasonable time after performance has been completed under this contract any VECP submitted pursuant to this clause. Until a contract modification applies a VECP to this contract, the Contractor shall remain obligated to perform in accordance with the terms of the existing contract. Contract modifications made pursuant to this clause will so state. The decision of the Contracting Officer as to the acceptance of any VECP under this contract (<u>including the decision as to which clause is applicable to the proposal if this contract contains both a "Value Engineering Incentive" and a "Value Engineering Program Requirement" clause</u>) shall be final and shall not be subject to the "Disputes" clause of this contract.

(e) Sharing. If a VECP submitted by the Contractor pursuant to this clause is accepted, the Contractor shall share in savings realized by the Government in accordance with the following provisions:

(1) <u>Instant Contract</u>.

(i) Definitions:

(A) Instant contract savings to the Contractor (ICS) is the unit cost reduction times the number of units affected in the instant contract. The proposed unit cost reduction includes estimated allowable Contractor development and implementation costs (CC). The Contractor's development and implementation costs include any subcontractor development and implementation costs and subcontractor incentive payments (<u>see (h) below</u>). For purposes of this clause, Contractor development costs are those costs incurred after the

Contractor has identified a specific VE project and prior to acceptance by the Government.

(B) Government Costs (GC) are those DOD costs which directly result from development and implementation of the VECP, such as test and evaluation of the VECP, and any increased cost in DoD operations, maintenance, and logistics support.

* * *

(2) <u>Concurrent Contracts</u>.

(i) If the VECP accepted under this contract is also used on concurrent contracts of the purchasing office for essentially the same items, the Contractor shall be paid a share of any savings as calculated in (ii) below.

(ii) Calculations

(A) Determine the reduction in the price of each concurrent contract(s) as a result of incorporating the VECP.

(B) Subtract from the total amount in (A) any Government costs (GC) not yet offset (<u>if GC was greater than ICS</u>) in (e) (1) (ii) (C) or (D) above, and any increase in the instant contract price, i.e., if ICS was negative in (e) (1) (ii) (D), if the resulting number is positive, multiply it by 50% (<u>25% if this is a VEPRC</u>). Add this amount to the instant contract price.

(3) <u>Future Contracts</u>.

(i) Definition. The term unit cost reduction for future contract sharing shall be the unit cost reduction under this instant contract without deducting any cost of development or impletion [sic].

(ii) If the VECP accepted under this contract is used on future purchases of essentially the same item by the purchasing office, or its successor, the Contractor shall share in the savings on all affected end items scheduled for delivery not later than 3 years after acceptance of the first item incorporating the VECP, or until the originally scheduled delivery date of the last affected end item under the instant contract, whichever is later. When sharing on future contracts is expected, the Contractor shall be responsible for the following:

(A) Maintaining records adequate to support identification of the first delivered unit to which the VECP applies. These records are considered an integral part of contract documentation and shall be maintained for a period of three years after final payment on the contract under which the VECP was accepted.

(B) Annotating the DD-250, Material Inspection and Receiving Report, which applies to the initial unit covered by the VECP with the following statement:

"This is the initial unit delivered which incorporates VECP NO. ____________________, Contract Modification No. ____________________, dated ________________."

(iii) Calculations. At the time each eligible future contract is awarded:

(A) Determine the number of units scheduled to be delivered prior to expiration of the Contractor sharing period determined in (ii) above. Multiply this by the unit cost reduction as defined in (e) (3) (i).

(B) Subtract from the total amount in (A) any Government costs or instant contract increases not yet offset in (e) (1) (ii) (C) or (D), or in (e) (2) (ii) (B), or in other contracts awarded since acceptance of the VECP. If the resulting number is positive multiply it by 50% (25% if this is a VEPRC) and add the result to the instant contract price.

(f) Payment. The Contractor's concurrent and future contract shares should be paid upon modification of concurrent contracts or future contract award, or within six (6) months thereafter. However, any such payments are subject to the condition that to the extent the Government does not receive delivery of and accept all items on which the share is paid, the Contractor shall reimburse the Government the proportionate share of the payments. If this clause is modified to provide for lump sum payments, such payments shall be made upon modification of the instant contract.

4. On 24 June 1980, DES 12-77A was superseded by MIL-C-44030(GL) for Coat, All Weather, Man's Black, w/Removable Liner. The requirements of DES 12-77A were incorporated into this new specification. Appellant's contract was not required to be modified and was not modified to include MIL-C-44030 and continued to require production in accordance with the requirements of DES 12-77A.

The VECP Approval

5. On 9 September 1980, appellant submitted a VECP to modify DES 12-77A, which stated:

> Value Engineering Proposal Change recommendation to delete Operation 22C "Stitch sleeve lining to sleeve 1 inch from bottom of overedge seam of lining."
>
> Value Engineering Proposal Change recommendation; change 15-D from "Overedge stitch bottom rawedge [sic] of sleeve lining."
>
> Change to: Safety stitch sleeve lining to sleeve catching interlining.

> Result in Savings: 6¢ per coat.
>
> Changing this operation will not affect servability [sic] or appearance in any way.

(R4, tab 6)

6. By letter dated 18 September 1980, the contracting officer replied to appellant's letter as follows:

> This is to acknowledge receipt of your Value Engineering Change proposal dated 9 September 1980 submitted under contract DLA100-80-C-2972 for Raincoat, Man's, Black, LP/P DES 12-77A. Your proposal, hereinafter identified as VECP 8680, recommends overedging the bottom raw edge of the sleeve lining.
>
> To permit a proper and complete evaluation of your proposal we will require a separate detailed cost estimate for both the existing contract requirement and the proposed change to provide an estimate of the reduction in costs that will result from acceptance of your Value Engineering Change Proposal. The Value Engineering Incentive Clause (J09), copy attached, in your contract requires this information to be furnished by the proposer. This cost breakdown should also include indirect costs and percentages applied to direct labor and material costs. We request you furnish this information as soon as possible.
>
> We will promptly notify you of the results after completion of the evaluation. Your interest and participation in the Value Engineering Program is much appreciated.

(R4, tab 7)

7. Following a preliminary evaluation, the VECP was forwarded to Natick on 2 October 1980 for a decision of whether to approve this proposed change. The letter transmitting the VECP was as follows:

> SUBJECT: Value Engineering Change Proposal 8680, Raincoat, Man's Black, w/Removable Liner, LP/P DES 12-77A
>
> * * *
>
> 1. Attached is subject VECP from M. Bianchi of California proposing a change in construction of the sleeve on subject raincoat.

2. ~~Our technical personnel~~ have reviewed the proposal and believe the recommendation to combine two operations in one by using a safety stitch machine in overedging the bottom raw edge and stitching the lining to sleeve catching the interlining has merit. There is the possibility that the sleeve lining may finish slightly longer, however, the lining is required to be tacked to the outer sleeve and serviceability will not be affected.

3. Contractor's estimated unit savings of $.06 projected over the number of raincoats to be procured in FY 81 would result in annual savings of $41,459.

4. We request the proposal be evaluated and we be apprised of your decision by 21 October 1980.

(R4, tab 17)

8. On 15 October 1980, appellant responded to the contracting officer's 18 September 1980 letter and submitted the following information:

VECP #8680 recommends overedging the bottom raw edge of the sleeve lining by reference (A).

In evaluating the cost savings for the above subject VECP, the direct labor is as stated 6¢ per coat. We can only estimate 2¢ for indirect cost and 2¢ as a percentage to apply to direct labor and material cost. Total savings to the government of 10¢ (By reference B).

(R4, tab 8)

9. On 25 November 1980, Natick informed DPSC that VECP 8680 had been approved for use in DES 12-77A and its follow-on specification, MIL-C-44030(GL), both of which contained the same description for operations labelled 15d and 22d. Natick authorized changing both DES 12-77A and MIL-C-44030 as follows:

Page 20

Operation 15d. - Delete in its entirety and substitute:

"15d. Safety stitch bottom raw edge of sleeve lining to bottom of sleeve, catching interlining with not less than 3/8 inch seam.

| Stitch Type | Seam and Stitching Type | .... |
|---|---|---|
| | | .... |
| 515, 516 or 519 | SSa-2 | .... |

* * *



000211

Operation 22c - Delete Operation 22c and Re-Letter Operation 22d to 22c.

(R4, tab 17)

10. By letter dated 29 December 1980, the acting Chairman of the Clothing and Textile Branch, Technical and Quality Assurance Division of the Directorate of Clothing and Textiles sent an Inter-Office Memorandum listing five items to which VECP 8680 "can be made applicable." They were:

| | |
|---|---|
| Coat, All Weather, Mn's | MIL-C-44030 |
| Coat, All Weather, Wmn's | MIL-C-43972 |
| Coat, All Weather, Mn's (CG) | MIL-R-87003 |
| Coat, All Weather, Wmn's (CG) | MIL-R-87009 |
| Coat, All Weather, Mn's (AF) | MIL-R-87110 |

(R4, tab 19) The record contains no indication that, other than MIL-C-44030, any of the above-listed specifications were changed. At that time, DPSC did not have authority to change specifications. It made recommendations to various service offices responsible for issuance of specifications which then made the determination whether to make such changes. It often took a long time to incorporate various changes into a clothing specification. Items which were acquired frequently and/or in large quantities received more immediate attention. Prior to a specification change, a letter directive was issued modifying the specification to reflect the change or changes for a particular item. At Natick, an individual was assigned specific items which were not necessarily related either by use or type. It was that individual's responsibility to revise specifications once a value engineering change had been approved. There was no procedure whereby all other personnel were notified of a specific change for which another individual was responsible although it was possible they might learn about the change.

11. By Inter-Office Memorandum dated 30 December 1980, the Chief of the Technical and Quality Assurance Division of the Directorate of Clothing and Textiles requested that the following contracts be modified to incorporate VECP 8680:

| | |
|---|---|
| Centre Mfg. | DLA100-80-C-2485 |
| Centre Mfg. | DLA100-81-C-2225 |
| Centre Mfg. | DLA100-80-C-2782 |
| Centre Mfg. | DLA100-80-C-3401 |
| Major Coat | DLA100-80-C-2472 |
| MBOC | DLA100-80-C-2972 |

12. On 29 January 1981, Natick informed DPSC that findings from a follow-up evaluation of VECP 8680 indicated that a line tack in the lining of the sleeve should be added as an additional operation to MIL-C-44030(GL) and DES 12-77A to take-up the excess lining fabric. The Government considers that the line tack was an outgrowth of and resulted from VECP

8680. Appellant does not concur that this tack was required as a result of VECP 8680.

13. By letter dated 10 March 1981, the Chief of the Product Engineering Office, Directorate of Manufacturing, concluded the following:

> 1. Reference IOM, your Office, dated 19 February 1981, subject as above.
>
> 2. A direct labor savings of .0071 standard hours will be realized when sleeve lining is joined to sleeve with a safety stitch in lieu of overlock and single needle stitching.
>
> 3. Overhead and profit are not included in the above figure.

Handwritten on the document is the following:

> 0.0071 x $4.75/hour = 0.033725
> + 80% overhead = 0.060705
> + 20% G & A = <u>0.073</u> per unit

(R4, tab 12) While when or by whom the above calculation was made and placed on the letter has not been established in the record before us, it was apparently by someone in the Government prior to recommending an amount for finalized savings to the contracting officer. (See F/F 14)

14. On 20 March 1981, the Value Engineering Office of the Directorate of Clothing and Textiles recommended to the contracting officer that the savings be finalized at $.07 per unit, with appellant eligible for a 50% share of the savings, or $0.035 per unit.

15. On 31 March 1981 the contracting officer notified appellant that VECP 8680 had been accepted at a unit price yet to be established and that the contract would soon be modified. Unilateral Modification P00005, effective 31 March 1981, made no change in the contract price but provided, insofar as VECP 8680 was concerned:

> 1. Pursuant to the Changes Article and Value Engineering Clause J09, Specification MIL-C-44030 [DES 12.77A rather than the cited MIL specification was applicable to this contract] is changed as follows as a result of VECP #8680:
>
> a. Delete operation 15.d, "overedge the bottom raw edge of the sleeve lining".
> b. Change operation 22.c to read: "Safety stitch bottom sleeve lining to sleeve bottom catching interlining". [This is actually a paraphrase of the revised operation 15d. Operation 22c was eliminated. See Finding 9, <u>supra</u>]

000213

2. As a result of the above accepted VECP, the CMT unit contract price of all units subsequent to and including the initial unit covered by the VECP is to be reduced by $.035 for payment purposes to reflect the Government's share of the savings.
3. Contractor is entitled to 50% of the unit savings or $.035 for all Coat, All Weather,,[sic] Man's, Black w/removable liner using the accepted change #8680 during the royalty period. The royalty period shall extend for a period of 3 years after accetpance [sic] of the first item incorporating the VECP.
4. Contractor is obligated to annotate the DD Form 250 which applies to the initial unit covered by the VECP #8680.

(R4, tab 2 at 15)

16. The initial unit manufactured under Contract 2972, as modified by VECP 8680, was delivered to and accepted by the Government on 6 April 1981. The applicable royalty period for VECP 8680, therefore, is 6 April 1981 through 5 April 1984. The contract payments to appellant for the instant contract were never adjusted to reflect savings attributable to VECP 8680.

17. By Modification P00007, dated 16 November 1981, the undelivered quantity of 87,094 units remaining on Contract 2972 was terminated for default.

VECP 8680

18. All stitches and seams used in construction of Government clothing are described in FED-STD-571 (January 25, 1965). Each type of stitch or seam is assigned a number. The stitches and seams used both before and after approval of VECP 8680 existed in FED-STD-571. Prior to incorporation of the change due to VECP 8680, DES 12-77A Operation 15d required seam and stitching type EFd-1 with a choice of 502, 503 or 504 stitch type. Operation 22c required seam and stitching type SSa-1 with a 301 stitch type. After the change resulting from VECP 8680, one operation replaced these two operations. Operation 22c was deleted in its entirety and Operation 15d was changed to require seam and stitching type SSa-2 with a choice of 515, 516 or 519 stitch type (F/F 9, supra).

19. A safety stitch is a term used to describe a family of stitches composed of rows of single needle joining stitches and rows of overedging stitches, formed simultaneously with one pass through a sewing machine. The combination of the joining and overedging operations results in a change in the seam type to a less complex and more cost effective seam. Stitches 515 through 519 are all in the family of safety stitches. They vary depending on the types of single needle stitch and the type of overedge stitch utilized. Stitch types 502, 503 and 504 originally contained in DES-12-77A are overedge stitches. Seam type EFd-1 refers to the type of stitching produced by overedging the cut edge of one ply of fabric. Operation 22c required stitching of the sleeve lining to the shell sleeve one inch from the bottom of the overedged seam of lining using stitch type 301, a single

needle stitch performed on a lock stitch, and seam type SSa-1. SSa-1 is the most frequently used seam type and is accomplished by laying two plies of fabric together and joining the plies a specified distance from their common cut edge with the single needle 301 stitch.

20. Prior to submittal of VECP 8680, DES 12-77A required the use of safety stitches in eight other operations during production of the All Weather coat which was the subject of that purchase description. These were:

15. Make lining (yoke).

a. Join front lining to front sleeve lining at armhole with a <u>safety stitch</u>. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

b. Position front edge of back sleeve lining and front edge of cape to shoulder edge of front lining and <u>safety stitch</u> with stitching continued the entire length of sleeve (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

c. Position back edge of cape and back edge of back sleeve lining to front edge of back lining and <u>safety stitch</u> to bottom of armhole. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

[d. Overedge stitch bottom raw edge of sleeve lining using Stitch type 502, 503 or 504 and seam EFd-1, prior to the change due to VECP 8680. See F/F 9 for incorporation of VECP 8680 using Stitch type 515, 516 or 519 and seam and stitching type SSa-2]

e. Close side seam of front and back lining and underarm seam of sleeve in one operation with a <u>safety stitch</u>. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

* * *

<u>MAKE LINER</u>

35. Attach front sleeve of liner to front of liner.

a. Position front sleeve to front of liner as indicated by marks on pattern and <u>safety stitch</u> around armhole. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

b. Position front edge of back sleeve to shoulder edge of front of liner and <u>safety stitch</u> with stitching continued the entire length of sleeve. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

000215

> c. Position back edge of back sleeve to front edge of back liner and <u>safety stitch</u> to bottom armhole. (Stitch type 515, 516 or 519; seam and stitching type SSa-2).
>
> d. Close side seams of front and back of liner and underarm seam of sleeve in one operation with a <u>safety stitch</u>. . . . (Stitch type 515, 516 or 519; seam and stitching type SSa-2).

[Emphasis added] (R4, tab 5 at 19, 28-29)

<u>The Claim</u>

21. Appellant was not in agreement with the Government's calculated savings of $0.07 per unit and did not sign Modification P00005. No payments for VECP 8680 have ever been made to appellant. On 16 November 1987 appellant submitted a certified claim, received on 17 November 1987, for payment of its share of savings. No decision was issued by the contracting officer. When the contracting officer failed to respond to another request for a decision, appellant filed an appeal with this Board.

22. In its complaint, appellant contended that the savings as verified by the Government when it approved VECP 8680 did not include savings for indirect costs, contractor and Government furnished material or profit and alleged that the properly calculated savings for VECP 8680 were $0.164 per coat so that its share was $.082 per coat. Appellant, therefore, sought a royalty of "at least $63,502.52" for the instant contract and five other contracts because of utilization of VECP 8680 on "at least 774,421" units. Appellant further alleged on information and belief that the Government experienced collateral savings and savings on additional contracts about which it was not currently aware at the time of filing its complaint and that it would "amend its claim as further information concerning the government's use of this VECP becomes known." (Complaint, Para. 9-12)

23. Appellant's president reviewed 2,223 specifications utilized in the manufacture of military garments to determine those which were modified after VECP-8680 and which he concluded were the "mirror image" or were the "functional equivalent" of VECP 8680. Where no explanation or basis for the change was found for twenty specifications, he concluded that the change was because of VECP 8680. These specifications form the basis for appellant's claim for concurrent and future savings.[1/] On 15 February 1991 appellant supplied the Government with a list of those specifications for which it was claiming a share of savings. Appellant recognizes that it did not invent the safety stitch or introduce its use into Government specifications and seeks a share of savings for the Government's use of the safety stitch on garment locations where the safety stitch was not being used at the time of approval of VECP 8680. Based on calculations, discussed below, appellant alleges that it should receive instant and future contract savings from implementation of VECP 8680 of $2,175,807.56 for essentially the same item and $3,997,660.80 for collateral savings. Appellant also seeks interest.

The Government agrees that appellant is entitled to receive interest from 16 November 1987, but not prior to that date.[2/]

24. The specifications which appellant includes in its present claim are set forth below. A brief description of the operation(s) which appellant claims were due to its VECP is set forth under each item. Included are instances where a specification was issued using the safety stitch operation or was changed so that two operations were combined into one operation. Also included are instances where a lapped seam was required since appellant argues that a lapped type seam is functionally equivalent to the overedging operation described in VECP 8680. The lapped seam (LSC-2) is formed by folding an inside ply of material into an outside ply of material and then sewing the folds together, involving the combination of two operations -- joining and edge protection.

| MILSPEC | ITEM | 1/2 UNIT SAVINGS | TOTAL NO. UNITS | TOTAL CONTR.SAVINGS |
|---|---|---|---|---|
| S-44093 | Shirt, Woman's, Long Sleeve, Polyester/Cotton<br>Make sleeve; join front to side body; join shoulder seams and back to front; set sleeves | $0.149 | 425,033 | $ 63,331 |
| S-44102 | Skirt, Woman's Classic Design Polyester/Wool<br>Make pocket and attach label; attach pocket | 0.033 | 84,417 | 2,786 |
| S-44090 | Shirt, Woman's Short Sleeve, Polyester/Cotton<br>Make sleeve underseam; join front to side body; join shoulder seams and back to side body; set sleeves | 0.149 | 926,028 | 137,973 |
| S-44092 | Slacks, Woman's Classic Design, Polyester/Wool<br>Make pocket and attach label | 0.033 | 256,648 | 8,469 |
| S-44039 | Shirt, Man's, Long Sleeve, Polyester/Cotton<br>Set sleeve to armhole; join side and underarm seams | 0.071 | 2,848,840 | 292,263 |



000217

| | | | | |
|---|---|---|---|---|
| S-87169 | Shirt, Woman's, Utility<br>Set sleeves; join side seams and sleeve seams | 0.063 | 142,326 | 8,967 |
| L-44089 | Liner, Night, Camouflage Parka, Desert<br>Join liner (Lap seam) | 0.101 | 260,023 | 26,262 |
| T-44047 | Trousers, Combat, Woodland Camouflage<br>Make hip pockets; make and stitch side hanging pockets | 0.136 | 11,914,174 | 1,620,328 |
| J-87024 | Jacket, Insect Repellent<br>Amended spec 5/4/84 to permit alternate of using safety stitch to attach interlining and sleeve | 0.028 | 104,431 | 2,924 |
| S-44041 | Man's Short Sleeve Shirt<br>Set sleeves; join side and underarm seams | 0.054 | 3,032,442 | 163,752 |
| C-87093 | Coverall, Man's, Fire Retardant<br>Join back arm seam; set sleeve; stitch crotch seam | 0.110 | 163,260 | 17,959 |
| P-6279J | Parka, Extreme Cold Weather, Type N-3B<br>Join sleeve linings | .0.085 | 227,863 | 19,368 |
| S-29368A | Shirt, Woman's Long/Short Sleeve, Polyester/Cotton<br>Changed operation from: Make bust and front darts;<br>to: Assemble front and side panels (Alternate operation) | 0.027 | 108,408 | 2,927 |
| S-87005A | Skirt, Woman's, Dress<br>Added alternate zipper attachment with safety stitch | 0.014 | 1,435 | 20 |

| | | TOTAL NO. UNITS |
|---|---|---|
| O-44109 | Overall, Combat Vehicle Crewman's<br>Series of seams using safety stitch and lap seam; Make leg cuff-slide fastening openings; make front pockets openings, attach pockets; make thigh and shin pleats and close pockets | 10,383 |
| S-83234B | Skirt, Woman's Blue<br>Make pockets | 154,284 |
| S-0037951 | Smock, Medical Assistant's, Man's<br>Join Shoulder seams; make and set sleeves; join side and underarm seams | 55,512 |
| S-3649E | Shirt, Man's Tropical, Polyester/Wool<br>Set sleeves; close sides and sleeves | 1,440,407 |
| S-44110 | Slacks, Woman's Maternity Work Uniform<br>Join stretch panel | 153,640 |

25. Each of the above-listed specifications reflected a specification modification from two operations prior to the submittal of VECP 8680 to one operation or a new specification using a safety stitch machine with stitch type 515, 516, 517 or 519 and, in most instances, seam type SSa-2. A few operations required a lap seam or seam SSa-1 rather than the SSa-2. In some instances the safety stitch operation was an alternate method of construction rather than a mandatory method. If a bidder has both types of equipment or can afford the equipment necessary for using the safety stitch, the manufacturer will prepare an estimate using each method and select the least expensive in order to be competitive.

26. Appellant was unable to obtain sufficient information during discovery relating to delivery schedules and number of units procured for some of the specifications included in its claim (the last five items set forth in Finding 24). It, therefore, estimated the number of units procured during the royalty period from information for a later period provided by Government procurement centers (such as DLA) to a company named Information Handling Systems and compiled into a database called "Haystack". Using the information contained in Haystack for the years 1983 to 1991, appellant

calculated an average for each year and then used this average (multiplied by three) to estimate the number of units for each of the five items included in the "Total No. Units" column listed above with no dollar figure listed under "Total Contract Savings" (F/F 24). Appellant seeks the product of the amount we conclude appellant should receive per unit for those items multiplied by the number of estimated units. Appellant had included one other specification (making the 20 total - F/F 23) in its claim for future savings, MIL-C-87170. Since it was unable to obtain any information through either discovery or its own sources upon which it could base an estimate of units obtained during the royalty period, in its brief appellant stated it was not claiming any savings from that specification.

Quantification of the Contract Savings

27. A consultant to the apparel industries appeared for appellant. He calculated savings on direct labor and material for Contract 2972 by estimating the manufacturing time and material required for all operations prior to and after approval of VECP 8680. The difference represented the direct labor and material saved for each unit.

28. Using a sophisticated system of time/motion studies and a data base of production standards (expressed in Standard Allowed Minutes per piece) for similar types of garments, he calculated the Standard Allowed Minutes (SAM) savings to be 0.734, as follows:

| No. | Description | SAM |
|---|---|---|
| 15d | Overedge bottom of sleeve lining | 0.697 |
| 22c | Set Sleeve lining to sleeve | 1.271 |
| | Original Total Standard Minutes (SAM) | 1.968 |
| 15d | Combining operations per VECP 8680 | 1.234 |
| | Savings | 0.734 |

(Exh. 1073 at 19)

29. To calculate the Total Direct Labor Minutes Saved, appellant's expert added the Associated Direct Labor Factor and the Support Direct Labor Factor to the 0.734 SAM. He used 20 percent, based on experience with similar shops, to compute the Associated Direct Labor Factor. This included training of direct labor, repairs, relocation of direct labor personnel to balance the production line and machine downtime. He used 15 percent, based on experience with similar shops, to compute the Support Direct Labor Factor which included the direct supervisors, bundle girls, mechanics and quality assurance personnel. This was calculated as follows:

| | |
|---|---|
| Net Standard Minutes Saved | 0.734 |
| Associated Direct Labor Factor (20%) | 0.147 |
| Subtotal | 0.881 |



000220

| | |
|---|---|
| Support Direct Labor Factor (15%) | 0.132 |
| Total Direct Labor Minutes Saved | 1.013 |

(Exh. 1073, p. 20)

30. After calculating the labor savings because of VECP 8680, appellant's expert estimated the amount of fabric, lining and interlining which in his opinion should have been saved as a result of the VECP. Operation 22c had required a seam allowance of 1 inch. When this operation was eliminated by VECP 8680, a pattern change to eliminate excess material and reduce the seam allowance to 3/8 inch was possible. This would have resulted in a savings of 5/8 inches for the Government furnished fabric, the lining and the interlining.

31. VECP 8680 did not include a suggestion that the lining be shortened, thereby saving fabric. In its submittal of estimated savings submitted on 15 October 1980, appellant estimated a savings for direct labor but none for material (F/F 8). Nor was there a change in the patterns to shorten the lining. Revision of Government patterns is a complicated matter and is not the responsibility of nor performed by DPSC. The cognizant Government office did not elect to change the patterns and testimony at the hearing by an individual who was not involved with approval of VECP 8680 by Natick nor with the requirement of addition of the line tack (see F/F 12) was that this was so that there would be sufficient material so that if the sleeve had to be lengthened for the user there would be sufficient lining material. This same witness had drafted an all weather coat specification in 1977 which used an operation similar to that suggested by VECP 8680. However, it did not require the lining to be tacked to the sleeve shell. There was also testimony that the lining could have been left alone completely, "not putting any bar tack at all, leave it loose" (tr. 6-134). We conclude that the record fails to persuade us that the addition of the line tack was necessary because of VECP 8680.

32. Appellant's expert used what is termed the "square inch method" to calculate the total material which he concluded could have been saved as a result of VECP 8680, as follows:

| Part | Sq.Inch/ Sleeve | Saved Per Garment |
|---|---|---|
| GFM (Back and front sleeve material) | 10.313 | 20.626 |
| Lining (Back and front sleeve) | 10.131 | 20.626 |
| Nonwoven Interlining | 9.844 | 19.688 |

(Exh. 1073, p. 21)

33. Appellant's expert accounting witness quantified the claim using the savings in labor and material set forth above. He concluded that it would be appropriate to factor in an escalation rate for labor and material costs for the three-year period during which appellant was entitled to share in instant and future contract savings because it was a time when both were rising. Using Labor Force Employment and Earnings statistics for Apparel and Other Textile Products published by the U. S. Department of Commerce, Bureau of Economic Analysis, in the Survey of Current Business, he calculated a labor escalation of $0.333. He used the mid-point of appellant's performance under this contract, December 1980 as the starting point and the midpoint of the three year period, October 1982, as the date for the average labor rate for the three-year period. Adding the escalation rate to appellant's average labor rate of $4.00 during performance of this contract, he made the following computation:

| | |
|---|---|
| Contractor Labor Rate/Hour for Contract 2972 [Based on a DCAA Audit report which took no exception to average incurred contract direct labor rate of $4.00 per hour submitted by appellant] | $4.000 |
| Rate Escalation | 0.333 |
| Escalated Contractor Labor Rate/Hour | $4.333 |
| Labor Rate/Minute ($0.072/60) | $0.072 |
| Total Direct Labor Minutes Saved [F/F 29] | 1.013 |
| Total Direct Labor Savings per Garment | $0.073 |
| Indirect Expense Savings per Garment @ 47.94% [Based on DCAA recommended forward pricing rate] | $0.035 |

34. Appellant's accounting expert also calculated the dollars applicable to material savings. Using the Producer Price Index for Textile Products and Apparel published by the U. S. Department of Commerce, Bureau of Economic Analysis, in the Survey of Current Business, he estimated an escalation for fabric furnished by both the contractor and Government based on a midpoint of performance of the royalty period of October 1982. Applying these escalated fabric costs to the estimated square inch savings/sleeve (F/F 31), he estimated savings for contractor supplied fabric (lining and interlining) of $0.026 per garment and Government furnished material savings of $0.038 per garment (exh. 1029 at 3-6, 8-9).

35. Appellant used 47.94 percent as its indirect expense rate. This was the recommended Defense Contract Audit Agency (DCAA) rate for appellant's calendar year 1980. While the overhead experienced by appellant during 1981 was higher than this due to problems encountered by appellant and its cessation of operations during 1981, in developing the unit savings,

because of lack of historical data, appellant made no increase in this rate. The Government used 80 percent for overhead and 20 percent for G&A, a total of 100 percent (F/F 13). The 1980 indirect expense rate was lower than that experienced by appellant in 1981. No audit was performed by the Government for 1981. We conclude that the rate used by the contracting officer in her unilateral determination of the instant contract savings is the appropriate rate to use in determining instant contract savings.

36. Appellant included a profit factor of 11.9 percent in estimating its price for this contract. In estimating the amount of savings for VECP 8680, appellant calculated profit on its costs, excluding GFM, at this 11.9 percent. ASPR 1-1703.1 (d), in effect at the time of award of the subject contract, provided:

> On instant and future contracts the contractor's profit or fee shall be excluded when calculating the net savings.

37. Summarizing the various savings, appellant's accounting expert calculated that the savings were as follows:

| | |
|---|---|
| Contractor Furnished Materials Savings | $0.026 |
| Direct Labor Savings | 0.073 |
| Indirect Expense Savings | 0.035 |
| Other Direct Cost Savings | 0.000 |
| Subtotal | $0.134 |
| Profit | 0.016 |
| Government Furnished Material Savings | 0.038 |
| Total Savings/Garment | $0.188 |
| Contractor Assigned Savings (50%) | $0.094 |

38. The contractor assigned savings of $0.094 was multiplied by 837,329 units estimated as delivered during the royalty period to claim a total savings for items obtained using MIL-C-44030 of $78,709. Appellant used the services of a consultant to determine the quantity of units delivered under the instant contract and other contracts using MIL-C-44030 for which it concludes that the VECP was made applicable. The consultant reviewed contract procurement history records from Government records obtained during discovery and information from a commercially available database known as "Haystack" (see F/F 26). Neither of these sources had complete information but by combining them and making certain assumptions based on available information as to delivery schedules, he reached the following conclusions about deliveries of the Man's All Weather Coat w/Removable Liner produced using MIL-C-44030 or DES 12.77A (exh. 1041, p. 1):

| Cont.No. DLA100- | Manufacturer Name | Award Date | Quantity | Qty in Royalty Per |
|---|---|---|---|---|
| 80-C-2485 | Centre Mfg Co. | Jan-80 | 125,840 | 0 |
| 80-C-2972 | M Bianchi of Calif. | Jun-80 | 125,240 | 22,000 |
| 81-C-2227 | Major Coat Co. | Oct-80 | 58,976 | 28,976 |
| 81-C-2773 | Centre Mfg Co. | Feb-81 | 91,176 | 91,176 |
| 81-C-2773* | Centre Mgf Co. | Feb-81 | 91,184 | 91,184 |
| 81-C-3451 | Centre Mfg Co. | Sep-81 | 156,776 | 156,776 |
| 81-C-3451* | Centre Mfg Co. | Sep-81 | 78,384 | 78,384 |
| 82-C-0562 | Centre Mfg Co. | May 82 | 218,591 | 218,591 |
| 83-C-0649 | Centre Mfg Co. | May-83 | 123,858 | 123,858 |
| 84-C-0285 | Centre Mfg Co. | Dec-83 | 174,028 | 26,384 |
| TOTALS | | | 1,244,053 | 837,329 |

*/ Option quantities

The record contains no information concerning utilization of VECP 8680 in contracts other than DLA100-80-C-2485 for which modifications were suggested by the Chief of the Technical and Quality Assurance Division of the Directorate of Clothing and Textiles because of VECP 8680 (F/F 11).

39. In developing this appeal, appellant was at a disadvantage since, other than information available through sources such as Haystack, all of the information it needed was in the possession of the Government.[3/] The Government now argues that the above information concerning concurrent contracts fails to reflect items which were rejected or variations (decreases) delivered in quantities permitted under the contracts. We conclude that under the circumstances the information in the record, summarized above, presents a fair basis for determining the quantity of similar coats delivered during the royalty period.

40. Under the J09, Value Engineering Incentive clause paragraph (e)(2) (F/F 3), savings attributable to concurrent contracts are determined using the reduction in price of each concurrent contract. VECP 8680 was a mandatory change which was incorporated into the concurrent and future contracts using MIL-C-44030(GL). At the same time that VECP 8680 was added to the contracts, the line tack was also added. The prices negotiated with Centre and Major on their contracts combined those two changes. That resulted in an increase, rather than a decrease, in contract price so that the Government's position is that there were no concurrent or future savings for the contracts, other than appellant's, listed above in F/F 38. We have concluded in F/F 31 that this record has failed to establish that the addition of the line tack was required by VECP 8680. We, therefore, conclude that the per unit saving we determine is applicable to the instant contract is a reasonable per unit savings for the contracts under which the same garment was manufactured during the savings period.

41. Paragraph (e)(3)(iii) of the Value Engineering Incentive clause (F/F 3) permits the Government to reduce the future contract savings for

certain stated reasons. Based on concerns that the Government might argue that it was not entitled to the amount determined for instant contract savings on future items, appellant "reengineered" the items included in its claim for future contract savings. The same detailed and extensive method was used for determining the instant contract unit savings and the reengineered unit savings for each contract for which appellant seeks inclusion in savings resulting from VECP 8680. The reengineered per unit savings for which appellant concluded it had sufficient information to make the computation are set forth in F/F 24. Appellant seeks recovery for the last five specifications at the amount we conclude it is entitled to receive for instant contract savings because of its inability to "reengineer" savings for those specifications. Whether instant contract savings or recalculated savings for a future contract are used in determining quantum is a matter left to us for decision in this appeal.

42. The Government does not challenge the methodology used by appellant in its calculations. Its objections essentially challenge whether appellant is entitled to recover for savings resulting from the inclusion of the safety stitch in other specifications as future savings under this contract (which issue will be discussed, infra) and quantification of some of the items.

43. The Value Engineering Incentive clause in appellant's contract did not provide for collateral savings. The standard Armed Services Procurement Regulation (ASPR) clause contained a provision for collateral savings, such as savings relating to handling of materials, storage of particular goods, shipment of particular goods, etc., with a maximum of $100,000 or the price of the contract on which the VECP is submitted, whichever is greater. Since appellant was unable to obtain any information during discovery which it could use in determining collateral savings to the Government from VECP 8680, it seeks its contract price of $3,997,366.40 (F/F 2) as collateral savings from approval of this VECP.

44. ASPR 1-1703.2 (1 July 1976), in effect at the time of award of the subject contract, entitled "Collateral Savings" provides that the Collateral Savings clause "may be excluded from a contract or class of contracts when the HPA [Head of the Procuring Activity] determines that the cost of computing and tracking collateral savings will exceed benefits to be derived." In accordance with the foregoing, the DPSC Contracting Manual instructs the Clothing and Textile Directorate to exclude the collateral savings provision from the Value Engineering Incentive clause because the head of the activity had determined that the cost of tracking collateral savings would exceed the benefits to be derived from acceptance of a VECP, and the collateral savings provision was therefore omitted from the contract (tr. 5/39, 80). The standard Value Engineering Incentive clause, supra, contains, at subparagraph (e)(4) the provision concerning Collateral Savings and includes the provision that

> . . . The determination of the amount of collateral savings, if any, will be made solely by the Government and not be subject to the "Disputes" clause of this contract.

DECISION

Jurisdictional Issue

In its posthearing brief, the Government argues that the Board lacks jurisdiction to consider appellant's claim for those specifications which appellant alleges were revised because of VECP 8680 other than the specification for the all weather coat since that portion of the claim based on those specifications (F/F 24) was never submitted to the contracting officer for final decision. While a motion to dismiss for lack of jurisdiction based on a similar argument was denied in our opinion in ASBCA Nos. 37029 and 37071, supra, we reiterate our conclusion that appellant's claim contained all the information available to it at the time of filing and that the enlargement of its claim is the result of information obtained during discovery from information unavailable until supplied by the Government. The increase in dollars did not result from new claims, new legal theories, or new factual bases for recovery. While the Government's argument and request that these additional specifications be remanded to the contracting officer was not captioned as a motion to dismiss, we consider it such and deny the motion.

Essentially the Same Item

The major dispute, which has permeated this appeal throughout, is the question of what constitutes "essentially the same item." It is of utmost importance in this appeal since it determines the number of units to which a relatively small per unit savings (09.4¢ according to appellant, 03.2¢ according to the Government) will apply and establish appellant's share of contract savings because of acceptance of VECP 8680. It has clouded all efforts to resolve this dispute by settlement, and was the subject of our earlier opinion on the Motion for Partial Summary Judgment where we concluded that this question was a factual one which must be determined taking into consideration the VECP involved and the items involved in the particular claim. Appellant has created many volumes of detailed analyses to quantify those specifications which it considers were changed because of acceptance of VECP 8680. Before we reach consideration of these materials, however, we must first determine whether each specification included in appellant's claim meets the definition of "essentially the same item" as used in the Value Engineering Incentive clause, J09 (F/F/3) under which a share of savings on both concurrent and future contracts for essentially the same items is awarded.

Appellant's Position

Appellant uses a very broad interpretaion of both what approval of VECP 8680 actually includes and what constitutes "essentially the same item" as used in J09. Its position, in defining the term, is that the safety stitch operation recommended by VECP 8680 is not restricted to any garment or material; it is only confined to the edge of two pieces of fabric going together. Therefore, even though VECP 8680 was submitted on the raincoat specification to cover specific operations involving the raincoat lining, i.e., overedging the lining and then joining it to the sleeve, appellant



000226

maintains that the focus of VECP 8680 was to combine the two separate operations of overedging and joining into a single operation using the safety stitch and that any garment utilizing such operation would qualify as essentially the same items. Appellant also argues that VECP 8680 included the combination of operations that are the functional equivalent of the overedging and joining operations described in VECP 8680 on essentially the same items. Functionally equivalent operations would be the (1) protection of raw edges using a lapped type seam and (2) sewing of multiple single needle rows using a lock stitch (F/F 24). In appellant's view, the safety stitch is not restricted to any seam and can be used on all garments and is essentially the same operation with respect to all garments without regard to the type of garment involved or, as long as compatible materials are used, to the type of material involved and does not require the use of any specific machine.

Appellant maintains that the objective of VECP 8680 was to improve productivity and save material where two or more plies of fabric are joined together and where one or more of the plies is "neatened" or protected from unravelling. The intent is achieved by (1) combining the two specific operations of overedging and joining, or (2) combining the two sewing operations (with multiple steps) that are the functional equivalent of the overedging and joining operations specified for the raincoat. While appellant recognizes that the VECP 8680 was framed in terms of the operations included in the specification applicable to its contract, it maintains that this was because it had to submit the VECP in terms of its application to the garment involved in its contract because of the format required. It asserts that the VECP was broader than that and "[i]f the articles can use the concept or its functional equivalent and have benefitted from appellant's proposal or its functional equivalent, the articles should be considered essentially the same and a royalty sharing based upon the cost savings the Government has enjoyed is appropriate" (app. br. at 125).

The Government's Position

The Government interprets the language in the Value Engineering Incentive clause in a much narrower fashion. Its position is that the language in paragraphs (e)(2)(i) (sharing in savings on concurrent contracts) and (e)(3)(ii) (F/F 3) (sharing in savings on future contracts) which speaks of purchases of "essentially the same item" means an item which serves the same function and has the same fabrication. Therefore, in the case before us, savings are applicable only to purchases of all-weather coats which required the use of the safety stitch in attaching the sleeve lining to the sleeve of the coat. In addition, where the requirement is an alternate method of construction, savings are payable only in those instances where the alternate using the safety stitch was actually used.

Conclusion

We cannot accept the position of either party. In our view, appellant's position is too broad and the Government's position is too narrow. We agree with appellant that application of the Value Engineering Incentive clause

must be liberally interpreted, since its purpose is to encourage contractors to make suggestions which will save the Government money by allowing them to share in such savings. However, the clause itself indicates that there are limits in both the period for such savings and the item procured. Therefore, we must examine the facts for each particular situation. We cannot make a broad statement that is generically applicable.

While we recognize that the decision in M. Bianchi of California, ASBCA Nos. 37029 and 37071, supra, rejected appellant's position that any item packed in a shipping container (box) was "essentially the same item" as used in the J09 clause similar to the one in the instant appeal, and concluded that most of the items were not even remotely similar to the woman's pantsuit purchased under the contract involved in that appeal, the question is factual and must be considered based on the garment and the VECP.

We are not persuaded by appellant's argument that the term should be defined to include any application of the safety stitch to any item of clothing. The safety stitch was not a new or novel operation. It was even used in other operations in the specification which was involved in this contract (F/F 20). As a matter of fact, many of the applications for which appellant claims entitlement are more similar to the operations which were already in the specification prior to submittal of VECP 8680 and we cannot accept appellant's argument that its submittal "reminded" the Government it should consider using the stitch in other specifications and applications. The fact that the safety stitch is incorporated into manufacture of the garment indicates that the Government has already concluded that it would meet the functional and other requirements of the garment. Otherwise, it would not have designated the use of the stitch. Appellant could have expressed its submittal in broader terms and specified its application to the instant contract. It did not do so. We, therefore, conclude that recovery for savings under this VECP would only apply to items which reflected the change appellant had suggested.

Nor are we persuaded by the Government's reliance on dicta in our opinion in Tennier Industries, Inc., ASBCA No. 29464, 86-3 BCA ¶ 19,046. That case concluded that the contractor was not entitled to any savings because the Government was already testing the subject of its proposal. The Board was not faced with the question before us and did not consider the term "essentially the same item" when it concluded that two sleeping bags were not "one and the same." In our view, "one and the same" is a different conclusion from "essentially the same." At best, the conclusions which the Government draws from that opinion are based on dicta.

We also limit our consideration to 6 April 1981 through 5 April 1984, the period during which appellant would share in savings. This would eliminate any consideration of MIL-J-87024. Appellant's claim included 104,431 jackets delivered during the royalty period. However, this was prior to issuance of the amendment to the specification on 4 May 1984 which appellant alleges resulted in incorporation of VECP 8680 (F/F 24). Examining each of the remaining eighteen operations for which appellant seeks a share of savings (F/F 24), we conclude that none can be attributed to VECP 8680. We eliminate the operations requiring the use of a lap seam

~~(F/F 24)~~ since that is a different type of seam than the seam recommended by appellant. We also eliminate those specifications which require the use of the stitch and seam in VECP 8680 which join other seams, such as side seams, or the setting of the sleeve into the garment or other operations unrelated to that suggested by appellant in its VECP.

We, therefore, conclude that appellant is not entitled to recover instant or future contract savings for any of the nineteen items included in its claim as set forth in F/F 24.

Quantum

Having reached the conclusions set forth above, we must consider the per unit savings resulting from incorporation of the safety stitch operation approved as VECP 8680 and the number of units to which those savings should be applied. We have already concluded that the instant contract savings should not be reduced by the cost of adding the line or bar tack as implementation costs for the VECP (F/F 31). The record failed to establish that VECP 8680 required such inclusion.

Direct Labor Savings

Appellant introduced extensive evidence of costs before and after the changes resulting from VECP 8680. It seeks both savings in labor and in material. We have set forth the after-the-fact computations in F/F 27-37. Included in appellant's computation was a calculation of escalation of costs over the three-year savings period. The Government argues that there is no provision in the Value Engineering Incentive clause for escalation of costs. That clause, F/F 3, is silent about this question. It neither permits or prohibits increases due to escalation of costs over the payment period. It permits the savings and recognizes that this may include some estimates. See, for example, paragraph (e)(1)(i)(A).

While it may be proper to use escalation when estimating the amount of instant contract savings prospectively pursuant to paragraph (e)(1)(i)(A) of the Value Engineering Incentive clause, the instant contract savings here are calculated on appellant's actual, experienced labor rate of $4.00 per hour. This already reflects any labor rate escalation which may have occurred during contract performance. Since the clause provides that future contract savings are calculated using "instant contract savings," there is no provision for escalation during the royalty period beyond what may have been reflected in instant contract savings.

Contractor and Government Furnished Material Savings

Appellant also seeks savings for material because of the approved VECP. While it recognizes that there were no actual material savings (F/F 31), it argues that there should have been new patterns issued and savings in material would have resulted. We have already concluded that a line tack because of the excess fabric length was not established as a result of implementing VECP 8680 (F/F 3). By the same token, we conclude that

appellant's recovery is limited by the proposal which it made when submitting the VECP. It could have included a recommendation that the patterns be adjusted and that this would save fabric. It did not do so. Therefore, we do not consider it part of VECP 8680. The proposal as submitted by appellant was sketchy at best and did not contain all the documentation required by the clause (F/F 3 at (b)). The Government requested additional information which, when provided, also lacked the type of detail appellant supplied as proof for this hearing. If appellant considered that there would be a saving of fabric, it could have said so. Its submittal and additional response both addressed direct labor savings. There was no reference to direct material savings. The only reference to material was to 2¢ savings "as a percentage to apply to direct labor and material cost." It is not clear just what appellant meant by that, but it is clear that in estimating a 10¢ savings, in addition to the above 2¢, appellant estimated 6¢ for direct labor and 2¢ for overhead (F/F 8). We conclude that there is no basis for including an amount for unrealized fabric savings on the basis that there could have been such savings had patterns been changed.

Indirect Expenses

The DCAA recommended rate for 1980 of 47.94 percent was used by appellant in calculating instant contract savings because of lack of historical data for 1981 (F/F 35). We conclude that overhead for 1981 was greater than that for 1980. The Government had used 100 percent and this amount was accepted by the contracting officer in making the determination of unit savings as a result of VECP 8680. We conclude that the 47.94 percent did not reflect the 1981 overhead and accept the amount used by the contracting officer in determining unit savings. Cf. S. W. Electronics & Manufacturing Corp. v United States, 655 F.2d 1078 (Ct. Cl. 1981).

Profit; Concurrent Contract Savings; Future Contract Savings

Appellant seeks profit of 11.9 percent. It recognizes that it is not entitled to profit on instant contract savings but argues that it is entitled to them on concurrent and future contract savings. We do not agree. Concurrent contract savings should be based on the actual negotiated savings under those contracts. Since, in the instant case, the Government negotiated those contracts with two changes, for one of which (the line tack) we have concluded this VECP should not be charged, we conclude that instant contract savings would be a reasonable jury verdict amount to apply to concurrent contract savings. Future contract savings are also based on instant contract savings unless the Government determines that there should be an adjustment. It made none and we see no basis for doing so as to the items for which we conclude appellant should recover.

Appellant also states that the 11.9 percent is included in instant contract savings not as profit on savings but as part of its estimate of acquisition savings. We consider this a euphemism for profit and unallowable pursuant to ASPR 1-1706.1 (F/F 36). We are also not persuaded by appellant's argument that the prohibition on profit pertains only to appellant's contracts and not to contracts of third parties. Since, by the

clause; concurrent contract savings are the negotiated savings to the concurrent contractor and future contract savings are, with certain exceptions, based upon the instant contract savings, we conclude that the prohibition of profit pertains to all savings permitted under the clause.

Instant Contract Savings

Considering all of the above, after eliminating those items in appellant's calculation which we have determined should not be included, we conclude that, based upon this record, the instant contract savings resulting for VECP 8630 was $0.14 (14¢) per unit. Contractor assigned savings, 50 percent of this amount, would be $0.07 (7¢) per unit. Multiplying $0.07 by the 837,329 units we have concluded was a reasonable number (F/F 38), we conclude appellant is entitled to the following as contract savings for instant, concurrent and future contracts:

$0.07 x 837,329 = $58,613.03

Collateral Savings

The Value Engineering Incentive clause included in this contract, J09 (F/F 3), did not contain the provision for collateral savings resulting from acceptance of a value engineering change proposal. ASPR 1-1703.2 (1 July 1976) permits such exclusion when the head of the procuring activity determines that the cost of computing and tracking collateral savings would exceed the benefits derived from the change (F/F 44). Appellant argues that the record fails to contain the requisite documentation for this determination so collateral savings should be awarded. By the same token, appellant failed to submit the requisite prediction of any collateral savings as required by J09 paragraph (b)(iv), the Value Engineering Incentive clause in the contract (F/F 3). We conclude that the unrebutted testimony that the DPSC Manual instructing that the collateral savings clause not be included because of a determination by the agency head is sufficient for purposes of this record.

Appellant is not entitled to recover collateral savings which it seeks ($3,997,660.80).

Interest

Appellant seeks interest from six months after approval of VECP 8680 since J09(f) requires payment of concurrent and future savings within six months of modification of concurrent or future contracts. That paragraph makes no provision for interest. It is well established that payment by the Government of interest is only permitted by contract, statute or regulation. Here there is no such provision. Interest is payable pursuant to the Contract Disputes Act from the date of receipt of the claim until paid. While the parties agree that that date was 16 November 1987, the facts indicate the claim was not received until 17 November 1987. Appellant is entitled to interest on any amount due from 17 November 1987 at the applicable rates.

Summary

The parties submitted well written and extensive briefs. We have considered all of the arguments which they included but, in order to not prolong an already lengthy opinion, we have not addressed them all directly. Those we have not discussed will not change the results we have reached. Because of the conclusions we have reached, we need not consider appellant's Motion to Strike Government Exhibits 28-38.

We have concluded that appellant's definition of its VECP was far broader and more extensive than the VECP 8680 which it submitted and which was approved. We have further concluded that under the record of this appeal recovery is limited to the all-weather coats which incorporated VECP 8680.

Since this appeal concerns determination of quantum, we have discussed the various elements which appellant included in calculating its claim and have concluded that the per unit savings were $0.14 per unit of which appellant is entitled to receive $0.07. Applying this to the number of units, we have concluded that appellant's share of savings is $58,613.03. Interest on amounts due appellant should be computed from 17 November 1987.

The appeal is sustained in the amount of $58,613.03 plus interest on amounts due appellant from 17 November 1987 and denied as to the rest.

Dated: 10 February 1993

RUTH C. BURG
Administrative Judge
Member of the Armed Services
Board of Contract Appeals

I concur

W. JOHN RIISMANDEL
Administrative Judge
Acting Chairman, Armed Services
Board of Contract Appeals

I concur

WILLIAM J. RUBERRY
Administrative Judge
Vice Chairman, Armed Services
Board of Contract Appeals

NOTES

1. Initially appellant included 21 specifications in its claim. Upon obtaining additional information from the Government, which was the sole party with appropriate information, appellant refined its claim to the 20 specifications included in its brief. Appellant supplied the Government with a list of the specifications on 15 February 1991. On the first day of the hearing, the Government offered Exhibits 28-38, Limited Purchase Descriptions issued prior to VECP incorporating certain changes which were included in subsequent specifications upon which appellant relied for eleven of the specifications included in its claim. They were received in evidence over appellant's objection. On 6 September 1991, appellant filed a written Motion to Strike these exhibits as hearsay based on the Government's failure to authenticate or identify these documents pursuant to the Federal Rules of Evidence, or, in the alternative, a Motion for the Imposition of Discovery Sanctions to preclude for failure to acknowledge the existence of this information or produce it during discovery despite repeated discovery requests for such information.

2. We recognize that the Government, in its response to appellant's proposed Finding 332, indicated that it did not dispute interest from 16 February 1987. However, we conclude that this was a typographical error, since that date is unrelated to any dates involved in this appeal and other parts of the Government's reply brief (including in its conclusion at page 88).

3. During preparation of its appeal appellant had great difficulty in obtaining information concerning other Government contracts and information which was solely in the Government's possession. There were numerous motions to compel directed to a former Government counsel assigned to this appeal and, ultimately, severe sanctions were imposed because of failure to comply with Board orders concerning discovery. Present counsel were very cooperative and should in no way be tarred by action of prior counsel.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 36518, Appeal of M. Bianchi of California, rendered in conformance with the Board's Charter.

Dated: 1 1 FEB 1993

EDWARD S. ADAMKEWICZ
Recorder, Armed Services
Board of Contract Appeals



000233

CERTIFICATE OF FINALITY

ASBCA No. 36518 Appeal of M. Bianchi of California

TO BE COMPLETED BY CONTRACTOR. RETURN ORIGINAL to the Armed Services Board of Contract Appeals. (If completed by an attorney or firm representing contractor, original power of attorney must accompany this form.)

A. Address to which check should be sent:

B. Contractor Certification:

Contractor hereby certifies that:

(1) Contractor has not initiated and will not initiate any proceedings for review, reconsideration, or appeal of this award; and

(2) Contractor agrees to accept the amount awarded, plus any interest due in accordance with section 12 of the Contract Disputes Act of 1978, in full and final satisfaction of the award. Payment shall be a full discharge of the United States of all claims and demands arising out of the matters involved in the claim or controversy.

(Typed Name and Signature)

(Date) (Title)

Please return within 10 days to avoid unnecessary delay in payment.

CERTIFICATE OF FINALITY

ASBCA No. 36518 Appeal of M. Bianchi of California

TO BE COMPLETED BY CONTRACTOR. RETURN ORIGINAL to the Armed Services Board of Contract Appeals. (If completed by an attorney or firm representing contractor, original power of attorney must accompany this form.)

A. Address to which check should be sent:

B. Contractor Certification:

Contractor hereby certifies that:

(1) Contractor has not initiated and will not initiate any proceedings for review, reconsideration, or appeal of this award; and

(2) Contractor agrees to accept the amount awarded, plus any interest due in accordance with section 12 of the Contract Disputes Act of 1978, in full and final satisfaction of the award. Payment shall be a full discharge of the United States of all claims and demands arising out of the matters involved in the claim or controversy.

(Typed Name and Signature)

(Date) (Title)

Please return within 10 days to avoid unnecessary delay in payment.

ARMED SERVICES BOARD OF CONTRACT APPEALS
SKYLINE 6
5109 LEESBURG PIKE
FALLS CHURCH VA 22041-3208
Telephone: (703) 681-8502

REPLY TO
ATTENTION OF

29 December 2000

CERTIFIED MAIL
RECEIPT REQUESTED

Michael W. Clancy, Esq.
Holland & Knight LLP
2100 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20037-3202

Kathleen D. Hallam, Esq.
Chief Trial Attorney
Defense Supply Center - Philadelphia
DSCP-GA
PO Box 60530
Philadelphia, PA 19145-0530

Re: ASBCA No. 37029
Appeal of M. Bianchi of California
Under Contract No. DLA100-80-C-2290

Dear Counsel:

Enclosed is one authenticated copy of the Board's decision.

The Board has received the following instructions from the Department of the Treasury for processing payment of awards from the Judgment Fund. If the parties do not contemplate an appeal or motion for reconsideration but plan to use the Judgment Fund for payment of the monetary award, the U.S. Treasury requires that the government agency concerned submit completed copies of the following forms:



Printed on Recycled Paper

- FMS Form 195: Judgment Fund Payment Request;
- FMS Form 196: Judgment Fund Award data Sheet;
- FMS 197A: Voucher for Payment;
- FMS 198: Judgment Fund Award Data Sheet Additional Deductions (if applicable);
- Certificates of Finality from the government agency and the contractor/appellant; and
- A copy of the Board's decision.

Copies of the appropriate documents are enclosed for use by the parties. The Government, using FMS Form 195 as a transmittal letter, should send the completed forms to:

Judgment Fund Section
Financial Management Service
Department of the Treasury
Room 6F03
3700 East-West Highway
Hyattsville, MD 20782

Telephone: (202) 874-6664

Very truly yours,

EDWARD S. ADAMKEWICZ
Recorder

Enclosures.



000237

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| M. Bianchi of California | ) | ASBCA No. 37029 |
| | ) | |
| Under Contract No. DLA100-80-C-2290 | ) | |

APPEARANCE FOR THE APPELLANT: Michael W. Clancy, Esq.
Holland & Knight LLP
Washington, DC

APPEARANCE FOR THE GOVERNMENT: Kathleen D. Hallam, Esq.
Chief Trial Attorney
Defense Supply Center
Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE SHACKLEFORD
ON REMAND FROM THE COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

This appeal is on remand from the Court of Appeals for the Federal Circuit (CAFC). Appellant filed a brief on quantum, the Government filed a response to appellant's brief and, finally, appellant filed a reply brief on quantum. The appeal has been the subject of numerous opinions both at the Board and at the CAFC,[1] and while familiarity with those decisions is presumed it is appropriate to set forth a brief review of the facts and the decided cases so as to put the remand in perspective.

Bianchi was awarded a contract in 1979 to supply Air Force women's pantsuit coats in accordance with Purchase Description ENEU 78-7, which was later superseded by MIL-C-87160. The contract included a Value Engineering Incentive (VEI) clause, pursuant to which Bianchi submitted two Value Engineering Change Proposals (VECP), one recommending the contract requirement for five coats per box be changed to 10 or 20 coats with a corresponding increase in the depth of the boxes (VECP 1180), while the other proposed eliminating wasted space in the packing boxes by changing the number of coats per box from the contract requirement of five per box to 10 coats per box with no change in box dimensions (VECP 8780). The VECPs were not accepted by the contracting officer.

In 1980, another contractor, Vi-Mil, was awarded a contract for the same item of clothing as Bianchi, and pursuant to the VEI clause in its contract, Vi-Mil submitted a

VECP proposing a change in the number of coats to be packed in each box. The Government accepted Vi-Mil's VECP in modified form.

Subsequently, in 1988, Bianchi filed claims for royalties under its previously rejected VECPs, and, after a contracting officer failed to issue decisions, appeals were made to this Board and docketed as ASBCA Nos. 37029 (VECP 1180) and 37071 (VECP 8780). While the Government conceded at trial that the Bianchi VECPs were constructively accepted when the Vi-Mil VECP was accepted, the Board, nevertheless, denied the appeals on the basis that the Bianchi contract was complete and the relationship had ended when the Vi-Mil VECP was accepted and thus there was no basis for constructive acceptance. *Bianchi II.* On appeal to the CAFC, the Board's decision was vacated as to entitlement and remanded to the Board to allow Bianchi to obtain discovery and present evidence on (1) the allegation that its VECPs were rejected in bad faith and (2) the allegation that Bianchi's VECPs were constructively accepted prior to termination of its own contractual relationship with the Government. *Bianchi III.*

Pursuant to the remand we held that the contractual relationship between Bianchi and the Government still existed at the time of the acceptance of the Vi-Mil VECP and thus we granted the appeals as to entitlement and proceeded to decide quantum. We held as to Bianchi's VECP 8780, in ASBCA No. 37071, for reasons not herein relevant, that Bianchi was not entitled to any royalties. As to Bianchi's VECP 1180, we held in ASBCA No. 37029, that the royalty period was contemporaneous with the royalty period of Vi-Mil (22 June 1984 to 21 June 1987), that the number of garments on which the royalty should be computed was also the same quantity as under the Vi-Mil contract (38,815), and that the royalty, or share of savings allowed was $.3185 per garment. The total award was $12,362.58 plus Contract Disputes Act interest. *Bianchi IV.*

On motion for reconsideration in ASBCA No. 37029, Bianchi questioned both our selection of the royalty period and our determination of the number of garments subject to the royalty. We rejected Bianchi's argument that DAC 76-26 mandated a different, more lucrative royalty period. As to the number of garments subject to the royalty, we set forth several different contentions appellant had taken in these proceedings as to the number of garments on which to base compensation. We stated that of the number sought on reconsideration, 106,550, when reduced by the number delivered internally from the DPSC Directorate of Manufacturing, which were not subject to royalty payments, "only 54,773 items remain[ed] in appellant's . . . calculation." *Bianchi V.* We thus affirmed our figure of 38,815 garments. *Bianchi V.*[2]

Bianchi appealed to the CAFC. The Court affirmed our determination of the royalty period, rejected Bianchi's contention that DAC 76-26 mandated a different more lucrative royalty period, and affirmed our exclusion of royalties on garments obtained from intra-agency sources. Bianchi's final basis for appeal was that substantial evidence

did not support the Board's determination that Bianchi was entitled to receive royalties on only 38,815 garments. On that issue the Court questioned the Board's explanation as to why the evidence of the number of garments subject to the royalty propounded by Bianchi and its expert witnesses was less credible than the number obtained from the Vi-Mil royalty payment. The Court stated in part as follows:

> In the absence of any support for the 38,815 figure other than that it was derived from the Vi-Mil recovery, and in the absence of any explanation for the rejection of the figures proffered by Bianchi, we are unable to determine why the Board selected the number of garments on which the Vi-Mil recovery was based rather than the number of garments calculated by Bianchi's expert. It may be that there is some flaw in the numbers adduced by Bianchi, but the Board did not point to any such flaw, and the government in its brief and oral argument did not do so either. Without some indication of why the Board chose the government's figure rather than Bianchi's, we are unable to determine whether the Board's selection of 38,815 as the number of garments subject to the VECP is supported by substantial evidence. Accordingly, we vacate the Board's order as to quantum and remand the case to the Board for further proceedings on the quantum issue, including an explanation for the Board's determination as to the number of garments subject to the VECP.

To resolve the remand, we make additional findings of fact relative to the number of garments subject to royalty payments for Bianchi. The numbering of these additional findings continues from where we left off in *Bianchi IV*.

<u>Findings of Fact on Number of Garments Delivered During Royalty Period</u>

36. Modification No. P00011 to the Vi-Mil contract, which was part of the evidentiary record made at trial (ex. A-1036 at 3) and P00012 to the Vi-Mil contract (Gov't cross motion for summary judgment, attach. 1), which was not, both evidence the number of garments subject to royalties under that contract. Modification No. P00012 was dated 3 October 1986, over eight months prior to the expiration of the Vi-Mil royalty period.

37. The database upon which appellant relied for determination of the number of garments delivered during a given royalty period was prepared by appellant's expert witness, Mr. James W. Sutherland (Sutherland) (tr. 2/8). Sutherland, an expert in the computer analysis of data, amassed procurement data on several different garments

procured by DPSC, including the women's pantsuit coat at issue here. He used the same methodology for all of the garment types. (Tr. 2/38; exs. A-1000-02)

38. The underlying data used by Sutherland came from two sources. DPSC provided documents to Bianchi's owner who in turn gave those documents to Sutherland. Sutherland also received data from the HAYSTACK database, a procurement information source maintained by Information Handling Systems (IHS), a commercial establishment. HAYSTACK included procurement information from multiple government sources, including DPSC. (Tr. 2/8-10)

39. Sutherland created a Total Procurement Database for each garment by combining information from IHS' HAYSTACK with information provided by DPSC (tr. 2/31-32). He was careful to eliminate duplicate records (tr. 2/32) and when he did not have information on a scheduled or actual delivery he used normal procurement lead time (the period between contract award and date of first scheduled delivery) to predict the most likely deliveries for a particular contract (tr. 2/33-34).

40. Following is a matrix depicting the quantities delivered during the Vi-Mil royalty period per Vi-Mil's P00011 and P00012 and the corresponding data for the same royalty period using data from the documents in the front cover of appellant's exhibit 1001 for Mil-C-87160, but excluding purchases with a prefix of SCO100 which are intra-agency transfers (tr. 2/65) not subject to royalties.

Comparison of Data Bases for Quantities Delivered During Royalty Period
(22 June 1984 to 21 June 1987)

| Contract Number | Quantities Per Vi-Mil P00011and12 | Quantities Per Bianchi Data[3] |
|---|---|---|
| DLA100-84-M-CB20 | 608 | 0 |
| DLA100-84-M-CB45 | 706 | 705 |
| DLA100-84-C-0724 | 4,440 | 4,365 |
| DLA100-84-C-0751 | 1,606 | 1,575 |
| DLA100-85-M-CA32 | 660 | 660 |
| DLA100-85-C-0339 | 7,050 | 7,050 |
| DLA100-85-C-0376 | 4,425 | 4,425 |
| DLA100-85-C-0742 | 19,320 | 20,971 |
| DLA100-85-M-CA32 | 0 | 660 |
| DLA100-85-C-0339 | 0 | 150 |
| DLA100-85-C-0339 | 0 | 3,525 |
| DLA100-85-M-CA41 | 0 | 660 |
| DLA100-83-C-0563 | 0 | 6.686 |
| Totals | 38,815 | 51,432 |

000241

41. Except for the 608 garments purchased under Contract DLA100-84-M-CB20 (CB20) which was not included in Bianchi's data, the remaining contracts and quantities under the Vi-Mil modifications closely track corresponding data from Bianchi. The Bianchi data includes five additional groups of purchases not included under the Vi-Mil modifications, and while we do not know why that anomaly exists, we observe that Vi-Mil P00012 was executed over eight months prior to the end of the royalty period, much of the data was not subject to cross examination at trial and we have no evidence of how the Vi-Mil data was compiled.

42. We now find that the Bianchi underlying data generated by Sutherland on delivery of Air Force women's pantsuit coats is credible and may be used for determining the number delivered during the Vi-Mil royalty period. Thus, we add the quantity under contract CB20 not included in the Bianchi data to the quantity computed by Bianchi to yield a total of 52,040 (51,432 + 608) women's pantsuit coats delivered during the applicable royalty period and incorporating the constructively accepted Bianchi VECP 1180. At a royalty share of $.3185 per garment, the Bianchi royalty payment computes to $16,574.74.

DECISION

The CAFC remanded this appeal to us to explain the Board's determination of the number of garments subject to the VECP. We previously found the Vi-Mil quantities more reliable primarily because, unlike the Bianchi data, they were the subject of bilateral agreements and appeared to be undisputed by the parties to those agreements. Having reexamined that determination, we now decide that Bianchi's data is more reliable and determine that Bianchi is entitled to recover for a total of 52,040 garments (finding 42) at $.3185 per garment for a total of $16,574.74 together with CDA interest from 3 March 1988 until paid. *See Bianchi IV* at 141,863.

Appellant makes additional arguments, characterizing language in several of the Court and Board opinions as *dicta* with respect to what constitutes "essentially the same item" and thus urging us to include garments other than the women's pantsuit coat produced in accordance with Mil-C-87160 to calculate the royalty payments. These arguments are without merit, they go beyond the scope of the remand and they involve matters already decided and either not appealed or affirmed by the CAFC in the various decisions previously issued in this case.

The appeal is sustained as to quantum as set forth above, and, in all other respects, it is denied.

Dated: 28 December 2000

RICHARD SHACKLEFORD
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

EUNICE W. THOMAS
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

NOTES

1 *M. Bianchi of California*, ASBCA Nos. 36518, 37029, 37071, 37395, 37798, unpublished opinion dated 2 March 1990 (*Bianchi I*); *M. Bianchi of California*, ASBCA Nos. 37029, 37071, 93-1 BCA ¶ 25,309 (*Bianchi II*); *Bianchi v. Perry*, 31 F.3d 1163 (Fed. Cir. 1994) (*Bianchi III*); *M. Bianchi of California*, ASBCA Nos. 37029, 37071, 96-2 BCA ¶ 28,410 (*Bianchi IV*), *aff'd on recon.*, 97-1 BCA ¶ 28,767 (*Bianchi V*); *Bianchi v. Cohen*, No. 97-1394 (Fed. Cir. December 3, 1998) (*Bianchi VI*).

2 The number 54,773 was incorrect. It should have been 51,342.

3 We recognize that there is a discrepancy between this total and the corrected total in footnote 2. In *Bianchi V* we relied on an attachment to appellant's motion for reconsideration, which attachment was apparently created for the motion. For Contract No. DLA100-85-C-0339 on line 12 of that attachment, 60 garments are shown to have been delivered, 30 in October and 30 in November 1985. Here, we relied on appellant's trial exhibit 1001 which showed on the same line, for the same contract, 150 garments delivered, 30 per month from October 1985 to February 1986.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 37029, Appeal of M. Bianchi of California, rendered in conformance with the Board's Charter.

Dated: 29 DEC 2000

EDWARD S. ADAMKEWICZ
Recorder, Armed Services
Board of Contract Appeals

000244

# CERTIFICATE OF FINALITY

ASBCA No. 37029 Appeal of M. Bianchi of California

TO BE COMPLETED BY CONTRACTOR. SUBMIT ORIGINAL TO THE GOVERNMENT'S ATTORNEY. (If completed by an attorney or firm representing contractor, original power of attorney must accompany this form.)

A. Payee Taxpayer Identification Number, SSN, or EIN:

B. Address to which check or electronic fund transfer should be sent:

C. Contractor Certification:

Contractor hereby certifies that:

(1) Contractor has not initiated and will not initiate any proceedings for review, reconsideration, or appeal of this award; and

(2) Contractor agrees to accept the amount awarded, with Contract Disputes Act interest from 3 March 1988 until paid, in full and final satisfaction of the award. Payment shall be a full discharge of the United States of all claims and demands arising out of the matters involved in the claim or controversy.

______________________________
(Signature)

______________________________
(Typed Name)

______________ ______________________________
(Date) (Title)

Please submit within 10 days to avoid unnecessary delay in payment.

# In the United States Claims Court

No. 90-3961C

(Filed: October 16, 1992)

RECEIVED OCT 20 1992

* * * * * * * * * *

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, *

Plaintiff, *

v. *

UNITED STATES OF AMERICA, *

Defendant and Third Party Plaintiff, *

v. *

MAURICE L. BIANCHI, *

Third Party Defendant. *

* * * * * * * * * *

THIS OPINION WILL NOT BE PUBLISHED IN THE UNITED STATES CLAIMS COURT REPORTER.

Michael L. Burack, Washington, D.C., attorney for plaintiff.

Michael A. Hordell, Washington, D.C., attorney for third-party defendant.

Mark A. Melnick, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

HODGES, Judge.

Plaintiff Bank of America (Bank) sues to recover money erroneously paid to Bianchi by Defendant. All parties move for summary judgment. We rule for Defendant.

FACTS

During 1979 and 1980 the Defense Logistics Agency (Defendant) awarded three contracts to third-party defendant (Bianchi) to manufacture coats and jackets. After award, Bianchi assigned the proceeds and rights associated with each contract to the Bank in return for financial backing. Following each assignment, the Bank notified the appropriate contracting officer and disbursing officer in accordance with the Anti-Assignment Act. 31 U.S.C. § 3727 (1988), 41 U.S.C. § 15 (1988). Each notification was acknowledged.

In late 1980 Bianchi applied to the Bank for a $500,000 loan and signed a security agreement granting the Bank "all rights to the payment of money now owned or hereafter acquired by Borrower, . . . including, but not limited to, accounts, contract rights, chattel paper, instruments and general intangibles . . ." (collateral). The Small Business Administration (SBA) insured the loan up to 90% of its value in return for a lien on the collateral.

In July 1981 SBA insured an additional $50,000 loan from the Bank to Bianchi for working capital. SBA took as security for the new loan "assignment of proceeds arising from claims against the Government and or the Defense Logistics Agency."

Bianchi defaulted on the loans in August and October 1981, and the Bank demanded payment from SBA on its loan guarantees in December. In return for SBA's payment, the Bank assigned all of its rights in both loans to SBA, including its first lien rights to the collateral.

Bianchi's contracts with Defendant resulted in a contract dispute which was appealed to the Armed Services Board of Contract Appeals. In 1988, the Board directed Defendant to pay Bianchi $1.1 million. Defendant paid the money to Bianchi as ordered, notwithstanding the various assignments of rights associated with the contracts. Defendant realized its error, and in October 1990 it sent a letter to Bianchi demanding that he repay the money. Bianchi refused. Believing that it was entitled to the judgment paid Bianchi, the Bank initiated this suit against the Government in November 1990. Defendant impleaded Bianchi as third-party defendant.

DECISION

1. Summary Judgment

Summary judgment is proper when no genuine issues of material fact are presented. The mere existence of some factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). We have considered each party's motion for summary judgment on its own merits, and we find summary judgment to be proper here.

2. Bianchi Assignments to Bank

Bianchi alleges that his original assignments to the Bank were not valid because they were made under duress and because they were claims against the government which did not meet the requirements of the Anti-Assignment Act. 31 U.S.C. § 3727 (1988), 41 U.S.C. § 15 (1988). However, a party opposing summary judgment must set

forth specific facts showing that there is a genuine issue for trial. Anderson, 477 U.S. at 248; Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Bianchi has not met that burden with his broad allegations of fraud and duress. We need not address unsupported allegations made over ten years after the assignments.

The three original assignments of contractual rights by Bianchi to the Bank meet all of the requirements of the Anti-Assignment Act. The Bank (1) qualified as a financial institution, (2) loaned or made available money to Bianchi for the performance of the contracts, and (3) provided appropriate notice to the contracting officers and disbursing officers associated with each contract. Manufacturers Hanover Trust Co. v. United States, 590 F.2d 893 (Ct. Cl. 1978). Bianchi's assignments to the Bank were therefore effective.

3. Defendant's Payment to Bianchi

Bianchi asserts that Defendant is not entitled to repayment of the money. However, the Government may recover funds that its agents have wrongfully, erroneously, or illegally paid. American Nat'l Bank and Trust v. United States, 23 Cl. Ct. 542, 547 (1991); United States v. Wurts, 303 U.S. 414, 415 (1938). The Government cannot be estopped from recovering by the mistakes of its officers or agents. American Nat'l Bank, 23 Cl. Ct. at 547. Ordinarily, the Government may recover its erroneously paid funds without regard to the passage of time. Wurts, 303 U.S. at 416. In this case, Defendant made an erroneous payment to Bianchi, and Bianchi must return the payment.

Bianchi argues that the six-year Statute of Limitations has run since the claim first