5. Interest

The Government seeks interest on the money from November 1988 when it erroneously paid Bianchi. See Astro-Space Labs., Inc. v. United States, 470 F.2d 1003, 1020 (Ct. Cl. 1972) (court has discretion to award interest). However, the erroneous payment resulted from Defendant's own negligence, and Defendant did not request return of the money until it sent the October 1990 letter to Bianchi. Interest on the erroneous payment is therefore denied.

## CONCLUSION

Defendant's motion for summary judgment is GRANTED. Plaintiff's motion for summary judgment is DENIED. Third-party defendant's cross-motion for summary judgment is DENIED. Third-party defendant is ordered to repay the Government the sum of $1,141,220.83. The Clerk will dismiss plaintiff's complaint. No costs.

‹K OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, Plaintiff/Cross-Appellant,

v.

The UNITED STATES, Defendant/Third Party Plaintiff-Appellee,

v.

Maurice L. BIANCHI, Third Party Defendant-Appellant.

Nos. 93-5059, 93-5060.

United States Court of Appeals, Federal Circuit.

April 29, 1994.

Rehearing Denied June 23, 1994.

Bank of America filed complaint against government seeking payment of over $1 million as defense contractor's assignee under Assignment of Claims Act. The government asserted as an affirmative defense Small Business Administration's (SBA) superior right to money paid to government contractor under settlement agreement. Subsequently government filed third-party complaint against contractor seeking return of money paid under settlement. The Court of Federal Claims, Hodges, J., granted summary judgment in favor of government against bank and granted summary judgment in favor of government against contractor. The Court of Appeals for the Federal Circuit held that: (1) where government had waived right to challenge settlement as part of settlement agreement, government was precluded from seeking to recover settlement award through third-party complaint; (2) bank retained right to receive payments under contracts after it assigned its interest in guaranty loans to SBA for payment on loan guarantees; and (3) Act limited government's rights to set off government contractor's debts against payment to bank as contractor's liability on promissory notes did not arise from defense contracts.

Reversed in part, vacated in part.

Mayer, Circuit Judge, filed opinion concurring in part and concurring in judgment.

1. United States ⚟88

Government's right to recoup erroneously paid funds cannot be invoked by government as means to circumvent legal obligation.

2. United States ⚟88

Where government agreed to settle contractor's claims and voluntarily relinquished its right to disturb settlement in return for contractor's agreement to discontinue action against government, government could not invoke right to recoup erroneously paid funds to circumvent government's obligation under settlement, particularly absent any indiction that parties failed to deal with each other at arm's length or that contractor withheld material information and where government had adequate knowledge of various financial arrangements associated with contract.

3. United States ⚟88

Absent any fraud, misdirection or concealment, government could not recover funds paid in good faith and to satisfaction of interested parties.

4. United States ⚟88

Where government had waived its right to challenge settlement, government was precluded from seeking to recover settlement award through third-party complaint filed in Court of Federal Claims.

5. United States ⚟53(8), 111(12)

Where Bank of America obtained security interest in contract receivables through assignment in return for original loans to finance contract performance and was granted security interest in receivables again when Bank later extended guaranteed loan, and second interest was eventually transferred by Bank to Small Business Administration (SBA) in return for payment on loan guarantees, SBA took its interest subject to preexisting interest retained by Bank; rights under guaranteed loans attached after interest on earlier loan secured by same collateral, and record showed that SBA clear knew of Bank's senior interest in contract payments. 31 U.S.C.A. § 3727; 41 U.S.C.A. § 15.



6. United States ⚟111(1

As assignee under Ass Act, Bank of America's se contractor's contract rec right to bring suit again recover any contract paym er. 31 U.S.C.A. § 3727;

7. United States ⚟111(1

As assignee under Ass Act, Bank of America's s government contractor's c included right to bring su ment to recover any contr to another, which Bank ha in transfer of portion of s Small Business Administr turn for payment on loan Bank had right to payme ernment's payment to co settlement of contract dis under contract that sho Bank under assignme § 3727; 41 U.S.C.A. § 1

8. United States ⚟130(

Like any creditor, go to set off contractor's deb due the contractor. 41

9. United States ⚟111

Assignment of Clair ited government's rights tor's debts against paym der Act, government cor that assignee's right to would not be subject to for any liability of assig or any department or a arose independently of c § 3727; 41 U.S.C.A. §

10. United States ⚟1

Goal of Assignmen make it easier for contr formance of their oblig ment. 31 U.S.C.A. § § 15.

1. The United States Cla the United States Cour October 29, 1992. Fe

>88

ght to recoup erroneous-
: be invoked by govern-
circumvent legal obli-

>88

ent agreed to settle con-
voluntarily relinquished
settlement in return for
ent to discontinue action
. government could not
p erroneously paid funds
ment's obligation under
rly absent any indiction
deal with each other at
contractor withheld ma-
d where government had
of various financial ar-
ed with contract.

>88

id, misdirection or con-
ct could not recover
to satisfaction of

88

ent had waived its right
it, government was pre-
to recover settlement
party complaint filed in
ims.

53(8), 111(12)

merica obtained securi-
ct receivables through
for original loans to
rmance and was grant-
in receivables again
nded guaranteed loan.
was eventually trans-
nall Business Adminis-
n for payment on loan
its interest subject to
tained by Bank; rights
s attached after inter-
ured by same collater-
that SBA clear knew
rest in contract pay-
727; 41 U.S.C.A.



6. United States ⟹111(12)

As assignee under Assignment of Claims Act, Bank of America's security interest in contractor's contract receivables included right to bring suit against government to recover any contract payment made to another. 31 U.S.C.A. § 3727; 41 U.S.C.A. § 15.

7. United States ⟹111(12)

As assignee under Assignment of Claims Act, Bank of America's security interest in government contractor's contract receivables included right to bring suit against government to recover any contract payment made to another, which Bank had not relinquished in transfer of portion of security interest to Small Business Administration (SBA) in return for payment on loan guaranty, and thus Bank had right to payment under Act; government's payment to contractor/assignor in settlement of contract dispute was payment under contract that should have gone to Bank under assignment. 31 U.S.C.A. § 3727; 41 U.S.C.A. § 15.

8. United States ⟹130(3)

Like any creditor, government has right to set off contractor's debts against payment due the contractor. 41 U.S.C.A. § 15.

9. United States ⟹111(12)

Assignment of Claims Act expressly limited government's rights to set off contractor's debts against payment to assignee; under Act, government contracts could provide that assignee's right to contract payments would not be subject to reduction or setoff for any liability of assignor to United States, or any department or agency thereof, which arose independently of contract. 31 U.S.C.A. § 3727; 41 U.S.C.A. § 15.

10. United States ⟹111(1)

Goal of Assignment of Claims Act is to make it easier for contractors to finance performance of their obligations to the government. 31 U.S.C.A. § 3727; 41 U.S.C.A. § 15.

11. United States ⟹111(12)

Government contractor's liability to Small Business Administration (SBA) on promissory note was independent of defense contracts and therefore contractor's assignee was entitled to recover amount due under government's settlement with contractor, although notes were intended to finance performance of contracts, and security agreements expressly listed rights to contract payments as collateral, liability on notes did not arise from defense contracts but was imposed by loan documents, and government had conceded any defense to payment based on inadequate performance of contracts by settling contractor's contract claims. 31 U.S.C.A. § 3727; 41 U.S.C.A. § 15.

---

Michael L. Burack, Wilmer, Cutler & Pickering, Washington, DC, argued for plaintiff/cross-appellant. With him on the brief were Eric R. Markus and Lydia R. Pulley.

Mark A. Meinick, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendant/third party plaintiff-appellee. With him on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief were Sandra Guydon, Office of Philadelphia, Pennsylvania and Joel K. Meese, Small Business Admin., of counsel.

Michael A. Hordell, Petrillo & Hordell, Washington, DC, argued for third party defendant-appellant. With him on the brief was Eric L. Lipman, of counsel. Mr. Hordell and the law firm of Petrillo & Hordell, withdrew as counsel of record with the courts permission before the matter was decided.

Before RICH, MAYER, and LOURIE, Circuit Judges.

PER CURIAM.

Maurice L. Bianchi appeals the judgment of the United States Court of Federal Claims,[1] No. 90-3961C, entered pursuant to the grant of summary judgment in favor of the United States, and the denial of his

1. The United States Claims Court was renamed the United States Court of Federal Claims on [illegible] tion Act of 1992, Pub.L. No. 102-572, § 902(a), 106 Stat. 4506, 4516.

cross-motion for summary judgment. Bank of America likewise appeals the court's grant of summary judgment in favor of the United States against it, and the denial of its motion for summary judgment. We reverse in part and vacate in part.

*Background*

The following facts are not disputed. In June 1979, Bianchi executed a security agreement in favor of Bank of America (bank), granting it a security interest in his property, including after-acquired accounts and contract rights. This interest secured Bianchi's existing obligations to the bank, as well as future loans and advances by the bank to Bianchi.

During 1979 and 1980, the Defense Logistics Agency (DLA) awarded three contracts for military clothing (numbers DLA100–79–C2894, DLA100–80–C2290, and DLA100–80–C2972) to M. Bianchi of California, a sole proprietorship of Maurice Bianchi. Shortly after the award of each contract, Bianchi assigned the proceeds and rights associated with each contract to the bank as security for loans to finance Bianchi's performance of the contracts. The bank notified the appropriate contracting and disbursing officers in accordance with the Assignment of Claims Act, 31 U.S.C. § 3727 (1988), 41 U.S.C. § 15 (1988); the government acknowledged and accepted each assignment. Thereafter, the bank received payments from the government of sums due Bianchi under the contracts.

Later in 1980, Bianchi and the bank sought to restructure their relationship, applying to the Small Business Administration (SBA) for a 90 percent guarantee on an additional $500,000 loan to Bianchi. The application disclosed the bank's preexisting lien position. The SBA approved the application, and the bank issued the loan; the collateral included a third lien on all receivables, including contract rights. Bianchi executed another security agreement, again granting the bank a security interest in all rights to payment of money owned or thereafter acquired by him. In July of 1981, the bank made another 90 percent SBA guaranteed loan to Bianchi of $50,000. The new loan was covered by the future advances clause of the December 1980 agreement.

Soon thereafter, DLA terminated two of the contracts for default. Bianchi defaulted on the loans, including both the SBA guaranteed loans and the bank's prior non-guaranteed loans. In December 1981, the bank applied to the SBA for payment on the guarantees, in return for which it assigned its interest in the guaranteed loans to the SBA.

In 1981, Bianchi instituted a series of claims under the contracts before the Armed Services Board of Contract Appeals (board). In September 1988, DLA and Bianchi agreed to settle the claims. Under the settlement agreement, DLA agreed to pay $617,500 plus interest directly to Bianchi. The government paid Bianchi a total of $1,141,220.83.

In June 1990, the bank requested that the government pay it the settlement amount under the Assignment of Claims Act. On October 23, 1990, DLA wrote to Bianchi, demanding repayment of the money, acknowledging that payment should have gone to the bank under the assignment. Bianchi made no repayment, and the government took no further action until the bank filed this suit.

On November 21, 1990, the bank filed its complaint against the government in the United States Court of Federal Claims seeking payment of the $1,141,220.83 as assignee under the Assignment of Claims Act. The government asserted as an affirmative defense the SBA's superior right to the money paid to Bianchi. On April 16, 1992, the government filed a third-party complaint against Bianchi seeking return of the money paid under the settlement.

All parties moved for summary judgment. The court granted summary judgment in favor of the government against the bank, holding that the bank had assigned its rights to the SBA and had no further claim on money due Bianchi under the contracts. The court also granted summary judgment in favor of the government against Bianchi in the amount of $1,141,220.83, concluding that the government had erroneously paid Bianchi and was therefore entitled to repayment.

*Discussion*

I.

Bianchi raises constitutior
al objections to the judgme
the Court of Federal Claim
reach Bianchi's constitution
cause we conclude that the
not entitled to assert its cla
chi in the first instance.[2]

The funds the governme
er through its third-party
from an agreement reached
ernment and Bianchi in 19
tractual dispute. Pursuant
the government agreed to
500 plus interest in satisfa
claims. This agreement
into a decision of the Arm
of Contract Appeals, in w
lated that the parties waiv
appeal or seek reconsidera
decision.

In support of its claim a
government now contend
ment award was paid to
vention of the various assi
associated with Bianchi's
it has a right to recover an
ly paid from the public tr
ernment does not have tha

[1, 2] The government
erroneously paid funds ca
the government as a mea
legal obligation. In ret
agreement to discontinue
the government, the gov
settle his claims and volu
its right to disturb the se
accordingly ceased purs
claims and the governme
held to its end of the
strongly favors settleme
there is a compelling publ
cy in upholding and e
agreements voluntarily e
*Street v. Spiegel, Inc.*,

2. Although the concurren
case on constitutional gro
doctrine that we should a
tional questions where an
upon which our decision

IF

clause of the December 1980

er, DLA terminated two of
default. Bianchi defaulted
luding both the SBA guaran
he bank's prior non-guaran
December 1981, the bank
3A for payment on the guar
n for which it assigned its
uaranteed loans to the SBA.

nchi instituted a series of
contracts before the Armed
f Contract Appeals (board).
38, DLA and Bianchi agreed
ims. Under the settlement
agreed to pay $617,500 plus
to Bianchi. The govern-
hi a total of $1,141,220.83.

the bank requested that the
it the settlement amount
nment of Claims Act. On
), DLA wrote to Bianchi,
yment of the money, ac-
pa ent should have gone
r assignment. Bianchi
ien., and the government
action until the bank filed

21, 1990, the bank filed its
the government in the
urt of Federal Claims seek-
e $1,141,220.83 as assignee
ment of Claims Act. The
ted as an affirmative de-
uperior right to the money
On April 16, 1992, the gov-
rd-party complaint against
eturn of the money paid
ent.

d for summary judgment.
summary judgment in fa-
ment against the bank.
nk had assigned its rights
had no further claim on
under the contracts. The
summary judgment in fa-
ent against Bianchi in the
20.83, concluding that the
rroneously paid Bianchi
ed to repayment.



*Discussion*

I.

Bianchi raises constitutional and procedural objections to the judgment against him in the Court of Federal Claims. We decline to reach Bianchi's constitutional arguments because we conclude that the government was not entitled to assert its claims against Bianchi in the first instance.[2]

The funds the government seeks to recover through its third-party complaint stem from an agreement reached between the government and Bianchi in 1988 settling a contractual dispute. Pursuant to the agreement, the government agreed to pay Bianchi $617,500 plus interest in satisfaction of Bianchi's claims. This agreement was incorporated into a decision of the Armed Services Board of Contract Appeals, in which it was stipulated that the parties waived their rights to appeal or seek reconsideration of the board's decision.

In support of its claim against Bianchi, the government now contends that the settlement award was paid to Bianchi in contravention of the various assignments of rights associated with Bianchi's contracts and that it has a right to recover any funds erroneously paid from the public treasury. The government does not have that right in this case.

[1, 2] The government's right to recoup erroneously paid funds cannot be invoked by the government as a means to circumvent a legal obligation. In return for Bianchi's agreement to discontinue his action against the government, the government agreed to settle his claims and voluntarily relinquished its right to disturb the settlement. Bianchi accordingly ceased pursuing his contract claims and the government must likewise be held to its end of the bargain. "The law strongly favors settlement of litigation, and there is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into." *Hemstreet v. Spiegel, Inc.*, 851 F.2d 348, 350 (Fed.Cir.1988) (citing *Bergh v. Department of Transp.*, 794 F.2d 1575, 1577 (Fed.Cir.), *cert. denied*, 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986)).

[3] The government does not challenge the validity or the enforceability of the settlement. Indeed, there is no indication that the parties failed to deal with each other at arm's length or that Bianchi withheld material information. The government certainly had adequate knowledge of the various financial arrangements associated with the contracts in view of the fact that the assignments from Bianchi to the bank were made pursuant to the Assignment of Claims Act, which was designed to protect the government from secret assignments. *See McKenzie v. Irving Trust Co.*, 323 U.S. 365, 369, 65 S.Ct. 405, 407, 89 L.Ed. 305 (1945); *Pittman v. United States*, 116 F.Supp. 576, 580 (1953), *cert. denied*, 348 U.S. 815, 75 S.Ct. 23, 99 L.Ed. 642 (1954). In the absence of any fraud, misdirection, or concealment, the government may not recover funds paid in good faith and to the satisfaction of the interested parties. *See McKnight v. United States*, 13 Ct.Cl. 292, 313, 1800 WL 946 (1877), *aff'd*, 98 U.S. 179, 25 L.Ed. 115 (1878). Here, "[t]here was nothing contrary to good morals or conscience in the payment or receipt of the money. The facts were all known." 98 U.S. at 185–86.

[4] The government could easily have taken appropriate steps to avoid incurring any liability to the bank. For example, the government could have insisted that any settlement award be paid to the bank in view of the bank's asserted security interest. The government did not do so, perhaps because Bianchi would not have agreed to that arrangement or because the government presumed that the bank retained an inferior interest. Whatever the reason for its failure to protect itself, the government cannot now renege on its commitment to honor its settlement with Bianchi, into which it entered voluntarily and with full knowledge of the facts.

2. Although the concurrence would resolve this case on constitutional grounds, we adhere to the doctrine that we should avoid deciding constitutional questions where an alternative basis exists upon which our decision may rest. *See Hagans v. Lavine*, 415 U.S. 528, 565, 94 S.Ct. 1372, 1393, 39 L.Ed.2d 577 (1974) (Rehnquist, J., dissenting); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1126 (Fed.Cir.1985) (Markey, C.J., additional views).

000255

"To permit [the government] to escape its obligation under the settlement would seriously decrease the willingness of parties to settle litigation on mutually agreeable terms and thus weaken the efficacy of settlements generally." *Hemstreet*, 851 F.2d at 350.

Although the government waived its right to challenge the board's decision awarding payment to Bianchi, it attempts to do just that by means of a third-party complaint filed in another forum. The government should not be allowed to do indirectly what it is prohibited from doing directly. We therefore hold that the government, having waived its right to challenge the settlement, is precluded from seeking to recover the settlement award through a third-party complaint filed in the Court of Federal Claims.

II.

In its cross-appeal, Bank of America challenges the trial court's conclusion that the bank retained no right to receive payments under the Bianchi contracts after it assigned its interest in the guaranteed loans to the SBA in return for payment on the loan guarantees. Specifically, the bank argues that it is entitled to judgment because of its superior right to contract payments as Bianchi's assignee under the Assignment of Claims Act.

[5] Both the bank and the SBA claim a security interest in Bianchi's contract receivables. The bank obtained its interest, the assignment, in return for its original loans to finance Bianchi's contract performance. When it later extended the guaranteed loans, Bianchi again granted it a security interest in the receivables, an interest the bank eventually transferred to the SBA in return for payment on the loan guarantees. The Court of Federal Claims agreed with the government that this transfer assigned all of the bank's interest in the contract payments, not merely those associated with the guaranteed loans.

The loan documents refute this position, for they show that the bank assigned away only its rights "in th[ose] certain Note[s]" relating to the guaranteed loans. Since the rights under the guaranteed loans attached after the interest under the earlier loans secured by the same collateral, the SBA took its interest subject to the preexisting interest retained by the bank. *Cf. United States v. McDermott*, — U.S. —, —, 113 S.Ct. 1526, 1531, 123 L.Ed.2d 128 (1993) ("When two private lenders both exact from the same debtor security agreements with after-acquired-property clauses, the second lender knows . . . that that category of property will be subject to another claim"). Indeed, the record shows that the SBA clearly knew of the bank's senior interest in the contract payments.

[6, 7] As an assignee under the Assignment of Claims Act, the bank's security interest included the right to bring a suit against the government to recover any contract payment made to another. *Produce Factors Corp. v. United States*, 467 F.2d 1343, 1349 (Ct.Cl.1972). As we said, the bank never relinquished this right. "The Government having received timely notice of plaintiff's assignment paid [Bianchi] at its peril. And where an erroneous payment is made by the Government it is no bar to the rightful claimant." *Central Nat'l Bank v. United States*, 91 F.Supp. 738, 741 (Ct.Cl. 1950) (citation omitted). The government's payment to Bianchi in settlement of the contract dispute was a payment under the contract that should have gone to the bank under the assignment. Thus, the bank has a right to the payment under the Act.

[8] The government asserts a right to set off the amount that Bianchi owed to the SBA against any money owed to the bank by virtue of the settlement. Of course, like any creditor, the government has the right to set off a contractor's debts against payments due the contractor. *United States v. Munsey Trust Co.*, 332 U.S. 234, 239, 67 S.Ct. 1599, 1601–02, 91 L.Ed. 2022 (1947). The government argues that as an assignee, the bank had no greater claim to the payment than did Bianchi, its assignor. If true, the government could set off Bianchi's liability to the SBA against money due the bank. *Cf. id.* at 239–40, 67 S.Ct. at 1601–02 ("Insofar as the suitor in the Court of Claims asserted the contractor's title to the sum in dispute, that court was under statutory duty to recognize the undisputed claim ... United States").

[9] But the bank is n... nary assignee. The Ass... Act expressly limits the ... to set off Bianchi's debts ... the bank. 31 U.S.C. § 37... Under the Act, governm... provide that an assignee'... payments "shall not be s... or set-off for any liability ... assignor to the United St... ment or agency thereof w... dently of such contract . . ... Bianchi's contracts conta...

[10] The goal of t... Claims Act is to make it... tors to finance perform... gations to the governmen... *Corp. v. United States*, ... The inclusion of "no set-o... some of the uncertainty t... hinder financing by en... stream of payments una... tractor's potentially num... the United States not i... tract from which the ... *Central Bank v. United* ... 643, 73 S.Ct. 917, 919, 9... *See Produce Factors*, 46... signee's right to receive ... proceeds dependent only ... the contractor of his ... gations").

[11] While the gove... against the bank any def... Bianchi under the contra... *Corp.*, 467 F.2d at 1349 ... failure of consideration) ... ness to the government ... contracts, but from the ... ment argues that the no... dent of the contracts, fo... to finance the performa... and, indeed, the secu... pressly listed rights to ... collateral. Even accept... bility on the notes was ... tracts, however, we agre... the liability on the notes ... ly of such contract."

ıder the earlier loans
collateral, the SBA took
the preexisting interest
. Cf. United States v.
, ——, ——, 113 S.Ct.
L.2d 128 (1993) ("When
oth exact from the same
eements with after-ac-
ses, the second lender
ategory of property will
r claim"). Indeed, the
e SBA clearly knew of
terest in the contract

gnee under the Assign-
the bank's security in-
right to bring a suit
ent to recover any con-
to another. Produce
nited States, 467 F.2d
72). As we said, the
shed this right. "The
received timely notice of
t paid [Bianchi] at its
n. neous payment is
is no bar to the
Central Nat'l Bank v.
Supp. 738, 741 (Ct.Cl.
ed). The government's
n settlement of the con-
payment under the con-
ave gone to the bank
t. Thus, the bank has a
it under the Act.

ent asserts a right to set
Bianchi owed to the SBA
owed to the bank by
ent. Of course, like any
ment has the right to set
ots against payments due
nited States v. Munsey
234, 239, 67 S.Ct. 1599,
022 (1947). The govern-
s an assignee, the bank
to the payment than did
r. If true, the govern-
Bianchi's liability to the
due the bank. Cf. id. at
1601–02 ("Insofar as the
of Claims asserted the
th n in dispute, that
t duty to recognize

the undisputed claim for damages of the United States").

[9] But the bank is not simply an ordinary assignee. The Assignment of Claims Act expressly limits the government's right to set off Bianchi's debts against payments to the bank. 31 U.S.C. § 3727; 41 U.S.C. § 15. Under the Act, government contracts may provide that an assignee's right to contract payments "shall not be subject to reduction or set-off for any liability of any nature of the assignor to the United States or any department or agency thereof which arises independently of such contract. . . ." 41 U.S.C. § 15. Bianchi's contracts contained such a clause.

[10] The goal of the Assignment of Claims Act is to make it easier for contractors to finance performance of their obligations to the government. Produce Factors Corp. v. United States, 467 F.2d at 1348. The inclusion of "no set-off" clauses alleviates some of the uncertainty that would otherwise hinder financing by ensuring assignees a stream of payments unaffected by the contractor's potentially numerous "obligations to the United States not imposed by the contract from which the payments flowed." *Central Bank v. United States*, 345 U.S. 639, 643, 73 S.Ct. 917, 919, 97 L.Ed. 1312 (1953). *See Produce Factors*, 467 F.2d at 1348 (assignee's right to receive payment of contract proceeds dependent only on "performance by the contractor of his contractual obligations").

[11] While the government could assert against the bank any defenses arising against Bianchi under the contracts, *Produce Factors Corp.*, 467 F.2d at 1349 (non-performance or failure of consideration), Bianchi's indebtedness to the government arose not from the contracts, but from the notes. The government argues that the notes are not independent of the contracts, for they were intended to finance the performance of the contracts, and, indeed, the security agreements expressly listed rights to contract payments as collateral. Even accepting that Bianchi's liability on the notes was "related to" the contracts, however, we agree with the bank that the liability on the notes arose "independently of such contract."

The Supreme Court addressed this language in *Central Bank v. United States*, 345 U.S. at 646, 73 S.Ct. at 920, ruling that the United States could not set off a contractor's tax indebtedness against sums due an assignee on the contract. The tax liability arose from the contractor's failure to pay withholding and unemployment taxes for work done on the contract. The Court reasoned, however, that the government could not set off the tax because it did not arise from the contract; the tax was imposed by statute, and would have been due even absent a contract with the government. *Id.* at 645–46.

Like a contractor's tax liability, Bianchi's liability on the notes did not arise from his defense contracts, it was imposed by the loan documents. He could owe on the notes even if he had no contract. Moreover, the government has conceded any defense to payment based on inadequate performance of the contracts by settling Bianchi's contract claims. Because his liability on the notes "lay neither in execution nor in breach of the contract[s]," *Central Bank*, 345 U.S. at 646, 73 S.Ct. at 920, Bianchi's liability to the SBA on the notes is independent of the contracts, barring set-off by the government. Therefore, the bank should recover the amount due under the government's settlement with Bianchi.

*Conclusion*

Accordingly, we reverse the judgment of the Court of Federal Claims in the government's favor against the bank, and vacate the judgment in favor of the government against Bianchi.

*COSTS*

The bank and Bianchi shall have their costs.

*REVERSE IN PART, VACATE IN PART.*

MAYER, Circuit Judge, concurring in part and concurring in the judgment.

I join the court's opinion insofar as it explains why the bank prevails. I also agree that the government's claims against Bianchi should have been dismissed, but write separately because I do not believe the Court of

Federal Claims had jurisdiction to reach the merits of those claims. I share the reluctance to reach constitutional questions, but the court impermissibly assumed there is jurisdiction where there is none.

The Court of Federal Claims based its jurisdiction over Bianchi on 41 U.S.C. § 114(b) (Supp. IV 1992), which says that court may "summon any and all persons with legal capacity to be sued to appear as a party or parties in any suit or proceeding of any nature whatsoever pending in said court to assert and defend their interests. . . ." More specifically, section 114(b) authorizes the Court of Federal Claims to hear the government's "claims and contingent claims for the recovery of money hereafter paid by the United States in respect of the transaction or matter which constitutes the subject matter" of the pending suit. *Id.*

This court has said that under section 114(b) the Court of Federal Claims may render judgment against a third party on claims by the government in two situations: first, where that party also asserts a claim against the United States; and second, where a plaintiff sues the government for money that the government has disbursed to the third party under a mistake of fact or law. *United States v. Rush*, 804 F.2d 645, 647 (Fed.Cir. 1986); *Bowser Inc. v. United States*, 420 F.2d 1057, 1062, 190 Ct.Cl. 441 (1970). By its language, section 114(b) apparently applies to these government claims, which seek return of the settlement payment, the subject of the bank's suit. The question thus becomes whether the grant of jurisdiction over the government's claims is constitutionally permissible.

Bianchi's constitutional attack on section 114(b) arises from Article III of the Constitution, which provides that

> [t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

U.S. Const., Art. III, § 1. The Court of Federal Claims is established under Article I not Article III. 28 U.S.C. § 171(a) (Supp. IV 1992) ("The Court is declared to be a court established under Article I of the Constitution of the United States").

The Supreme Court tells us that "Article III, § 1, serves both to protect 'the role of the independent judiciary within the constitutional scheme of tripartite government,' and to safeguard litigants' 'right to have claims decided before judges who are free from potential domination by other branches of government.'" *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848, 106 S.Ct. 3245, 3255, 92 L.Ed.2d 675 (1986) (citations omitted). When examining congressional action for impermissible intrusions upon the integrity of the judiciary, the Court has declined to adopt fixed rules, fearing undue restrictions on Congress' Article I powers. *Id.* at 851, 106 S.Ct. at 3257. The task is to consider both the nature of the right to be adjudicated and the concerns that led Congress to deviate from Article III in this statutory scheme. *Id.*

Some disputes, especially those arising between the government and others over the performance of the constitutional functions of the political branches, have historically been subject to resolution exclusively by those branches. *Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 67, 102 S.Ct. 2858, 2869, 73 L.Ed.2d 598 (1982) (plurality opinion). Because such disputes could be resolved without resort to the judicial power of the United States, Congress is free to assign their adjudication to administrative agencies or Article I courts. *See Thomas v. Union Carbide Agric. Prod.*, 473 U.S. 568, 589, 105 S.Ct. 3325, 3337, 87 L.Ed.2d 409 (1985). These cases are said to involve "public rights"; by contrast, "private rights" cases—those that fall outside the traditional realm of the political branches—must be heard under the auspices of Article III. *Northern Pipeline*, 458 U.S. at 70, 102 S.Ct. at 2871.

Government contract disputes are classic public rights matters. Historically, government contracts provided that the decision

a contracting officer was
tion under the contract,
Article III review. *Seat*
*United States*, 903 F.2d
1990). These provisions
tional scrutiny because, 
sovereign immunity, the
always decline to be sue
tractors. When Congr
right of action on the con
Claims, and then in the
Federal Claims, it was
tions to the new right, in
the right to a jury trial
forum. *Id.* at 1563.

This court applied th
ject a constitutional c
114(b) in *United States*
645, 647 (Fed.Cir.1986).
the dispute between th
third party contractor
rights—that is, it arose
ment and persons subje
connection with the co
of the executive and leg
. . . historically could h
exclusively by those b
F.2d at 647. *See No*
U.S. at 67, 102 S.Ct. at
further; resolution of
however, requires an
*Rush* was a public rig

Rush contracted wi
construct a shopping c
of Arnold Air Force
contract was one for

* Like Bianchi, Rush chal
der both Article III and
The *Rush* court cited
*United States*, 141 F.S
which the governmen
*Casualty* upheld the va
the face of a Seventh A
lar to Bianchi's. Bu
decided by the Court 
without a jury, much
Federal Claims, but
under Article III. *Gl*
530, 534, 82 S.Ct. 1
1962); see Act of Ju
226, added to 28 U.S
hereby declared to be
Article III of Constitu

II, § 1. The Court of tablished under Article I J.S.C. § 171(a) (Supp. IV s declared to be a court rticle I of the Constitu- States").

urt tells us that "Article h to protect 'the role of ciary within the constitu- partite government,' and ts' 'right to have claims ges who are free from n by other branches of nmodity Futures Trad- r, 478 U.S. 833, 848, 106 L.Ed.2d 675 (1986) (cita- hen examining congres- impermissible intrusions f the judiciary, the Court opt fixed rules, fearing on Congress' Article I 106 S.Ct. at 3257. The both the nature of the te d the concerns that rom Article III in Id.

pecially those arising be- ent and others over the constitutional functions of es, have historically been on exclusively by those n Pipeline Co. v. Mara- 458 U.S. 50, 67, 102 S.Ct. L.2d 598 (1982) (plurality such disputes could be sort to the judicial power es, Congress is free to cation to administrative I courts. See Thomas v. ic. Prod., 473 U.S. 568, 5, 3337, 87 L.Ed.2d 409 are said to involve "pub- ntrast, "private rights" ll outside the traditional ical branches—must be auspices of Article III. 458 U.S. at 70, 102 S.Ct.

disputes are classic Historically, govern- that the decision of

a contracting officer was final on any question under the contract, and not subject to Article III review. *Seaboard Lumber Co. v. United States,* 903 F.2d 1560, 1564 (Fed.Cir. 1990). These provisions withstand constitutional scrutiny because, under the concept of sovereign immunity, the government could always decline to be sued by aggrieved contractors. When Congress later created a right of action on the contract in the Court of Claims, and then in the Article I Court of Federal Claims, it was free to attach conditions to the new right, including the waiver of the right to a jury trial or to an Article III forum. *Id.* at 1563.

This court applied these principles to reject a constitutional challenge to section 114(b) in *United States v. Rush,* 804 F.2d 645, 647 (Fed.Cir.1986). We determined that the dispute between the government and a third party contractor turned on public rights—that is, it arose "between the government and persons subject to its authority in connection with the constitutional functions of the executive and legislative branches and ... historically could have been determined exclusively by those branches." *Rush,* 804 F.2d at 647. *See Northern Pipeline,* 458 U.S. at 67, 102 S.Ct. at 2869. *Rush* went no further; resolution of the case before us, however, requires an examination of why *Rush* was a public rights dispute.*

Rush contracted with the Air Force to construct a shopping center on the grounds of Arnold Air Force Station. Because the contract was one for the procurement of services by the government, it was necessarily controlled by the provisions of the Contract Disputes Act (CDA). 41 U.S.C. § 602(a) (1988); *Seaboard Lumber Co.,* 903 F.2d at 1565. Under the CDA, the government waived its right to assert sovereign immunity against Rush's contractual claims in return for the contractor's waiver of his right to an Article III trial of government claims against him. 903 F.2d at 1567. Thus, the government could cross-claim against Rush in the Court of Federal Claims seeking return of an alleged overpayment that was the subject of a surety's suit against the government in that court.

Like the contract in *Rush,* Bianchi's DLA contracts were governed by the CDA, so Bianchi waived his rights under Article III by entering into them. When the government terminated the contracts, Bianchi complied with the CDA and sought relief before the Board of Contract Appeals. The parties then settled the dispute.**

Now the government seeks to recover the money it paid Bianchi under the voluntary settlement, a joint action to fully and finally terminate the prior case. It is not itself a contract for the procurement of goods or services that falls under the CDA, so the terms of that Act do not apply. *Cf. Coastal Corp. v. United States,* 713 F.2d 728, 730 (Fed.Cir.1983) (rejecting theory that CDA applies to "contracts tangentially connected with government procurement of goods and services"). Absent the controlling provisions of the CDA, there is no historical basis for

* Like Bianchi, Rush challenged section 114(b) under both Article III and the Seventh Amendment. The *Rush* court cited *Maryland Casualty Co. v. United States,* 141 F.Supp. 900 (Ct.Cl.1956), on which the government relies here. *Maryland Casualty* upheld the validity of section 114(b) in the face of a Seventh Amendment challenge similar to Bianchi's. But *Maryland Casualty* was decided by the Court of Claims, a court that sat without a jury, much like the present Court of Federal Claims, but one that was established under Article III. *Glidden v. Zdanok,* 370 U.S. 530, 584, 82 S.Ct. 1459, 1490, 8 L.Ed.2d 671 (1962); *see* Act of July 28, 1953, § 1, 67 Stat. 226, added to 28 U.S.C. § 171 ("Such court is hereby declared to be a court established under Article III of Constitution of the United States"). *Maryland Casualty* supports the *Rush* Seventh Amendment holding, but it does not constrain our analysis of section 114(b) under the broader scope of Article III.

** Under the settlement, the parties agreed that Bianchi "is entitled to recover $617,500.00 on his claims ...; that the Government is entitled to take nothing on its claims ...; that Mr. Bianchi is entitled to interest ...; and that the parties waive their rights to seek reconsideration of this stipulated decision of the Board or to appeal that stipulated decision...." *Appeals of M. Bianchi of California,* ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934 (September 29, 1988). Moreover, Bianchi was required to execute a Certificate of Finality, under which he agreed to accept the award as "a full discharge to the United States of all claims and demands arising out of the matters involved...." Certificate of Finality, ASBCA Nos. 26362, et al.

resolution of the government's claims against Bianchi by the legislative or executive branches. This is not a case involving a right created by Congress or one assigned by the Constitution or tradition to the political branches. Indeed, if the government had sought to recover the settlement payment absent this precipitative suit by the bank, it would have had to sue in the district court. Whatever rights the government may have to recover its officers' allegedly erroneous payments, *see United States v. Wurts,* 303 U.S. 414, 415, 58 S.Ct. 637, 638, 82 L.Ed. 932 (1938), it is not necessarily entitled to advert to an Article I forum.

Nor does Bianchi's waiver of his Article III rights under the DLA contracts extend to the settlement. Under the settlement agreement, he accepted a single payment in full satisfaction of his claims under the terminated contracts. The parties agreed that the settlement would be final, and waived any right to reconsideration or appeal to this court. The government was completely discharged from all obligations under the contracts, and, given the broad language of the agreement, Bianchi's obligations, including his contractual duty to submit to Article I jurisdiction, were likewise discharged. The settlement extinguished the prior relationship under the contracts. *Cf. Brock & Blevins Co. v. United States,* 343 F.2d 951, 954, 170 Ct.Cl. 52 (1965). Thus, what was a matter of public rights—a contractual relationship controlled by the CDA—became a private rights dispute after the settlement. The government's concern that it might be subject to inconsistent judgments cannot overcome the demands of Article III where the government so clearly had the ability to protect its rights, but surrendered them. The government's claims against Bianchi should have been dismissed for lack of jurisdiction.

Jerry L. WEDDEL, and wife, Lea Ann Weddel, on behalf of their minor daughter, Cassie Ann Weddel, Petitioners–Appellants,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent–Appellee.

No. 94–5001.

United States Court of Appeals, Federal Circuit.

May 9, 1994.

Rehearing Denied; Suggestion for Rehearing In Banc Declined July 7, 1994.

Appeal was taken from order of the United States Court of Federal Claims, Merow, J., which dismissed petition for compensation under the National Childhood Vaccine Injury Compensation Act. The Court of Appeals, Clevenger, Circuit Judge, held that: (1) dismissal of pending state court action prior to filing of petition under the Act was required and was jurisdictional; (2) state court action was not dismissed until motion to dismiss was received by the state court; and (3) plaintiffs' petition had been a "filing" under the Act even though it was lacking the required cover letter and medical records.

Affirmed.

1. Federal Courts ⚷13

Claim that premature filing of petition for compensation under the National Childhood Vaccine Injury Compensation Act should equitably toll statute of limitations was not ripe for adjudication where second petition for compensation had not yet been filed and dismissed. Public Health Service Act, § 2111(a)(5)(A, B), as amended, 42 U.S.C.A. § 300aa–11(a)(5)(A, B); RCFC, Vaccine Rule 8(f), 28 U.S.C.A.

2. Pretrial Procedure ⚷676

Under Texas law, plaintiff's dismissal as of right was governed by the receipt rule, rather than the mailbox rule, and was not effective until court received motion to dismiss.

3. Federal ...

Trial court's resolution of i... involving statutory interpretation ... dictional delineation is reviewed ...

4. Statutes ⚷214

Under traditional rule of stat... pretation, courts look first to t... evidence of intent, such as textu... alone.

5. Statutes ⚷188, 219(2)

If it is clear what the words ... legislature would mean in the ... normal speaker of English, us... circumstances in which they we... intent will be imputed to the le... enforced notwithstanding confli... pronouncements or extrinsic evi... trary intent.

6. Statutes ⚷214

If plain meaning of statute ... sult that is not just harsh, cu... stark and troubling, but so biz... gress could not have intended ... look to extrinsic evidence of ...

7. Drugs and Narcotics ⚷2...

Fact that cover sheet an... ords were missing from peti... National Childhood Vaccine I... sation Act did not preclude th... being a filing within the mea... Rules, and it was time of th... petition, not the time when th... missing cover sheet and m... which would determine wh... was timely filed and wheth... action was pending when it w... Health Service Act, § 211... amended, 42 U.S.C.A. § ... B); RCFC, Vaccine Rule ...

8. Drugs and Narcotics ⚷...

If party has already su... facturer in state court, part... no-fault federal compensa... stead, but not until stat... dismissed. Public Heal... § 2111(a)(5)(A, B), as ame... § 300aa–11(a)(5)(A, B).

000260

NOTE: Pursuant to Fed. Cir. R. 47.6, this order is not citable as precedent. It is a public record.

United States Court of Appeals for the Federal Circuit

93-5059,-5060

RECEIVED
OCT 06 1994
Ans'd.......

BANK OF AMERICA NATIONAL TRUST and SAVINGS ASSOCIATION,

Plaintiff/Cross-Appellant,

v.

THE UNITED STATES,

Defendant/Third Party Plaintiff-Appellee,

v.

MAURICE L. BIANCHI,

Third Party Defendant-Appellant.

Before RICH, MAYER, and LOURIE, Circuit Judges.

ORDER

Under the Equal Access to Justice Act, 28 U.S.C. § 2412(d) (1988) (EAJA), Maurice L. Bianchi requests an award of attorney fees and expenses incurred in defending against the government's third party claim. The government has moved to dismiss the application as untimely, asserting that there is not yet a final judgment in Bianchi's favor.

On April 29, 1994, this court vacated the judgment of the Court of Federal Claims, No. 90-3961C, in favor of the government against Bianchi. Bank of America Nat. Trust & Sav. Ass'n v. United States, 23 F.3d 380, 385 (Fed. Cir. 1994). Based on a settlement

agreement by which Bianchi agreed to settle his contract claims against the government in return for a payment of $1,141,220.83, this court held "that the government, having waived its right to challenge the settlement, [was] precluded from seeking to recover the settlement award through a third-party complaint filed in the Court of Federal Claims." Id. at 384. The government correctly argues that only its third party claim, and not its contingent claim, was before us on appeal; it is clear from our decision, however, that the contingent claim must fail as well since it is based on identical grounds. Indeed, all that remains of the government's claims against Bianchi is the purely ministerial act of entering judgment against the government in the Court of Federal Claims. See Gavette v. Office of Personnel Management, 808 F.2d 1456, 1459 (Fed. Cir. 1986) (in banc); Skip Kirchdorfer, Inc., v. United States, 803 F.2d 711, 712 (Fed. Cir. 1986).

The government's time for filing a petition for a writ of certiorari has now passed; the judgment is therefore final for EAJA purposes and the government's motion to dismiss is denied. See Melkonyan v. Sullivan, 501 U.S. 89, 96 (1991) ("The 30-day EAJA clock begins to run after the time to appeal that 'final judgment' has expired."); Skip Kirchdorfer, Inc., 803 F.2d at 712. We now consider the merits of Bianchi's application for attorney fees.

Under the EAJA, as a prevailing party Bianchi is entitled to an award of attorney fees and expenses "unless the Court finds that the position of the United States was substantially justified . . . ." 28 U.S.C. § 2412(d)(1)(A). This court will deny an award

under this section if the government "was clearly reasonable in asserting its position . . . in view of the law and the facts." Gavette, 808 F.2d at 1467 (emphasis in original); see also Pierce v. Underwood, 487 U.S. 552, 565 (1988). In this case, the government was not unreasonable in its position that it had an absolute right to recover money erroneously paid to Bianchi, and the Court of Federal Claims agreed. Although we ruled against the government, we cannot conclude that its position did not satisfy the statutory standard.

Accordingly, it is ORDERED that Bianchi's application for attorney fees and expenses is DENIED.

FOR THE COURT

9/30/94
Date

Francis X. Gindhart
Francis X. Gindhart
Clerk

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT
SEP 30 1994
FRANCIS X. GINDHART
CLERK

# In the United States Court of Federal Claims

A TRUE COPY: 1/31/97
TEST:
DAVID A. LAMPEN
Clerk, U.S. Court of Federal Claims
By ________ Deputy Clerk

* * * * * * * * *

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant and Third Party Plaintiff,

v.

MAURICE L. BIANCHI,

Third Party Defendant.

* * * * * * * * *

No. 90-3961C

Filed: July 26, 1995

FILED
JUL 26 1995
U.S. COURT OF FEDERAL CLAIMS

ORDER

Plaintiff originally calculated that it was entitled to $1.09 million in principal and interest from the time of the wrongful payment by SBA to Bianchi. We required further explanation to determine the qualified principal amounts and plaintiff's entitlement to interest.

I. Principal

Plaintiff is entitled to repayment of all monies loaned to Bianchi that were available for contract performance. The outstanding principal amounts, $292,940.05 and $49,200, are undisputedly "qualified."

Plaintiff argues that a $50,000 non-guaranteed portion of the $500,000 SBA loan should also be included because the Bank did not assign that portion to SBA. The December 1981 loan agreement states that "Bank of America . . . hereby assigns and transfers to the Small Business Administration all of its right, title and interest" in the Bianchi-SBA loan. Plaintiff directs our attention to other loan documents to vary the terms of the agreement, contrary to this unambiguous language. Those documents indicate that

SBA could purchase the guaranteed portion of a loan. We need not rely on those inconclusive statements to interpret the agreement. The Bank may not recover on the unpaid principal of that loan because its rights to that amount were fully assigned.

II. Interest

Plaintiff's calculations included interest through November 1994. We questioned those numbers because the United States generally is not obliged to pay interest unless a statute or contract so provides. The payment of interest in this situation is not governed by the Contract Disputes Act, 41 U.S.C. § 611 (1988). An assignment of government contract proceeds does not create a contractual relationship between the assignee and the United States. Produce Factors Corp. v. United States, 199 Ct. Cl. 572, 580-81 (1972). The Government's obligations arise solely from the Assignment of Claims Act. Id. at 581.

Plaintiff argues that Continental Bank and Trust Co. v. United States, 189 Ct. Cl. 99 (1969), and Chelsea Factors, Inc. v. United States, 149 Ct. Cl. 202 (1960), mandate an award of interest. In those cases, the assignee sought payments that were not made, rather than a mistaken payment to the wrong party. The court did not award statutory interest. Continental Bank, 189 Ct. Cl. at 109. The Government had to pay for the value received on the contract -- not interest. Chelsea Factors, 149 Ct. Cl. at 215. A mistaken payment does not merit a payment of interest under this analysis. See also Central National Bank of Richmond v. United States, 117 Ct. Cl. 389 (1950) (judgment for assignee in amount of mistaken payment not including interest).

CONCLUSION

The Clerk will enter judgment for the Bank in the amount of $342,140.05. The third party complaint against Bianchi is dismissed. No costs.

Robert H. Hodges, Jr.
Judge

# In the United States Court of Federal Claims

No. 90-3961 C

FILED
JUL 28 1995
U.S. COURT OF FEDERAL CLAIMS

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION,

*Plaintiff,*

v.

THE UNITED STATES

*Defendant and Third Party Plaintiff,*

v.

MAURICE L. BIANCHI,

*Third Party Defendant.*

JUDGMENT 1/31/97

A TRUE COPY:
TEST:
DAVID A. LAMPEN
Clerk, U.S. Court of Federal Claims
By ________ Deputy Clerk

Pursuant to the court's order of July 26, 1995,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff recover of and from the United States the sum of $342,140.05. The third party complaint against Bianchi is dismissed. No costs.

David A. Lampen
Clerk of Court

July 28, 1995

By: ________
Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 72, re number of copies and listing of all plaintiffs. Filing fee is $105.00.

# In the United States Court of Federal Claims

No. 90-3961 C

FILED
AUG 22 1995
U.S. COURT OF FEDERAL CLAIMS

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION,

*Plaintiff,*

v.

THE UNITED STATES

*Defendant and Third Party Plaintiff,*

v.

MAURICE L. BIANCHI,

*Third Party Defendant.*

CORRECTED JUDGMENT

A TRUE COPY: 1/31/97
TEST:
DAVID A. LAMPEN
Clerk, U.S. Court of Federal Claims
By [signature]
Deputy Clerk

Pursuant to the court's order of August 14, 1995,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff recover of and from the United States the sum of $717,009.94. The third party complaint against Bianchi is dismissed. No costs.

David A. Lampen
Clerk of Court

August 22, 1995

By: [signature]
Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 72, re number of copies and listing of all plaintiffs. Filing fee is $105.00.

-1-95 FRI 9:22 0 BRUNETTE/HILL P.02

RECEIVED
AUG 2 2 1995

# In the United States Court of Federal Claims

No. 90-3961 C

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION,

*Plaintiff,*

v.

THE UNITED STATES

*Defendant and Third Party Plaintiff,*

v.

MAURICE L. BIANCHI,

*Third Party Defendant.*

CORRECTED JUDGMENT

FILED AUG 22 1995

Pursuant to the court's order of August 14, 1995,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff recover of and from the United States the sum of $717,009.94. The third party complaint against Bianchi is dismissed. No costs.

David A. Lampen
Clerk of Court

August 22, 1995

By: ______________
Deputy Clerk

000288

NOTE: As to appeal, 60 days from this date, see RCFC 72, re number of copies and listing of all plaintiffs. Filing fee is $105.00.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Application Under Equal Access to Justice Act -- M. Bianchi of California Under Contract Nos. DLA100-79-C-2594 DLA100-80-C-2990 DLA100-80-C-2972 | ) | ASBCA Nos. 26362 26363 26364 26365 26366 26505 26506 26513 26642 29932 29933 29934 |

APPEARANCE(S) FOR THE APPLICANT: Michael A. Hordell, Esq.
Petrillo & Hordell
Washington, D.C.

APPEARANCE(S) FOR THE GOVERNMENT: Alvin M. LaCoste, Esq.
Wayne J. Bober, Esq.
Trial Attorneys
Defense Personnel Support Center (DLA)
Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE RUBG

On 29 September 1989 the Board issued its opinion on many of the issues involved in this application for attorney's fees and expenses under the Equal Access to Justice Act, 5 U. S. C. § 504, and remanded the matter to the parties for negotiation in accordance with that decision (ASBCA No. 26362, et al, 90-1 BCA ¶ 22,369). The parties were unable to reach agreement on quantum. Since a settlement conference with the parties and the presiding judge also proved unsuccessful, the Board will resolve quantum based upon the extensive documentation filed by the parties.

In our decision on the merits of this application, we set forth a detailed discussion about the contracts involved in the dispute, the settlement of which resulted in this application. We see no necessity for a detailed repetition in this opinion. We concluded (1) that the Government's position was not substantially justified in failing to grant applicant an extension of time for imposition of a first article inspection requirement, (2) that the Government's position was substantially justified as to the pattern problems arising under these contracts, (3) that the Government was not substantially justified in refusing to extend delivery dates under Contract 2594, so that the contractor was forced to accelerate production under that contract, (4) that the Government was not responsible for costs incurred in prioritizing Contract 2290 before Contract 2284, (5) that applicant is limited in its recovery of attorney fees to a maximum of $75.00 per hour, (6) that the parties should negotiate the impact on legal fees caused by the applicant's change of attorneys three (now four) times during the course of this litigation and the impact of assignment and reassignment

000289

of Government counsel numerous times during the course of this litigation, (6) that the parties should negotiate whether any discovery in these appeals was unnecessary and should not be subject to reimbursement to applicant, (7) that fees and expenses for Mr. Bianchi were not reimbursable under this application, (8) that, under current regulations, expert witness fees are limited to $33.53 per hour plus travel and per diem expenses, (9) that accounting fees and expenses should be recalculated limiting professional fees to $75.00 per hour and eliminating any clerical services, such as word processing or typing which are considered office overhead expenses typically subsumed in professional hourly rates, and (10) that reasonableness of the number of accounting hours claimed should be negotiated by the parties.

When the parties were unable to resolve the quantum by negotiation, they submitted extensive briefs and documentation setting forth the specific amounts and items upon which they were unable to agree. Following the settlement conference, applicant made another submission in which it made additional adjustments to reflect matters raised by the Government. Applicant's revised claim is $925,441.83, reduced from its original claim of $1,998,720.15 prior to our opinion on entitlement. We shall only discuss those items still in dispute between the parties.

<u>Allocation and Reasonableness of Legal Fees</u>

The major area of dispute between the parties concerns the allocation of the fees and expenses among the various matters involved in these appeals. As recited in our prior opinion, only five of the numerous issues before the Board in these appeals were the subject of a hearing and the appeals were settled, reserving several matters, prior to issuance of a formal decision on the litigated issues. One reservation was:

> c. [T]his settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act to recover whatever legal fees and litigation expenses to which he may be entitled in connection with these claims and appeals. The Parties stipulate that the issues of prevailing party and substantial justification will be decided on the basis of the record made at the first trial.

The parties are not in agreement as to the impact of this reservation on allocation of allowable fees and litigation expenses. The Government's position is that allocation should be based solely on our determinations of prevailing party and substantial justification on the litigated issues without any consideration of the issues which were not tried but which were part of the settlement. Therefore, it proposes that the allocation should be on some objective basis such as the ratio of proposed findings of fact in applicant's post-hearing brief for issues in which we concluded the Government's position was substantially justified or applicant was not the prevailing party (80 percent) or the ratio of the number of exhibits introduced into evidence at the hearing using the same approach (which calculates to approximately 74 per cent).

Applicant maintains that this was not the intent of the parties in entering into the reservation set forth above and that the allocation must take into consideration all issues which were included in the settlement and the various stages at which the fees and expenses were incurred. Neither of the present Government counsel participated in the actual settlement of these appeals on the merits or in the drafting of the settlement agreement or release language set forth above. We conclude that the Government's proposal for an allocation on either basis set forth above or some similar basis is too mechanical for the resolution of this issue. It also fails to recognize substantial Government claims totalling over $2,500,000 (for excess costs of reprocurement, recovery of alleged unliquidated progress payments, costs of unreturned Government furnished material, and reduction in price for delivery of substandard items) which were not pursued by the Government as a result of the settlement of these appeals. We, therefore, conclude that recovery of fees and expenses is not to be based solely on our determinations concerning the litigated issues.

Nor can we agree with the Government that the applicant has failed to properly itemize or segregate its application on the basis of the various issues or that the amounts charged are unreasonable. This is not a situation where the applicant has presented us with unsupported figures. The application is supported with in excess of a file drawer of data, including detailed, itemized statements from each of the law firms and experts involved in these appeals. To require the depth of detail demanded by the Government would require that an entire new accounting system be developed for any appeal which would potentially have an application filed under the Equal Access to Justice Act and, in our view, would go far beyond the types of detail necessary for us to reach a jury verdict. We recognize that the most difficult types of allocation involve situations where the parties have settled their disputes, but that does not preclude recovery under the Equal Access to Justice Act.

In our decision on the merits of this application, we indicated that the claims involved in the underlying appeals were intertwined and difficult of segregation. By the same token, we cannot use any of the mechanistic approaches suggested by the Government in allocating legal fees and expenses. Nor were many of the legal fees and expenses incurred capable of the type of billing segregation which the Government argues should have been maintained. Applicant, recognizing that some allocation must be made, has suggested the total amount it seeks in this application be reduced by $100,000. There is no rationale or basis for using this amount to reach a jury verdict and we decline to do so.

The problems involved in allocating between the fees and expenses which are recoverable under EAJA is the reason that the parties were urged to negotiate a settlement based on our entitlement opinion. Their failure to do so will not preclude this Board from reaching a jury verdict since the detailed and carefully prepared submittals by the applicant do give us a basis for reaching such a verdict.



000271

Analysis of the services of each of the three law firms which represented the applicant up to and including the final briefings of quantum under this application makes it possible to reach a jury verdict for that portion of the legal fees and expenses which we conclude are recoverable under this application. Applicant's first legal counsel, Paul, Gordon & Friedland, was involved in early stages of the appeals. This included the initial discovery, including depositions, and the designation of issues which the parties considered the major areas of dispute. As previously noted, it was anticipated at the time of such designation that, if those issues were resolved, the parties would probably be able to negotiate settlements as to the remainder. A great amount of time was spent reviewing documentary evidence - a necessary exercise before one could even begin to determine to which issue or issues particular evidence pertained. This discovery was not limited to the issues which did go to hearing but encompassed all of the issues, including the Government claims of $2.5 million. We estimate that about half of this firm's efforts pertained to matters as to which appellant was the prevailing party and the Government's position was not substantially justified. Therefore, we conclude that appellant is entitled to recover 50 per cent of allowable legal fees for the services of Paul, Gordon & Friedland.

That firm was replaced prior to the oral hearing of the litigated issues by the legal firm of Rogers and Wells. At its request, an additional issue was added and it prepared, tried and briefed the litigated issues and attempted to negotiate a settlement before and after post-hearing conferences concerning probable outcome of the litigated issues. Since most of its efforts concerned the issues for which we have reached conclusions as to who was the prevailing party and for which the Government's position was or was not substantially justified, we conclude that - based on our earlier decision as to prevailing party and substantial justification - 30 per cent of the allowable legal fees of Rogers & Wells are recoverable under this application.

Applicant was then represented by McKenna, Conner & Cuneo, who became involved after unsuccessful settlement negotiations by the parties after hearing, briefing and post-hearing negotiations. They were involved in settlement negotiations with and without the presiding judge, preparation for trial of all remaining issues, including quantum, ultimate settlement of the appeals and preparation and presentation of the application for legal fees and litigation expenses for these appeals. The applicant argues that all of the efforts of McKenna, Conner & Cuneo were after litigation and briefing and were directed toward preparation for hearing of the remaining issues and of quantum and the fees and expenses involved in this application. However, recovery can be had only for that portion of the fees and expenses involved in this application in which applicant is considered the prevailing party and the Government's position was not substantially justified. It is for this reason that we do not agree with applicant's segregation of expenses into those incurred before 30 June 1986 (the date of the last submittal of proposed findings of fact following the oral hearing

on a portion of the issues involved in the appeals) and those incurred after that date or that all time in compiling and submitting the EAJA claim is recoverable. We conclude – again based on our estimate of what work pertained to matters as to which appellant was the prevailing party and the Government's position was not substantially justified – that the applicant is entitled to recover 75 per cent of the allowable legal fees of McKenna, Conner & Cuneo.

In summary, we have reached the following conclusions regarding the percentage of allowable fees which should be recovered by applicant:

| | |
|---|---|
| Paul, Gordon & Friedland | 50% |
| Rogers & Wells | 30% |
| McKenna, Conner & Cuneo | 75% |

The Government further argues that applicant's fees are unreasonable since they include additional hours generated because of two changes in counsel by applicant and because of unnecessary depositions taken by appellant. The hours are challenged in the abstract. No specific number of hours are designated. Because of the number of appeals and the complexity of issues presented, we conclude that the number and length of depositions was not unreasonable. To the extent that there might have been additional billable hours caused by change in counsel, they have been included in the jury verdict percentages set forth above. The Government also challenges estimated legal and accounting fees for additional services anticipated as a result of this opinion. The application includes five hours for such legal and six hours for such accounting fees. Since the applicant again changed its counsel after closing of the record for this application, we have allowed one hour for a telephone conference call between counsel and the presiding judge on this matter on 12 July 1990, and have reduced the total fees for McKenna, Conner & Cuneo by four hours ($500.00), resulting in claimed legal fees of $160,598 for that firm.

The hours claimed have been adjusted by applicant to reflect the other amounts which the Government has challenged. We see no need to set them forth here since they are clearly delineated in the schedules attached to applicant's submittal of 3 May 1990. Total legal fees, therefore, are as follows:

| | | |
|---|---|---|
| Paul, Gordon & Friedland | $190,725.00 x 50% = | $95,362.50 |
| Rogers & Wells | 174,412.50 x 30% = | 52,323.75 |
| McKenna, Conner & Cuneo | 160,598.00 x 75% = | 120,448.50 |
| | TOTAL | $268,134.75 |

Expenses

Applicant has conceded certain adjustments made in expenses which it claims. Applying these adjustments and allocating the expenses on the same basis that legal fees have been allocated, we conclude applicant is entitled to recover expenses as follows:

| | | |
|---|---|---|
| Paul, Gordon & Friedland | $50,538.31 x 50% = | $25,269.16 |
| Rogers & Wells | 90,266.96 x 30% = | 27,080.09 |
| McKenna, Conner & Cuneo | 13,584.00 x 75% = | 13,938.00 |
| | TOTAL | $66,287.25 |

Paralegal Expenses

The application contains paralegal fees billed by Paul, Gordon & Friedland and by McKenna, Conner & Cuneo. No paralegal fees were billed by Rogers & Wells. The paralegal engaged by Paul, Gordon & Friedland, was an independent contractor who was paid $25 per hour by the firm and the Government does not challenge that the amount claimed of $32,540 represents paralegal costs to that firm.

Paralegal fees for McKenna, Conner & Cuneo were billed at $75 per hour. Recognizing the limitation to recovery under EAJA for cost to the law firm for its paralegals by this and other Boards, in its initial application, paralegal fees for 689.5 hours were included at a rate of $48 per hours for a total of $33,321.70. In its 15 March 1990 submittal (after our decision on entitlement) the Government challenged this hourly rate and argues that the hourly rate should be based on the annual salary paid the paralegal ($26,600) plus pension contribution, FICA and bonus ($6,650) divided by annual working hours of 2080. This calculates to $16 per hour. The Government, therefore, argues that the allowable amount should be $11,032 rather than the amount claimed by applicant. We do not agree with the applicant that the Government's challenge of the hourly rate was untimely.

The difference results from inclusion of indirect costs in the hourly rate computed based on the method of allocating indirect costs and by basing the hourly rate on 1300 billable hours per paralegal per year used for accounting and budgeting purposes by the McKenna, Conner & Cuneo, East Coast Practice Group. The Government argues that these expenses should be subsumed in the legal fees not as part of paralegal costs. We conclude that it is appropriate to include indirect costs as part of the cost to the law firm of its paralegals since they generate indirect costs for the firm. Nor do we consider the method of allocation of these indirect costs unreasonable.

We see no necessity to recite in detail the method by which the indirect costs were determined (App.'s Suppl. Brief in Support of Its Application for Fees Pursuant to the EAJA, 16 Feb. 1990, Exh. 3). The indirect costs applied in this instance are less than half of the total figure included in the claim for the hourly paralegal rate. The Government has not disputed the underlying figures or method of computation and we conclude that they appear reasonable. By the same token, the utilization of 1300 hours per

year rather than 2000 is acceptable to us. The amount of unbillable time during the year becomes part of overhead for an employee and is an appropriate part of the cost to the firm for the paralegal's services. We, therefore, hold that applicant is entitled to reimbursement under EAJA for the proportionate amount of paralegal hours which we have concluded should be allowed for services of the particular law firm involved.

| | | |
|---|---|---|
| Paul, Gordon & Friedland | $32,540.00 x 50% = | $16,270.00 |
| McKenna, Conner & Cuneo | 33,321.70 x 75% = | 24,991.28 |
| | TOTAL | $41,261.28 |

Accounting Expenses

Applicant includes accounting fees and expenses from three sources in its claim. The charges have been adjusted to reflect the limitation of $75 per hour maximum allowable fees and to eliminate any duplication of charges where listed both directly and included in the invoices of various legal firms, as follows:

| | | |
|---|---|---|
| Gene G. Burnhurst, Accountant | 1,366.00 hrs(1982-84) | $15,160.00 |
| H.K. Grimshaw | | |
| 1983 | unk. hrs | 356.00 |
| 1987 | unk. hrs | 275.00 |
| Peter Elliott Accountancy Corp. | | |
| 1983 | 145.20 hrs | 8,894.00 |
| 1984 | 305.00 hrs | 18,368.03 |
| 1985 | 109.75 hrs | 7,628.15 |
| 1986 | 25.25 hrs | 1,872.75 |
| 1987 | 156.50 hrs | 12,839.16 |
| 1988 | 276.50 hrs | 22,131.59 |
| 1989-90 | 307.25 hrs | 18,640.70 |

The Government has challenged some of the expenses of the Peter Elliott Accountancy Corp., most especially invoices dated 5, 18 and 24 April 1990. Each of these invoices is attached to applicant's submittal of 3 May 1990 and indicates it was related to updating the EAJA claim or was related to attending the settlement conference at this Board. The Government also argues that Mr. Elliott's presence was not required at the settlement conference so that all fees and expenses related to his attending that conference should be disallowed as unreasonable. We do not agree. The conference was an attempt to negotiate the quantum to be paid under EAJA based on the Board's entitlement decision since the parties had been unable to resolve the matter. While it was unsuccessful, the presence of the accountant who prepared the detailed schedules which were the basis for the quantum was both understandable and reasonable. The Government also challenges that 17 hours were spent revising the EAJA claim for final submission on the theory that it was prepared using a "lotus" type spreadsheet software program which the Government argues a clerk could have modified in two or three hours. We do not consider this argument by counsel in his letter of 16 May 1990 a sufficient basis for holding the charge unreasonable. The claim summary comprised 22 printed pages of spread sheets with a number of changes on a line by line basis to adjust for corrections

and limitations on hourly rates. Corrections consisted of more than the mechanical correction of spread sheets. Someone had to review and note the corrections as well as review the corrected schedules. The Government also challenges the previously noted six hours which are included in the submittal as a charge for Peter Elliott Accountancy Corp. for review and finalization of the quantum portion of this application after this opinion issues. We have no authority to allow recovery for expenses which may be incurred in the future and have eliminated them from the claim, thereby reducing the 1989-90 Peter Elliott Accountancy Corp. fees from $18,640.70 to $18,190.70. We, therefore, conclude that the amounts incurred for accounting services were reasonable and, in the nature of a jury verdict, allowable in accordance with the percentages allocated for legal services for the similar time frames, as follows:

| | | |
|---|---|---|
| Gene G. Burnhurst, Accountant | $15,160.00 @ 50% | $ 7,580.00 |
| H.K. Grimshaw | | |
| 1983 | 356.00 @ 50% | 178.00 |
| 1987 | 275.00 @ 75% | 206.25 |
| Peter Elliott Accountancy Corp. | | |
| 1983 | 8,894.00 @ 50% | 4,447.00 |
| 1984 | 18,368.03 @ 50% | 9,184.02 |
| 1985 | 7,628.15 @ 30% | 2,288.45 |
| 1986 | 1,872.75 @ 30% | 561.83 |
| 1987 | 12,839.16 @ 75% | 9,629.37 |
| 1988 | 22,131.59 @ 75% | 16,598.69 |
| 1989-90 | 18,190.70 @ 75% | 13,643.03 |
| | TOTAL | $64,316.64 |

Expert Witness Fees and Expenses

In our entitlement opinion on this application we concluded that, pursuant to EAJA 5 U.S.C. § 504(b)(1)(A) and DFARs 37.104-73(1), compensation of expert witnesses could not exceed the highest rate for grade GS-15, which, as of 1987, was $33.53 per hour. Applicant argues that this rate should be modified by reducing the number of annual hours in the divisor to 1352 hours (instead of the 2087 used) by elimination of vacation time, holidays, sick leave, and an "efficiency quotient" and then increasing the result for indirect expenses and support. This results in an hourly fee of $73, which amount it has used in its revised claim. Applicant paid its experts, and the Government expert whom it deposed, at varying amounts between $100 and $150 per hour. The Government argues that the amount should be limited to the $33.53 hourly rate cited in our prior opinion.

The relevant portion of the statute provides:

> (A) "fees and other expenses" includes the reasonable expenses of expert witnesses....except that (i) <u>no expert witnesses shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the agency involved</u>....[emphasis added]

After issuance of our opinion on entitlement, the Government admitted that it paid the expert it had contracted to use in the oral hearing on the remaining issues and on quantum in these appeals, at an hourly rate in excess of the $75 hourly rate included by applicant in its revised claim. (The presumption that the Government's payment of its expert was proper and appropriate has not been rebutted.) */ We, therefore, modify our prior opinion and conclude that, pursuant to the statute set forth above, the amount of $75 per hour claimed by applicant is allowable since it does not exceed "the highest rate of compensation for expert witnesses paid by the agency involved."

Applying the percentages which we have concluded should be utilized on the basis of the type of activities involved in the various time frames, we conclude that applicant is entitled to recover for fees and expenses of expert witness as follows:

| | | |
|---|---|---|
| Pollack & Pollack, Inc. | $ 6,839.02 @ 75% | $ 5,129.27 |
| Magnal Limited | 59,840.64 @ 50% | 29,920.32 |
| Dole & Associates | 900.00 @ 75% | 675.00 |
| | TOTAL | $35,724.59 |

## Other Expenses

In addition to its claim for reimbursement of expenses incurred in deposing the Government expert (set forth above under "Dole & Associates"), applicant claims $84 for Pamela Gerkin. That invoice indicates 7 hours spent for "legal billing analysis." While not specifically challenged by the Government, we do not consider this amount sufficiently identified as to be allowable under this EAJA application.

## Summary

In summary, we conclude that allowable attorneys' fees and expenses under this EAJA application are as follows:

| | |
|---|---|
| Legal Fees | $268,134.75 |
| Legal Expenses | 66,287.25 |
| Paralegal Expenses | 41,261.23 |
| Accounting Expenses | 64,316.64 |
| Expert Witness Expenses | 35,724.59 |
| TOTAL | $475,724.51 |

*/ The Government was ordered to submit a copy of the contract with its expert or an affidavit indicating the hourly rate paid its expert. It has failed to do so. Appellant paid the expert $100 per hour for his deposition.

Dated: 20 September 1990

RUTH C. BURG
Administrative Judge
Member of the Armed Services
Board of Contract Appeals

I concur

WILLIAM J. RUBERRY
Administrative Judge
Acting Chairman, Armed Services
Board of Contract Appeals

I concur

V. JOHN RIISMANDEL
Administrative Judge
Vice Chairman, Armed Services
Board of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals on an application for fees and other expenses incurred in connection with ASBCA No. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933 and 29934, Application of M. Bianchi of California, rendered in accordance with 5 U.S.C.A. § 504.

Dated: 25 SEP 1990

for EDWARD S. ADAMKEWICZ
Recorder, Armed Services
Board of Contract Appeals



000278

GEORGE E. GRAZIADEI, ESQ.
Nevada Bar Number 001775
SCOTT MICHAEL CANTOR, ESQ.
Nevada Bar Number 001713
302 E. Carson Avenue, Suite 400
Las Vegas, Nevada 89101
(702) 477-7733
Attorneys for Plaintiff

RECEIVED AND FILED
AUG 4 2 08 PM '94
CAROL C. FITZGERALD
CLERK
BY ____________
DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

MAURICE BIANCHI fdba as M. BIANCHI OF CALIFORNIA,

Plaintiff,

vs.

WILLIAM J. PERRY, Secretary of Defense, THE DEPARTMENT OF DEFENSE OF THE UNITED STATES OF AMERICA, VICE ADMIRAL E. M. STRAW, Director of the Defense Logistics Agency, THE DEFENSE LOGISTICS AGENCY, BRIGADIER GENERAL HENRY R. GLISSON, Commander of the Defense Personnel Support Center, a Division of the Defense Logistics Agency, THE DEFENSE PERSONNEL SUPPORT CENTER and DOES I through XX, inclusive,

Defendants.

CASE NO. CV-S-94-00686-HDM (RJJ)

COMPLAINT IN THE NATURE OF MANDAMUS

I.

JURISDICTION AND VENUE

1. This is an action to compel officers of the United States to perform their duties pursuant to 28 U.S.C. Section 1361. This Court has jurisdiction pursuant to 28 U.S.C. Section 1361, 28 U.S.C. Section 1346 and 28 U.S.C. Section 1331.

000279

2. Venue is proper in the United States District Court for the District of Nevada pursuant to 28 U.S.C. Section 1391(e)(4).

II.

PARTIES

3. MAURICE BIANCHI is a resident of the State of Nevada who formerly conducted a proprietorship under the name and style of M. BIANCHI OF CALIFORNIA.

4. The Defendant, WILLIAM J. PERRY, is the duly appointed, qualified and acting Secretary of Defense of the United States of America.

5. The Defendant, THE DEPARTMENT OF DEFENSE OF THE UNITED STATES OF AMERICA, is a constituent member of the executive branch of the United States Government.

6. The Defendant, VICE ADMIRAL E. M. STRAW, is the Director of THE DEFENSE LOGISTICS AGENCY.

7. The Defendant, THE DEFENSE LOGISTICS AGENCY, is a component or constituent division of THE DEPARTMENT OF DEFENSE OF THE UNITED STATES OF AMERICA.

8. The Defendant, BRIGADIER GENERAL HENRY R. GLISSON, is the Commander of THE DEFENSE PERSONNEL SUPPORT CENTER, a division of THE DEFENSE LOGISTICS AGENCY.

9. The Defendant, THE DEFENSE PERSONNEL SUPPORT CENTER, is a division of THE DEFENSE LOGISTICS AGENCY and a component of or a constituent division of THE DEPARTMENT OF DEFENSE OF THE UNITED STATES OF AMERICA.

10. That the true names or capacities, whether corporate or associate, individual or otherwise, of Defendants DOE I

through XX, inclusive, are unknown to Plaintiff who, therefore, sues said Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein as a DOE is legally responsible in some manner for the events and happenings herein referred to and proximately caused injury and damages thereby to Plaintiff as hereinafter alleged.

III.

ALLEGATIONS AND CLAIM FOR RELIEF

11. Plaintiff, MAURICE BIANCHI, who formerly conducted business as M. BIANCHI OF CALIFORNIA, who made a claim pursuant to the Equal Access to Justice Act, hereinafter referred to as "EAJA", 5 U.S.C. Section 504.

12. That on or about September 20, 1990, the Armed Services Board of Contract Appeals, hereinafter referred to as "ASBCA", rendered a Final Opinion granting Plaintiff an award of $475,724.51. A copy of that Opinion rendered pursuant to 5 U.S.C. Section 504(c)(1) is attached hereto and made a part hereof as Exhibit "1".

13. That on September 28, 1990, Plaintiff submitted a Certificate of Finality pursuant to Rule 29 of the ASBCA Rules (1980). The Government failed to submit a certificate of finality pursuant to said Rule.

14. Pursuant to Rule 17 of the ASBCA Equal Access to Justice Act Interim Procedures, an award made by the Board pursuant to its procedures shall be payable by the respondent agency over which the applicant has prevailed in the underlying contract disputes act appeal.

15. The Final Opinion of the ASBCA was made pursuant to an Application for Attorney's Fees and Expenses under the EAJA, 5 U.S.C. Section 504, and the Final Opinion was rendered pursuant to 5 U.S.C. Section 504(c)(1) and Rules 15 and 17 of the ASBCA'S Equal Access to Justice Act Interim Procedures.

16. Despite the Final Opinion of the ASBCA, the Defendants have failed and refused to pay the Plaintiff the sums awarded to him pursuant to that Final Opinion.

17. That on May 20, 1994, the Plaintiff, through counsel, made demand upon Defendant, BRIGADIER GENERAL HENRY T. GLISSON, for payment of the amount of the award, namely to wit, $475,724.51, for payment of the sums and for reasons for denial of the request for payment of the awards. A copy of that correspondence is attached hereto and made a part hereof as Exhibit "2".

18. That on July 8, 1994, the Plaintiff, through counsel, made demand upon THE DEFENSE LOGISTICS AGENCY, for payment of the award pursuant to the Final Opinion of the ASBCA. A copy of that correspondence is attached hereto and made a part hereof as Exhibit "3".

19. THE DEPARTMENT OF DEFENSE OF THE UNITED STATES OF AMERICA and its constituent agencies, including THE DEFENSE LOGISTICS AGENCY and THE DEFENSE PERSONNEL SUPPORT CENTER, failed to file a motion for reconsideration of the Final Opinion of the ASBCA and failed to file an appeal of that Opinion as provided for in 5 U.S.C. Section 504(c)(2).

20. THE DEPARTMENT OF DEFENSE OF THE UNITED STATES OF AMERICA, THE DEFENSE LOGISTICS AGENCY and THE DEFENSE PERSONNEL

SUPPORT CENTER have failed and refuse to pay any part of the award to the Plaintiff pursuant to the Final Opinion of the ASBCA, or any interest accruing thereon, and continues to so refuse.

21. That it has been necessary for the Plaintiff to engage services of counsel to prosecute this claim and he is entitled to a reasonable attorneys' fee and costs incurred under the Equal Access to Justice Act, 28 U.S. Code, Section 2412.

WHEREFORE Plaintiff prays this Court as follows:

1. For a judgment and order directing the Defendants, and each of them, to forthwith pay the Plaintiff any and all sums awarded to the Plaintiff pursuant to the Final Opinion of the ASBCA, Exhibit "1" hereto, together with interest thereon accruing from the date of the award, namely to wit, September 20, 1990;

2. For attorneys' fees and costs of suit incurred pursuant to 28 U.S.C. 2412;

3. For such other and further relief as to the Court seems just and proper in the premises.

DATED this 3rd of August, 1994.

Respectfully submitted,

GRAZIADEI & CANTOR, LTD.

BY: [signature]

GEORGE E. GRAZIADEI, ESQ.
SCOTT MICHAEL CANTOR, ESQ.
302 E. Carson Avenue, Suite 400
Las Vegas, Nevada 89101
Attorneys for Plaintiff
MAURICE BIANCHI

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Application Under Equal Access to Justice Act -- | ) | |
| M. Bianchi of California | ) | ASBCA Nos. 26362 26363 26364 26365 26366 26505 26506 26513 26642 29932 29933 29934 |
| Under Contract Nos. DLA100-79-C-2894 DLA100-80-C-2990 DLA100-80-C-2972 | ) | |

APPEARANCE(S) FOR THE APPLICANT: Michael A. Hordell, Esq.
Petrillo & Hordell
Washington, D.C.

APPEARANCE(S) FOR THE GOVERNMENT: Alvin M. LaCoste, Esq.
Wayne J. Bober, Esq.
Trial Attorneys
Defense Personnel Support Center (DLA)
Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE BURG

On 29 September 1989 the Board issued its opinion on many of the issues involved in this application for attorney's fees and expenses under the Equal Access to Justice Act, 5 U. S. C. § 504, and remanded the matter to the parties for negotiation in accordance with that decision (ASBCA No. 26362, et al, 90-1 BCA ¶ 22,369). The parties were unable to reach agreement on quantum. Since a settlement conference with the parties and the presiding judge also proved unsuccessful, the Board will resolve quantum based upon the extensive documentation filed by the parties.

In our decision on the merits of this application, we set forth a detailed discussion about the contracts involved in the dispute, the settlement of which resulted in this application. We see no necessity for a detailed repetition in this opinion. We concluded (1) that the Government's position was not substantially justified in failing to grant applicant an extension of time for imposition of a first article inspection requirement, (2) that the Government's position was substantially justified as to the pattern problems arising under these contracts, (3) that the Government was not substantially justified in refusing to extend delivery dates under Contract 2894, so that the contractor was forced to accelerate production under that contract, (4) that the Government was not responsible for costs incurred in prioritizing Contract 2290 before Contract 2284, (5) that applicant is limited in its recovery of attorney fees to a maximum of $75.00 per hour, (6) that the parties should negotiate the impact on legal fees caused by the applicant's change of attorneys three (now four) times during the course of this litigation and the impact of assignment and reassignment

000284

EXHIBIT "1"