of Government counsel numerous times during the course of this litigation, (6) that the parties should negotiate whether any discovery in these appeals was unnecessary and should not be subject to reimbursement to applicant, (7) that fees and expenses for Mr. Bianchi were not reimbursable under this application, (8) that, under current regulations, expert witness fees are limited to $33.53 per hour plus travel and per diem expenses, (9) that accounting fees and expenses should be recalculated limiting professional fees to $75.00 per hour and eliminating any clerical services, such as word processing or typing which are considered office overhead expenses typically subsumed in professional hourly rates, and (10) that reasonableness of the number of accounting hours claimed should be negotiated by the parties.

When the parties were unable to resolve the quantum by negotiation, they submitted extensive briefs and documentation setting forth the specific amounts and items upon which they were unable to agree. Following the settlement conference, applicant made another submission in which it made additional adjustments to reflect matters raised by the Government. Applicant's revised claim is $925,441.83, reduced from its original claim of $1,998,720.15 prior to our opinion on entitlement. We shall only discuss those items still in dispute between the parties.

Allocation and Reasonableness of Legal Fees

The major area of dispute between the parties concerns the allocation of the fees and expenses among the various matters involved in these appeals. As recited in our prior opinion, only five of the numerous issues before the Board in these appeals were the subject of a hearing and the appeals were settled, reserving several matters, prior to issuance of a formal decision on the litigated issues. One reservation was:

> c. [T]his settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act to recover whatever legal fees and litigation expenses to which he may be entitled in connection with these claims and appeals. The Parties stipulate that the issues of prevailing party and substantial justification will be decided on the basis of the record made at the first trial.

The parties are not in agreement as to the impact of this reservation on allocation of allowable fees and litigation expenses. The Government's position is that allocation should be based solely on our determinations of prevailing party and substantial justification on the litigated issues without any consideration of the issues which were not tried but which were part of the settlement. Therefore, it proposes that the allocation should be on some objective basis such as the ratio of proposed findings of fact in applicant's post-hearing brief for issues in which we concluded the Government's position was substantially justified or applicant was not the prevailing party (80 percent) or the ratio of the number of exhibits introduced into evidence at the hearing using the same approach (which calculates to approximately 74 per cent).

Applicant maintains that this was not the intent of the parties in entering into the reservation set forth above and that the allocation must take into consideration all issues which were included in the settlement and the various stages at which the fees and expenses were incurred. Neither of the present Government counsel participated in the actual settlement of these appeals on the merits or in the drafting of the settlement agreement or release language set forth above. We conclude that the Government's proposal for an allocation on either basis set forth above or some similar basis is too mechanical for the resolution of this issue. It also fails to recognize substantial Government claims totalling over $2,500,000 (for excess costs of reprocurement, recovery of alleged unliquidated progress payments, costs of unreturned Government furnished material, and reduction in price for delivery of substandard items) which were not pursued by the Government as a result of the settlement of these appeals. We, therefore, conclude that recovery of fees and expenses is not to be based solely on our determinations concerning the litigated issues.

Nor can we agree with the Government that the applicant has failed to properly itemize or segregate its application on the basis of the various issues or that the amounts charged are unreasonable. This is not a situation where the applicant has presented us with unsupported figures. The application is supported with in excess of a file drawer of data, including detailed, itemized statements from each of the law firms and experts involved in these appeals. To require the depth of detail demanded by the Government would require that an entire new accounting system be developed for any appeal which would potentially have an application filed under the Equal Access to Justice Act and, in our view, would go far beyond the types of detail necessary for us to reach a jury verdict. We recognize that the most difficult types of allocation involve situations where the parties have settled their disputes, but that does not preclude recovery under the Equal Access to Justice Act.

In our decision on the merits of this application, we indicated that the claims involved in the underlying appeals were intertwined and difficult of segregation. By the same token, we cannot use any of the mechanistic approaches suggested by the Government in allocating legal fees and expenses. Nor were many of the legal fees and expenses incurred capable of the type of billing segregation which the Government argues should have been maintained. Applicant, recognizing that some allocation must be made, has suggested the total amount it seeks in this application be reduced by $100,000. There is no rationale or basis for using this amount to reach a jury verdict and we decline to do so.

The problems involved in allocating between the fees and expenses which are recoverable under EAJA is the reason that the parties were urged to negotiate a settlement based on our entitlement opinion. Their failure to do so will not preclude this Board from reaching a jury verdict since the detailed and carefully prepared submittals by the applicant do give us a basis for reaching such a verdict.

Analysis of the services of each of the three law firms which represented the applicant up to and including the final briefings of quantum under this application makes it possible to reach a jury verdict for that portion of the legal fees and expenses which we conclude are recoverable under this application. Applicant's first legal counsel, Paul, Gordon & Friedland, was involved in early stages of the appeals. This included the initial discovery, including depositions, and the designation of issues which the parties considered the major areas of dispute. As previously noted, it was anticipated at the time of such designation that, if those issues were resolved, the parties would probably be able to negotiate settlements as to the remainder. A great amount of time was spent reviewing documentary evidence — a necessary exercise before one could even begin to determine to which issue or issues particular evidence pertained. This discovery was not limited to the issues which did go to hearing but encompassed all of the issues, including the Government claims of $2.5 million. We estimate that about half of this firm's efforts pertained to matters as to which appellant was the prevailing party and the Government's position was not substantially justified. Therefore, we conclude that appellant is entitled to recover 50 per cent of allowable legal fees for the services of Paul, Gordon & Friedland.

That firm was replaced prior to the oral hearing of the litigated issues by the legal firm of Rogers and Wells. At its request, an additional issue was added and it prepared, tried and briefed the litigated issues and attempted to negotiate a settlement before and after post-hearing conferences concerning probable outcome of the litigated issues. Since most of its efforts concerned the issues for which we have reached conclusions as to who was the prevailing party and for which the Government's position was or was not substantially justified, we conclude that — based on our earlier decision as to prevailing party and substantial justification — 30 per cent of the allowable legal fees of Rogers & Wells are recoverable under this application.

Applicant was then represented by McKenna, Conner & Cuneo, who became involved after unsuccessful settlement negotiations by the parties after hearing, briefing and post-hearing negotiations. They were involved in settlement negotiations with and without the presiding judge, preparation for trial of all remaining issues, including quantum, ultimate settlement of the appeals and preparation and presentation of the application for legal fees and litigation expenses for these appeals. The applicant argues that all of the efforts of McKenna, Conner & Cuneo were after litigation and briefing and were directed toward preparation for hearing of the remaining issues and of quantum and the fees and expenses involved in this application. However, recovery can be had only for that portion of the fees and expenses involved in this application in which applicant is considered the prevailing party and the Government's position was not substantially justified. It is for this reason that we do not agree with applicant's segregation of expenses into those incurred before 30 June 1986 (the date of the last submittal of proposed findings of fact following the oral hearing

on a portion of the issues involved in the appeals) and those incurred after that date or that all time in compiling and submitting the EAJA claim is recoverable. We conclude — again based on our estimate of what work pertained to matters as to which appellant was the prevailing party and the Government's position was not substantially justified — that the applicant is entitled to recover 75 per cent of the allowable legal fees of McKenna, Conner & Cuneo.

In summary, we have reached the following conclusions regarding the percentage of allowable fees which should be recovered by applicant:

| | |
|---|---|
| Paul, Gordon & Friedland | 50% |
| Rogers & Wells | 30% |
| McKenna, Conner & Cuneo | 75% |

The Government further argues that applicant's fees are unreasonable since they include additional hours generated because of two changes in counsel by applicant and because of unnecessary depositions taken by appellant. The hours are challenged in the abstract. No specific number of hours are designated. Because of the number of appeals and the complexity of issues presented, we conclude that the number and length of depositions was not unreasonable. To the extent that there might have been additional billable hours caused by change in counsel, they have been included in the jury verdict percentages set forth above. The Government also challenges estimated legal and accounting fees for additional services anticipated as a result of this opinion. The application includes five hours for such legal and six hours for such accounting fees. Since the applicant again changed its counsel after closing of the record for this application, we have allowed one hour for a telephone conference call between counsel and the presiding judge on this matter on 12 July 1990, and have reduced the total fees for McKenna, Conner & Cuneo by four hours ($300.00), resulting in claimed legal fees of $160,598 for that firm.

The hours claimed have been adjusted by applicant to reflect the other amounts which the Government has challenged. We see no need to set them forth here since they are clearly delineated in the schedules attached to applicant's submittal of 3 May 1990. Total legal fees, therefore, are as follows:

| | | |
|---|---|---|
| Paul, Gordon & Friedland | $190,725.00 x 50% = | $95,362.50 |
| Rogers & Wells | 174,412.50 x 30% = | 52,323.75 |
| McKenna, Conner & Cuneo | 160,598.00 x 75% = | 120,448.50 |
| | TOTAL | $268,134.75 |



000288

E-8-015

Expenses

Applicant has conceded certain adjustments made in expenses which it claims. Applying these adjustments and allocating the expenses on the same basis that legal fees have been allocated, we conclude applicant is entitled to recover expenses as follows:

| | | |
|---|---|---|
| Paul, Gordon & Friedland | $50,538.31 x 50% = | $25,269.16 |
| Rogers & Wells | 90,266.96 x 30% = | 27,080.09 |
| McKenna, Conner & Cuneo | 18,584.00 x 75% = | 13,938.00 |
| | TOTAL | $66,287.25 |

Paralegal Expenses

The application contains paralegal fees billed by Paul, Gordon & Friedland and by McKenna, Conner & Cuneo. No paralegal fees were billed by Rogers & Wells. The paralegal engaged by Paul, Gordon & Friedland, was an independent contractor who was paid $25 per hour by the firm and the Government does not challenge that the amount claimed of $32,540 represents paralegal costs to that firm.

Paralegal fees for McKenna, Conner & Cuneo were billed at $75 per hour. Recognizing the limitation to recovery under EAJA for cost to the law firm for its paralegals by this and other Boards, in its initial application, paralegal fees for 689.5 hours were included at a rate of $48 per hours for a total of $33,321.70. In its 15 March 1990 submittal (after our decision on entitlement) the Government challenged this hourly rate and argues that the hourly rate should be based on the annual salary paid the paralegal ($26,600) plus pension contribution, FICA and bonus ($6,650) divided by annual working hours of 2080. This calculates to $16 per hour. The Government, therefore, argues that the allowable amount should be $11,032 rather than the amount claimed by applicant. We do not agree with the applicant that the Government's challenge of the hourly rate was untimely.

The difference results from inclusion of indirect costs in the hourly rate computed based on the method of allocating indirect costs and by basing the hourly rate on 1300 billable hours per paralegal per year used for accounting and budgeting purposes by the McKenna, Conner & Cuneo, East Coast Practice Group. The Government argues that these expenses should be subsumed in the legal fees not as part of paralegal costs. We conclude that it is appropriate to include indirect costs as part of the cost to the law firm of its paralegals since they generate indirect costs for the firm. Nor do we consider the method of allocation of these indirect costs unreasonable.

We see no necessity to recite in detail the method by which the indirect costs were determined (App.'s Suppl. Brief in Support of Its Application for Fees Pursuant to the EAJA, 16 Feb. 1990, Exh. 3). The indirect costs applied in this instance are less than half of the total figure included in the claim for the hourly paralegal rate. The Government has not disputed the underlying figures or method of computation and we conclude that they appear reasonable. By the same token, the utilization of 1300 hours per

year rather than 2080 is acceptable to us. The amount of unbillable time during the year becomes part of overhead for an employee and is an appropriate part of the cost to the firm for the paralegal's services. We, therefore, hold that applicant is entitled to reimbursement under EAJA for the proportionate amount of paralegal hours which we have concluded should be allowed for services of the particular law firm involved.

| | | |
|---|---|---|
| Paul, Gordon & Friedland | $32,540.00 x 50% = | $16,270.00 |
| McKenna, Conner & Cuneo | 33,321.70 x 75% = | 24,991.28 |
| | TOTAL | $41,261.28 |

Accounting Expenses

Applicant includes accounting fees and expenses from three sources in its claim. The charges have been adjusted to reflect the limitation of $75 per hour maximum allowable fees and to eliminate any duplication of charges where listed both directly and included in the invoices of various legal firms, as follows:

| | | |
|---|---|---|
| Gene G. Burnhurst, Accountant | 1,366.00 hrs (1982-84) | $15,160.00 |
| H.K. Grimshaw | | |
| 1983 | unk. hrs | 356.00 |
| 1987 | unk. hrs | 275.00 |
| Peter Elliott Accountancy Corp. | | |
| 1983 | 145.30 hrs | 8,894.00 |
| 1984 | 305.00 hrs | 18,368.03 |
| 1985 | 109.75 hrs | 7,628.15 |
| 1986 | 25.25 hrs | 1,872.75 |
| 1987 | 156.50 hrs | 12,839.16 |
| 1988 | 276.50 hrs | 22,131.59 |
| 1989-90 | 307.25 hrs | 18,640.70 |

The Government has challenged some of the expenses of the Peter Elliott Accountancy Corp., most especially invoices dated 5, 18 and 24 April 1990. Each of these invoices is attached to applicant's submittal of 3 May 1990 and indicates it was related to updating the EAJA claim or was related to attending the settlement conference at this Board. The Government also argues that Mr. Elliott's presence was not required at the settlement conference so that all fees and expenses related to his attending that conference should be disallowed as unreasonable. We do not agree. The conference was an attempt to negotiate the quantum to be paid under EAJA based on the Board's entitlement decision since the parties had been unable to resolve the matter. While it was unsuccessful, the presence of the accountant who prepared the detailed schedules which were the basis for the quantum was both understandable and reasonable. The Government also challenges that 17 hours were spent revising the EAJA claim for final submission on the theory that it was prepared using a "lotus" type spreadsheet software program which the Government argues a clerk could have modified in two or three hours. We do not consider this argument by counsel in his letter of 16 May 1990 a sufficient basis for holding the charge unreasonable. The claim summary comprised 22 printed pages of spread sheets with a number of changes on a line by line basis to adjust for corrections

and limitations on hourly rates. Corrections consisted of more than the mechanical correction of spread sheets. Someone had to review and note the corrections as well as review the corrected schedules. The Government also challenges the previously noted six hours which are included in the submittal as a charge for Peter Elliott Accountancy Corp. for review and finalization of the quantum portion of this application after this opinion issues. We have no authority to allow recovery for expenses which may be incurred in the future and have eliminated them from the claim, thereby reducing the 1989-90 Peter Elliott Accountancy Copp. fees from $18,640.70 to $18,190.70. We, therefore, conclude that the amounts incurred for accounting services were reasonable and, in the nature of a jury verdict, allowable in accordance with the percentages allocated for legal services for the similar time frames, as follows:

| | | |
|---|---|---|
| Gene G. Burnhurst, Accountant | $15,160.00 @ 50% | $ 7,580.00 |
| H.K. Grimshaw | | |
| 1983 | 356.00 @ 50% | 178.00 |
| 1987 | 275.00 @ 75% | 206.25 |
| Peter Elliott Accountancy Corp. | | |
| 1983 | 8,894.00 @ 50% | 4,447.00 |
| 1984 | 18,368.03 @ 50% | 9,184.02 |
| 1985 | 7,628.15 @ 30% | 2,288.45 |
| 1986 | 1,872.75 @ 30% | 561.83 |
| 1987 | 12,839.16 @ 75% | 9,629.37 |
| 1988 | 22,131.59 @ 75% | 16,598.69 |
| 1989-90 | 18,190.70 @ 75% | 13,643.03 |
| | TOTAL | $64,316.64 |

## Expert Witness Fees and Expenses

In our entitlement opinion on this application we concluded that, pursuant to EAJA 5 U.S.C. § 504(b)(1)(A) and DFARs 37.104-70(1), compensation of expert witnesses could not exceed the highest rate for grade GS-15, which, as of 1987, was $33.53 per hour. Applicant argues that this rate should be modified by reducing the number of annual hours in the divisor to 1552 hours (instead of the 2087 used) by elimination of vacation time, holidays, sick leave, and an "efficiency quotient" and then increasing the result for indirect expenses and support. This results in an hourly fee of $75, which amount it has used in its revised claim. Applicant paid its experts, and the Government expert whom it deposed, at varying amounts between $100 and $150 per hour. The Government argues that the amount should be limited to the $33.53 hourly rate cited in our prior opinion.

The relevant portion of the statute provides:

> (A) "fees and other expenses" includes the reasonable expenses of expert witnesses.....except that (1) <u>no expert witnesses shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the agency involved</u>.....[emphasis added]



000291

E-8-018

After issuance of our opinion on entitlement, the Government admitted that it paid the expert it had contracted to use in the oral hearing on the remaining issues and on quantum in these appeals, at an hourly rate in excess of the $75 hourly rate included by applicant in its revised claim. (The presumption that the Government's payment of its expert was proper and appropriate has not been rebutted.) */ We, therefore, modify our prior opinion and conclude that, pursuant to the statute set forth above, the amount of $75 per hour claimed by applicant is allowable since it does not exceed "the highest rate of compensation for expert witnesses paid by the agency involved."

Applying the percentages which we have concluded should be utilized on the basis of the type of activities involved in the various time frames, we conclude that applicant is entitled to recover for fees and expenses of expert witness as follows:

| | | |
|---|---|---|
| Pollack & Pollack, Inc. | $ 6,839.02 @ 75% | $ 5,129.27 |
| Magnal Limited | 59,840.64 @ 50% | 29,920.32 |
| Dole & Associates | 900.00 @ 75% | 675.00 |
| | TOTAL | $35,724.59 |

Other Expenses

In addition to its claim for reimbursement of expenses incurred in deposing the Government expert (set forth above under "Dole & Associates"), applicant claims $84 for Pamela Gerkin. That invoice indicates 7 hours spent for "legal billing analysis." While not specifically challenged by the Government, we do not consider this amount sufficiently identified as to be allowable under this EAJA application.

Summary

In summary, we conclude that allowable attorneys' fees and expenses under this EAJA application are as follows:

| | |
|---|---|
| Legal Fees | $268,134.75 |
| Legal Expenses | 66,287.25 |
| Paralegal Expenses | 41,261.28 |
| Accounting Expenses | 64,316.64 |
| Expert Witness Expenses | 35,724.59 |
| TOTAL | $475,724.51 |

*/ The Government was ordered to submit a copy of the contract with its expert or an affidavit indicating the hourly rate paid its expert. It has failed to do so. Appellant paid the expert $100 per hour for his deposition.

Dated: 20 September 1990

RUTH C. BURG
Administrative Judge
Member of the Armed Services
Board of Contract Appeals

I concur

WILLIAM J. RUBERRY
Administrative Judge
Acting Chairman, Armed Services
Board of Contract Appeals

I concur

JOHN RIISMANDEL
Administrative Judge
Vice Chairman, Armed Services
Board of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals on an application for fees and other expenses incurred in connection with ASBCA No. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933 and 29934, Application of M. Bianchi of California, rendered in accordance with 5 U.S.C.A. § 504.

Dated: 25 SEP 1990

for
EDWARD S. ADAMKEWICZ
Recorder, Armed Services
Board of Contract Appeals

# Graziadei & Cantor, Ltd.

GEORGE E. GRAZIADEI
SCOTT MICHAEL CANTOR

May 20, 1994

PLEASE REFER TO:

Defense Logistics Attorney
Defense Personnel Support Center
DPSC-G
3000 South 20th Street
Philadelphia, Pennsylvania 79101-2419

Attn: Brigadier General Henry T. Glisson, Commander
Michael Trourelli, Chief Counsel

Re: Appeal of M. Bianchi of California
Under Contract Nos. DLA-100-80-C-2972
ASBCA Appeal Nos. 36518, 26362, et al.

Gentlemen:

On September 20, 1990, an Opinion was rendered in favor of M. Bianchi of California under the Equal Access to Justice Act on ASBCA Number 26362, et al. by Judge Ruth C. Burg in the amount of $475,724.51. A Certificate of Finality was filed in a timely manner with the ASBCA.

On February 10, 1993, an Opinion was rendered in favor of M. Bianchi of California under ASBCA 36518 by Judge Ruth C. Burg awarding to Bianchi $58,613.04 plus interest from November 17, 1987. A Certificate of Finality was also filed in a timely manner.

Repeated telephone calls and written communications were sent to Attorneys Thomas Hornack and John Logue requesting payment for the above awards. However, no payments have been made and no positive responses received from their office, although the appeal time has expired for these awards.

Pursuant to 5 USCS §555(e) request is hereby being made that you advise the undersigned of the reasons for denial of the request for payment of these awards as soon as possible. In the event you fail to do so in a timely manner, our client has instructed us to file an action before the U.S. District Court for the enforcement of said awards.

000294

EXHIBIT "2"

302 East Carson Avenue, Suite 400 • Las Vegas, Nevada 89101 • Telephone (702) 477-7733 • Telecopier (702) 477-0020

May 20, 1994
Page Two

Kindly guide yourself accordingly.

Very truly yours,

GRAZIADEI & CANTOR, LTD.

GEORGE E. GRAZIADEI, ESQ.

GEG/ah
cc: Thomas Hornack, Chief Trial Attorney
John Logue, Trial Attorney

# Graziadei & Cantor, Ltd.

GEORGE E. GRAZIADEI
SCOTT MICHAEL CANTOR

July 8, 1994

PLEASE REFER TO

Thomas G. Hornak, Esq.
Defense Logistics Agency
Defense Personal Support Center
2800 South 20th Street
Philadelphia, Pennsylvania 19101-8419

Re: ASBCA Nos. 36518 and 26362 et al.
Appeals of M. Bianchi of California
Under Contracts DLA 100-79-C-2894
DLA 100-80-C-2990
DLA 100-80-C-2992

Dear Mr. Hornak:

On June 8, 1994, you communicated your response to the ASBCA's orders of May 17 and May 23, 1994, wherein you acknowledged the government's liability for the VECP and EAJA awards. You relied on the fact that the decision of the Court of Appeals for the Federal Circuit's decision was not final and questioned as to whether the monies were the subject of Bianchi's assignments to the Bank of America.

You were made aware that the United States Court of Appeals for the Federal Circuit denied the government's Petition for Rehearing by a copy of my communication to the Armed Services Board of Contract Appeals dated July 1, 1994. On June 14, 1994, in our communication to the ASBCA as a supplement to our reply to your response, The case of Petro Elect. Construction Co., Inc., decided by the Board on August 27, 1987, wherein the Board ruled that claims arising under the Equal Access to Justice Act was a statutory right independent of rights guaranteed by the Contract or Contract Disputes Act was cited. Therefore, an assignment of the contract to the Bank of America did not include Bianchi's statutory right under the Equal Access to Justice Act Claim.

Therefore, the rationale of your response of June 8, 1994, is no longer valid to justify a delay in executing the Certificates of Finality so that Bianchi could be paid, forthwith.

000298

EXHIBIT "3"

Thomas J. Hornak, Esq.
July 8, 1994
Page Two.

In the event you fail to cause affirmative action for the payment to Bianchi for the above captioned awards, an action will be filed in the United States District Court within ten (10) days from the date hereof to enforce the payments together with sanctions.

Kindly guide yourself accordingly.

Very truly yours,

GRAZIADEI & CANTOR, LTD.

GEORGE E. GRAZIADEI, ESQ.

GEG/ah
cc: Maurice Bianchi

Case 1:04-cv-00440-MBH Document 26-4 Filed 11/15/2004 Page 14 of 30



district court did not err in denying the motion to suppress Edmo's statement.

AFFIRMED.

Maurice BIANCHI, fdba M. Bianchi of California, Plaintiff–Appellant,

v.

William J. PERRY, Secretary of Defense; United States Department of Defense; E.M. Straw, Vice Admiral, Director of the Defense Logistics Agency: The Defense Logistics Agency; Henry R. Glisson, Brigadier General, Commander of the Defense Personnel Support Center, a Division of the Defense Logistics Agency; The Defense Personnel Support Center, Defendants–Appellees.

No. 96–15869.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 1997.

Decided April 9, 1998.

Government contractor brought action to collect fees and expenses he was awarded under Equal Access to Justice Act (EAJA) in accordance with settlement agreement with government. The United States District Court for the District of Nevada, Howard D. McKibben, J., granted summary judgment for government. Contractor appealed. The Court of Appeals, Kleinfeid, Circuit Judge, held that: (1) lack of parallelism in paragraphs in settlement agreement did not establish parties' intent that contractor would take settlement amount free from setoff, but not EAJA award, and (2) prior appellate decision that government lacked setoff right as to settlement amount and interest had res judicata effect as to government's setoff rights against contractor's EAJA award.

Reversed.

1. Compromise and Settlement ⇐11

Lack of parallelism in paragraphs in settlement agreement between government and contractor regarding amounts to which contractor was entitled, amounts he could pursue under value engineering change proposal claims, and attorney fees and costs he could pursue under Equal Access to Justice Act (EAJA) did not establish parties' intent that contractor would take settlement amount free from setoff, but not EAJA award; in context of agreement, contractor's right to "pursue" award meant government would pay award once it was established. 28 U.S.C.A. § 2412.

2. Judgment ⇐720

Prior appellate decision that government lacked right to setoff against settlement and interest owed to contractor under settlement agreement, based on contractor's assignment to his bank and bank's assignment to Small Business Administration (SBA), had res judicata effect as to government's setoff rights with respect to attorney fees awarded to contractor pursuant to Equal Access to Justice Act (EAJA), which contractor retained right to pursue under settlement agreement. 28 U.S.C.A. § 2412; Restatement of Restitution § 12.

---

George E. Graziadei (On the Briefs); and Scott Michael Cantor (Argued), Graziadei & Cantor, Ltd., Las Vegas, NV, Gerson B. Kramer (Argued), Chevy Chase, MD, for plaintiff-appellant.

Mark A. Melnick, Commercial Litigation Branch, Department of Justice, Washington, DC, for defendants-appellees.

Appeal from the United States District Court for the District of Nevada Howard D. McKibben, District Judge, Presiding. D.C. No. CV-94-00686-HDM.

Before: PREGERSON, NOONAN and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

This is a res judicata case regarding settlement of a government contract dispute.

## Facts

The government hired Bianchi to sew garments for the military. In 1979 and 1980, it

contracted for Bianchi to make about 43,000 raincoats for the Navy, 27,000 women's jackets for the Air Force, and 125,000 men's coats. Bianchi borrowed money from Bank of America secured in part by an assignment of contract proceeds. The bank loan was guaranteed by the Small Business Administration. The bank went through the proper steps to obtain government approval of the assignments and to make them binding upon the government.

Claims arose in all directions. Bianchi and the bank had a dispute in state court over whether the bank properly performed its duties under the loan agreement. Bianchi and the United States had a dispute in the Armed Services Board of Contract Appeals over whether the government owed him more money. Eventually the bank and the government had a dispute as well.

Bianchi's claim against the military was settled by stipulation. The stipulation, made in September 1988, provided that Bianchi would recover $617,500 plus interest, the government would recover nothing on its claims, and Bianchi reserved his rights to pursue "value engineering change proposal claims," and to pursue his Equal Access to Justice Act claim for legal fees and expenses related to his claims.[1] The Armed Services Board of Contract Appeals then issued a decision accepting the stipulation, and saying "the appeals are sustained" and "in the nature of a consent judgment, the Board makes a monetary award in the amount of $617,500.00 with interest from 18 June 1981." With more than seven years of interest, the government's obligation under this judgment was $1,141,220.83. The government paid Bianchi that amount of money.

Two years later, in 1990, Bank of America filed a complaint in the United States Claims Court against the government. The bank's complaint said that Bianchi owed the bank more than $1.1 million, so the government should have paid the money to the bank, not to Bianchi. The government's answer in the Claims Court claimed a right to setoff. The government claimed that because the Small Business Administration had already paid the bank on its 90% guarantee of Bianchi's loan, and Bianchi owed the SBA more than the amount he had been paid, the government was entitled to setoff whatever Bianchi owed the SBA against what the government owed the bank.

The government filed a third-party complaint against Bianchi in the Claims Court proceeding. In that complaint, the government said that it paid Bianchi his $1.1 million settlement in error, because he owed the Small Business Administration more than that. The complaint says "the SBA was entitled to the entire $1,141,220.83. Consequently that money was erroneously paid to Mr. Bianchi. Neither he nor the bank was entitled to it.... The government is enti-

1. Here is the stipulation in full:

The parties to the above-listed appeals agree to stipulate to the following decision by the Board:

"1. The parties agree that Mr. Maurice Bianchi, as the successor to M. Bianchi of California, is entitled to recover $617,500.00 on his claims in the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26505, 26506, 26513, 26642, 29932, 29933 and 29934; that the government is entitled to take nothing on its claims in the following appeals: ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933 and 29934; and that Mr. Bianchi is entitled to interest computed in accordance with Clauses L78 (Disputes (1979 MAR)) of the contracts, at the rates prescribed by the Secretary of the Treasury, under the Renegotiation Act, Public Law 92-41, on the principal amount of $617,500, such interest to run from June 19, 1981 until the date of payment; and that the parties waive their rights to seek reconsideration of this stipulated decision of the Board or to appeal that stipulated decision;

"2. This settlement is without prejudice to Mr. Bianchi's right to pursue any and all Value Engineering Change Proposal Claims under his contracts with DPSC; and

"3. This settlement is without prejudice to Mr. Bianchi's right to pursue an application under the Equal Access to Justice Act to recover whatever legal fees and litigation expenses to which he may be entitled in connection with these claims and appeals. The parties stipulate that the issues of prevailing party and substantial justification will be decided on the basis of the record made at the first trial. The parties agree that the application for legal fees and litigation expenses under the Equal Access to Justice Act will be submitted within thirty days of receipt by Appellant of the agreed-upon settlement program."

Except as noted above, Appellant and the government agree to stipulate to the dismissal of these appeals with prejudice.

tled to the repayment of the $1,141,220.33 erroneously paid by it to Mr. Bianchi."

The bank initially lost in the Claims Court. The court held that the government may recover funds erroneously paid, under *American National Bank and Trust v. United States*, 23 Cl.Ct. 542, 547 (1991) and *United States v. Wurts*, 303 U.S. 414, 415, 58 S.Ct. 637, 638, 82 L.Ed. 932 (1938). Because the government had paid Bianchi in error, Bianchi had to return the money. The bank was entitled to nothing on its assignment, because the SBA had already paid the guarantee, and the bank had assigned the notes to the SBA. The Claims Court ruled that the government's erroneous payment to Bianchi had resulted from its own negligence, and it had not requested its money back until October of 1990, so interest was denied.

Bianchi appealed, and won. In a published decision, *Bank of America National Trust & Savings Association v. United States*, 23 F.3d 380 (Fed.Cir.1994), Bianchi won a determination that the government was not entitled to assert its claim against Bianchi at all. *Id.* at 384. The reason was that the government had settled on paying him $617,500 plus interest. The Federal Circuit said there is a strong policy of upholding and enforcing settlement agreements, and "the government's right to recoup erroneously paid funds cannot be invoked by the government as a means to circumvent a legal obligation." *Id.* at 383. The settlement was made at arms' length, there was no claim that Bianchi withheld material information, the government knew of the assignments to the bank and the bank's assignments to the SBA. The Federal Circuit noted that there was no evidence of any fraud, misdirection or concealment by Bianchi. "In the absence of any fraud, misdirection, or concealment, the government may not recover funds paid in good faith and to the satisfaction of the interested parties." *Id.*

The Federal Circuit pointed out that the government could easily have protected itself against liability to the bank, and perhaps did not because Bianchi would not have agreed to a settlement in which he would not receive the $617,500 plus interest. "[W]hatever the reason for its failure to protect itself, the government cannot now renege on its commitment to honor its settlement with Bianchi, into which it entered into voluntarily and with full knowledge of the facts." *Id.* The Federal Circuit considered whether the government could recover from its putatively mistaken payment by the indirect means of a third-party complaint on the bank's claim, even though the settlement had been incorporated in a final judgment, and decided that "the government should not be allowed to do indirectly what it is prohibited from doing directly." *Id.* at 384.

The bank prevailed against the government as well, based on the seniority of its claim. The Federal Circuit held that "the government's payment to Bianchi in settlement of the contract dispute was a payment under the contract that should have gone to the bank under the assignment." *Id.* at 384. The SBA contract had limited setoff rights, so that government rights against Bianchi could not be set off against the bank. *Id.* at 385.

Meanwhile, before the bank ever sued the government, Bianchi had litigated his claim for Equal Access to Justice attorney's fees and expenses before the Armed Services Board of Contract Appeals. After an opinion in 1989, and a remand for negotiation, the Board decided in a second opinion September 25, 1990, that Bianchi was entitled to $475,-724.51 for legal fees and expenses. But the government did not send Bianchi the money.

Eventually, after complying with all of the demand procedures required by statutes and regulations, Bianchi filed an action in the United States District Court for the District of Nevada, to collect the $475,724.51 EAJA fees and expenses he had won in the Armed Services Board of Contract Appeals. This was money he had spent in the early '80s to make the government pay him for the raincoats and jackets. The district court granted summary judgment against Bianchi on this claim. Bianchi's appeal of this summary judgment is what we have before us now.

The district court decided that Bianchi's EAJA claim was sufficiently distinct from the claim ruled upon by the Federal Circuit, so it should be treated differently for purposes of setoff. The district court concluded that the government could use its claim for mistaken payment as a setoff against what it owed

Bianchi on his successful $475,000 Equal Access to Justice Act award.

Analysis

The hard questions in this case relate to setoff. When the government makes a mistaken agreement to settle a claim (if indeed the agreement or payment was mistaken), should it be allowed to recover the money by setting it off against that claim or another? We do not have to answer that question. The Federal Circuit did. Even if the settlement was negligently made, even though it was with the government, a deal is a deal. Though other questions are raised, this case finally turns on whether the Federal Circuit decision is res judicata on setoff against another part of the same deal. It is.

I. Parole Evidence.

The settlement with Bianchi, for $617,500 in new money, may not have been erroneous at all. Bianchi submitted affidavits in opposition to summary judgment which tended to show that he and his lawyer had raised and discussed the SBA claims when they negotiated the $617,500 settlement. The affidavits indicated that the settlement was cut from $635,000 dollars to $617,500, in order to include a nominal amount satisfactory to the government to settle the SBA claims against Bianchi. In addition, the government had offered a $100,000 larger settlement that would include the Equal Access to Justice claim, or else had offered the lesser amount reserving Bianchi's right to pursue his Equal Access to Justice Act claim. Bianchi thought he would get more than $100,000, so he had turned down the $735,000 dollar offer to include EAJA fees and expenses. His $475,000 EAJA award shows he was right.

The district court held that this evidence should not be considered, under the parole evidence rule. Bianchi argues on appeal that it should be considered, because his affidavit and other materials show that the settlement stipulation was not a fully integrated agreement. Under Bianchi's theory, as evidenced by the affidavit and contemporaneous correspondence, the government's payment to him was not a mistake at all. The purpose was to pay him personally enough money to induce him to settle, and to pay that money without a silent setoff of what he owed the SBA on his defaulted and assigned bank loans.

We conclude that we do not have to decide whether the district court erred in excluding these materials under the parole evidence rule. Because the res judicata consequences of the Federal Circuit decision, combined with a fair reading of the stipulation and judgment before the Armed Services Board of Contract Appeals, are conclusive of the effect of the settlement agreement in favor of Bianchi, we need not decide whether the parole evidence should have been considered.

II. The Settlement Agreement.

[1] The stipulation the parties made is typical of the forms used to settle disputed claims in both directions, with specified rights reserved to allow one side to pursue additional amounts. The form is that (1) Bianchi "is entitled to recover" $617,500 plus interest, (2) "the government is entitled to take nothing on its claims," (3) the settlement is "without prejudice to" Bianchi's right to pursue "Value Engineering Change Proposal claims," and (4) the settlement is "without prejudice to" Bianchi's right to pursue an EAJA application to recover whatever fees and expenses he may be entitled to. Enormous numbers of claims are settled with similar forms every week, with the government and in innumerable private lawsuits about torts and contracts. We share the Federal Circuit's concern that "there is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into." *Bank of America*, 23 F.3d at 383.

Any honest and competent lawyer would understand this settlement agreement in the same way. It means Bianchi gets $617,500 plus interest, plus whatever he can win on his "Value Engineering Change Proposal claims," plus whatever he can win on his Equal Access to Justice Act claim. Attorney's fees claims often are broken out of a settlement, as in this one, because the parties cannot agree on what determinations a court will make on prevailing party, substantial justification, and amount, *see* 5 U.S.C. § 504, and each is willing to bear the risk of a less favorable determination than it expects.

000301

For a lawyer to enter into such a settlement agreement, with the unstated intention that his client should not pay the money agreed to, would be sharp practice. The government argues from lack of parallelism in the phrasing of the different paragraphs of the settlement agreement that Bianchi is only entitled to the $617,500 without setoff, not the EAJA award. The settlement agreement said Bianchi "is entitled to recover" the $617,500, but only that it is "without prejudice to" his "right to pursue" his Equal Access to Justice Act claim "to recover" attorneys' fees and expenses, so it did not agree to pay the EAJA award. The government's theory is that it promised Bianchi could "recover" the $617,500, but not the EAJA award, which it only left Mr. Bianchi free to "pursue."

We reject the distinction. It is apparent from a reading of the stipulation in its entirety that the parties did not mean that the government would only pay the $617,500, but dispute payment of what Mr. Bianchi was found to be entitled to as an EAJA award. Had the government meant that, the agreement would have said so. The agreement says Bianchi is entitled "to recover" the $617,500 principal, and that he is "entitled to" interest, yet even though the agreement did not use the phrase "to recover" regarding Mr. Bianchi's entitlement to interest, neither side understood absence of the phrase to imply that he could not "recover" the interest without a setoff. The agreement does use the phrase "to recover" in the EAJA provision, "right to pursue an application ... to recover." The phrase "to recover" is not in the Value Engineering Change proposal Claims paragraph, "right to pursue." Not a single one of the provisions is written in parallel phrasing with any other. The only plausible reading we can see for the slight differences in phrasing are lack of careful editing for parallelism, not an expressed mutual intention that even if Bianchi won an EAJA award, it would not be paid without a fight. In the context of this dispute, the word "pursue" meant that Bianchi had to win an EAJA award, but once the award was established, the government would pay it. In private actions where there is a right to attorneys' fees, lawyers frequently agree to settle for a principal amount and to allow one side to pursue an attorneys' fees award, meaning that they will pay it once entitlement to attorneys' fees and amount are determined. Were an insurance defense lawyer to enter into such a settlement agreement on behalf of an insurance company, and then claim that they only promised to allow pursuit of the money, not to pay it, the best the lawyer and insurer could hope for would be long-term distrust, and more likely they could expect bad faith litigation. Giving the settlement agreement so strained construction would encourage sharp practice. Thus we conclude that there is no difference in whether the government agreed to pay the $617,500 and whether it agreed to pay the EAJA award, once Mr. Bianchi had won a liquidated amount. The setoff issue is the same as to both. To the extent that the government had a claim against Bianchi for his unpaid SBA loans, the settlement agreement no more allowed the government to lie in the weeds with a setoff against the EAJA award than with the $617,500.

III. The Federal Circuit Decision.

[2] Although the Federal Circuit decision dealt only with the $617,500, not the EAJA award, the reason for the Federal Circuit result does not allow for a distinction between the one and the other. With respect to the EAJA attorney's fees, as with the principal and interest, the government acted with its eyes open. It had full knowledge of the assignment of Bianchi's right to payment to his bank, and of the bank's assignment to the SBA. The Federal Circuit decision establishes that there was no fraud, and the government made a commitment to pay Bianchi the money despite its potential entitlements against him. If the government mistakenly overlooked its rights (and it may not have), then its own negligent error does not entitle it to renege on its commitment. *See Restatement of Restitution* § 12 (unilateral mistake not grounds for restitution). Allowing the government to renege on its commitment because it negligently agreed to pay Bianchi more than it should have agreed to pay him "would seriously decrease the willingness of parties to settle litigation on mutually agreeable terms and thus weaken the efficacy of

settlements generally." *Bank of America*, 23 F.3d at 384. Using the setoff against the attorney's fees would have exactly the same effect as allowing its use against the $617,500 or the interest, and "the government should not be allowed to do indirectly what it is prohibited from doing directly." *See id.*

Because its ratio decidendi does not allow for a distinction, we conclude that the Federal Circuit decision is res judicata. That decision established that the government was not entitled to a setoff against the $617,500 or the interest based on Bianchi's assignment to his bank and the bank's assignment to the SBA. The reasoning of the decision establishes that the assignments could not entitle the government to a setoff against the settlement at all. The meaning of that agreement, with respect to setoff, has already been conclusively determined by the Federal Circuit. *See Robi v. Five Platters, Inc.*, 838 F.2d 318, 321–22 (9th Cir.1988).

## Conclusion

Although Bianchi's parole evidence suggests that the government intentionally relinquished whatever right it had to collect the SBA loan from the proceeds of Bianchi's award, we have assumed the contrary, because we are not deciding the parole evidence issue. Thus, we assume that the government negligently omitted to provide in the settlement agreement that it would set off its SBA entitlement against Bianchi's contract entitlement. Even so, it is nevertheless res judicata under the Federal Circuit decision that the government walked away from the money. We will not impose a strained reading on the settlement agreement that would enable the government to recover from its own negligence by sharp practice.

REVERSED.

KEY NUMBER SYSTEM

Ha Jenny NGO, Plaintiff–Appellee,

v.

RENO HILTON RESORT CORPORATION, d/b/a Reno Hilton; Hilton Hotels Corporation, Defendants–Appellants.

Ha Jenny NGO, Plaintiff–Appellant,

v.

RENO HILTON RESORT CORPORATION, d/b/a Reno Hilton; Hilton Hotels Corporation, Defendants–Appellees.

Ha Jenny NGO, Plaintiff–Appellee,

v.

RENO HILTON RESORT CORPORATION, d/b/a Reno Hilton; Hilton Hotels Corporation, Defendants–Appellants.

Nos. 95–16909, 95–16911 and 96–15553.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 10, 1996.
Decided April 9, 1998.

Employee brought Title VII action against employer. The United States District Court for the District of Nevada, Howard D. McKibben, J., entered judgment in favor of employee on compensatory damages claim, but granted employer judgment as a matter of law on punitive damages claim. Parties appealed. The Court of Appeals, Browning, Circuit Judge, held that: (1) to obtain punitive damages, employee was required to make showing beyond threshold level of intent required for compensatory liability, and (2) employer's conduct did not warrant punitive damages award.

Affirmed in part; reversed and remanded in part.

1. Civil Rights ⇐404

Employees seeking punitive damages under Title VII must make showing beyond threshold level of intent required for compensatory liability; award of punitive damages under Title VII is proper where acts of discrimination giving rise to liability are wil-

NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED
MAY 24 1999
CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

MAURICE BIANCHI, fdba M. Bianchi of California,

Plaintiff-Appellant,

v.

WILLIAM J. PERRY, Secretary of Defense; UNITED STATES DEPARTMENT OF DEFENSE; E. M. STRAW, Vice Admiral, Director of the Defense Logistics Agency; THE DEFENSE LOGISTICS AGENCY; HENRY R. GLISSON, Brigadier General, Commander of the Defense Personnel Support Center, a Division of the Defense Logistics Agency; THE DEFENSE PERSONNEL SUPPORT CENTER,

Defendants-Appellees.

No. 96-15869

D.C. No. CV-94-00686-HDM

ORDER

Before: PREGERSON, NOONAN and KLEINFELD, Circuit Judges.

Appellant Bianchi's application for fees and expenses under the Equal Access to Justice Act is GRANTED, in the amount of $67,961.24. The clerk is directed to enter judgment for that amount. His argument for additional amounts, though not without some basis, is rejected. Appellee's arguments for reductions

are rejected. Appellee's motion for leave to file a surreply is granted, and the surreply has been considered.

George E. Graziadei
GRAZIADEI & CANTOR
Suite 400
302 East Carson Ave.
Las Vegas, NV 89101

em
96-15869

# STEPHENS, GOURLEY & BYWATER

ATTORNEYS AT LAW

*An Association of Professional Corporations*

David A. Stephens email: dstephens@lvcm.com
Gordon E. Bywater email: gbywater@lvcm.com
R. Vaughn Gourley+ email: vgourley@lvcm.com
+Also Admitted in Utah

## FAX TRANSMISSION SHEET

| | |
|---|---|
| DATE: November 8, 2004 | FROM: R. VAUGHN GOURLEY, ESQ. |
| TO: SCOTT CANTOR, ESQ. | |
| REGARDING: MAURY BIANCHI VS. UNITED STATES | |
| FAX NO.: 477-0020 | NUMBER OF PAGES (INCLUDING THIS SHEET): 4 |
| MESSAGE**: | |

_____ Per our discussion of

_____ For your information; no reply required

_____ Read and acknowledge receipt

_____ Take requested action

_____ Per your request of

_____ Read, sign and return by mail

_____ Review and telephone sender

_____ Review and edit

_____ Review and comment in writing

_____ Hard copy of document(s) will follow

**MESSAGE: IF THERE ARE PROBLEMS WITH THIS TRANSMISSION, OR IF ALL PAGES ARE NOT RECEIVED, PLEASE CALL OUR OFFICE AT 656-2355. THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND CONTAINS INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE (COLLECT) AND RETURN THE ORIGINAL MESSAGE TO THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

000307

3636 N. Rancho Drive, Las Vegas, Nevada 89130
Telephone: (702) 656-2355 | Facsimile: (702) 656-2776

GEORGE E. GRAZIADEI, ESQ.
Nevada Bar Number 001775
SCOTT MICHAEL CANTOR, ESQ.
Nevada Bar Number 001713
302 E. Carson Avenue, Suite 400
Las Vegas, Nevada 89101
(702) 477-7733
Attorneys for Plaintiff

FILED
AUG 31 1 31 PM '94
CAROL C. FITZGERALD CLERK
BY DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

MAURICE BIANCHI fdba as M. BIANCHI OF CALIFORNIA,

Plaintiff,

vs.

CHARLES BOUSHER, Comptroller General of the United States of America, THE UNITED STATES GENERAL ACCOUNTING OFFICE and DOES I through XX, inclusive,

Defendants.

CASE NO.

CV-S-94-00747-LDG (RJJ)

COMPLAINT IN THE NATURE OF MANDAMUS

I.

JURISDICTION AND VENUE

1. This is an action to compel officers of the United States to perform their duties pursuant to 28 U.S.C. Section 1361. This Court has jurisdiction pursuant to 28 U.S.C. Section 1361, 28 U.S.C. Section 1346 and 28 U.S.C. Section 1331.

2. Venue is proper in the United States District Court for the District of Nevada pursuant to 28 U.S.C. Section 1391(e)(3).

/ / /

/ / /

II.

PARTIES

3. MAURICE BIANCHI is a resident of the State of Nevada who formerly conducted a proprietorship under the name and style of M. BIANCHI OF CALIFORNIA.

4. The Defendant, CHARLES BOUSHER, is the duly appointed, qualified and acting Comptroller General of the United States of America.

5. The Defendant, THE UNITED STATES GENERAL ACCOUNTING OFFICE, is an instrumentality of THE UNITED STATES OF AMERICA, headed by the Comptroller General.

6. That the true names or capacities, whether corporate or associate, individual or otherwise, of Defendants DOE I through XX, inclusive, are unknown to Plaintiff who, therefore, sues said Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein as a DOE is legally responsible in some manner for the events and happenings herein referred to and proximately caused injury and damages thereby to Plaintiff as hereinafter alleged.

III.

ALLEGATIONS AND CLAIM FOR RELIEF

7. Plaintiff, MAURICE BIANCHI, formerly conducted business as M. BIANCHI OF CALIFORNIA, and made a claim pursuant to the Contract Disputes Act, 41 U.S.C. Section 605(c)(3).

8. That on or about February 10, 1993, the Armed Services Board of Contract Appeals, hereinafter referred to as "ASBCA", rendered a Final Opinion granting Plaintiff an award of

000309

$58,613.03, plus interest from November 17, 1987. A copy of that Opinion rendered pursuant to 41 U.S.C. Section 607(e) is attached hereto and made a part hereof as Exhibit "1".

9. That on February 23, 1994, Plaintiff submitted a Certificate of Finality pursuant to Rule 28(e) of the ASBCA Rules (1980). The Government failed to submit a certificate of finality pursuant to said Rule.

10. On June 27, 1994, the Recorder of the Armed Services Board of Contract Appeals notified the Defendant, THE UNITED STATES GENERAL ACCOUNTING OFFICE of the ASBCA Decision awarding the sum of $58,613.03 to the Plaintiff on February 10,1993, and certified said award for review and payment.

11. The Final Opinion of the ASBCA was made pursuant to an Appeal by Plaintiff of a Value Engineering Change Proposal, (VECP), to the Armed Services Board of Contract Appeals, pursuant to the Contract Disputes Act, 41 U.S.C. Section 605.

12. That pursuant to 31 U.S.C. Section 1304 and 41 U.S.C. Section 612, the Defendants are required to promptly pay the award under the Decision of the ASBCA.

13. That there are no debts due and owing to the United States Government as a set-off pursuant to 31 U.S.C. Section 3728.

14. Despite the Final Opinion of the ASBCA, the Defendants have failed and refused to pay the Plaintiff the sums awarded to him pursuant to that Final Opinion.

15. That on August 12, 1994, the Plaintiff, through counsel, made demand upon Defendant, THE UNITED STATES GENERAL ACCOUNTING OFFICE, for payment of the amount of the award,

namely to wit, $58,613.03, together with interest for payment of the sums awarded. A copy of that correspondence is attached hereto and made a part hereof as Exhibit "2".

16. The Defendants, CHARLES BOUSHER, Comptroller General of the United States of America and THE UNITED STATES GENERAL ACCOUNTING OFFICE, have failed and refuse to pay the Plaintiff the sums awarded to him pursuant to that Final Opinion of the ASBCA, or any interest accruing thereon, and continues to so refuse.

17. That it has been necessary for the Plaintiff to engage services of counsel to prosecute this claim and he is entitled to a reasonable attorneys' fee and costs incurred under the Equal Access to Justice Act, 28 U.S.C. Section 2412.

WHEREFORE Plaintiff prays this Court as follows:

1. For a judgment and order directing the Defendants, and each of them, to forthwith pay the Plaintiff any and all sums awarded to the Plaintiff pursuant to the Final Opinion of the ASBCA, Exhibit "1" hereto, together with interest thereon from November 17, 1987;

2. For attorneys' fees and costs of suit incurred pursuant to 28 U.S.C. 2412;

/ / /

/ / /

/ / /

000011

3. For such other and further relief as to the Court seems just and proper in the premises.

DATED this 31 of August, 1994.

Respectfully submitted,

GRAZIADEI & CANTOR, LTD.

BY: [signature]

GEORGE E. GRAZIADEI, ESQ.
SCOTT MICHAEL CANTOR, ESQ.
302 E. Carson Avenue, Suite 400
Las Vegas, Nevada 89101
Attorneys for Plaintiff
MAURICE BIANCHI

ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --

M. Bianchi of California ) ASBCA No. 36518

Under Contract No. DLA100-80-C-2972 )

APPEARANCE(S) FOR THE APPELLANT: Michael A. Hordell, Esq.
Laurel A. Heneghan, Esq.
Petrillo & Hordell
Washington, DC

APPEARANCE(S) FOR THE GOVERNMENT: Thomas Hornak, Esq.
Chief Trial Attorney
Stephanie L. Zimmt-Mack, Esq.
Patricia A. Papas, Esq.
Trial Attorneys
Defense Personnel Support Center (DLA)
Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE BURG

The Government accepted a Value Engineering Change Proposal (VECP) submitted by appellant during performance of this contract. The parties were unable to agree either as to the per unit amount which was saved because of the VECP or the number of units to which the savings applied. When the contracting officer failed to issue a decision, appellant filed this appeal pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §605(c)(3). Appellant seeks $2,175,807.56 as instant, concurrent and future contract savings and $3,997,660.80 as collateral savings, for a total of $6,173,468.36.

FINDINGS OF FACT

1. Various findings of fact pertaining to this contract were the subject of a prior opinion of this Board on the motion for partial summary judgment filed in this appeal dated 2 March 1990 (unpublished) and in our opinion in ASBCA Nos. 37029 and 37071, 92-_ BCA ¶ ______, (decided 31 July 1992) and, to the extent to which we consider them relevant, they are adopted herein.

The Contract

2. On 23 June 1980, the Defense Personnel Support Center (DPSC) of Philadelphia, Pennsylvania, Defense Logistics Agency (DLA), awarded appellant Contract No. DLA100-80-C-2972 for the manufacture of 125,240 Man's Black All Weather Coat with removable lining at a unit price of $31.92 and a total contract price of $3,997,366.40. The coat was to be manufactured in accordance with Limited Purchase Description 12-77A (DES 12-77A), dated



EXHIBIT "1"

~~1 November 1978, using~~ patterns dated 21 September 1979 issued by the United States Army Natick Research and Development Laboratory (Natick).

3. DES 12-77A incorporated by reference a federal standard, FED-STD-751 - Stitches, Seams and Stitching. The solicitation incorporated by reference DPSC Form 3540, the DPSC Master Solicitation for Clothing and Textiles. The Master Solicitation included Clause J09, Value Engineering Incentive, January 1978, which provided (R4, tab 4 at 14-15):

J09 VALUE ENGINEERING INCENTIVE (DPSC 1978 Jan)

(a) Application. This clause applies to a Contractor developed and documented Value Engineering Change Proposal (VECP) which:

(i) requires a change to this contract to implement the VECP, and

(ii) reduces the overall costs to the cognizant Military Department without impairing essential functions or characteristics, provided that it is not based:

(A) solely on a change in deliverable end item quantities, or

(B) a change in R&D end item or test quantities due solely to results of previous testing under this contract, or

(C) solely on a change to the contract type.

(b) Documentation. As a minimum, the following information shall be submitted by the Contractor with each VECP.

(i) a description of the difference between the existing contract requirement and the proposed change, and the comparative advantages and disadvantages of each, justification when a function or characteristic of an item is being altered, and the effect of the change on the performance of the end item;

(ii) an analysis and itemization of the requirements of the contract which must be changed if the VECP is accepted and a recommendation as to how to make each change (e.g., a suggested specification revision);

(iii) a separate detailed cost estimate for both the existing contract requirement and the proposed change to provide an estimate of the reduction in costs, if any, that will result from acceptance of the VECP, taking into account the costs of development and implementation by the Contractor (including any amount attributable to subcontracts in accordance with paragraph (h) below);

(iv) a prediction of any effects the proposed change would have on collateral costs to the Military Department such as Government-furnished property costs, costs of related items, and costs of maintenance and operation.