United States Court of Appeals,
Federal Circuit.

**BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, Plaintiff/Cross-Appellant,**
**v.**
**The UNITED STATES, Defendant/Third Party Plaintiff-Appellee,**
**v.**
**Maurice L. BIANCHI, Third Party Defendant-Appellant.**

**Nos. 93-5059, 93-5060.**

April 29, 1994.
Rehearing Denied June 23, 1994.

Bank of America filed complaint against government seeking payment of over $1 million as defense contractor's assignee under Assignment of Claims Act. The government asserted as an affirmative defense Small Business Administration's (SBA) superior right to money paid to government contractor under settlement agreement. Subsequently government filed third-party complaint against contractor seeking return of money paid under settlement. The Court of Federal Claims, Hodges, J., granted summary judgment in favor of government against bank and granted summary judgment in favor of government against contractor. The Court of Appeals for the Federal Circuit held that: (1) where government had waived right to challenge settlement as part of settlement agreement, government was precluded from seeking to recover settlement award through third-party complaint; (2) bank retained right to receive payments under contracts after it assigned its interest in guaranty loans to SBA for payment on loan guarantees; and (3) Act limited government's rights to set off government contractor's debts against payment to bank as contractor's liability on promissory notes did not arise from defense contracts.

Reversed in part, vacated in part.

Mayer, Circuit Judge, filed opinion concurring in part and concurring in judgment.

West Headnotes

**[1] United States ⚷88**
393k88

Government's right to recoup erroneously paid funds cannot be invoked by government as means to circumvent legal obligation.

**[2] United States ⚷88**
393k88

Where government agreed to settle contractor's claims and voluntarily relinquished its right to disturb settlement in return for contractor's agreement to discontinue action against government, government could not invoke right to recoup erroneously paid funds to circumvent government's obligation under settlement, particularly absent any indiction that parties failed to deal with each other at arm's length or that contractor withheld material information and where government had adequate knowledge of various financial arrangements associated with contract.

**[3] United States ⚷88**
393k88

Absent any fraud, misdirection or concealment, government could not recover funds paid in good faith and to satisfaction of interested parties.

**[4] United States ⚷88**
393k88

Where government had waived its right to challenge settlement, government was precluded from seeking to recover settlement award through third-party complaint filed in Court of Federal Claims.

**[5] United States ⚷53(8)**
393k53(8)

**[5] United States ⚷111(12)**
393k111(12)

Where Bank of America obtained security interest in contract receivables through assignment in return for original loans to finance contract performance and was granted security interest in receivables again when Bank later extended guaranteed loan, and second interest was eventually transferred by Bank to Small Business Administration (SBA) in return for payment on loan guarantees, SBA took its interest subject to preexisting interest retained by Bank; rights under guaranteed loans attached after interest

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

on earlier loan secured by same collateral, and record showed that SBA clear knew of Bank's senior interest in contract payments. 31 U.S.C.A. § 3727; 41 U.S.C.A. § 15.

**[6] United States ⚷111(12)**
393k111(12)

As assignee under Assignment of Claims Act, Bank of America's security interest in contractor's contract receivables included right to bring suit against government to recover any contract payment made to another. 31 U.S.C.A. § 3727; 41 U.S.C.A. § 15.

**[7] United States ⚷111(12)**
393k111(12)

As assignee under Assignment of Claims Act, Bank of America's security interest in government contractor's contract receivables included right to bring suit against government to recover any contract payment made to another, which Bank had not relinquished in transfer of portion of security interest to Small Business Administration (SBA) in return for payment on loan guaranty, and thus Bank had right to payment under Act; government's payment to contractor/assignor in settlement of contract dispute was payment under contract that should have gone to Bank under assignment. 31 U.S.C.A. § 3727; 41 U.S.C.A. § 15.

**[8] United States ⚷130(3)**
393k130(3)

Like any creditor, government has right to set off contractor's debts against payment due the contractor. 41 U.S.C.A. § 15.

**[9] United States ⚷111(12)**
393k111(12)

Assignment of Claims Act expressly limited government's rights to set off contractor's debts against payment to assignee; under Act, government contracts could provide that assignee's right to contract payments would not be subject to reduction or setoff for any liability of assignor to United States, or any department or agency thereof, which arose independently of contract. 31 U.S.C.A. § 3727; 41 U.S.C.A. § 15.

**[10] United States ⚷111(1)**
393k111(1)

Goal of Assignment of Claims Act is to make it easier for contractors to finance performance of their obligations to the government. 31 U.S.C.A. § 3727; 41 U.S.C.A. § 15.

**[11] United States ⚷111(12)**
393k111(12)

Government contractor's liability to Small Business Administration (SBA) on promissory note was independent of defense contracts and therefore contractor's assignee was entitled to recover amount due under government's settlement with contractor, although notes were intended to finance performance of contracts, and security agreements expressly listed rights to contract payments as collateral, liability on notes did not arise from defense contracts but was imposed by loan documents, and government had conceded any defense to payment based on inadequate performance of contracts by settling contractor's contract claims. 31 U.S.C.A. § 3727; 41 U.S.C.A. § 15.

***381** Michael L. Burack, Wilmer, Cutler & Pickering, Washington, DC, argued for plaintiff/cross-appellant. With him on the brief were Eric R. Markus and Lydia R. Pulley.

Mark A. Melnick, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendant/third party plaintiff-appellee. With him on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief were Sandra Guydon, Office of Philadelphia, Pennsylvania and Joel K. Meese, Small Business Admin., of counsel.

Michael A. Hordell, Petrillo & Hordell, Washington, DC, argued for third party defendant-appellant. With him on the brief was Eric L. Lipman, of counsel. Mr. Hordell and the law firm of Petrillo & Hordell, withdrew as counsel of record with the courts permission before the matter was decided.

Before RICH, MAYER, and LOURIE, Circuit Judges.

PER CURIAM.

Maurice L. Bianchi appeals the judgment of the United States Court of Federal Claims, [FN1] No. 90-3961C, entered pursuant to the grant of summary judgment in favor of the United States, and the denial of his ***382** cross-motion for summary judgment. Bank of America likewise appeals the court's grant of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

summary judgment in favor of the United States against it, and the denial of its motion for summary judgment. We reverse in part and vacate in part.

FN1. The United States Claims Court was renamed the United States Court of Federal Claims on October 29, 1992. Federal Courts Administration Act of 1992, Pub.L. No. 102-572, § 902(a), 106 Stat. 4506, 4516.

*Background*

The following facts are not disputed. In June 1979, Bianchi executed a security agreement in favor of Bank of America (bank), granting it a security interest in his property, including after-acquired accounts and contract rights. This interest secured Bianchi's existing obligations to the bank, as well as future loans and advances by the bank to Bianchi.

During 1979 and 1980, the Defense Logistics Agency (DLA) awarded three contracts for military clothing (numbers DLA100-79-C2894, DLA100-80-C2290, and DLA100-80-C2972) to M. Bianchi of California, a sole proprietorship of Maurice Bianchi. Shortly after the award of each contract, Bianchi assigned the proceeds and rights associated with each contract to the bank as security for loans to finance Bianchi's performance of the contracts. The bank notified the appropriate contracting and disbursing officers in accordance with the Assignment of Claims Act, 31 U.S.C. § 3727 (1988), 41 U.S.C. § 15 (1988); the government acknowledged and accepted each assignment. Thereafter, the bank received payments from the government of sums due Bianchi under the contracts.

Later in 1980, Bianchi and the bank sought to restructure their relationship, applying to the Small Business Administration (SBA) for a 90 percent guarantee on an additional $500,000 loan to Bianchi. The application disclosed the bank's preexisting lien position. The SBA approved the application, and the bank issued the loan; the collateral included a third lien on all receivables, including contract rights. Bianchi executed another security agreement, again granting the bank a security interest in all rights to payment of money owned or thereafter acquired by him. In July of 1981, the bank made another 90 percent SBA guaranteed loan to Bianchi of $50,000. The new loan was covered by the future advances clause of the December 1980 agreement.

Soon thereafter, DLA terminated two of the contracts for default. Bianchi defaulted on the loans, including both the SBA guaranteed loans and the bank's prior non-guaranteed loans. In December 1981, the bank applied to the SBA for payment on the guarantees, in return for which it assigned its interest in the guaranteed loans to the SBA.

In 1981, Bianchi instituted a series of claims under the contracts before the Armed Services Board of Contract Appeals (board). In September 1988, DLA and Bianchi agreed to settle the claims. Under the settlement agreement, DLA agreed to pay $617,500 plus interest directly to Bianchi. The government paid Bianchi a total of $1,141,220.83.

In June 1990, the bank requested that the government pay it the settlement amount under the Assignment of Claims Act. On October 23, 1990, DLA wrote to Bianchi, demanding repayment of the money, acknowledging that payment should have gone to the bank under the assignment. Bianchi made no repayment, and the government took no further action until the bank filed this suit.

On November 21, 1990, the bank filed its complaint against the government in the United States Court of Federal Claims seeking payment of the $1,141,220.83 as assignee under the Assignment of Claims Act. The government asserted as an affirmative defense the SBA's superior right to the money paid to Bianchi. On April 16, 1992, the government filed a third-party complaint against Bianchi seeking return of the money paid under the settlement.

All parties moved for summary judgment. The court granted summary judgment in favor of the government against the bank, holding that the bank had assigned its rights to the SBA and had no further claim on money due Bianchi under the contracts. The court also granted summary judgment in favor of the government against Bianchi in the amount of $1,141,220.83, concluding that the government had erroneously paid Bianchi and was therefore entitled to repayment.

***383** *Discussion*

I.

Bianchi raises constitutional and procedural objections to the judgment against him in the Court of Federal Claims. We decline to reach Bianchi's constitutional arguments because we conclude that the government was not entitled to assert its claims against Bianchi in the first instance. [FN2]

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

trial court's conclusion that the bank retained no right to receive payments under the Bianchi contracts after it assigned its interest in the guaranteed loans to the SBA in return for payment on the loan guarantees. Specifically, the bank argues that it is entitled to judgment because of its superior right to contract payments as Bianchi's assignee under the Assignment of Claims Act.

[5] Both the bank and the SBA claim a security interest in Bianchi's contract receivables. The bank obtained its interest, the assignment, in return for its original loans to finance Bianchi's contract performance. When it later extended the guaranteed loans, Bianchi again granted it a security interest in the receivables, an interest the bank eventually transferred to the SBA in return for payment on the loan guarantees. The Court of Federal Claims agreed with the government that this transfer assigned all of the bank's interest in the contract payments, not merely those associated with the guaranteed loans.

The loan documents refute this position, for they show that the bank assigned away only its rights "in th[ose] certain Note[s]" relating to the guaranteed loans. Since the rights under the guaranteed loans attached after the interest under the earlier loans secured by the same collateral, the SBA took its interest subject to the preexisting interest retained by the bank. *Cf. United States v. McDermott,* 507 U.S. 447, ----, 113 S.Ct. 1526, 1531, 123 L.Ed.2d 128 (1993) ("When two private lenders both exact from the same debtor security agreements with after-acquired-property clauses, the second lender knows ... that that category of property will be subject to another claim"). Indeed, the record shows that the SBA clearly knew of the bank's senior interest in the contract payments.

[6][7] As an assignee under the Assignment of Claims Act, the bank's security interest included the right to bring a suit against the government to recover any contract payment made to another. *Produce Factors Corp. v. United States,* 467 F.2d 1343, 1349 (Ct.Cl.1972). As we said, the bank never relinquished this right. "The Government having received timely notice of plaintiff's assignment paid [Bianchi] at its peril. And where an erroneous payment is made by the Government it is no bar to the rightful claimant." *Central Nat'l Bank v. United States,* 91 F.Supp. 738, 741 (Ct.Cl.1950) (citation omitted). The government's payment to Bianchi in settlement of the contract dispute was a payment under the contract that should have gone to the bank under the assignment. Thus, the bank has a right to the payment under the Act.

[8] The government asserts a right to set off the amount that Bianchi owed to the SBA against any money owed to the bank by virtue of the settlement. Of course, like any creditor, the government has the right to set off a contractor's debts against payments due the contractor. *United States v. Munsey Trust Co.,* 332 U.S. 234, 239, 67 S.Ct. 1599, 1601-02, 91 L.Ed. 2022 (1947). The government argues that as an assignee, the bank had no greater claim to the payment than did Bianchi, its assignor. If true, the government could set off Bianchi's liability to the SBA against money due the bank. *Cf. id.* at 239-40, 67 S.Ct. at 1601-02 ("Insofar as the suitor in the Court of Claims asserted the contractor's title to the sum in dispute, that court was under statutory duty to recognize ***385** the undisputed claim for damages of the United States").

[9] But the bank is not simply an ordinary assignee. The Assignment of Claims Act expressly limits the government's right to set off Bianchi's debts against payments to the bank. 31 U.S.C. § 3727; 41 U.S.C. § 15. Under the Act, government contracts may provide that an assignee's right to contract payments "shall not be subject to reduction or set-off for any liability of any nature of the assignor to the United States or any department or agency thereof which arises independently of such contract...." 41 U.S.C. § 15. Bianchi's contracts contained such a clause.

[10] The goal of the Assignment of Claims Act is to make it easier for contractors to finance performance of their obligations to the government. *Produce Factors Corp. v. United States,* 467 F.2d at 1348. The inclusion of "no set-off" clauses alleviates some of the uncertainty that would otherwise hinder financing by ensuring assignees a stream of payments unaffected by the contractor's potentially numerous "obligations to the United States not imposed by the contract from which the payments flowed." *Central Bank v. United States,* 345 U.S. 639, 643, 73 S.Ct. 917, 919, 97 L.Ed. 1312 (1953). *See Produce Factors,* 467 F.2d at 1348 (assignee's right to receive payment of contract proceeds dependent only on "performance by the contractor of his contractual obligations").

[11] While the government could assert against the bank any defenses arising against Bianchi under the contracts, *Produce Factors Corp.,* 467 F.2d at 1349 (non-performance or failure of consideration),

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Bianchi's indebtedness to the government arose not from the contracts, but from the notes. The government argues that the notes are not independent of the contracts, for they were intended to finance the performance of the contracts, and, indeed, the security agreements expressly listed rights to contract payments as collateral. Even accepting that Bianchi's liability on the notes was "related to" the contracts, however, we agree with the bank that the liability on the notes arose "independently of such contract."

The Supreme Court addressed this language in *Central Bank v. United States,* 345 U.S. at 646, 73 S.Ct. at 920, ruling that the United States could not set off a contractor's tax indebtedness against sums due an assignee on the contract. The tax liability arose from the contractor's failure to pay withholding and unemployment taxes for work done on the contract. The Court reasoned, however, that the government could not set off the tax because it did not arise from the contract; the tax was imposed by statute, and would have been due even absent a contract with the government. *Id.* at 645-46.

Like a contractor's tax liability, Bianchi's liability on the notes did not arise from his defense contracts, it was imposed by the loan documents. He could owe on the notes even if he had no contract. Moreover, the government has conceded any defense to payment based on inadequate performance of the contracts by settling Bianchi's contract claims. Because his liability on the notes "lay neither in execution nor in breach of the contract[s]," *Central Bank,* 345 U.S. at 646, 73 S.Ct. at 920, Bianchi's liability to the SBA on the notes is independent of the contracts, barring set-off by the government. Therefore, the bank should recover the amount due under the government's settlement with Bianchi.

*Conclusion*

Accordingly, we reverse the judgment of the Court of Federal Claims in the government's favor against the bank, and vacate the judgment in favor of the government against Bianchi.

*COSTS*

The bank and Bianchi shall have their costs.

*REVERSE IN PART, VACATE IN PART.*

MAYER, Circuit Judge, concurring in part and concurring in the judgment.

I join the court's opinion insofar as it explains why the bank prevails. I also agree that the government's claims against Bianchi should have been dismissed, but write separately because I do not believe the Court of ***386** Federal Claims had jurisdiction to reach the merits of those claims. I share the reluctance to reach constitutional questions, but the court impermissibly assumed there is jurisdiction where there is none.

The Court of Federal Claims based its jurisdiction over Bianchi on 41 U.S.C. § 114(b) (Supp. IV 1992), which says that court may "summon any and all persons with legal capacity to be sued to appear as a party or parties in any suit or proceeding of any nature whatsoever pending in said court to assert and defend their interests...." More specifically, section 114(b) authorizes the Court of Federal Claims to hear the government's "claims and contingent claims for the recovery of money hereafter paid by the United States in respect of the transaction or matter which constitutes the subject matter" of the pending suit. *Id.*

This court has said that under section 114(b) the Court of Federal Claims may render judgment against a third party on claims by the government in two situations: first, where that party also asserts a claim against the United States; and second, where a plaintiff sues the government for money that the government has disbursed to the third party under a mistake of fact or law. *United States v. Rush,* 804 F.2d 645, 647 (Fed.Cir.1986); *Bowser Inc. v. United States,* 420 F.2d 1057, 1062, 190 Ct.Cl. 441 (1970). By its language, section 114(b) apparently applies to these government claims, which seek return of the settlement payment, the subject of the bank's suit. The question thus becomes whether the grant of jurisdiction over the government's claims is constitutionally permissible.

Bianchi's constitutional attack on section 114(b) arises from Article III of the Constitution, which provides that

> [t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

U.S. Const., Art. III, § 1. The Court of Federal Claims is established under Article I not Article III.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FN2. Although the concurrence would resolve this case on constitutional grounds, we adhere to the doctrine that we should avoid deciding constitutional questions where an alternative basis exists upon which our decision may rest. *See Hagans v. Lavine,* 415 U.S. 528, 565, 94 S.Ct. 1372, 1393, 39 L.Ed.2d 577 (1974) (Rehnquist, J., dissenting); *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1126 (Fed.Cir.1985) (Markey, C.J., additional views).

The funds the government seeks to recover through its third-party complaint stem from an agreement reached between the government and Bianchi in 1988 settling a contractual dispute. Pursuant to the agreement, the government agreed to pay Bianchi $617,500 plus interest in satisfaction of Bianchi's claims. This agreement was incorporated into a decision of the Armed Services Board of Contract Appeals, in which it was stipulated that the parties waived their rights to appeal or seek reconsideration of the board's decision.

In support of its claim against Bianchi, the government now contends that the settlement award was paid to Bianchi in contravention of the various assignments of rights associated with Bianchi's contracts and that it has a right to recover any funds erroneously paid from the public treasury. The government does not have that right in this case.

[1][2] The government's right to recoup erroneously paid funds cannot be invoked by the government as a means to circumvent a legal obligation. In return for Bianchi's agreement to discontinue his action against the government, the government agreed to settle his claims and voluntarily relinquished its right to disturb the settlement. Bianchi accordingly ceased pursuing his contract claims and the government must likewise be held to its end of the bargain. "The law strongly favors settlement of litigation, and there is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into." *Hemstreet v. Spiegel, Inc.,* 851 F.2d 348, 350 (Fed.Cir.1988) (citing *Bergh v. Department of Transp.,* 794 F.2d 1575, 1577 (Fed.Cir.), *cert. denied,* 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986)).

[3] The government does not challenge the validity or the enforceability of the settlement. Indeed, there is no indication that the parties failed to deal with each other at arm's length or that Bianchi withheld material information. The government certainly had adequate knowledge of the various financial arrangements associated with the contracts in view of the fact that the assignments from Bianchi to the bank were made pursuant to the Assignment of Claims Act, which was designed to protect the government from secret assignments. *See McKenzie v. Irving Trust Co.,* 323 U.S. 365, 369, 65 S.Ct. 405, 407, 89 L.Ed. 305 (1945); *Pittman v. United States,* 116 F.Supp. 576, 580 (1953), *cert. denied,* 348 U.S. 815, 75 S.Ct. 23, 99 L.Ed. 642 (1954). In the absence of any fraud, misdirection, or concealment, the government may not recover funds paid in good faith and to the satisfaction of the interested parties. *See McKnight v. United States,* 13 Ct.Cl. 292, 313, 1800 WL 946 (1877), *aff'd,* 98 U.S. 179, 25 L.Ed. 115 (1878). Here, "[t]here was nothing contrary to good morals or conscience in the payment or receipt of the money. The facts were all known." 98 U.S. at 185-86.

[4] The government could easily have taken appropriate steps to avoid incurring any liability to the bank. For example, the government could have insisted that any settlement award be paid to the bank in view of the bank's asserted security interest. The government did not do so, perhaps because Bianchi would not have agreed to that arrangement or because the government presumed that the bank retained an inferior interest. Whatever the reason for its failure to protect itself, the government cannot now renege on its commitment to honor its settlement with Bianchi, into which it entered voluntarily and with full knowledge of the facts. ***384** "To permit [the government] to escape its obligation under the settlement would seriously decrease the willingness of parties to settle litigation on mutually agreeable terms and thus weaken the efficacy of settlements generally." *Hemstreet,* 851 F.2d at 350.

Although the government waived its right to challenge the board's decision awarding payment to Bianchi, it attempts to do just that by means of a third-party complaint filed in another forum. The government should not be allowed to do indirectly what it is prohibited from doing directly. We therefore hold that the government, having waived its right to challenge the settlement, is precluded from seeking to recover the settlement award through a third-party complaint filed in the Court of Federal Claims.

II.

In its cross-appeal, Bank of America challenges the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

28 U.S.C. § 171(a) (Supp. IV 1992) ("The Court is declared to be a court established under Article I of the Constitution of the United States").

The Supreme Court tells us that "Article III, § 1, serves both to protect 'the role of the independent judiciary within the constitutional scheme of tripartite government,' and to safeguard litigants' 'right to have claims decided before judges who are free from potential domination by other branches of government.' " *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 848, 106 S.Ct. 3245, 3255, 92 L.Ed.2d 675 (1986) (citations omitted). When examining congressional action for impermissible intrusions upon the integrity of the judiciary, the Court has declined to adopt fixed rules, fearing undue restrictions on Congress' Article I powers. *Id.* at 851, 106 S.Ct. at 3257. The task is to consider both the nature of the right to be adjudicated and the concerns that led Congress to deviate from Article III in this statutory scheme. *Id.*

Some disputes, especially those arising between the government and others over the performance of the constitutional functions of the political branches, have historically been subject to resolution exclusively by those branches. *Northern Pipeline Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 67, 102 S.Ct. 2858, 2869, 73 L.Ed.2d 598 (1982) (plurality opinion). Because such disputes could be resolved without resort to the judicial power of the United States, Congress is free to assign their adjudication to administrative agencies or Article I courts. *See Thomas v. Union Carbide Agric. Prod.,* 473 U.S. 568, 589, 105 S.Ct. 3325, 3337, 87 L.Ed.2d 409 (1985). These cases are said to involve "public rights"; by contrast, "private rights" cases--those that fall outside the traditional realm of the political branches--must be heard under the auspices of Article III. *Northern Pipeline,* 458 U.S. at 70, 102 S.Ct. at 2871.

Government contract disputes are classic public rights matters. Historically, government contracts provided that the decision of ***387** a contracting officer was final on any question under the contract, and not subject to Article III review. *Seaboard Lumber Co. v. United States,* 903 F.2d 1560, 1564 (Fed.Cir.1990). These provisions withstand constitutional scrutiny because, under the concept of sovereign immunity, the government could always decline to be sued by aggrieved contractors. When Congress later created a right of action on the contract in the Court of Claims, and then in the Article I Court of Federal Claims, it was free to attach conditions to the new right, including the waiver of the right to a jury trial or to an Article III forum. *Id.* at 1563.

This court applied these principles to reject a constitutional challenge to section 114(b) in *United States v. Rush,* 804 F.2d 645, 647 (Fed.Cir.1986). We determined that the dispute between the government and a third party contractor turned on public rights--that is, it arose "between the government and persons subject to its authority in connection with the constitutional functions of the executive and legislative branches and ... historically could have been determined exclusively by those branches." *Rush,* 804 F.2d at 647. *See Northern Pipeline,* 458 U.S. at 67, 102 S.Ct. at 2869. *Rush* went no further; resolution of the case before us, however, requires an examination of why *Rush* was a public rights dispute. [FN*]

FN* Like Bianchi, Rush challenged section 114(b) under both Article III and the Seventh Amendment. The *Rush* court cited *Maryland Casualty Co. v. United States,* 141 F.Supp. 900 (Ct.Cl.1956), on which the government relies here. *Maryland Casualty* upheld the validity of section 114(b) in the face of a Seventh Amendment challenge similar to Bianchi's. But *Maryland Casualty* was decided by the Court of Claims, a court that sat without a jury, much like the present Court of Federal Claims, but one that was established under Article III. *Glidden v. Zdanok,* 370 U.S. 530, 584, 82 S.Ct. 1459, 1490, 8 L.Ed.2d 671 (1962); *see* Act of July 28, 1953, § 1, 67 Stat. 226, added to 28 U.S.C. § 171 ("Such court is hereby declared to be a court established under Article III of Constitution of the United States"). *Maryland Casualty* supports the *Rush* Seventh Amendment holding, but it does not constrain our analysis of section 114(b) under the broader scope of Article III.

Rush contracted with the Air Force to construct a shopping center on the grounds of Arnold Air Force Station. Because the contract was one for the procurement of services by the government, it was necessarily controlled by the provisions of the Contract Disputes Act (CDA). 41 U.S.C. § 602(a) (1988); *Seaboard Lumber Co.,* 903 F.2d at 1565. Under the CDA, the government waived its right to assert sovereign immunity against Rush's contractual claims in return for the contractor's waiver of his right

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

to an Article III trial of government claims against him. 903 F.2d at 1567. Thus, the government could cross-claim against Rush in the Court of Federal Claims seeking return of an alleged overpayment that was the subject of a surety's suit against the government in that court.

Like the contract in *Rush,* Bianchi's DLA contracts were governed by the CDA, so Bianchi waived his rights under Article III by entering into them. When the government terminated the contracts, Bianchi complied with the CDA and sought relief before the Board of Contract Appeals. The parties then settled the dispute. [FN**]

FN** Under the settlement, the parties agreed that Bianchi "is entitled to recover $617,500.00 on his claims ...; that the Government is entitled to take nothing on its claims ...; that Mr. Bianchi is entitled to interest ...; and that the parties waive their rights to seek reconsideration of this stipulated decision of the Board or to appeal that stipulated decision...." *Appeals of M. Bianchi of California,* ASBCA Nos. 26362, 26363, 26364, 26365, 26366, 26505, 26506, 26513, 26642, 29932, 29933, and 29934 (September 29, 1988). Moreover, Bianchi was required to execute a Certificate of Finality, under which he agreed to accept the award as "a full discharge to the United States of all claims and demands arising out of the matters involved...." Certificate of Finality, ASBCA Nos. 26362, et al.

Now the government seeks to recover the money it paid Bianchi under the voluntary settlement, a joint action to fully and finally terminate the prior case. It is not itself a contract for the procurement of goods or services that falls under the CDA, so the terms of that Act do not apply. *Cf. Coastal Corp. v. United States,* 713 F.2d 728, 730 (Fed.Cir.1983) (rejecting theory that CDA applies to "contracts tangentially connected with government procurement of goods and services"). Absent the controlling provisions of the CDA, there is no historical basis for *388 resolution of the government's claims against Bianchi by the legislative or executive branches. This is not a case involving a right created by Congress or one assigned by the Constitution or tradition to the political branches. Indeed, if the government had sought to recover the settlement payment absent this precipitative suit by the bank, it would have had to sue in the district court. Whatever rights the government may have to recover its officers' allegedly erroneous payments, *see United States v. Wurts,* 303 U.S. 414, 415, 58 S.Ct. 637, 638, 82 L.Ed. 932 (1938), it is not necessarily entitled to advert to an Article I forum.

Nor does Bianchi's waiver of his Article III rights under the DLA contracts extend to the settlement. Under the settlement agreement, he accepted a single payment in full satisfaction of his claims under the terminated contracts. The parties agreed that the settlement would be final, and waived any right to reconsideration or appeal to this court. The government was completely discharged from all obligations under the contracts, and, given the broad language of the agreement, Bianchi's obligations, including his contractual duty to submit to Article I jurisdiction, were likewise discharged. The settlement extinguished the prior relationship under the contracts. *Cf. Brock & Blevins Co. v. United States,* 343 F.2d 951, 954, 170 Ct.Cl. 52 (1965). Thus, what was a matter of public rights--a contractual relationship controlled by the CDA--became a private rights dispute after the settlement. The government's concern that it might be subject to inconsistent judgments cannot overcome the demands of Article III where the government so clearly had the ability to protect its rights, but surrendered them. The government's claims against Bianchi should have been dismissed for lack of jurisdiction.

23 F.3d 380, 39 Cont.Cas.Fed. (CCH) P 76,660

END OF DOCUMENT

000507

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Melnick, M.

# In the United States Court of Federal Claims

* * * * * * * * *

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, *

Plaintiff, *

v. *

UNITED STATES OF AMERICA, *

Defendant and Third Party Plaintiff, *

v. *

MAURICE L. BIANCHI, *

Third Party Defendant. *

* * * * * * * * *

No. 90-3961C

Filed: August 14, 1995

FILED
AUG 14 1995
U.S. COURT OF FEDERAL CLAIMS

ORDER

The amount of recovery indicated in the July 26 order was in error. The Clerk will enter a corrected judgment in the amount of $717,009.94. No costs.

John P. Wiese

John P. Wiese, Judge, for
Robert H. Hodges, Jr., Judge

000508

# In the United States Court of Federal Claims

Michael L. Burack, Esq., ATTY OF RECORD
Wilmer, Cotter & Pickering
2445 M St. NW, Washington, DC 20037

**BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION,**

*Plaintiff,*

**v.**

**THE UNITED STATES** **No. 90-3961 C**

*Defendant and Third Party Plaintiff,*

**v.**

**MAURICE L. BIANCHI,**

*Third Party Defendant.*

At the Court of Federal Claims held in Washington, D.C., on the 14th day of August A.D. 1995, a corrected judgment was ordered to be entered as follows: that plaintiff recover of and from the United States the sum of $717,009.94. The third party complaint against Bianchi is dismissed. No costs.

*A true copy of record.*

*In testimony whereof I have hereunto set my hand and affixed the seal of said Court at Washington, this 22nd day of August, A. D. 1995.*

David A. Lampen
*David A. Lampen, Clerk*

*Attest:*

Loren A. Smith
*Loren A. Smith, Chief Judge*

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-

United States General Accounting Office

Melnick
Closed 11/2

GAO

Certificate of Settlement

Office of General Counsel
Washington, DC 20548

CA 3F496

| 1. **Claim No.** Z-181-122 | 2. **Date** OCT 25 1995 | 3. Voucher No. |
|---|---|---|
| 4. **Payee**<br>Bank of America National Trust and Savings Association<br>Northern California Special Assets Group<br>Unit # 1415<br>Box 37000<br>San Francisco, California 94137<br><br>Inge Ronk<br>Vice President | | 5. Paid by<br><br>11-2-95 |

6. **I CERTIFY** that there is due from the United States to the above-named claimant(s), payable from the appropriations indicated, the sum of $717,009.94, because of the action dated August 22, 1995, arising in the case of Bank of America National Trust and Savings Association, v. United States and Bianchi, in the United States Court of Federal Claims, 90-3961 C.

20X1740

247037
000510

General Counsel

075

By [signature]

| 7. Paid by check drawn on the Treasurer of the United States | 8. Check No. | 9. Date |
|---|---|---|

(GAO Order 1160.1

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-00

GAO Form 39 (Rev. 9/91)

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on the 3rd day of September, 2004, I caused to be placed in the United States mail (first-class postage prepaid) a copy of the foregoing "Defendant's Supplemental Responses To Plaintiff's First Set Of Interrogatories And Requests For The Production Of Documents," addressed as follows:

R. Vaughn Gourley
Stephens, Gourley & Bywater
3636 North Rancho Drive
Las Vegas, NV 89130

Lattisa Brown

LII
legal information institute

# US CODE COLLECTION

Collection home    Search    Donate

TITLE 28 > PART IV > CHAPTER 91 > § 1494    Prev | Next

## § 1494. Accounts of officers, agents or contractors

*Release date: 2003-05-15*

The United States Court of Federal Claims shall have jurisdiction to determine the amount, if any, due to or from the United States by reason of any unsettled account of any officer or agent of, or contractor with, the United States, or a guarantor, surety or personal representative of any such officer, agent or contractor, and to render judgment thereof,[1] where—

(1) claimant or the person he represents has applied to the proper department of the Government for settlement of the account;

(2) three years have elapsed from the date of such application without settlement; and

(3) no suit upon the same has been brought by the United States.

*Search this title:*

Search Title 28

Notes
Updates
Parallel authorities (CFR)
Your comments

[1] So in original. Probably should be "thereon,".

Credits    About us    Prev | Next
Send email

000512

LII
legal information institute

collection home

US CODE COLLECTION

Search

TITLE 28 > PART IV > CHAPTER 91 > Sec. 1500.

Prev | Next

## Sec. 1500. - Pendency of claims in other courts

The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States

*Search this title:*

Search Title 28

Notes
Updates
Parallel authorities (CFR)
Topical references

Prev | Next

© copyright about us send email

LII
legal information institute

US CODE COLLECTION

Collection home Search Donate

TITLE 28 > PART VI > CHAPTER 161 > § 2401

Prev | Next

# § 2401. Time for commencing action against United States

*Release date: 2003-05-15*

**(a)** Except as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. The action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases.

**(b)** A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

*Search this title:*

Search Title 28.

Notes
Updates
Parallel authorities (CFR)
Your comments

Credits About us Prev | Next Send email

000514